UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
—————————————————————————

WONDER WILLIAMS,

                                        Plaintiff,

                                                                    9:16-CV-01343
v.                                                                  (GTS/TWD)

KEVIN HESSE, et al.,

                                        Defendants.
—————————————————————————

APPEARANCES:                                    OF COUNSEL:

WONDER WILLIAMS
Plaintiff, *pro se*
10-A-0102
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

HON. ERIC T. SCHNEIDERMAN                        RICHARD LOMBARDO, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

        This *pro se* civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been

referred for Report and Recommendation by the Hon. Glenn T. Suddaby, Chief United States

District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Wonder

Williams, an inmate in custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), alleges violation of his constitutional rights under the First

and Eighth Amendments while confined in the Special Housing Unit ("SHU") at Auburn

Correctional Facility. (Dkt. No. 1.) Defendants are Corrections Officer Hesse, Captain Chuttey, Superintendent Graham, First Deputy Robinson, Sergeant Donnelly, Deputy Superintendent Fagan, and Lieutenant Quinn. *Id*. Liberally construed, Plaintiff alleges Hesse retaliated against him for filing grievances and complaints by, among other things, destroying some of Plaintiff's legal documents, repeatedly harassing and threatening Plaintiff, and denying Plaintiff requested legal material and notary services. *Id*. at 5-13.[1] Plaintiff also claims Hesse assaulted him. *Id*. at 12-13. Plaintiff alleges Chuttey, Graham, Donnelly, Robinson, Fagan, and Quinn are liable as supervisors because, among other things, they failed to correct the continuing misconduct of their staff after Plaintiff reported it to them on multiple occasions, they failed to supervise their staff, and they allowed the misconduct to continue. *Id*. at 5-13. Plaintiff's numerous letters sent to the supervisory officials are attached as exhibits to the complaint. (Dkt. No. 1-1.)

Pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 18.) Plaintiff opposes the motion. (Dkt. No. 20.) For the reasons that follow, the Court recommends that Defendants' motion be granted in part and denied in part.

# I.     BACKGROUND

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

On December 2, 2013, Plaintiff asked Hesse for the "yellow pages" or a "legal book or listings that contained lawyers, their services, and contact information." *Id*. Hesse responded,

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

"what for?"  *Id.* at ¶ 21.  Plaintiff told Hesse he needed to find a lawyer for litigation.  *Id.*  Hesse

refused to provide Plaintiff with the attorney contact information because of the grievances and

complaints Plaintiff had filed.  *Id.*  Plaintiff asked, "so it's because of my complaints [i.e.

grievances] that you won't look into that for me?"  *Id.* (unaltered text; brackets in original).

Hesse responded, "you get the picture now."  *Id.*

On December 3, 2013, Hesse questioned Plaintiff about the grievances Plaintiff had filed.

*Id.* at 5.  Specifically, Hesse stated, "[w]hy the fuck are you tryna make waves, writing

grievances and shit?  You're pissing me and alot of people off."  *Id.* at 6 (unaltered text).

Plaintiff responded, "Oh really, there wouldn't be any if ya'll just do what's right and do your

jobs.  Besides don't be coming to me about this, and don't concern yourself with what I do."  *Id.*

(unaltered text).  Hesse threatened, "Yeah, whatever, you heard what I said.  Remember you

gotta go through me to send and receive shit from the law library.  Keep fucking around and your

important papers gonna come up lost or destroy.  Don't be stupid."  *Id.* (unaltered text).  Hesse

took Plaintiff's legal documents and papers, including "sworn affidavit, legal civil claims and

documentary evidence, etc.," that Plaintiff was sending to the law library to be copied and

returned to Plaintiff.  *Id.*  Plaintiff filed a grievance regarding this exchange with Hesse.  *Id.*  In

addition, Plaintiff verbally informed Chuttey that he was being retaliated against for filing

grievances and, at Chuttey's direction, sent Chuttey a letter.  *Id.*

On December 4, 2013, Plaintiff inquired about the status of the legal documents he gave

to Hesse for copying the previous day.  *Id.* at 7.  The officer on duty did not have Plaintiff's legal

documents and there was no indication that Hesse had sent Plaintiff's legal documents to be

copied.  *Id.*  Later that day, Plaintiff wrote a grievance "about the legal documents not being

returned," and sent a letter to Chuttey.  *Id.*  On December 5, 2013, Plaintiff wrote complaint

letters to Graham and Chuttey and requested that the surveillance videos be preserved from December 4, 2014.  *Id*.

On December 9, 2013, Plaintiff notified Hesse that the legal documents he gave Hesse to be copied on December 3, 2013, had not been returned.  *Id*.  Hesse told Plaintiff "all that shits gone."  *Id*. (unaltered text).  Hesse explained that Plaintiff's legal documents "got intentionally 'lost' because Plaintiff had pissed him off due to all of Plaintiff's grievance complaints."  *Id*. (unaltered text).  Hesse continued, "What?  Do I look like a joke, did I look like I was kidding when I told you that I was gonna fucking lose your paperwork?  Besides, I did someone a favor, cause that shit looked to me like some sort of civil complaint or something.  Take all this as a lesson learned and chill with the write-ups and complaints."  *Id*. (unaltered text).  Plaintiff explained that he really needed his legal documents.  *Id*.  Hesse responded, "what's done is done, deal with it."  *Id*.

Plaintiff filed a grievance regarding the December 9, 2013, incident, and wrote letters to Graham, Robinson, Chuttey, and Quinn.  (Dkt. No. 1-1 at 9, 13, 15, 17.)  Plaintiff verbally informed Robinson about Hesse's conduct on December 9, 2013.  *Id*. at 9.  Plaintiff followed-up with Donnelly, Hesse's direct supervisor, on December 21, 2013, and December 22, 2013.  *Id*. On December 26, 2013, Plaintiff verbally complained to Graham about Hesse's retaliatory conduct and of Donnelly's failure to investigate or address Hesse's conduct.  *Id.* at 10.

Hesse also retaliated against Plaintiff on January 27, 2014, by refusing to notarize Plaintiff's legal documents.  *Id*.  Donnelly witnessed Hesse's conduct without intervening.  *Id.* The next day, Plaintiff filed a grievance and verbally informed Graham that Hesse refused to provide notary services.  *Id*. at 10-11.  Plaintiff spoke to Chuttey and Fagan about the notary incident on February 3, 2014, and February 5, 2014, respectively.  *Id*.

On February 21, 2014, Hesse approached Plaintiff's cell in a very hostile, angry, and threatening manner. *Id*. at 12. Hesse threatened Plaintiff with "bodily harm" and told Plaintiff to stop writing complaints and to not pursue his filed grievances any further. *Id*. Hesse told Plaintiff he would have Plaintiff "fucked up real bad" whenever Plaintiff returned to "population" or "whenever the opportunity presented itself." *Id*. Hesse then stated, "I'm gonna show you how I deal with your kind, porch monkey." *Id*. (unaltered text). Hesse further threatened to kill Plaintiff if Plaintiff "grieve[d] him again." *Id*. Next, Hesse assaulted Plaintiff by spitting chewing tobacco into Plaintiff's face and right eye. *Id*. Plaintiff suffered extreme pain, stinging, and burning in his right eye, and could not see out of his right eye for six hours. *Id*. Plaintiff experienced a severe headache for days. *Id*. Plaintiff filed another grievance against Hesse regarding the tobacco spitting and threats. *Id*. at 13.

Plaintiff sent letters to Chuttey, Fagan, Graham, Quinn, and Robinson detailing the tobacco spitting incident. *Id*. Plaintiff requested that Defendants and DOCCS take administrative action against Hesse. (Dkt. No. 1-1 at 32-33, 36, 39, 42, 45.) In his letter to Fagan, Plaintiff wrote, "[t]his officer continues to retaliate and commit wrongful acts against me. You are well aware of the prior incidents involving [Hesse] and others." *Id*. at 42. In his letter to Graham, Plaintiff questioned why nothing had been done about Hesse's conduct despite writing multiple grievances and complaint letters. *Id*. at 32. Plaintiff verbally informed Graham and Robinson about the tobacco spitting and questioned them on their inaction to prevent additional misconduct despite their awareness of it. (Dkt. No. 1 at 13; Dkt. No. 1-1 at 32, 36.)

## II. LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). The motion tests the formal legal sufficiency of the

complaint by determining whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*, 550 at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

6

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs*, *Inc. v. Old Navy*, *LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus.*, *Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference.").

"The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the [p]laintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464(TJM), 2008 WL 4693153, at *6 n.41 (N.D.N.Y. Oct. 22, 2008)[2] (collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y.) (where a *pro se* plaintiff is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004); *see also Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (in reviewing the district court's dismissal of *pro se* plaintiff's claim, the Second Circuit considered the plaintiff's affidavit submitted in opposition to motion to dismiss).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even

---

[2]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Id.*

## III.   ANALYSIS

Defendants seek dismissal of Plaintiff's complaint in its entirety for failure to state a claim.  (Dkt. No. 18-1 at 4-9.)  Alternatively, Defendants argue Plaintiff's Eighth Amendment excessive force claim should be dismissed as against Chuttey, Graham, Donnelly, Robinson, Fagan, and Quinn for lack of personal involvement.  *Id.* at 10-12.  Defendants contend they are entitled to qualified immunity.  *Id*. at 13-15.  Lastly, Defendants move to dismiss Plaintiff's request for declaratory judgment.  *Id.* at 15.

### A.   Plaintiff's Retaliation Claims

Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing the

following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, Plaintiff claims he filed numerous grievances while confined at Auburn. (Dkt. No 1 at 6-8, 10, 13.) Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (filing a prison grievance is a constitutionally protected activity).

To meet the second prong of the retaliation test, the plaintiff must allege that the defendants took adverse action against him because he filed grievances. The Second Circuit has defined "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citation omitted; omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.* If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity, "the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 493.

Finally, the plaintiff must establish a causal connection between the protected conduct and the adverse action. "To satisfy the causal-connection prong of a retaliation claim, an inmate must show "that the protected conduct was a 'substantial or motivating factor' in the prison

officials' decision to take action against the plaintiff." *Vega v. Artus*, 610 F. Supp. 2d 185, 207

(N.D.N.Y. 2009) (Suddaby, J.) (citation omitted).  The court may consider a number of factors

when determining whether a causal connection exists, including "(1) the temporal proximity

between the protected activity and the alleged retaliatory act; (2) the inmate's prior good

disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the

defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.

2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

### 1.    Refusal to Provide Attorney Contact Information

Plaintiff claims that on December 2, 2013, in retaliation for filing grievances, Hesse

refused to provide Plaintiff with attorney contact information.  (Dkt. No. 1 at 8-9.)  Defendants

argue that even assuming this incident constituted adverse action, Plaintiff has failed to allege

protected speech or conduct that supposedly caused the adverse action.  (Dkt. No. 18-1 at 5-6.)

Defendants contend the complaint contains no allegation that Plaintiff filed a grievance or

complaint against Hesse prior to December 2, 2013, and, instead, "Plaintiff simply alleges that

that Hesse refused Plaintiff's request for a list of attorneys . . . based upon Plaintiff's vague

assertions that he had previously filed unspecified grievances and complaints." *Id*. at 6.

"At this stage of the proceeding, plaintiff need only allege facts that plausibly suggest a

causal connection between the grievances that he filed and the adverse action that he

experienced." *Ford v. Martuscello*, No. 9:14-cv-1566 (DNH/DEP), 2017 WL 4181385, at *5

(N.D.N.Y. June 23, 2016) ("The fact that none of the grievances were alleged to have been filed

against the defendants is not dispositive of whether plaintiff has stated a claim against them.");

*see also Hernandez v. Goord*, 312 F. Supp. 2d 537, 545 (S.D.N.Y. 2004) (denying motion to

dismiss retaliation claim where plaintiff did not expressly allege that corrections officers that

engaged in adverse action were the subject of the grievances filed by plaintiff); *Jean-Laurent v. Lane*, 11-CV-0186 (NAM/TWD), 2013 WL 600213, at *9 (N.D.N.Y. Jan. 24, 2013) (finding the temporal proximity between the defendant learning of the lawsuit against other correctional officers and the adverse action made a facially plausible showing of causation retaliation claim), *adopted by* 2013 WL 599893 (N.D.N.Y. Feb. 13, 2013). Further, the court may consider a number of factors when determining whether a causal connection exists, including "statements by the defendant concerning his motivation." *Baskerville*, 224 F. Supp. 2d at 732 (S.D.N.Y. 2002) (citation omitted).

Here, Plaintiff alleges Hesse refused to provide him attorney contact information because of previous grievances he had filed. (Dkt. No. 1 at 8.) Plaintiff claims Hesse "flat out stated that he would not assist" due to Plaintiff's "grievances and all the complaints." *Id*. at 8-9. Plaintiff stated in response, "So it's cause of my complaints [i.e. grievances] that you won't look into that for me?" *Id*. at 9 (unaltered text; bracket in original). Hesse responded, "You get the picture now." *Id*.

At this juncture, the Court finds Plaintiff's allegation is "sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Davis*, 320 F.3d at 354 (citation omitted). Therefore, the Court recommends denying Defendants' motion as it relates to this incident.

### 2.    Disappearance of Legal Documents

Plaintiff claims that on December 3, 2013, Hesse threatened to prevent Plaintiff from obtaining library services, threatened to lose and destroy Plaintiff's legal documents, and carried out this threat by destroying Plaintiff's legal documents. (Dkt. No. 1 at 6-7.) Again, Defendants

argue Plaintiff has failed to allege protected speech or conduct that supposedly caused the adverse action. (Dkt. No. 18-1 at 5-6.)

As an initial matter, courts have found that the threat of losing legal documents followed by their disappearance is an adverse action sufficient to deter a similarly situated inmate. *Smith v. City of New York*, No. 03 Civ. 7576 (NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (retaliatory destruction of prisoner's legal documents and papers was designed to deter the inmate's exercise of constitutional rights and constitutes adverse action for purposes of a retaliation claim); *Smith v. Maypes-Rhynders*, No. 07 Civ. 11241(PAC/MHD), 2009 WL 874439, at *5 (S.D.N.Y. Mar. 31, 2009) (same).

For the same reasons as above, the Court finds Plaintiff has plausibly alleged facts that establish a causal connection. In his complaint and response to Defendants' motion, Plaintiff contends that Hesse's conduct was precipitated by grievances filed against other prison personnel. (Dkt. No. 1 at 5-6; Dkt. No. 20 at 2.) While questioning Plaintiff about these grievances, Plaintiff claims Hesse stated that "you are pissing me and a lot of people off" and threatened to lose or destroy Plaintiff's legal documents if Plaintiff insisted on filing more complaints. *Id.* at 6.

Plaintiff claims Hesse carried out this threat the next day. (Dkt. No. 1 at 6.) Hesse did not return Plaintiff's documents that day and, in fact, the documents were never returned to him. *Id*. at 6-7. On December 4, 2013, Plaintiff learned that his legal documents were never sent for copying services. *Id*. at 7. Additionally, Plaintiff claims that on December 9, 2013, Hesse told Plaintiff that he "made certain that all [P]laintiff's legal paperwork and materials sent with [him] got intentionally 'lost' because [P]laintiff had pissed him off due to the plaintiff's grievance

complaints." *Id.* at 7. Hesse said, "[t]ake this as a lesson learned and chill with the write-ups and complaints." *Id.* at 8.

Based on the foregoing, the Court finds Plaintiff's allegations are sufficient to withstand a motion to dismiss. Thus, the Court recommends denying Defendants' motion as it relates to this incident.

### 3.    Refusal to Provide Notary Services

Plaintiff alleges Hesse retaliated against him by refusing to provide Plaintiff notary services on January 27, 2014. (Dkt. No. 1 at 10.) Specifically, Plaintiff claims that after he signed an affidavit statement and an affidavit of service in Hesse's presence, Hesse refused to notarize the documents. (Dkt. No. 1 at 10.) As to this claim, Defendants contend refusing to provide notary services does not constitute an adverse action and that there are no alleged facts that establish a causal connection. (Dkt. No. 18-1 at 7.[3])

The refusal of notary services, "knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter 'a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Guillory v. Haywood*, No. 9:13-cv-01564 (MAD/TWD), 2015 WL 268933, at * 17 (N.D.N.Y. Jan. 21, 2015) (citing *Pidlypchak*, 389 F.3d at 381, 383) (finding a denial of law library services, which prevented the plaintiff from obtaining necessary notary and copying services to file a supplemental brief in a

---

[3] Defendants argue "[r]efusing to notarize a documents imply does not constitute adverse action." (Dkt. No. 18-1 at 7.) Defendants rely on *Harnage v. Brighhaupt*, No. 3:12cv1521 (AWT), 2016 U.S. Dist. Lexis 72535, at *15-17 (D. Conn. June 3, 2016). There, on summary judgment, the court found there was, at most, a temporary limitation on his ability to obtain notary services because the document at issue was eventually filed with the court. *Id*. This case is factually distinguishable from *Harnage* because there are no facts alleged to suggest that Hesse's refusal to notarize the legal documents at issue resulted in only a temporary limitation on Plaintiff's right to access the courts. At this stage, without more, the Court will not speculate as to whether Hesse's alleged refusal resulted in only a temporary delay of notary services.

pending suit, constituted an adverse action on a motion to dismiss). Viewed in the light most favorable to Plaintiff, the Court finds Plaintiff has plausibly alleged adverse action.

Defendants further argue there are no alleged facts that "would demonstrate that Hesse refused to notarize Plaintiff's document in retaliation for filing grievances against Hesse." (Dkt. No. 18-1 at 7.) However, where there is a short time between protected activity and an adverse action, there is sufficient evidence of a causal connection at this stage of the litigation. *See, e.g.*, *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (holding the short time between protected activity and retaliation coupled with defendants' involvement in the decision to transfer was sufficient to support inference of retaliatory motive). Indeed,

> [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Wallace v. Fisher*, No. 9:13-CV-1208 (GTS/CFH), 2015 WL 64533, at *5 (N.D.N.Y. Jan. 5, 2015) (citing *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted)). Here, just six weeks passed between the protected conduct and Hesse's alleged refusal to provide notary services. (*See* Dkt. No. 1 at 8-10.) Indeed, by January 27, 2014, Plaintiff had filed at least three grievances against Hesse. (Dkt. No. 1 at 7-8.)

Further, as set forth above, courts may consider a number of factors when determining whether a causal connection exists, including "statements by the defendant concerning his motivation." *Baskerville*, 224 F. Supp. 2d at 732 (S.D.N.Y. 2002) (citation omitted). Here, Plaintiff avers that on more than one occasion Hesse told Plaintiff that he was "pissing [him] and

a lot of people off," and that his prior actions were motivated by Plaintiff's grievances and complaints. (Dkt. No. 1 at 6-7; *see also* Dkt. No. 20 at 2.)

Based on the foregoing, the Court finds Plaintiff has plausibly alleged an adverse action and causal connection. Therefore, the Court recommends denying Defendants' motion as it relates to this incident.

### 4.    Verbal Threats and Spitting Chewing Tobacco

Plaintiff alleges Hesse retaliated against him by verbally threatening him and spitting chewing tobacco into his right eye on February 21, 2014. (Dkt. No. 1 at 12.) Specifically, Plaintiff claims Hesse entered his cell and threatened Plaintiff with bodily harm if Plaintiff continued to file grievances against him or other personnel. *Id.* Hesse threatened to kill Plaintiff if Plaintiff filed another grievance against him and then spat chewing tobacco in Plaintiff's face and right eye. *Id.* Defendants submit that such conduct does not constitute adverse action. (Dkt. No. 18-1 at 7-8.) At this juncture, the Court disagrees.

"[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Whether threats constitute adverse action in a particular case is dependent upon the specificity of the threat and the context in which it was made. *See Sharpe v. Taylor*, No. 9:05-CV-1003 (GTS/GHL), 2009 WL 1743987, at *9 (N.D.N.Y. Mar. 26, 2009); *Hofelich v. Ercole*, No. 06 Civ. 13697 (PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) ("whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered"); *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK)(GWG), 2007 WL

1544629, at *23 (S.D.N.Y. May 29, 2007) (collecting cases); *compare Hepworth v. Suffolk Cty.*, No. 02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate) *with Bartley v. Collins*, No. 05-CV-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we are going to get you, you better drop the suit," do not rise to the level of adverse action); *see also Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001) (officer's statement to plaintiff that he "would teach [plaintiff] a lesson and give him something to sue for" stated a retaliation claim).

Here, Plaintiff alleges Hesse, among other things, threatened to have Plaintiff "'fucked up real bad' whenever Plaintiff got placed into population or whenever the opportunity presented itself." (Dkt. No. 1 at 12.) Hesse threatened to kill Plaintiff if he filed another grievance against him. *Id.* Hess also stated, "I'm gonna show you how I deal with your kind, porch monkey," and spit chewing tobacco in Plaintiff's face and right eye." *Id.* (unaltered text). Plaintiff claims he experienced severe burning, pain, and a temporary loss of vision in his right eye for nearly six hours, and a severe headache for days. *Id.* at 12-13. Taken together and construing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has plausibly alleged adverse action. Therefore, the Court recommends denying Defendants' motion to dismiss as it relates to this incident.

Based on the foregoing, the Court recommends denying Defendants' motion to dismiss Plaintiff's First Amendment retaliation claims.

### B.    Plaintiff's Excessive Force Claim

Plaintiff alleges Hesse subjected him to excessive force by spitting chewing tobacco in his face on February 21, 2014.  (Dkt. No. 1 at 17.)  Defendants argue this single incident does not constitute excessive force.  (Dkt. No. 18-1 at 9.)  The Court agrees.

"As a matter of law, a single incident of spitting does not constitute excessive force." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 348 (N.D.N.Y. 2010) (Hurd, J.) (citations omitted) (finding that corrections officer who spat chewing tobacco in the face of a prisoner did not violate the Eighth Amendment); *see, e.g.*, *Greene v. Mazzuca*, 485 F. Supp. 2d 447, 451 (S.D.N.Y. 2007) (holding that yelling, spitting at and threatening an inmate do not "rise to the level at which prevailing doctrine sets the constitutional bar to establish cruel and unusual punishment"); *Headley v. Fisher*, No. 06 CV 6331, 2008 WL 1990771, at *14 (S.D.N.Y. May 7, 2008) (holding that spitting in the inmate's face, slapping and pushing did not give rise to the claim of excessive force).

Therefore, the Court recommends dismissing Plaintiff's Eighth Amendment excessive force claim with prejudice pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted because the problem with this claim is substantive and cannot be cured by a better pleading.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### C.    Qualified Immunity

The doctrine of qualified immunity precludes civil liability where either prison officials performing discretionary functions "did not violate clearly established law," or "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (citations and internal quotations omitted); *accord Ford v. McGinnis*, 352 F.3d 582, 596 (2d Cir. 2003) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 (1982)).  A qualified immunity defense may be asserted as part of a motion under Federal Rules of Civil Procedure 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle."  *McKenna v. Wright*, 386 F.3d 432, 434-35 (2d Cir. 2004).

Defendants contend they are entitled to qualified immunity only in the vaguest and most general terms: "At the time of the incidents alleged in the complaint, it was not clearly established and a reasonable official in defendants' position could not know that the conduct that defendant Hesse is alleged to have engaged in could constitute a constitutional violation."  (Dkt. No. 18-1 at 14-15.)  Defendants offer no explanation as to what right was not "clearly established."  *See id*.  The constitutional right of an inmate to seek a remedy for his grievances without suffering retaliation was well-established at the time the alleged violations occurred. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988).  Nor do Defendants offer an explanation as to why it would have not been clear to a reasonable officer in Hesse's position that he would violate Plaintiff's First Amendment rights by, among other things, destroying some of Plaintiff's legal documents, repeatedly harassing and threatening Plaintiff, and denying Plaintiff requested legal material and notary services.

Accordingly, at least for purposes of this motion, Defendants have not demonstrated that they are entitled to qualified immunity.  Therefore, the Court recommends denying Defendants qualified immunity at this time.

### D.    Declaratory Relief

In addition to compensatory and punitive damages, Plaintiff seeks declaratory relief. (Dkt. No. 1 at 18.)  Because Plaintiff is no longer incarcerated at Auburn, his claim for

declaratory relief is moot. *Salahuddin*, 467 F.3d at 272 ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *see, e.g.*, *Verley v. Wright*, No. 02 Civ. 1182 (PKC), 2007 WL 2822199, at *9 (S.D.N.Y. Sept. 27, 2007) ("To the extent that plaintiff seeks injunctive and declaratory relief directed at officials at [the transferring facility], those claims are now moot as plaintiff is no longer incarcerated [there]."). Thus, the Court recommends dismissing Plaintiff's claim for declaratory relief.

**WHEREFORE**, based on the foregoing, it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 18) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that (1) Defendants' motion to dismiss Plaintiff's First Amendment retaliation claims be **denied**; (2) Defendants' motion to dismiss Plaintiff's Eighth Amendment excessive force claim be **granted**; (3) Defendants' motion to dismiss on qualified immunity grounds be **denied**; and (4) Defendants' motion to dismiss Plaintiff's claims for declaratory relief be **granted**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [4] Such objections shall be filed with the Clerk of the

---

[4] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam));

28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: February 2, 2018
       Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2008 WL 4693153

---

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, David L. Cochran, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to
42 U.S.C. § 1983, was referred to the Hon. George H.
Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008
recommended that Defendants motion to dismiss be
granted in part and denied in part. Specifically,
Judge Lowe recommended that Plaintiff's Fourteenth
Amendment procedural due process claim against
Defendant Varkiar regarding his disciplinary hearing
be dismissed if, within thirty (30) days from the
filing of this Final Order, Plaintiff does not file
an Amended Complaint that successfully states a
Fourteenth Amendment procedural due process claim.
It was recommended that Plaintiff's remaining claims be
dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation,
essentially raising the same arguments presented to the
Magistrate Judge.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Lowe for the reasons stated in the
Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be
**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
by the Honorable Thomas J. McAvoy, Senior United
States District Judge, for Report and Recommendation
with regard to any dispositive motions filed, pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally,
in his Complaint, Raymond Robles ("Plaintiff") alleges
that three employees of the New York State Department
of Correctional Services ("DOCS"), as well as DOCS
itself, violated his rights under the Eighth and Fourteenth
Amendments when they (1) required him to submit to
a random urinalysis test when they knew he was taking
a medication that would prevent him from providing a
urine sample, and (2) charged, convicted, and punished
him with eighty-seven days in a Special Housing Unit for
refusing to provide a urine sample. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Currently pending before the Court is

2008 WL 4693153

Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

# I. BACKGROUND

### A. Summary of Plaintiff's Complaint
**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom

at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's

own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of

course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the

complaint is submitted *pro se.*"[39]  In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[40]

**\*6**  For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[41]  Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[42]  Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[43]  Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[44]  In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.[45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[47]  Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[48]  Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[49]

### III. ANALYSIS

#### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States

Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].)  In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket";[50]  (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ...";[51]  and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice.[52]

**\*7**  For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities.[53]  However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

#### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 26 of 203

the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment (or perhaps inadequate-prison-conditions) under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the

three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his

medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural

due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED*** with prejudice, and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,*

984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30     *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1      *See, infra,* note 41 of this Report-Recommendation (citing cases).

2      (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4      (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8      (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9      (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10     (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11     (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12     (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15     (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16     (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17     (*Id.*)

18     (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19     (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax.)

20     (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax.)

21     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of

disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also* *Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,*

125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ...

requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c] [1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a "*plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from

hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46    *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12,

2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at

*2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66,

105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element

requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.); *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60    *See, supra,* note 44 of this Report-Recommendation.

61    *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008)

Robles v. Bleau, Not Reported in F.Supp.2d (2008)
Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 35 of 203
2008 WL 4693153

(Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62   *See, supra,* note 44 of this Report-Recommendation.

63   *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U.

under numerous conditions of confinement that were more restrictive than those in general population).

64   *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65   *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66   *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives

defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67     *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68     *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69     *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered

no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

## All Citations

Not Reported in F.Supp.2d, 2008 WL 4693153

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 600213
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John
Doe # 1; John Doe # 2; Sgt. Beard; Sgt. Pauline;
Lt. Jones; DSS McAuliffe; Dr. Mays; Dr.
John Doe; Jane Doe; Supt. Barkley; Supt.
Hulihan; Dep. Comm. Linquist, Defendants.

No. 9:11–CV–186 (NAM/TWD).
|
Jan. 24, 2013.

**Attorneys and Law Firms**

Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Gregory J. Rodriguez, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*REPORT AND RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, was initially referred
to Magistrate Judge George H. Lowe for Report
and Recommendation to the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon
Magistrate Judge Lowe's retirement on February 9,
2012, the case was reassigned to me. Plaintiff Phillip
Jean–Laurent ("Jean–Laurent") has brought this action
against Defendants Correctional Officers Patrick Lane
("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall
("Tyndall"); Correctional Sergeants Matthew Beard
("Beard") and David Pawlin ("Pawlin") (sued incorrectly
as "Sgt. Pauline"); Correctional Lieutenant Norman
Jones ("Jones"); Deputy Superintendent Security
Brian McAuliffe ("McAuliffe"); Superintendents Warren
Barkley ("Barkley") and William Hulihan ("Hulihan");

Appeal Review Officer Norman Bezio ("Bezio"); Deputy
Commissioner Christopher Lindquist ("Lindquist") (sued
incorrectly as "Dep. Comm. Linquist"); Dr. Charles
Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John
Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt.
Nos. 1, ¶¶ 9–16, and 6–17. [1] )

[1]    Page numbers in citations to filed documents refer to
the page numbers assigned by the Court's electronic
filing system rather than to the page number in the
original document.

Defendants, with the exception of the four Doe
Defendants who have not yet been identified and served,
now move to dismiss Plaintiff's Complaint for failure
to state a claim under Federal Rule of Civil Procedure
12(b)(6). [2] (Dkt. No. 23.) For the reasons set forth
below, the Court recommends that Defendants' motion be
**GRANTED** in part and **DENIED** in part.

[2]    Because the Doe Defendants have been excluded from
the motion, this Report and Recommendation does
not address the legal sufficiency of the claims asserted
against them in the Complaint.

## I. BACKGROUND [3]

[3]    The background facts set forth herein are taken from
Plaintiff's Complaint.

### A. Facts Concerning Plaintiff's Claims Arising Out of
his Storage of Draft Bags and the Destruction of His
Legal Documents

Plaintiff is a former prisoner of the New York State
Department of Correctional and Community Supervision
("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008,
Plaintiff was transferred from Elmira Correctional
Facility ("Elmira") to Cape Vincent Correctional Facility
("Cape Vincent"). *Id.* at ¶ 17. Eight draft bags containing
Plaintiff's personal property were sent from Elmira to
Cape Vincent at the time of the transfer. *Id.* Plaintiff's
personal belongings did not all fit into the storage lockers
provided for his use at Cape Vincent, so he stored personal
legal documents and materials and books in two draft bags
placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer
at the time, advised Plaintiff that he could not store
belongings in draft bags and would have to purchase
storage containers from the commissary for his excess

belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id .* at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the SITU.

[4]   Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:
    Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.

A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

[5]   Plaintiff has not identified the nature of the allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

**B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio**

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower

back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

[6]     It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.*

at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

### C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

### D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to

Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

## III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint

include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d

119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). [7]

[7]    Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6**  Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

## C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a

constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011) (Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* ––– U.S. ––––, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

[8]   The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

### D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8**   To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff —namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist.*

*Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

### 1. *Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings[9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

[9]    *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

***9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, *3, 2005 U.S. Dist. LEXIS 7903, at *10 (S.D.N.Y. May 3, 2005) (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher,* No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at *14, 2012 U.S. Dist. LEXIS 39116, at *41 (N.D.N.Y. Feb.29, 2012) (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash,* No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at *6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006) (Kahn D.J., Homer, M.J.)

*(same)*; *Kotler v. Daby,* No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011) (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer,* 682 F.Supp.2d 423, 433 (S.D.N.Y.2010) (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse actions by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

#### 2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly,* No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012) (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore,

I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

#### 3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

#### 4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 12193, at \*24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim analysis, I recommend that Plaintiff be granted leave to amend

should he be able to plead specific facts supporting causation. [10]

[10]  *See Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at \*10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

### E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.*

2013 WL 600213

(citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–03. The inmate then must establish that the provider consciously and intentionally disregarded or

ignored that serious medical need. *See Farmer,* 511 U.S. at 825; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–6.

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith,* 316 F.3d at 185. Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. Claim of Cruel and Inhuman Treatment By Defendant Pawlin

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing society," *Estelle,* 429 U.S. at 102, Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 47 of 203
Jean-Laurent v. Lane, Not Reported in F.Supp.2d (2013)
2013 WL 600213

inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

2. *Claim of Medical Indifference Against Defendant Moehs*

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance,* 143 F.3d at 703. Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim.[11] *See Guarneri v. Hazzard,* No. 9:06–CV–0985, 2008 WL 552872, at \*6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008) (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas,* No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at \*14, 2002 U.S. Dist. LEXIS 17359, at \*50 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit, compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion.[12] Therefore, the Court recommends that Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

[11] Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

[12] If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

3. *Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU*

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."

*McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (*"[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**\*15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal, [13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [14]

[13]    There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

[14]    The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

4. *Claim of Indifference to Serious Medical Needs*
   *Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged

Jean-Laurent v. Lane, Not Reported in F.Supp.2d (2013)
Case 9:16-cv-01343-GTS-TWD Document 25 Filed 02/02/18 Page 49 of 203
2013 WL 600213

constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable; *Walker v. Pataro,* No. 99 Civ. 4607(GBD) (AJP), 2002 WL 664040, at *12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at *13, 2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual

enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

### G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

#### 1. Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe [15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing

fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

15     Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones. [16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

16     The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges. [17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

17     The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

### 2. *Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 at ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id.* at 64, the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were

more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19**  Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal

involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's rights through an appeal, he failed to remedy the wrong. *Colon,* 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J.) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); *Moore v. Scully,* No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20**  Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

### H. Plaintiff's Pendent State Claims

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations

and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See*

*O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \*16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, the Court recommends that Defendants' motion be ***GRANTED*** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin, Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be *DENIED* as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 600213

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 599893
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Phillip JEAN–LAURENT, Plaintiff,

v.

C.O. LANE; C.O. Briggs; C.O. Tyndall; John
Doe # 1; John Doe # 2; Sgt. Beard; Sgt. Pauline;
Lt. Jones; DSS McAuliffe; Dr. Mays; Dr.
John Doe; Jane Doe; Supt. Barkley; Supt.
Hulihan; Dep. Comm. Linquist, Defendants.

No. 9:11–CV–186 (NAM/TWD).
|
Feb. 15, 2013.

**Attorneys and Law Firms**

Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the
State of New York, Gregory J. Rodriguez, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*ORDER*

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's ReportRecommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 599893

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Tirado v. Shutt, S.D.N.Y., February 23, 2015

2005 WL 1026551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Andre SMITH, Plaintiff,
v.
THE CITY OF NEW YORK, Captain Kennedy
# 425, Corrections Officer Bennett #
12929, Warden Mark Farsi, Defendants.

No. 03 Civ. 7576(NRB).
|
May 3, 2005.

**Attorneys and Law Firms**

Andre Smith, Southport Correctional Facility, Pine City,
NY, Plaintiff pro se.

Michael Chestnov, Assistant Corporation Counsel, New
York, NY, for Defendants.

## MEMORANDUM AND ORDER

BUCHWALD, J.

*1 Plaintiff Andre Smith, presently incarcerated at
the Southport Correctional Facility in Pine City, New
York, brings this action *pro se* under 42 U.S.C. §
1983 against the City of New York, Captain Anthony
Kennedy ("Captain Kennedy"), Corrections Officer
Dwayne Bennett ("C.O.Bennett"), and Warden Mark
Farsi ("Warden Farsi"). Plaintiff claims that defendants
destroyed his personal property and legal papers in
retaliation for his filing a federal lawsuit against another
corrections officer, thereby interfering with his right of
access to the courts and depriving him of his property
without due process. Plaintiff brings suit under 42 U.S.C.
§ 1983 seeking compensatory and punitive damages
for violations of his First, Fourth, and Fourteenth
Amendments constitutional rights.

Plaintiff filed his initial complaint against defendants on
July 11, 2003, and an amended complaint ("Am.Compl.")
on September 28, 2003. On October 20, 2004, defendants

moved for summary judgment pursuant to Fed.R.Civ.P.
56. For the reasons discussed below, defendants' motion
is granted in part and denied in part.

## BACKGROUND [1]

[1]   This factual statement is based on the plaintiff's
amended complaint and deposition testimony except
where noted.

At all times relevant to this complaint, plaintiff was
incarcerated in the Central Punitive Segregation Unit at
the Otis Bantum Correction Center on Rikers Island. On
the morning of July 8, 2003, plaintiff left Rikers Island
for arraignment in a criminal proceeding. *See* Pl.'s Dep.
at 86. When he returned to his housing area ("2-South")
at approximately 6:00 p.m., plaintiff's cell and locker
were open and C.O. Bennett informed plaintiff that his
property had been moved from Cell 14 to Cell 15. *Id.* at 91,
93. Plaintiff claims that prison regulations required him to
be present when his property was moved. When plaintiff
asked why his property was taken, C.O. Bennett replied
with something to the effect of, "I don't like you, I'm pretty
sure you know why." *Id.* at 94-95.

After learning that C.O. Bennett had moved his
belongings, plaintiff demanded to speak with Captain
Kennedy, C.O. Bennett's supervisor. When Captain
Kennedy arrived, he allegedly told plaintiff "things
happen, this is our house." Am. Compl. ¶ 19. [2] Eventually,
plaintiff requested to see the property removed from his
cell and locker. Pl.'s Dep. at 113-14. When C.O. Bennett
retrieved plaintiff's property, several items were missing.
*Id.* at 118. In addition to approximately nine hundred
dollars worth of personal property, [3] plaintiff was missing
a substantial amount of his legal materials from his cell
and locker. Am. Compl. ¶¶ 15-16.

[2]   At his deposition, however, plaintiff testified that
Captain Kennedy stated that he did not know where
plaintiff's belongings were because C.O. Bennett had
packed them. Pl.'s Dep. at 132.

[3]   The missing personal property included personal
photographs, hygiene products, clothing, books and
magazines. *See id.* at 192-93.

At the time of the incident, plaintiff had one criminal
case [4] and two civil lawsuits pending in this district. Both

2005 WL 1026551

of plaintiff's civil lawsuits involved incidents at plaintiff's prison facility, and both named Rikers Island corrections officers as defendants. [5] One of plaintiff's cases named a corrections officer Jordan ("C.O.Jordan"), another corrections officer assigned to plaintiff's housing unit, as a defendant. Plaintiff's complaint alleges that C.O. Jordan and C.O. Bennett are friends from working together in 2-South, and that C.O. Bennett's actions were in retaliation for plaintiff naming C.O. Jordan in the lawsuit. All of the corrections officers named by plaintiff in his two lawsuits were served copies of plaintiff's complaints by U.S. Marshals on July 8, 2003, the date of the current incident. [6]

[4]    It is unclear from the record where the criminal case against plaintiff was filed.

[5]    Plaintiff's lawsuits concerned an alleged assault by a corrections officer, and an earlier incident of destruction of plaintiff's property by corrections officers. *See Smith v. Benston, et al.,* No. 03 Civ 3979(MBM) (S.D.N.Y. filed June 2, 2003) ("No. 03 Civ 3979"); *Smith v. Robertson,* No. 03 Civ. 3989(KMW) (S.D.N.Y. Oct. 16, 2003)(order dismissing the action with prejudice due to settlement) ("No. 03 Civ 3989").

[6]    While it does not appear that the individual defendants were served directly by U.S. Marshals, other corrections officers at Rikers Island accepted service on their behalf on the morning of July 8, 2003. Defs.' Exs. C, D.

**\*2** The specific legal materials allegedly destroyed varied for each case. In his criminal case, plaintiff lost his copies of numerous motions drafted by his lawyer, along with his copy of his grand jury minutes. Pl.'s Dep. at 119. Through his lawyer, plaintiff was able to secure replacement copies of the legal documents within approximately three weeks, well before the case went to trial in November of 2003. *Id.* at 120, 204-05.

In the two civil cases, both filed on June 2, 2003, the plaintiff lost copies of his complaints, docket sheets, a *pro se* book, a jailhouse lawyer's manual, and different motions that he was "supposed to be looking over and studying because [he] was pro se." *Id.* at 121. In one case, No. 03 Civ. 3989, plaintiff was able to replace the destroyed documents within one week, but plaintiff complains that "instead of [the parties] settling the case at a specific time, [they] had to wait." *Id.* at 123-24. In

the other case, No. 03 Civ. 3979, plaintiff allegedly lost copies of various documents sent by defendants' counsel. *See id.* at 124. Plaintiff does not elaborate how the loss has impacted that case, and concedes that he is not certain that he even possessed these documents on July 8, 2003, the date of the alleged incident. *See id.* at 128. As of the date of this opinion, case No. 03 Civ. 3979 remains pending before Chief Judge Mukasey.

## DISCUSSION

Between his complaint and deposition testimony, plaintiff has alleged three constitutional claims under § 1983:(1) retaliation for the exercise of a constitutionally protected right; (2) denial of access to the courts; and (3) deprivation of property without due process. [7] These claims are discussed in turn below.

[7]    To the extent plaintiff makes a claim for violation of his Fourth Amendment rights, plaintiff's claim fails because he does not have a right to be free from searches and seizures of the property in his cell. *See Hudson v. Palmer,* 468 U.S. 517, 525-27, 528 n. 8 (1984) (; *Bell v. Wolfish,* 441 U.S. 520, 537 (1979)("Loss of freedom of choice and privacy are inherent incidents of confinement...."); *Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at \*5 (S.D.N.Y. Aug. 26, 2002).

### I. Standard for Summary Judgment
Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993).

In order to defeat such a motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (internal quotation marks omitted). In addition, when deciding a motion for summary judgment, a district court may only consider evidence that would be admissible at trail. *See Nora Beverages v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir.2001).

II. First Amendment Retaliation

 **\*3** Plaintiff alleges that the defendants deprived him of property in retaliation for his filing federal lawsuits against other corrections officers at Rikers Island. Such actions are prohibited under the Constitution because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993).

Courts approach such retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To survive summary judgment, a plaintiff alleging retaliation must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes,* 239 F.3d at 492. *See also Winthrow v. Donnelly,* 356 F.Supp.2d 273, 275 (W.D.N.Y.2005) (applying *Dawes* standard to summary judgment motion); *Contes v. Porr,* 345 F.Supp.2d 372, 377-78 (S.D.N.Y.2004) (same). Since access to the courts is an established constitutional right, *Bounds v. Smith,* 430 U.S. 817, 821 (1977), we turn to the second and third prongs of the retaliation test.

Adverse action is conduct "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. What constitutes adverse action is context specific, and "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against

them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999). *De minimis* acts of retaliation do not chill the exercise of constitutional rights, and thus are insufficient to support a First Amendment retaliation claim. *See Davidson v. Chestnut,* 193 F.3d 144, 150-51 (2d Cir.1999).

The adverse action alleged by plaintiff involves the destruction of his legal papers and his personal property. This action was specifically directed against plaintiff, was in violation of prison regulations, and deprived him of a substantial amount of personal property. Such retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action. *See Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at \*2 (S.D.N.Y. June 4, 2003). In addition, the retaliatory conduct alleged here involves more than just the destruction of personal property. Instead, the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers. Accordingly, we find that plaintiff has established an adverse action substantial enough to satisfy the second prong of the retaliation test. *See Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at \*5 (S.D.N.Y. Aug. 26, 2002).

 **\*4** For the third prong, plaintiff must establish a casual connection between the filing of his lawsuits and the retaliatory event. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). With respect to C.O. Bennett, plaintiff has provided direct evidence of the connection between the two events as well as a temporal connection. First, plaintiff alleges that C.O. Bennett's statement "I don't like you, I'm pretty sure you know why" is evidence that plaintiff's property was destroyed because of his lawsuit against C.O. Bennett's co-worker, C.O. Jordan. Taken alone, this statement might not provide sufficient evidence to survive summary judgment, as C.O. Bennett has provided an affidavit that he had no knowledge of plaintiff's lawsuit against Officer Jordan. *See* Defs.' Notice of Motion for Summ. J., Ex. F (Aff. of Dwayne Bennett). However, when this alleged statement is combined with circumstantial evidence regarding the timing of the incident, plaintiff has established genuine issues of material fact regarding the reason for the

destruction of his property. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995) ("In light of the combination of circumstantial and direct evidence of retaliation that [plaintiff] presents, we conclude that his claim, however valid it may ultimately prove to be, is sufficiently strong to defeat the motion for summary judgment.").

First, plaintiff has established that his property was destroyed on the very same day that the other Rikers Island corrections officers were served with the plaintiff's complaints in his civil suits. Defs.' Ex. C, D. [8] Although plaintiff had filed his lawsuits in early June, it is quite likely that July 8, 2003, is the first date that the individual corrections officers learned they had been named in plaintiff's lawsuits. Second, plaintiff alleges that C .O. Jordan had been working in 2-South immediately prior to C.O. Bennett's shift on the day of the incident, providing C.O. Jordan with an opportunity to discuss with C.O. Bennett plaintiff's lawsuits. Pl.'s Dep. at 95. In light of this highly suspicious timing and C.O. Bennett's alleged statement, a reasonable jury could find a causal connection between the destruction of plaintiff's property and plaintiff's protected action. Accordingly, defendants' motion for summary judgment on the retaliation claim is denied as to C.O. Bennett.

[8]    While a U.S. Marshal did not directly serve C.O. Jordan, the proof of service filed by plaintiff establishes that another corrections officer at Rikers Island, C.O. Houston, accepted service on C.O. Jordan's behalf on the morning of July 8, 2003.

With respect to the other named individual defendants, Captain Kennedy and Warden Farsi, plaintiff must establish their personal involvement in the retaliation in order to sustain a claim under section 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The Second Circuit has described the personal involvement of a supervisory defendant that is required to sustain a claim under section 1983:

**\*5** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices

occurred, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff does not claim either defendant actually destroyed his property. Instead, plaintiff cites two statements by Captain Kennedy and Warden Farsi as evidence of their complicity in the retaliatory action, implying either that they directly ordered the retaliation, or at least were aware of it and failed to act as C.O. Bennett committed the constitutional violation. With respect to Captain Kennedy, plaintiff alleges in his complaint that Captain Kennedy told him "things happen, this is our house" after the incident. Am. Compl. ¶ 19. During his deposition, plaintiff further argued that "[Captain Kennedy] is a supervisor, he had-has to know everything that's going on," and reasoned it was "possible" that Captain Kennedy ordered the retaliation. Pl.'s Dep. at 134. As for Warden Farsi, plaintiff states that C.O. Bennett told plaintiff that Warden Farsi had said to C.O. Bennett "this inmate has been bringing too much attention to this jail. Eventually he's going to find out whose house this is." Am. Comp. ¶ 20. At his deposition, plaintiff further stated that "one of his officers is being sued; you would think that this warden would know about it." *Id.* at 163.

Plaintiff's evidence of both defendants personal involvement is minimal, and it is quite possible that plaintiff merely assumes Captain Kennedy's and Warden Farsi's involvement based on their respective positions within the prison. If so, plaintiff's claim against the defendants will ultimately be unsuccessful. *See Colon,* 58 F.3d at 874. When ruling on a summary judgment motion, however, the Court must view the evidence in the light most favorable to the nonmovant. Given the alleged statements as well as the circumstantial evidence, a reasonable jury could believe that the defendants were personally involved in the violation. Moreover, the defendants have not submitted any evidence that Captain Kennedy and Warden Farsi were not involved in the

incident, failing to obtain affidavits from either regarding their alleged involvement. As we have stated before, "[t]he Court is not so sanguine about its ability to identify a plaintiff's false assertions that it will grant summary judgement to defendants who are unwilling to swear that they did not make the incriminating statements alleged." *Allah v. Greiner,* No. 03 Civ. 3789, 2004 WL 1713811, at * 5 (S.D . N.Y. July 29, 2004).

 **\*6** Accordingly, the motion for summary judgment on plaintiff's retaliation claim against Captain Kennedy and Warden Farsi is also denied. If the defendants can present the Court with affidavits or other evidence refuting plaintiff's allegations, the Court will consider another summary judgment motion on these claims.

We caution plaintiff that our denial of defendants' summary judgment motion does not reflect an opinion about the ultimate merits of plaintiff's case. At trial, plaintiff will likely be faced with direct testimony from C.O. Bennett denying any knowledge of plaintiff's lawsuits, and from Captain Kennedy and Warden Farsi denying any personal involvement in the alleged retaliation.[9] A reasonable jury might chose to believe such testimony rather than the primarily circumstantial evidence of retaliation that plaintiff has provided so far. Unlike the present motion, plaintiff's evidence will not be viewed in its most favorable light at trial, and the burden will be on him to prove his case against the defendants. Weighed equally against defendants' evidence, plaintiff's retaliation claim might very well fail.

[9]     Assuming that these defendants are not successful in any renewed motion for summary judgment they might make after submission of the required affidavits.

Whether or not plaintiff will be ultimately be successful in convincing a jury, however, is not for this Court to decide by motion. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998) ("[S]ummary judgment may not be granted simply because the court believes the plaintiff will be unable to meet his or her burden of persuasion at trial."). Based on the current record viewed in the light most favorable to the plaintiff, a reasonable jury could find that the defendants retaliated against him for the filing of lawsuits against Rikers Island corrections officers. Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is denied.

## III. Denial of Access to the Courts

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). Prisoners must have a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* at 825. The active interference of prison officials in the preparation or filing of legal documents may constitute denial of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 350 (1996). However, a prisoner must show an actual injury in order to sustain a claim for denial of access to the courts. *Id.* at 349. Actual injury occurs only when "the loss of [plaintiff's] materials prejudiced his ability to pursue a legal claim." *Santiago v. N.Y.C. Dep't of Corr.,* No. 97 Civ. 9190, 2003 WL 1563773, at \*5 (S.D.N.Y. Mar. 6, 2003); *see also Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Accordingly, to survive summary judgment, plaintiff must introduce evidence to establish that his ability to pursue his criminal and civil cases was hindered by the destruction of his legal papers. *See, e.g., Thomas v. Thomas,* No. 97 Civ. 4541, 2000 WL 307391, at \*3 (S.D.N.Y. Mar. 23, 2000).

### A. The Criminal Case
 **\*7** A prisoner who is represented by counsel on criminal charges suffers no actual injury to his access to the courts if he is able to present his legal claims through his attorney. *See Perez v. Metro. Corr. Ctr. Warden,* 5 F.Supp.2d 208, 211-12 (S.D.N.Y.1998); *Santiago,* 2003 WL 1563773, at \*5; *Shepherd v. Fraisher,* No. 96 Civ. 3283, 1999 WL 713839, at \*5 (S.D.N.Y. Sept. 14, 1999). Despite the loss of plaintiff's personal copies of his criminal papers, plaintiff's was afforded a full opportunity to pursue his criminal defense through his legal representative. Plaintiff's counsel was able to move on plaintiff's behalf and ultimately took plaintiff's case to trial in November of 2003. Pl.'s Dep. at 205. Plaintiff has not alleged that his attorney's ability to present his claims was fundamentally impeded by the loss of plaintiff's copies of the documents, just that it was an "inconvenience" to replace them. Pl.'s Dep. at 120. Accordingly, plaintiff had a reasonably adequate opportunity to present his claim via counsel, and has not established any actual impact on his defense in his criminal case from the destruction of his legal documents. *Perez,* 5 F.Supp.2d at 211.

### B. The Civil Cases

With respect to his civil cases, plaintiff has also failed to establish any actual injury from the destruction of his legal papers. First, both cases were only in their initial stages when plaintiff's legal mail was destroyed. As discussed above, plaintiff's complaints had just been served on defendants on the day of the incident. As such, it is highly unlikely in either case that there were any documents, either from the court or from defendants, that required plaintiff's response or immediate consideration when his legal papers were destroyed. Second, plaintiff was able to replace most of the documents within a relatively short period, and has articulated nothing more than minor delays from the loss of the documents. In case No. 03 Civ. 3989, plaintiff received a favorable settlement, and claims only that the case might have settled earlier if not for the destruction of the documents. Plaintiff's other case alleging assault by a corrections officer, No. 03 Civ. 3979, is still active and awaiting disposition nearly two years after the alleged incident.

The constitutional right of reasonable access to the courts is not violated by "[i]nterferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts." *Jermosen v. Coughlin,* No. 89 Civ. 1866, 1995 WL 144155, at *5 (S.D.N.Y. Mar. 30, 1995). Plaintiff has not established any injury to his legal claims from the destruction of his papers other than the alleged delays. Accordingly, there are no genuine issues of material fact regarding plaintiff's claim of denial of access to the courts, and we grant summary judgment to the defendants on this issue.

IV. Deprivation of Property Without Due Process

A quintessential aspect of due process is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)). However, when the deprivation is based upon the "random and unauthorized" act of a state employee, an adequate post-deprivation remedy is sufficient to satisfy due process. *Parratt v. Taylor,* 451 U.S. 527, 541 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986); *see also Hudson v. Palmer,* 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of procedural requirements of Due Process Clause if a meaningful postdeprivation remedy for the loss is available"); *Hellenic American Neighborhood*

*Action Comm. v. The City of New York,* 101 F.3d 877, 880 (2d Cir.1996). In *Parratt,* the Court recognized the impracticability of providing predeprivation hearings for tortious deprivations of property as "the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.* Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing meaningful, the State satisfies its constitutional obligations by providing the latter." *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984).

**\*8** However, not all unauthorized deprivations of property can be remedied by postdeprivation hearings. The Second Circuit has distinguished between the random and unauthorized acts of low-level state employees and certain unauthorized deprivations caused by high-level state officials. *Dwyer v. Regan,* 777 F.2d 825, 832-33 (2d Cir.1985). Recognizing that high-level policymakers have "final authority over the decision-making process," a high-ranking official's "ability to anticipate the actions that he intended [is] ... fairly attributable to the State itself." *Id.* at 833. As such, the acts of high-ranking officials, even if in violation of state procedures, are not "random and unauthorized" withing the meaning of *Parratt* and *Hudson.* Because the State can reasonably be expected to foresee the actions of its high-ranking senior officials, due process will not be satisfied by postdeprivation remedies for their actions. *Id.*

In the instant case, it is difficult to imagine how the State could have anticipated defendants' actions, or what type of predeprivation hearing the State could have provided plaintiff. Moreover, plaintiff has offered no evidence that the actions was anything other than "random and unauthorized" within the meaning of both *Parratt* and *Hudson.* Even assuming *arguendo* that Captain Kennedy and Warden Farsi were somehow involved in the deprivation, they are not the type of high-level policymakers whose actions are fully attributable to the State. *Mejia v. New York City Dep't of Corr.,* No. 96 Civ 2396, 1999 WL 138306, at *2 (E.D.N .Y. Mar. 5, 1999) (assistant warden and captain named in action do not qualify as policymakers). Accordingly, the availability of postdeprivation remedies is a defense to plaintiff's due process claim.

2005 WL 1026551

It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing by way of state law causes of action for "negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss ." *Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985); *see also Dove v. City of New York,* No. 99 Civ. 3020, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). "[P]laintiff's failure to take advantage of the state [law] does not convert his cause of action into a constitutional due process claim." *Smith,* 901 F.Supp. at 647; *see also Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987) ("[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries.").

Because the deprivation of plaintiff's property was random and unauthorized and plaintiff had access to meaningful postdeprivation remedies, due process was not violated. As such, defendants are entitled to summary judgment on this claim.

V. Plaintiff's Claims Against the City of New York

**\*9** In order to hold a municipality liable as a "person" under section 1983, the plaintiff must "first prove the existence of a municipal policy or custom to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985).

Plaintiff has failed to establish that the alleged constitutional violations were a result of any city policy or practice. Plaintiff's complaint alleges only that the city

"hired unqualified people and failed to adequately train them." Am. Compl. ¶ 25. First, plaintiff has offered no evidence to show that the City of New York has a policy of hiring unqualified individuals, nor has he identified any specific deficiencies in its supervision or training of its corrections officers. *See Board of the County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 409-10 (1997) (liability may attach if "violation of federal rights may be a highly predictable consequence of a [municipality's] failure [to train officers] ... to handle recurring situations"). Second, such a theory can only be the basis of section 1983 liability if the municipality's deficient conduct was the cause of plaintiff's injury. *See Morrissey v. City of New York,* 963 F.Supp. 270, 273-74 (S.D.N.Y.1997). As plaintiff has not established that any "identified deficiency in a city's [training or hiring] program" caused the his injury, *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989), we grant the defendants' motion for summary judgment on all of plaintiff's claim against the City of New York.

CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is denied with respect to the plaintiff's First Amendment retaliation claim against C.O. Bennett, Captain Kennedy, and Warden Farsi, and granted with respect to the other claims against the individual defendants, and granted with respect to all claims against the City of New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1026551

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 62 of 203

2009 WL 874439
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Julio Isley SMITH, Petitioner,
v.
Janet MAYPES–RHYNDERS, et al., Respondent.

No. 07 Civ. 11241(PAC)(MHD).
|
March 31, 2009.

West KeySummary

**1**    **Constitutional Law**
         Retaliation

**Prisons**
         Disposition of Seized Material

**Prisons**
         Punitive, Disciplinary, or Administrative
Confinement

**Prisons**
         Law Books, Law Libraries, and Legal
Materials

**Prisons**
         Wrongful Proceedings Against Prisoners;
False Misconduct Reports

A prisoner sufficiently demonstrated a causal
connection between the adverse actions he
was subjected to in response to engaging in
a protected activity, as required to support
a First Amendment retaliation claim against
prison officers and a deputy superintendent.
The prisoner alleged that he was subjected to
false disciplinary charges, which resulted in
a one-year term in special housing unit, the
wanton destruction of his personal property,
and the stealing of his legal and personal
papers, by the prison officers and the
deputy in response to exercising his right to
complain about staff misconduct. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.

Cases that cite this headnote

*ORDER ADOPTING R & R*

Honorable PAUL A. CROTTY, District Judge.

**\*1** *Pro se* Plaintiff Julio Isley Smith, an inmate in
the New York State correctional system, brings this
lawsuit under 42 U.S.C. § 1983 against nine corrections
officers, sergeants, and the Deputy Superintendent of
Green Haven Correctional Facility. He claims that the
Defendants harassed and threatened him, destroyed or
stole his property, and brought groundless disciplinary
charges against him in retaliation for his having
complained about alleged officer misconduct.

Plaintiff first filed a Complaint in this matter on
September 7, 2007, which the Court dismissed, *sua sponte,*
with leave to replead, on December 14, 2007. Plaintiff
filed an Amended Complaint on February 25, 2008, and
the Court referred the case to United States Magistrate
Judge Michael H. Dolinger for general pretrial matters.
On August 8, Defendants moved to dismiss the Amended
Complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure. Magistrate Judge Dolinger issued
a Report and Recommendation ("R & R") on March
11, 2009, recommending that the Defendants' motion be
granted as to some of the individual defendants and denied
as to the others.

The R & R provided ten days for written objections,
pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of
the Federal Rules of Civil Procedure. The R & R
specifically advised that "[f]ailure to file timely objections
may constitute a waiver of those objections both in the
District Court and on later appeal to the United States
Court of Appeals." (R & R 22.) No objections have been
filed.

*DISCUSSION*

"To accept the report and recommendation of a
magistrate, to which no timely objection has been made, a
district court need only satisfy itself that there is no clear
error on the face of the record." *Wilds v. United Parcel
Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). Upon
review and analysis, the Court finds no clear error and

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 63 of 203
Smith v. Maypes-Rhynders, Not Reported in F.Supp.2d (2009)
2009 WL 874439

agrees with Magistrate Judge Dolinger's determinations that:

1) Plaintiff has stated a claim for retaliation against Officers Rapalee, MacIssaac, Fredricks, Lawfer, Melious, and Weckesser, and Deputy Superintendent Cunningham, because Plaintiff alleges that they took adverse action against him by filing false disciplinary charges and telling other inmates that he was a child molester.

2) Plaintiff has failed to state a claim against Officers Maypes–Rhynders and Sergeants Montegari and Hillman because Plaintiff fails to allege that they took adverse actions against him with the necessary retaliatory intent.

3) Plaintiff adequately pleads a deprivation of his due process rights by Defendants Melious, Lawfer, and Cunningham because Plaintiff alleges that Cunningham, the hearing officer at his disciplinary hearing, was biased, and that Melious and Lawfer filed the allegedly false charges.

4) Plaintiff has properly alleged a claim against Defendants Melious and Lawfer for denial of access to the courts because he claims that they wrongfully took his legal papers, which allegedly resulted in Plaintiff losing a lawsuit.

**\*2** 5) A ruling on Defendants' immunity defense is premature based only on the pleadings.

Accordingly, the Court accepts and adopts the Report and Recommendation as its opinion. The Defendants' motion to dismiss is GRANTED with respect to Officer Maypes–Rhynders and Sergeant Montegari and Hillman, and DENIED with respect to all other Defendants. The order of reference to Magistrate Judge Dolinger is continual.

SO ORDERED.

## REPORT & RECOMMENDATION

MICHAEL H. DOLINGER, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

*Pro Se* Plaintiff Julio Isley SMITH Is an Inmate in the New York State correctional system. He commenced this lawsuit under 42 U.S.C. § 1983 against nine corrections officers and sergeants and the Deputy Superintendent at Green Haven Correctional Facility ("Green Haven"), contending principally that the defendants had engaged in a course of harassment directed against him in retaliation for his having complained about staff misconduct. In substance he alleges that various of the defendants made oral threats, destroyed or stole his property (including legal papers), and successfully pursued a baseless disciplinary proceeding against him. He seeks damages and injunctive relief.

Following the filing and service of an amended complaint, defendants have moved to dismiss the newest pleading. For the reasons that follow, we recommend that the motion be granted in part and denied in part.

## BACKGROUND

### A. The Allegations

Plaintiff's original complaint was received by the *Pro Se* Clerk on September 7, 2007 and dismissed by the court *sua sponte* three months later, with leave to file a more detailed amended complaint. (Order dated Dec. 14, 2007). Plaintiff filed his amended complaint on February 25, 2008 and eventually served it on the defendants. They in turn moved to dismiss.

The amended complaint names as defendants Officers Janet Maypes–Rhynders, Aaron D. Rapelee, Jeffrey W. MacIssaac, Chris A. Fredricks, Charles Lawfer, Daniel Melious, and James G. Weckesser; Sgts. Alfred P. Montegari and James I. Hillman; and Deputy Superintendent Robert Cunningham. The pleading alleges in fairly non-specific terms that, in retaliation for complaints that plaintiff had made about various Department of Correctional Services ("DOCS") staff members—including many of the defendants—a number of these officers and sergeants at one time or another have approached plaintiff and either threatened him or engaged in verbal abuse (Am.Compl.("Compl.")¶¶ 14, 18, 21–25), and that several of them have told other inmates that plaintiff was a child molester, thereby endangering his safety. (Compl.¶¶ 15, 17, 26, 27). He also asserts that at one point several defendants seized some of his legal papers and "trashed" his property during a retaliatory cell search (Compl.¶ 28), that someone—he

infers it was one or more of the defendants—stole some memoirs that he was writing (Compl.¶ 19), that one defendant destroyed a typewriter that he owned and a second one deliberately "flooded out" other property belonging to plaintiff (Compl.¶ 16–17), and that at a later time the corrections officer who had destroyed plaintiff's typewriter also destroyed his legal files as he returned from a court appearance. (Compl.¶ 30). In addition, plaintiff insists that two of the defendants filed baseless disciplinary charges against him that triggered a Tier III disciplinary hearing by a biased hearing officer, who convicted him on unspecified charges and imposed a 365–day term in the Special Housing Unit ("SHU") with other unspecified sanctions. (Compl.¶ 29).

**\*3** Based on these allegations, the complaint defines two claims. One is for retaliation. Plaintiff claims that the defendants were retaliating against him for his having filed a complaint with the DOCS Inspector General when he was incarcerated at the Great Meadow Correctional Facility and for additional grievances that he allegedly submitted, or attempted to submit, through the prison grievance system at Green Haven, as well as for oral complaints that he made about the conduct of staff members. (Compl.¶¶ 31–32). The other claim is, in substance, for denial of liberty and property without due process, apparently premised on the disciplinary sanctions imposed on him. (Compl.¶ 33).

### B. *Defendants' Motion*
Defendants seek dismissal, contending that plaintiff fails to state a claim for retaliation or due process. Alternatively, they argue that they are entitled to dismissal on the basis of a qualified-immunity defense. Plaintiff has filed a memorandum opposing the motion.

### *ANALYSIS*

#### A. *Rule 12(b)(6) Criteria*
We start by noting the standards that the movant must meet in order to obtain dismissal for failure to state a claim. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *accord, e.g., Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007); *Patane v. Clark,* 508 F.2d 106, 111 (2d Cir.2007).

In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. *See, e.g., Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006); *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996). Moreover, when the complaint has been authored, as here, by an untutored *pro se* plaintiff, the court is to interpret the pleading with particularly heightened solicitude, reading it "to raise the strongest arguments it suggests." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007); *see, e.g., Hughes v. Rowe,* 449 U.S. 5, 9–10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam); *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). In this regard, the court may treat the *pro se* plaintiff's response to the dismissal motion as a *de facto* amendment to, or clarification of, his complaint. *See, e.g., Hernandez v. Goord,* 312 F.Supp.2d 537, 542–43 (S.D.N.Y.2004) (citing, *inter alia, Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987)); *accord, Warren v. District of Columbia,* 353 F.3d 36, 37–38 (D.C.Cir.2004) (*citing Anyanwutaku v. Moore,* 151 F.3d 1053, 1058 (D.C.Cir.1998)).

Unlike the traditional test on a Rule 12(b)(6) motion, which required that the complaint not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Still,* 101 F.3d at 891 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), under *Twombly* a purported claim will not survive unless it is apparent from the face of the complaint that the claim is at least "plausible." *Twombly,* 550 U.S. at 559; *see also Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007), *cert. granted,* ––– U.S. ––––, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2008). *Twombly* does not impose "a universal standard of heightened fact pleading, but ... instead requir[es] a flexible 'plausibility standard', which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal,* 490 F.3d at 157–58 (emphasis in original). In short, the pleading must "raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 555).[1]

2009 WL 874439

1    The Second Circuit has not yet addressed the impact of *Twombly* on the assessment of pleadings by *pro se* litigants. We assume, however, that the plausibility test is applicable, but that the court's interpretation of what is said in the pleading must still accord with the flexible standard previously recognized when confronting a *pro se* pleading.

**\*4**  In addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by any party. Rather, it is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); *ATSI Commc'ns,* 493 F.3d at 98; *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999).

**B.** *Assessment of Defendants' 12(b)(6) Arguments*

In defendants' initial papers, they separately challenge the adequacy of plaintiff's retaliation and due-process claims, and in their reply they also argue that plaintiff does not state a claim for denial of access to the courts, a claim first explicitly identified as such in plaintiff's opposing papers. Finally, they argue that they are entitled to invoke a qualified-immunity defense at the pleading stage, based solely on the allegations of the complaint. We address these arguments in that order.

**1.** *Retaliation*

To state a claim for First Amendment retaliation, an inmate must allege (1) that he engaged in speech or conduct that was protected by the First Amendment, (2) that he suffered an adverse action by the defendant, and (3) "that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). There is no serious question that, for pleading purposes, plaintiff alleges protected activity, whether in the form of a complaint to the Inspector General or by the filing of internal grievances. *See, e .g., Pidlypchak,* 389 F.3d at 381, 383–84 (treating the filing of prison grievances as protected First Amendment activity). Defendants seem to question whether plaintiff has alleged that he was subjected to adverse actions, and they argue most vociferously that he fails to plead a causal connection between the protected activity and any adverse actions. We disagree except with respect to three of the defendants.

Although the Second Circuit has defined "adverse action" somewhat differently in prison and non-prison contexts, when an inmate asserts such a claim he must plead and prove that he was subjected to retaliatory actions "that would deter a similarly situated individual of ordinary firmness from exercising. constitutional rights." *Id.* at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). He may do so by alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation. *See id.* at 380–84.[2] Moreover, the question of whether a given action is sufficiently adverse to deter someone of " 'ordinary firmness' from exercising his rights" is a question of fact. *See, e.g., Espinal,* 554 F.3d at 227–28.

2    In *Pidlypchak* the Second Circuit declined to decide the precise contours of the "adverse action" requirement, but reaffirmed that it was solely an objective test and that it could be satisfied by a showing of injury independent of First Amendment chill. *Pidlypchak,* 389 F.3d at 381–84. The Court also expressed some apparent skepticism that a First Amendment chill showing could be precluded by virtue of the fact that the plaintiff had filed the lawsuit in which he asserted a retaliation claim. *See id.* at 381.

**\*5**  Plaintiff alleges a number of actions by some of the defendants that are, for pleading purposes, sufficient to satisfy the "adverse action" requirement. Most notably, he alleges the filing of assertedly false disciplinary charges, resulting in a one-year term in SHU and other sanctions. This plainly satisfies the "adverse action" requirement. *See Pidlypchak,* 389 F.3d at 384 (finding disciplinary conviction and three weeks of keeplock suffices). Moreover, plaintiff alleges the wonton destruction of his personal property as well as the stealing of his legal and personal papers, both of which should suffice, at least for pleading purposes, to establish injuries that are independent of a First Amendment chill, and could be found—depending on the circumstances—sufficiently serious to deter an inmate "of ordinary firmness" from exercising his right to complain about staff misconduct. In addition, plaintiff alleges at least one instance of a direct threat of physical harm by a prison officer (Compl.¶ 22), and further asserts in his

2009 WL 874439

motion papers that, as a result of his experiences at Green Haven, he has since been deterred from pressing charges against one of the defendants, now that he and that defendant are at the Attica Correctional Facility. (Pl.'s Mem. ¶ 18). Again, depending on the circumstances, this set of allegations, if proven, could suffice to demonstrate an objective chill, thus meeting the "adverse action" requirement.

One additional form of conduct alleged by plaintiff also appears to come at least arguably within the scope of adverse actions of sufficient moment to qualify as injurious independent of a First Amendment chill. Plaintiff alleges that a number of the defendants on various occasions indicated to other inmates that he was a child molester, a characterization that plaintiff claims endangered his physical safety in the prison and caused him severe psychological harm. (Compl.¶¶ 15, 17, 26, 27, 31–32). If we assume the truth of these allegations—as we must on this motion—together with plaintiff's further allegation that as a result of the entire range of defendants' activities he has suffered severe psychological injury, they are also sufficient to meet the pleading requirement for articulating an adverse action.[3]

[3]      To the extent that plaintiff may rely on his allegations that some of the defendants orally threatened him, we do not view these assertions as in of themselves sufficient to satisfy the pleading requirement for adverse actions.

The principal thrust of defendants' challenge to the retaliation claim as a whole is their assertion that plaintiff does not plead a causal connection between the protected activity and the adverse actions. This argument does not withstand scrutiny.

Plaintiff's original complaint was dismissed in part because he failed adequately to plead such a causal connection. The dismissal order focused on the fact that the pleading had cited, as plaintiff's protected activity, his filing of a complaint with the DOCS Inspector General while he was at the Great Meadow Correctional Facility and that it nonetheless did not allege any basis for inferring that any of the defendants—all of whom were employed at Green Haven—knew of the plaintiff's filing. The Order then directed that he fill that gap, among others. (Order dated Dec. 14, 2007 at 2–3).

*6 In the amended complaint, plaintiff does not refer to the Inspector General complaint until nearly the end of the document (Compl.¶ 31), and does not offer any factual allegations suggesting that any of the defendants had been aware of it when they engaged in the arguably adverse actions, although in his response to defendants' motion he asserts that "calls were made" from Great Meadow to Green Haven, warning of his transfer and proclivity for filing complaints. (Pl.'s Mem. ¶ 15). Instead, in the amended complaint he alleges that he filed or attempted to file a number of grievances at Green Haven against some of the defendants and also made oral complaints about some of them, and he suggests, both in the pleading and in his motion papers, that the defendant corrections officers and other DOCS staff members (including the Deputy Superintendent of Green Haven) were aware of his grievances and other complaints to senior staff as well as of his keeping a "log" of events at the prison and a list of officers with whom he had had problems, and that some of the defendants explicitly told him that they were retaliating for such activity or were planning to do so. (See, e.g., Compl. ¶¶ 14, 16, 18–19, 22–23, 27–28, 30; Pl.'s Mem. ¶¶ 8, 18–19).

These allegations, which refer to all but three defendants[4], plainly suffice to plead a causal connection between the protected activities and the adverse actions. If an inmate names a corrections officer in a grievance or makes an oral complaint about that officer to a supervisor, it is reasonable to infer that the officer in question will learn of that fact. Moreover, it also plausible to suggest that if an inmate files grievances against a number of officers, other prison staff at that level will also learn of plaintiff's activities. Furthermore, if, as plaintiff alleges, he was keeping a log (or memoir) apparently recounting the events that were giving rise to his complaints and keeping a list of disfavored corrections officers, and one or more prison staff members learned of that fact (see Compl. ¶¶ 19–20, 28), it is plausible to infer that other staffers would eventually hear about that as well.

[4]      The exceptions are Officer Maypes–Rhynders and Sergeants Montegari and Hillman.

In sum, plaintiff adequately pleads a claim for retaliation against some of the defendants. Based on the allegations in the complaint and the further elaboration in the plaintiff's motion papers, these include Officers Rapelee, MacIssaac, Fredricks, Lawfer, Melious, and Weckesser, and Deputy

Superintendent Cunningham, all of whom are alleged to have undertaken arguably adverse actions against plaintiff in circumstances from which it could be inferred that they acted with retaliatory intent. By the same token, plaintiff does not state a retaliation claim against defendants Officer Maypes–Rhynders and Sergeants Montegari and Hillman, since he does not allege that they undertook such adverse actions in circumstances suggesting the necessary retaliatory intent.

### 2. *Due Process*

**\*7** Plaintiff's due-process claim is predicated on his allegations that defendants Melious and Lawfer filed false misconduct charges against him, which led to a hearing before defendant Cunningham, who found him guilty and punished him severely while freely admitting that he had prejudged the case and determined plaintiff's guilt before the hearing had even begun. (Compl.¶ 29). Although defendants argue that these allegations do not state a claim, we disagree.

Defendants are correct in noting that the filing of false charges does not itself amount to a due-process violation. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *reh. en banc denied,* 826 F.2d 194 (2d Cir.1987). [5] If, however, these false charges trigger a hearing that is deficient under due-process standards, then the person who filed the charges may be held liable for their consequences. *See, e.g., Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995); *Freeman,* 808 F.2d at 951–52.

[5] As noted, the filing of false charges in retaliation for the exercise of First Amendment rights may give rise to a First Amendment claim. *See Pidlypchak,* 389 F.3d at 384; *see also Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

In this case plaintiff alleges that the hearing officer, defendant Cunningham, was biased, and indeed, he asserts that Cunningham admitted at the hearing that he had prejudged the case, possibly for retaliatory reasons. Although an inmate has only limited constitutionally-protected procedural rights in a disciplinary hearing, having his case heard by an unbiased decision-maker is one of them. *See, e.g., Edwards v. Balisok,* 520 U.S. 641, 647, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997); *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004); *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990). Plaintiff adequately pleads such bias and

its consequences, including a lengthy term in punitive isolation. Accordingly, he states a due-process claim against defendants Melious, Lawfer, and Cunningham. [6]

[6] Defendants do not press any other argument against the legal viability of the due-process claim.

### 3. *Denial of Access to the Courts*

Although the complaint does not explicitly articulate a claim for denial of access to the courts, it does allege the seizure and destruction of legal papers. In plaintiff's motion papers, however, he further alleges that as a result of being deprived of those documents, he lost a lawsuit in the New York Court of Claims. (Pl.'s Mem. ¶ 6).

Defendants argue that plaintiff fails to plead a claim. They assert (1) that he does not adequately allege that the seizure of his papers resulted in the loss of a meritorious lawsuit, (2) that in any event the seizure of his papers resulted only in a delay in his having access to them, and (3) that this event was not part of a pattern of such interference, thus precluding plaintiff from being able to demonstrate a violation of his constitutional rights. (Defs .' Reply Mem. 2–3).

This argument fails at several levels. To state a claim for denial of access to the courts, "the plaintiff must allege that the defendant 'took or was responsible for actions "that hindered [a plaintiff's] efforts to pursue a legal claim." ' " *Davis,* 320 F.3d at 351 (quoting *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (citing *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996))). As summarized in a decision cited by defendants and quoted by the Second Circuit in *Davis,* "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious claim." *Cancel v. Goord,* 2001 WL 303713, at \*4 (S.D.N.Y. Mar.29, 2001). Plaintiff has met that pleading test, as he asserts that defendants Melious and Lawfer "confiscated plaintiff[']s legal papers and due to the fact that they had not returned them in a reasonable fashion plaintiff lost a case in the court of claims due to not presenting a prima facie case ...." (Pl.'s Mem. ¶ 6). Although not artfully worded, this allegation can fairly be read to say that but for the loss of the papers, he would have prevailed in his lawsuit. Nothing more is required under Rule 8(a).

**\*8** Second, although plaintiff appears to imply that these particular papers may have been eventually returned to him, the fair implication is that they were not provided to him at a time when he needed them, and that as a result of this delay he lost the case. Again, Rule 8 does not require a more detailed pleading, especially from a *pro se* plaintiff.

Third, a claim for denial of access to the courts does not require an allegation (or proof) that the defendants engaged in an extended pattern of interference. Depending on the nature of the interference, one act may be serious enough to have imposed the required injurious consequence. *See, e.g., Key v. Artuz,* 1995 WL 542466, at \*1–2 (S.D.N.Y. Sept.13, 1995).

In arguing that a pattern is required (Defs.' Reply Mem. 2–3), defendants confuse two different, if potentially related, claims, and also misstate the test for both. They cite the *Cancel* decision, in which the court observed that, in asserting a claim for interference with legal mail coming into the prison, the inmate must demonstrate that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Cancel,* 2001 WL 303713, at \*6. That is, in part, true as a statement of what plaintiff usually must prove on a mail-interference claim, but that is not the claim being asserted here by Smith. Rather, he is alleging an interference with court access based on the deliberate detention and/or destruction of legal papers that were already in his possession. As the Second Circuit made clear in Davis, these are two separate claims, even though a denial-of-access claim may be premised on a prison's interference with inmate mail, and they have different elements. *See Davis,* 320 F.3d at 351. Indeed, *Cancel* made the same distinction, compare 2001 WL 303713, at \*4–5 (addressing claims of interference with court access) *with id .* at \*6–7 (addressing claim of withholding of incoming legal mail), and the quotation that defendants invoke came from the discussion of the mail-interference claim, not the court-access claim.[7] Defendants cite no legal authority, and we are aware of none, that requires pleading and proof of repeated instances of interference with access to the courts.

asserting a mail-interference claim, it is not clear that a single incident, if sufficiently egregious, would not suffice. *See Davis,* 320 F.3d at 351 ("[A]n isolated incident of mail tampering is *usually* insufficient to establish a constitutional violation.") (emphasis added). Moreover, even if a multiple-episode requirement were applied to claims of seizing or destroying legal documents already in an inmate's possession, plaintiff would seem to have met that requirement with his allegation of two blatant instances of such interference. (Compl.¶¶ 28, 30); *see Davis,* 320 F.3d at 351 ("In *Washington* we determined that as few as two incidents of mail tampering could constitute an actionable violation (1) if the incident suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received.") (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)).

In sum, plaintiff states a claim on this set of allegations against defendants Melious and Lawfer.

### 4. *Immunity*

Defendants' remaining argument is that in any event they are entitled to dismissal on the basis of a qualified-immunity defense. This argument, which is cast in entirely conclusory, non-specific terms, is seriously misguided.

An individual defendant sued for damages may invoke a qualified-immunity defense if he can demonstrate that his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the incident. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Blouin v. Spitzer,* 356 F.3d 348, 358 (2d Cir.2004); *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). The defendant will be deemed immune from liability if he can show either (1) that his conduct did not violate the plaintiff's "clearly established rights," or (2) that a reasonable person in the defendant's position could have believed, in view of all of the pertinent circumstances, that his conduct did not violate such a right. *See, e.g., Kerman v. City of New York,* 374 F.3d 93, 108–09 (2d Cir.2004).

**\*9** Typically such a defense rests on an evidentiary showing of what the defendant did and why, *see, e.g., id.* at 109; *Hurlman v. Rice,* 927 F.2d 74, 78 (2d Cir.1991)

---

[7] The mail-interference claim rests upon the right of an inmate to be present when legal mail is opened by the prison authorities. *See Wolff v. McDonnell,* 418 U.S. 539, 574–76, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Even if plaintiff were

Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 69 of 203
Smith v. Maypes-Rhynders, Not Reported in F.Supp.2d (2009)
2009 WL 874439

(finding that the second prong of the qualified immunity analysis "has its principal focus on the particular facts of the case"), although there may be circumstances in which an immunity defense will be upheld based solely on the pleadings. That would be the case if the defendant's conduct, as alleged by the plaintiff in his complaint, did not transgress a "clearly established statutory or constitutional right," or if the circumstances of the conduct, as alleged in the complaint, indisputably demonstrate that a reasonable state actor in the position of the defendant could have believed that his conduct was lawful. *See, e.g., Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1998); *Liffiton v. Keuker,* 850 F.2d 73, 76 (2d Cir.1988).

In this case, defendants' immunity argument consists of two assertions, which we quote in full—that "plaintiff has not pled a constitutional violation" and that "[i]n any event, there was no controlling authority that would have put defendants on notice that the actions alleged in the complaint were violations of plaintiff's constitutional rights." (Defs.' Mem. 6). These assertions are meritless.

The first argument is simply a repeat of defendants' insistence that the complaint fails to state a claim. To the extent that we have rejected that argument in large measure, its repetition in the guise of an immunity defense does not change the result.

The second argument fares no better. As our legal citations underscore, there is ample controlling precedent for the principles that an inmate has a right to be free from injurious retaliation for the exercise of his First Amendment rights, that he has a right not to be convicted and punished on disciplinary charges based on the findings of a biased decision-maker, and that he has a right to access to the courts which may not be subjected to deliberate, unreasonable, and prejudicial interference by prison personnel.

Whether there is any factual basis for plaintiff's claims and, even if so, whether the circumstances of the alleged violations by defendants were such as to have led reasonable prison employees in defendants' situation to believe that their actions were not in violation of plaintiff's constitutional rights are matters that must be the subject of evidentiary presentations. An immunity defense cannot succeed in this case based solely on the pleadings.

*CONCLUSION*

For the reasons stated, we recommend that the defendants' motion to dismiss be granted with respect to defendants Officer Maypes–Rhynders and Sergeants Montegari and Hillman and otherwise denied.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Paul A. Crotty, Room 735, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Thomas v. Arn,* 470 U.S. 140, 150–52 (1983); *DeLeon v. Strack,* 234 F.3d 84, 86 (2d Cir.2000) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989)).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 874439

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 70 of 203
Guillory v. Haywood, Not Reported in F.Supp.3d (2015)
2015 WL 268933

2015 WL 268933
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,
v.
Nancy HAYWOOD; Maureen Boll; Timothy
Maher; Michael Graziano; J. Dobbs; Potter; Sgt.
Donovan; and Goppert, Captain, Defendants.

No. 9:13–cv–01564 (MAD/TWD).
|
Signed Jan. 21, 2015.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York, State Attorney General, Albany
Office, Laura A. Sprague, AAG, of Counsel, Albany, NY,
for Defendants.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Kevin M. Hayden, Esq., of Counsel,
Albany NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

*1 Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision, commenced this action *pro se* under 42
U.S.C. § 1983. *See* Dkt. No. 24. Upon initial review,
Plaintiff's complaint was liberally construed to assert the
following causes of action: (1) denial of access to the courts
in violation of the First Amendment and in retaliation
for his litigation and complaints; (2) interference with
Plaintiff's outgoing legal mail in violation of the First
Amendment and in retaliation for his litigation and
complaints; (3) search of his cell and confiscation of his
property in retaliation for his litigation and complaints;
and (4) denial of equal protection in violation of the
Fourteenth Amendment. *See* Dkt. No. 11 at 6. The Court
dismissed Plaintiff's claims for money damages brought
against Defendants in their official capacities and also
dismissed Plaintiff's equal protection claim as conclusory.

*See id.* Thereafter, Plaintiff was granted leave to amend
his complaint to substitute Defendants Donovan and
Goppert for Defendants John Doe Number 1 and John
Doe Number 2. *See* Dkt. No. 23.

On April 30, 2014, Defendants filed a motion to dismiss.
*See* Dkt. No. 37. In a December 11, 2014 Order
and Report–Recommendation, Magistrate Judge Dancks
recommended that the Court grant in part and deny in
part Defendants' motion. *See* Dkt. No. 48. Specifically,
Magistrate Judge Dancks recommended that the Court
dismiss the following claims: (1) First Amendment denial
of access to courts, interference with legal mail, improper
opening of legal mail, and retaliation claims against
Defendants Maher, Dobbs, and Goppert for failure to
exhaust; (2) First Amendment denial of access to courts
claim against Defendants Potter and Graziano for failure
to state a claim; (3) First Amendment retaliation claim
against Defendant Potter arising out of the destruction
of the microwave oven in Plaintiff's housing unit; (4)
First Amendment claim for retaliation against Defendant
Graziano for failure to state a claim; (5) supervisory
liability claim against Defendant Graziano for failure
to state a claim; (6) supervisory liability claims against
Defendant Haywood for failure to state a claim; (7)
supervisory liability claims against Defendant Boll for
generally failing to remedy wrongs, creating and allowing
to continue customs and policies under which under which
constitutional practices occur, and failure to supervise
and monitor subordinates for failure to state a claim;
(8) supervisory liability claim against Defendant Boll in
connection with Plaintiff's denial of access to court claims
against Defendants Potter and Graziano relating to the
May 6, 2013, law library incident for failure to state a
claim; (9) supervisory liability claim against Defendant
Boll with regard to Plaintiff's denial of access to court,
interference with legal mail, and improper opening of
legal mail claims against Defendants Maher, Dobbs,
and Goppert in connection with the amended complaint
withheld from mailing to the court, for failure to state
a claim; and (10) retaliation claims against Defendants
Haywood and Boll for failure to state a claim. *See* Dkt.
No. 48 at 42–43. Further, the report recommended that
the Court deny Defendants' motion as to the following
claims: (1) Plaintiff's retaliation claim against Defendant
Potter arising out of the May 6, 2013, law library
incident; (2) Plaintiff's retaliation claim against Defendant
Donovan with regard to taking Plaintiff's legal papers
and kosher food; and (3) Plaintiff's supervisory liability

claim against Defendant Boll with regard to Plaintiff's retaliation claim against Defendant Potter regarding the May 6, 2013, law library incident. *See id.* Finally, Magistrate Judge Dancks recommended that the Court grant Plaintiff leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust his administrative remedies. *See id.* Neither party objected to the Order and Report–Recommendation. [1]

[1]    On January 9, 2015, the Court received a submission entitled "Plaintiff's Letter Motion to Correct the Record and Response to Magistrate Judge Dancks' December 11, 2014 Report and Recommendation ." Dkt. No. 49. In the submission, Plaintiff states that he is "not filing any objections to [the Order and Report–Recommendation]," but then states that he finds it necessary to "clarify a few facts in the interest of justice." *Id.* at 2–3. The Court has reviewed this document and has taken into consideration the clarifications that Plaintiff has provided.

**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human*

*Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure). *See* Dkt. No. 42.

When considering a Rule 12(b)(6) motion, the court accepts the material facts alleged in the complaint as true, drawing all inferences in favor of the non-moving party. *See, e.g., Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003) (citing *Patel v. Contemporary Classics of Beverley Hills,* 259 F.3d 123, 126 (2d Cir.2001)). The court is not bound, however, to accept as true legal conclusions with the appearance of factual statements. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The moving party has the heavy burden of showing that the plaintiff is not "entitled to offer evidence in support [his] claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). Thus, the court should only dismiss a 12(b) (6) motion where the plaintiff provides no "plausible" basis to support his claims. *See Twombly,* 550 U.S. at 556–57. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

**\*3** When a party proceeds *pro se,* the court must liberally construe his pleadings, holding them to a standard less stringent than formal pleadings drafted by lawyers. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). If a *pro se* plaintiff's complaint alleges civil rights violations, the court must construe his pleadings with "particular generosity." *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). Further, when a *pro se* plaintiff faces a motion to dismiss, the court may consider "materials outside the complaint to the extent they are consistent with the allegations in the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004).

Having reviewed the thorough and well-reasoned Order and Report–Recommendation and the parties submissions, the Court finds that Magistrate Judge

Dancks correctly determined that the Court should grant in part and deny in part Defendants' motion to dismiss the amended complaint. Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Dancks' Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 37) is **GRANTED in part and DENIED in part** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

Plaintiff, Patrick Guillory, an inmate presently confined in Clinton Correctional Facility ("Clinton"), has commenced this *pro se* action civil rights action under 42 U.S.C. § 1983 against Defendants Nancy Haywood ("Haywood"), an attorney in the Department of Corrections and Community Supervision ("DOCCS"); Maureen Boll ("Boll"), DOCCS Deputy Commissioner and Counsel; Timothy Maher ("Maher"), Deputy Superintendent of Programs at Greene Correctional Facility ("Greene"); Michael Graziano ("Graziano"), Deputy Superintendent of Administration at Greene; J. Dobbs ("Dobbs"), a corrections counselor at Greene; Rowland Potter ("Potter"), incorrectly sued as "Roland Potter," a corrections officer at Greene; Sergeant Donovan ("Donovan"), a corrections sergeant at Greene; and Captain Goppert ("Goppert"), a corrections captain at Greene. (Dkt. No. 24.)

Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Amended Complaint (Dkt. No. 24) for failure to state a claim, failure to exhaust, and on the grounds that two of Plaintiff's retaliation claims are duplicative of a claim pending in a separate action. (Dkt.Nos.37, 37–5.) Plaintiff has opposed Defendants' motion (Dkt. No. 41), and Defendants have filed a reply (Dkt. No. 42.) For reasons

explained below, the Court recommends that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND [1]

[1]    The Background is taken from the allegations in Plaintiff's Amended Complaint, along with documents the Court may properly consider on a Rule 12(b)(6) motion to dismiss.

### A. May 6, 2013, Library Call–Out

 ***4** On May 6, 2013, Plaintiff's name was on the law library call-out list for 1:00 p.m. (Dkt. No. 24 at ¶¶ 6–7.) Plaintiff had signed up for copying and notary service so that he could comply with the mailbox rule with regard to a May 7, 2013, court imposed deadline for filing a supplemental brief in an Article 78 proceeding entitled *Guillory v. Fischer,* Case No. 516282, that had been transferred to the New York State Supreme Court, Appellate Division Third Department ("Third Department"). [2] *Id.* at ¶¶ 6, 9, 21 and p. 39.

[2]    The sole respondent in the Article 78 proceeding was former DOCCS Commissioner, Brian Fischer. *See Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196 (3d Dep't 2013); *see also* Dkt. No. 37–4.

At approximately 12:05 pm on May 6th, Defendant Potter sent Plaintiff to the package room to pick up kosher food from his parents, and Plaintiff reported back to his housing unit at 12:35 pm. *Id.* at ¶ 8. At approximately 1:03 pm, the phone in Plaintiff's housing unit rang and Plaintiff heard Potter tell Kim Ann Johnson ("Johnson"), the law library officer, "Guillory is in the package room." *Id.* at ¶ 9. At the time, Plaintiff was standing twenty feet away from Potter and walked up to him and asked if the call was from the law library. *Id.* Potter denied Plaintiff's request for a pass to the law library despite his name being on the library call-out list. *Id.* Potter denied the request even after Plaintiff showed him the filing deadline for the supplemental brief. *Id.*

Defendant Graziano arrived to conduct an inspection of the housing unit to ensure compliance with DOCCS regulations at around 1:20 pm. *Id.* at ¶ 10. When Graziano and Potter passed near Plaintiff's cube, Plaintiff told Graziano that he was on the law library call-out list; that Johnson had called for him to report to the library; that he had a court imposed deadline; and that Potter had refused to permit him to report to the library. *Id.* Potter

2015 WL 268933

stood behind Graziano shaking his fist at Plaintiff while Plaintiff spoke with Graziano. *Id.* at ¶ 11. When Graziano asked Potter if what Plaintiff had told him was true, Potter responded that Plaintiff could go to the law library the next day. *Id.* at ¶ 12. Graziano told Plaintiff he would look into the matter but according to Plaintiff "did nothing but brush [him] off." *Id.* at ¶¶ 12, 17.

Plaintiff claims he missed the court imposed deadline because he was not allowed to go to the law library on May 6, 2013. *Id.* at ¶ 17. He alleges in his Amended Complaint that Potter did not want him to the go to the law library because Plaintiff had a lawsuit pending against him. *Id.*

### B. Refusal to Send Out Plaintiff's Amended Complaint
Pursuant to an April 17, 2013, Order issued by the Hon. Randolph F. Treece, M.J., in *Guillory v. Weber*, No. 9:12–CV–00280 (LEK/RFT) (N.D.N.Y.) ("*Weber*"), Plaintiff was given a deadline of April 30, 2013, to file an amended complaint. (Dkt. No. 24 at ¶ 3 and p. 35.) Plaintiff gave his very large amended complaint to the law library officer on April 25, 2013, so that the officer could type a letter memorandum to the mail room indicating that the amended complaint had to be sent out forthwith. *Id.* at ¶ 4. The letter memorandum was taped to the top of the bulk legal mail and sent to the mail room by the law library officer. *Id.* at ¶ 4.

**\*5** On May 7, 2013, Plaintiff's corrections counselor, Defendant Dobbs, called Plaintiff to his office regarding Defendant Maher's refusal to send out the amended complaint in *Weber* that was supposed to be mailed on April 25, 2013. *Id.* at ¶ 22. Plaintiff learned that the amended complaint had sat in the Greene administrative office from April 25, 2013, to May 7, 2013, despite the court imposed deadline, and that it had been opened and read by the security staff. *Id.* at ¶ 23. Maher gave the opened amended complaint to Dobbs to be returned to Plaintiff when they met on May 7, 2013. *Id.* at ¶¶ 23–24. The amended complaint was never received by the court. *Id.* at ¶ 33.

Plaintiff sent a letter to Maher on May 7, 2013, demanding to know why his legal mail had not been sent out. *Id.* at ¶ 24. Maher responded by letter memorandum of May 8, 2013, informing Plaintiff his legal mail had been under investigation by security staff. *Id.* at ¶ 25 and p. 41. According to Maher, the Business Office had received seven envelopes that were taped shut with

"Legal" stamped on them and an authorized advance request form for $168.40 dated April 25, 2013, with Plaintiff's name and din number. *Id.* at p. 43. There was a second advance request for postage. *Id.* The format of the letter from the law library accompanying the envelopes and authorized advance request forms was different than those previously seen by Maher. *Id.* In addition, the letter was dated Sunday, April 25, 2013, although April 25th was a Thursday, the signature was not legible, and it did not match law library officer Johnson's signature. *Id.*

Maher consulted with Superintendent Brandon Smith who recommended a security investigation. *Id.* The envelopes were forwarded to Defendant Goppert for investigation, and Maher contacted Library Services Central Office and was referred to Counsels Office. *Id.* Goppert returned the envelopes the following day, and they were given to Dobbs to return to Plaintiff. *Id.*

Plaintiff filed a grievance against Maher, Dobbs, and the security staff regarding the opening and destruction of his legal mail. *Id.* at ¶ 41 and pp. 53–59.

### C. Retaliation by Donovan and Potter for Plaintiff's Parent's Complaint Call to Defendant Boll, and Plaintiff's Filing of Grievances Against Potter
The late afternoon of May 9, 2013, Plaintiff's parents called Defendant Boll to report that Plaintiff was being harassed by Potter and that the facility had sat on his legal mail for two weeks, knowing that he had a court imposed deadline. (Dkt. No. 24 at ¶ 28.) The next day, Plaintiff's cell was searched by Corrections Officer J. Manchester on the direct order of Defendant Donovan. *Id.* at ¶ 29. Donovan took half of Plaintiff's kosher food and half of his legal mail. [3] *Id.* Plaintiff later received a contraband slip that said "no contraband found no property damaged." *Id.* Donovan told Plaintiff if he received any complaints about the search and had to come back to Plaintiff's unit, "we will take a trip to the Special Housing Unit ("SHU")." *Id.* Plaintiff has alleged that Donovan took his legal mail and kosher food in retaliation for his parents contacting DOCCS and previous grievances filed against Potter. *Id.*

[3]    In Paragraph 29 of his Amended Complaint, Plaintiff has alleged that Donovan took half of his legal mail and half of his kosher food on May 10, 2013. (Dkt. No. 24. at ¶ 29.) In Paragraph 32, Plaintiff has alleged

that on May 10, 2013, Donovan took all of his legal mail and kosher food. *Id.* at ¶ 32.

**\*6** On May 18, 2013, Potter intentionally destroyed the microwave in Plaintiff's housing unit. *Id.* at ¶ 35. While looking directly at Plaintiff and another inmate whose family had contacted Defendants Boll and Haywood, Potter said: "This is what inmates get when they call DOCCS on me!! Make another phone call and I will destroy the T.V. and Hot–Pot!" *Id.* A few minutes later, Potter called his supervisor and told him that the microwave had slipped out of his hands while he was doing a search. *Id.* at ¶ 36. Shortly thereafter, when he let Plaintiff out to report to the law library, Potter allegedly said "I have not forgot about what you did, you will be out of this jail soon when my buddies set your ass up, you bitch!" *Id.* at ¶ 37.

### D. Boll and Haywood
According to Plaintiff, after his parents called the DOCCS Office of Counsel and spoke to Boll, (Dkt. No. 24 at ¶ 28), Boll "apparently ordered more retaliation which is the custom, policy and procedure of [Boll and Defendant Haywood], resulting in Donovan's theft of his legal papers and kosher food and Potter's destruction of the microwave and threats to destroy the T.V. and hot-pot on May 18, 2013." *Id.* at ¶¶ 29, 35.

Plaintiff filed an Article 78 proceeding against Boll and Acting DOCCS Commissioner Anthony Annucci on or about May 18, 2013, in New York State Supreme Court, Greene County, regarding their refusal to address and investigate the withholding and confiscation and destruction of Plaintiff's legal mail and kosher food simply because his parents had contacted Boll. *Id.* at ¶ 38 and pp. 47–49. In his May 19, 2013, letter memorandum to Boll and Annucci regarding the Article 78 proceeding, Plaintiff accused Boll and Annucci of advising facilities to retaliate against inmates whose parents call DOCCS Office of Counsel to complain. *Id.* at p. 49.

In a July 2, 2013, letter from Boll to Plaintiff in response to his June 11, 2013, correspondence concerning his legal mail being destroyed, Boll informed Plaintiff that a letter written to Office of Counsel does not replace the formal or informal channels of problem resolution at Greene and recommended that Plaintiff use the grievance procedure set forth in DOCCS Directive 4040 for his complaints. *Id.* at pp. 68–69. Boll also informed Plaintiff that the Office

of Counsel had investigated his complaints and found no evidence that his mail was being destroyed or that he had been denied access to the law library. Boll elaborated on the findings of the investigation. *Id.*

Plaintiff contends that DOCCS counsel Defendant Haywood conducted an investigation into the actions of Defendants Dobbs, Maher, and Goppert with regard to Plaintiff missing his court deadline. *Id.* at ¶ 42. According to Plaintiff, Haywood admitted to conducting an investigation regarding his letters to her office and responded in a May 22, 2013, letter memorandum asserting that she would not comment on his concerns. *Id.* at ¶ 56. It is unclear whether Haywood's investigation is the investigation referenced in Boll's July 2, 2013, letter.

**\*7** Plaintiff claims that Boll and Haywood are in the habit of using threats and retaliation to frighten inmates whose parents call the Office of Counsel to report prison staff misconduct. *Id.* at ¶ 67. Plaintiff likens Boll and Haywood to "high ranking gang-bangers who put out hits upon prisoners who piss them off," and claims "these reckless defendants have a 100 man 'hit squad' who can retaliated (sic) in a matter of hours." *Id.*

## II. PROCEDURAL HISTORY
Plaintiff commenced this lawsuit in the United States District Court, Western District of New York on June 6, 2013. (Dkt. No. 1.) The action was transferred to the Northern District of New York by order of the Hon. William M. Skretny, Chief District Court Judge in the Western District of New York, on December 13, 2013. (Dkt. No. 8 .)

Plaintiff's application to proceed *in forma pauperis* was granted on February 10, 2014, by the Hon. Mae A. D'Agostino, D.J. (Dkt. No. 11 at 2.) Upon initial review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's Complaint, liberally construed, was found to have asserted claims for: (1) denial of access to the courts in violation of his First Amendment rights and in retaliation for his litigation and complaints; (2) interference with Plaintiff's outgoing legal mail in violation of his First Amendment rights and in retaliation for his litigation and complaints; (3) search of his cell and confiscation of his property in retaliation for his litigation and complaints; and (4) denial of equal protection in violation of his Fourteenth Amendment rights. *Id.* at 6.

Plaintiff's claims for money damages against the Defendants in their official capacities were dismissed with prejudice on initial review by Judge D'Agostino. *Id.* at 8. Plaintiff's equal protection claim was dismissed without prejudice because the claim was entirely conclusory. *Id.* The remainder of Plaintiff's claims against Defendants in their individual capacities survived initial review and were found to require a response. *Id.* at 9.

Plaintiff thereafter moved for leave to file an amended complaint substituting Defendants Donovan and Goppert for Defendants John Doe Number 1 and John Doe Number 2. (Dkt. Nos. 17; 17–1 at 1.) Plaintiff's motion to amend was granted, and Donovan and Goppert were added as party defendants. (Dkt. No. 23 at 3.) Defendants thereafter filed the motion to dismiss now before the Court for review and recommendation. (Dkt. No. 37.)

### III. LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b) (6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not shown that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*8** A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a) (2) "does not require detailed factual

allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau,* No. 07–CV– 0464, 2008 WL 4693153, at \*6 and n. 41, 2008 U.S. Dist. LEXIS 110029, at \*26–27 and n. 41 (N.D.N.Y. Oct. 22, 2008) [4] (collecting cases); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (where a *pro se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004); *see also Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (in reviewing district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit submitted in opposition to motion to dismiss). The Court has taken judicial notice of papers filed in other litigation involving Plaintiff and has considered

documents in Plaintiff's submissions in opposition to the extent they are consistent with the allegations in Plaintiff's Amended Complaint.

4      The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's note: Copies of unpublished decisions deleted for Westlaw purposes.]

**\*9** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## IV. ANALYSIS

### A. Failure to Exhaust with Regard to Claims Against Defendants Maher, Dobbs, and Goppert

Plaintiff claims that Defendants Maher, Dobbs, and Goppert violated his First, Fifth, Sixth, and Fourteenth Amendment rights by: (1) refusing to send out his amended complaint in *Guillory v. Weber,* thereby denying him access to court; (2) interference with his outgoing legal mail; (3) improperly reading his legal mail; and (4) doing the foregoing in retaliation for grievances and lawsuits filed by him. (Dkt. No. 24 at ¶¶ 48–53, 62.) Defendants seek dismissal of the claims on the grounds that at the time this lawsuit was commenced, Plaintiff had not completed exhaustion of his administrative remedies. (Dkt. No. 37– 5 at 9–10.) Plaintiff asserts that he had exhausted his administrative remedies before commencing the action because the Central Office Review Committee ("CORC") failed to decide his appeal in a timely manner. (Dkt. No. 41 at 12–15.) Plaintiff further asserts that because his grievance had been administratively exhausted by the

time he filed his Amended Complaint, his commencement of the lawsuit prior the exhaustion of his administrative remedies should be excused. *Id.* at 12.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

A plaintiff's failure to exhaust administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, a prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable civil rights claim. *Jones,* 549 U.S. at 211–17. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. [5] *Id.* at 215–16.

5      "If nonexhaustion is clear from the face of the complaint (and incorporated documents) a motion to dismiss pursuant to Rule 12(b) (6) for failure to exhaust should be granted." *Fuentes v. Furco,* No. 13–CV–6846, 2014 WL 4792110, at \*1, 2014 U.S. Dist. LEXIS 136261, at \*2 (S.D.N.Y. Sept.25, 2014) (Nathan, D.J.) (quoting *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

**\*10** In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones,* 549 U.S. at 218 (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. at 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3) (ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford, 548 U.S. at 93.* Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001), overruled on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Here, Plaintiff filed his original Complaint on June 6, 2013. (Dkt. No. 1.) Plaintiff filed his Amended Complaint on March 27, 2014. (Dkt. No. 24.) Papers related to Plaintiff's grievance against Maher, Dobbs, and unnamed security personnel, are annexed as an exhibit to Plaintiff's

Amended Complaint. (Dkt. No. 24, Exh. G. at 53–59.) Plaintiff's Grievance No. GNE–7816–13 naming Maher, Dobbs and security staff involved in holding his legal mail is dated May 20, 2013. *Id.* at 53. The IGRC denied Plaintiff's grievance on June 10, 2013. *Id.* at 55. Plaintiff appealed to the Superintendent on June 11, 2013, *id.,* and the appeal was denied on June 18, 2013. [6] *Id.* at 56. By the time Plaintiff appealed to CORC on June 19, 2013, he had already commenced this action. *Id.* In fact, according to the grievance papers annexed to Plaintiff's Amended Complaint, he commenced this action before the IGRC had denied the grievance. *Id.* at 55. Therefore, the fact that CORC did not decide the appeal until October 16, 2013, *id.* at 57, well beyond the thirty days provided for in § 701.5(d)(3)(ii), does not excuse Plaintiff's failure to exhaust prior to commencement of this action.

6    The Superintendent's determination is erroneously dated June 18, 2014. (Dkt. No. 24 at 56.) It is clear given Plaintiff's June 19, 2013 appeal to CORC that the Superintendent's determination was made on June 18, 2013. *Id.*

**\*11** As noted above, Plaintiff has argued in his opposition that since CORC has now rendered a disposition unfavorable to him, he has properly exhausted. (Dkt. No. 41 at 12.) However, the Second Circuit has held that "[s]ubsequent exhaustion after suit is filed ... is insufficient." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), overruled on other grounds, *Nussle* 534 U.S. at 523. While this may not be the most efficient outcome, as noted in *Mendez v. Artuz:*

> [T]he Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted.

No. 01 CIV. 4157(GEL), 2002 WL 313796, at \*2, 2002 U.S. Dist. LEXIS 3263, at \*4–5 (S.D.N.Y. Feb 27, 2002) (holding that prisoner failed to exhaust administrative

remedies when he commenced civil rights action before receiving decision from CORC) (citing *Neal,* 267 F.3d at 123). Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D.N.Y.2010) (citing *Neal,* 267 F.3d at 122).

Plaintiff's failure to exhaust does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). [7] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, the court should "inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

[7] The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U .S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec.13, 2011). The grievance system was also clearly available to Plaintiff, who was in the process of utilizing the IGP at the time he filed his original Complaint. (Dkt. No. 24 at 53–59.)

**\*12** Second, Defendants are not estopped from asserting this defense, inasmuch as Plaintiff has pleaded no facts indicating Defendants interfered in any way with the grievance process that was ultimately completed. (Dkt. No. 24.)

Third, there are no 'special circumstances' here to excuse Plaintiff's failure to exhaust, because:

> Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." Generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process.

*Ford v. Smith,* No. 9:12 CV 1109 (TJM/TWD), 2014 WL 652933, at *3, 2014 U.S. Dist. LEXIS 20581, at *8–9 (N.D.N.Y. Jan.16, 2014) (citations omitted). While Plaintiff has argued that his administrative remedies were exhausted because his CORC appeal was not decided for four months, that argument does not support a finding of special circumstances, particularly when Plaintiff commenced the action before CORC even received the appeal. Furthermore, although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense. *Id.*

In sum, Plaintiff had not yet exhausted all administrative remedies with regard to his claims against Maher, Dobbs, and Goppert at the time he filed this suit, and the Second Circuit's three-part inquiry reveals no justification for his failure to exhaust. Therefore, the Court recommends that Plaintiff's claims against Defendants' Maher, Dobbs, and Goppert be dismissed without prejudice for failure to exhaust administrative remedies. [8]

[8] In addition to seeking dismissal for failure to exhaust, Goppert asks that the Amended Complaint be dismissed as against him on the grounds that there are no factual allegations suggesting his involvement in the decision to hold or investigate Plaintiff's mail and no involvement by him in denying Plaintiff access to court. (Dkt. No. 37–5 at 20.) The same could be said of Dobbs, who is alleged to have done nothing more than meet with Plaintiff to return his legal mail after the investigation at Maher's direction. Because the Court is recommending dismissal for failure to exhaust, it makes no determination as to whether Plaintiff has stated a claim against Goppert or Dobbs

but does note that in the event Plaintiff amends to reassert his claims against Goppert and Dobbs as they are alleged in the Amended Complaint, the Court will almost certainly recommend dismissal for failure to state a claim.

### B. Plaintiff's First Amendment Claims for Denial of Access to Court Against Defendants Potter and Graziano

Plaintiff claims that Defendants Potter and Graziano, prevented him from mailing a supplemental brief in an Article 78 proceeding transferred to the Third Department in a timely manner by refusing to allow him to go to the law library for necessary copying and notary services. (Dkt. No. 24 at ¶¶ 6, 9, 21 and p. 39.)

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that the defendant acted deliberately and maliciously. *Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011) (Baxter, M.J.). Plaintiff's Amended Complaint, liberally construed, satisfies that requirement.

**\*13** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Rosario v. Fischer,* No. 11 Civ 4171, 2012 WL 4044901, at *7, 2012 U.S. Dist. LEXIS 133502, at *19–20 (S.D.N.Y. Aug.28, 2012) ("To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the

court to determine whether the claim had an arguable basis in either law or fact."). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

The only "actual injury" alleged by Plaintiff as a result of Potter and Graziano's alleged refusal to allow him to go to the law library on May 6, 2013, is that he was unable to file his supplemental brief by the deadline imposed by the Third Department. (Dkt. No. 24 at ¶ 44.) Plaintiff's Amended Complaint includes no description of the claim(s) asserted in the Article 78 proceeding, and includes no facts suggesting that the claim(s) were found on "more than hope." *Christopher,* 536 U.S. at 416. Plaintiff has done nothing more than allege in conclusory fashion that his claim was non-frivolous and that it was frustrated by his inability to mail his supplemental brief in a timely manner. *Id.* A missed deadline, without showing the frustration of a non-frivolous claim as a result, is insufficient to demonstrate actual injury. *See Cisnevas–Garcia v. Shipman,* No. 9:10–CV–179 (FJS/RFT), 2010 WL 5094637, at *1, 2010 U.S. Dist. LEXIS 129657, at *4 (N.D.N.Y. Dec.8, 2010).

In light of the foregoing, the Court recommends that Plaintiff's claims for denial of access to court against Potter and Graziano be dismissed for failure to state a claim. The fact that Plaintiff had already submitted a lengthy legal brief to the Third Department in the Article 78 proceeding (Dkt. No. 39), and the Third Department's confirmation of the DOCCS administrative determination being challenged based upon the evidence in the Article 78 record, *see Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196, render it highly unlikely that given the opportunity to replead Plaintiff will be able to state a denial of access to court claim against Potter and Graziano. Nonetheless, in light of Plaintiff's *pro se* status, the Court recommends that the dismissal be without prejudice, and that Plaintiff be given the opportunity to amend.

### C. Argument for Dismissal of Plaintiff's Law Library Retaliation Claims Against Defendants Potter and Graziano as Duplicative

**\*14** Defendants Potter and Graziano seek dismissal of Plaintiff's retaliation claim arising out of their refusal to allow him to go to the law library on May 6, 2013, on the grounds that the claim is identical to one asserted against

Potter in *Guillory v. Morris, et al.,* 13–CV–0378 (NAM/TWD) (*"Morris"* ), presently pending in the Northern District of New York. (Dkt. No. 37–5.)

On September 4, 2013, this Court issued a Text Order in *Morris* allowing Plaintiff to supplement his complaint with a document entitled "Supplemental Harassment by Correction Officer Potter," which asserted claims against Potter for denial of access to court and retaliation arising out of Potter's refusal to allow Plaintiff to go to the law library on May 6, 2013. (*Morris,* Dkt. No. 6.) Pursuant to the Text Order the supplement was added to Plaintiff's complaint and the supplemented pleading was docketed as an amended complaint." (*Morris,* Dkt. No. 15.)

Plaintiff's supplemental claim against Potter was identified as one for denial of access to court and dismissed without prejudice for failure to state a claim in the September 13, 2013, Decision and Order of the Hon. Norman A. Mordue on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 16.) Plaintiff has not filed an amended complaint since the issuance of that Decision and Order. Defendant Potter's Rule 12(b)(6) motion to dismiss Plaintiff's retaliation claims against him was denied by Judge Mordue based upon the recommendation of this Court. (Dkt.Nos.68, 75.)

It is well-settled that a district court, as "part of its general power to administer its docket," has discretion to "stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In *Colorado River,* the Supreme Court noted that since "[t]he complex problems that can arise from the multiple federal filings do not lend themselves to a rigid test," *id.,* "no precise rule has evolved" that governs the exercise of that discretion. *Colorado River,* 424 U.S. at 817. Rather, a district court must "consider the equities of the situation when exercising its discretion," *Curtis,* 226 F.3d at 138, "giving regard to conservation of judicial resources and comprehensive disposition of litigation ...." *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952).

The Second Circuit has endorsed the principle "that [w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989). The Court finds that at this point in the litigation, there are special circumstances that militate against dismissing the law library retaliation claims against Potter and Graziano in this case on the grounds that there are competing lawsuits.

**\*15** The retaliation claim in *Morris* is asserted only against Potter. Graziano is not a defendant in *Morris* but is already before the Court as a party defendant in this action. Because the retaliation claims against Potter and Graziano arise out of the same facts and litigation of the claims would likely involve much of the same evidence, conservation of judicial resources and comprehensive disposition of litigation favors retaining Plaintiff's law library related retaliation claims against both Potter and Graziano in this action. [9]

[9]    For reasons discussed below, the Court is recommending dismissal without prejudice of Plaintiff's retaliation claim against Graziano for failure to state a claim. If the recommendation is accepted by the District Court, the possibility that Plaintiff will be able successfully amend his claim against Graziano cannot be completely ruled out at present.

Conservation of judicial resources and comprehensive disposition of litigation also favor litigation of Plaintiff's law library retaliation claims and denial of access to court claims against Potter and Graziano in the same lawsuit, since both claims arise out of a common nucleus of facts. There is no denial of access to court claim pending against Potter in *Morris* in light of the dismissal of the claim without prejudice on initial review (*Morris,* Dkt. No. 16), and Plaintiff's failure to amend his complaint in an attempt to state a claim. Although the Court is recommending dismissal of Plaintiff's denial of access to court claim against Potter and Graziano for failure to state a claim in this case, the recommendation is that the dismissal be without prejudice. Therefore, the possibility that Plaintiff will be able to amend his denial of access to court claim cannot be ruled out by the Court at this point.

For the foregoing reasons, the Court recommends that Potter and Graziano's motion to dismiss Plaintiff's law library related retaliation claims on the grounds that a duplicative action is pending be denied without prejudice. [10]

10    Presumably, Potter is free to move to dismiss Plaintiff's retaliation claim in *Morris* on the grounds that the same claim has been asserted in this action.

### D. Plaintiff's Retaliation Claims Against Potter

Plaintiff claims that Potter refused to allow him to go to the law library on May 6, 2013, in retaliation for grievances and lawsuits filed by Plaintiff. (Dkt. No. 24 at ¶¶ 17, 60.) Plaintiff also claims that Potter destroyed the microwave in his housing unit in retaliation for his parents' call to Boll. *Id.* at ¶¶ 28, 35, 61. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

**\*16** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was

"protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

#### 1. *The Law Library Incident*

In paragraph 17 of his Amended Complaint, Plaintiff has alleged that "Defendant Potter does not enjoy me going to the law library at all since he found out about the litigation that is pending before this Court (which he is also a Defendant in *Guillory v. Cheryl Morris,* 9:13 cv 00378)." (Dkt. No. 24 at ¶ 17.) The original complaint in *Morris* was filed on April 4, 2013. (*Morris,* Dkt. No. 1.) Although Potter was named as a John Doe in Plaintiff's

original complaint, it can be inferred from the allegations asserted against defendant Doe, *i.e.,* forcing Plaintiff to have his side locks cut off, *id.* at ¶ 13, that Potter may very well have been recognized as Doe and made aware that the suit had been commenced prior to May 15, 2013, when the complaint was supplemented to substitute his name for John Doe. [11] (*Morris,* Dkt. No. 6.) Plaintiff has also alleged that the retaliation was for his filing a grievance against Potter on April 10, 2013. *Id.* at ¶ 32.

[11]  Plaintiff has also alleged that Potter refused to allow him to go to the law library in retaliation for informing Graziano about the refusal. *Id.* at 60. Since Plaintiff did not tell Graziano until after Potter had refused to allow him to go to the law library, the facts do not support a retaliation claim based upon Plaintiff's disclosure to Graziano. Furthermore, Plaintiff's conclusory assertion that Potter was retaliating against him for bringing lawsuits against the facility does not support a retaliation claim. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (Claims of retaliation must be "supported by specific and detailed factual allegations" and not stated "in wholly conclusory terms.") (quoting *Flaherty,* 713 F.2d at 13).

**\*17**  The filing of lawsuits is protected conduct for purposes of First Amendment claims. *See Colon,* 58 F.3d at 872 ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for redress of grievances.") Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter "a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383. In addition, the temporal connection between Plaintiff's pending lawsuit against Potter and the April 10, 2013, grievance against Potter, and Potter's refusal to allow Plaintiff to go to the law library, is "sufficient to support an inference that the protected conduct played a substantial part in the adverse action," *see Baskerville,* 224 F.Supp.2d at 732, for purposes of surviving a Rule 12(b)(6) motion.

Therefore, the Court recommends that Potter's motion to dismiss Plaintiff's retaliation claim arising out of his refusal to allow Plaintiff to go to the law library be denied.

*2. The Microwave Incident*

In addition to the specific arguments made by Defendants for dismissal of Plaintiff's retaliation claims against Potter and Graziano for not allowing him to go to the law library and the allegedly retaliatory cell search by Donovan, *id.* at 8–10, the Defendants have made a general argument for dismissal of all other retaliation claims that might be asserted in Plaintiff's Amended Complaint. (Dkt. No. 37–5 at 13–15.) Defendants have not identified the specific retaliation claims the argument is intended to address, the defendants involved in each retaliation claim, or specific facts relating to the retaliation claims they seek to have dismissed. *Id.* They have simply argued in conclusory terms that Plaintiff's Amended Complaint fails to include any non-conclusory allegations supporting retaliation and does not allege facts establishing that the Defendants were aware of Plaintiff's grievances and lawsuits at the time of the claimed retaliation, thereby leaving the Court to guess as to particular retaliation claims on which dismissal is sought. [12] *Id.* at 14–15.

[12]  Defendants' reliance upon a general argument for dismissal of Plaintiff's unspecified retaliation claims is to some degree understandable given the random, disorganized, and largely conclusory nature of much of Plaintiff's Amended Complaint.

Presumably, one of the claims intended to fall within the retaliation argument is Plaintiff's retaliation claim involving Potter's alleged destruction of the microwave in Plaintiff's housing unit, which occurred nine days after Plaintiff's parents called Boll to complain that Plaintiff was being harassed by Potter. (Dkt. No. 24 at ¶¶ 28, 35, 61.) Plaintiff claims that Potter destroyed the microwave while staring at Plaintiff and another inmate whose parents had called DOCCS Office of Counsel, and saying "this is what inmates get when they call DOCCS on me!!" *Id.* at ¶¶ 35. Plaintiff contends that the microwave destruction was in retaliation for the call to Boll and Plaintiff's grievances against Potter, one of which was filed on April 10, 2013. *Id,* at ¶ 32.

**\*18**  The filing of a grievance has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes). Inmate's verbal complaints to corrections officers and prison officials have also been found to constitute activity protected by the First Amendment. *See, e.g., Monko v. Cusak,* No. 9:11–CV–1218 (GTS/TWD),

2013 WL 5441724, *10, 2013 U.S. Dist. LEXIS 142053, at *23 (N.D.N.Y. Sept.27, 2013); *Brewer v. Kamas,* 533 F.Supp.2d 318, 329 (W.D.N.Y.2008); *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS at 29745 at *46 (N.D.N.Y. April 24, 2006), *aff'd,* 219 F. App'x 110 (2d Cir.2007).

Plaintiff's parents' call to Boll might arguably be construed as Plaintiff's own conduct for First Amendment protection purposes, since the call was made on Plaintiff's behalf, and it can be inferred at his direction. Defendants do not appear to have argued otherwise in seeking dismissal of Plaintiff's retaliation claims. Moreover, for purposes of this motion, the temporal proximity of the call to Boll and the destruction of the microwave, and Potter's alleged comment connecting the destruction to the call makes a plausible showing of causal connection for purposes of this motion. However, the Court finds that the destruction of the housing unit's microwave does not constitute adverse action "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" for purposes of stating a retaliation claim. *Pidlypchak,* 389 F.3d at 381, 383. Rather, as pleaded by Plaintiff, the destruction of the microwave was *de minimis.*

Plaintiff has alleged that corrections officers like to destroy microwaves because inmates use them to heat chicken purchased from the commissary. *Id.* at ¶ 38. However, Plaintiff's Amended Complaint contains no factual allegations regarding his personal use of the housing unit microwave or the impact of its destruction on him that would suggest the impact was more than *de minimis.* Furthermore, the Amended Complaint is devoid of allegations regarding the period of time the housing unit was without a microwave, although given Plaintiff's allegation that Potter contacted administration about the broken microwave and indicated he had dropped it, one could infer that it was likely replaced. *Id.* at ¶ 36.

Given Plaintiff's failure to make a plausible showing that the destruction of the microwave constituted adverse action for purposes of his retaliation claim against Potter, the Court recommends that the claim be dismissed for failure to state a claim. The Court further recommends that Plaintiff be granted leave to amend his claim in the unlikely event he can plead facts showing the impact of the destruction of the microwave was sufficiently severe so as to deter a "similarly situated individual

of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383.

**E. Claims Against Graziano**

*1. Retaliation*

**\*19** According to Plaintiff, he made Graziano aware of his court imposed deadline and of Potter's refusal to allow him to go to the law library when he came to Plaintiff's housing unit in the early afternoon of May 6, 2013. (Dkt. No. 24 at ¶ 10.) Graziano did not intervene on Plaintiff's behalf but did tell him he would look into it. *Id.* at ¶ 11. Plaintiff claims that instead, Graziano brushed him off. *Id.* at ¶ 17.

Plaintiff has not identified any First Amendment protected conduct engaged in by him for which Graziano might retaliate. Nor are there any other allegations in the Amended Complaint that make a plausible showing that Graziano's failure to intervene on Plaintiff's behalf and alleged failure to look into the law library matter were in retaliation for Plaintiff's First Amendment protected conduct. Therefore, the Court recommends dismissal of Plaintiff's retaliation claim against Graziano for failure to state a claim and further recommends that in light of Plaintiff's *pro se* status he be granted leave to amend.

*2. Supervisory Liability*

Plaintiff has alleged that Graziano knew Potter was violating his constitutional rights and did nothing about it. *Id.* at ¶ 64. Plaintiff describes Graziano's conduct as "the same type of liability that is addressed when a supervisor knew of the subordinate's past misconduct (prior grievances against Defendant Potter, beat ups by Defendant Potter, Set-ups by Defendant Potter), [and] failed to set up policies that help guide subordinate's conduct so that the violations of constitutional rights does (sic) not continue to occur, failed to inform and train staff (Defendants Potter, Goppert, Donovan, Defendant Dobbs and Maher) on policies designed to avoid the deprivations of constitutional rights; and failed to supervise the said defendants to ensure that they follow policies that are created to protect the said constitutional rights." *Id.*

Those factual allegations suggest an attempt by Plaintiff to assert a claim against Graziano for supervisory liability. The law is clear that "personal involvement

2015 WL 268933

of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*20** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [13]

[13]    The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

The only factual allegations showing direct participation by Graziano in the violation of Plaintiff's constitutional rights are those related to Plaintiff's denial of access to court claim against him, which the Court has

recommended be dismissed for failure to state a claim. Vague and conclusory claims that Graziano, as a supervisory official, has failed to provide proper training and supervision or created a policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (same).

Given the conclusory nature of Plaintiff's supervisory liability claim against Graziano, the Court recommends dismissal for failure to state a claim, with leave to amend granted in deference to Plaintiff's *pro se* status.

### F. Retaliation Claim Against Donovan

According to Plaintiff, the day after Plaintiffs' parents called Boll to complain about Potter and the holding of his legal mail, Defendant Donovan directed a corrections officer to conduct a search of Plaintiff's cell and took either half or all of Plaintiff's legal documents and food. (Dkt. No. 24 at ¶¶ 29, 32.) Plaintiff claims that the cell search and taking of his property were in retaliation for the call to Boll as well as Plaintiff's filing of grievances against Potter. *Id.* at ¶ 32. In his opposition to Defendants' motion to dismiss, Plaintiff has clarified that he is not asserting a property deprivation claim under the Fourth or Fourteenth Amendments, but rather is specifically asserting a retaliation claim, and the Court has taken Plaintiff at his word. [14] (Dkt. No. 41 at 17.)

[14]    The Second Circuit has, in any event, held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of post-deprivation remedies" in the New York Court of Claims." *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996).

As noted above, an inmate's verbal complaints to corrections officers and prison officials have been found to constitute activity protected by the First Amendment. Although Plaintiff has not alleged facts showing that

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 85 of 203
Guillory v. Haywood, Not Reported in F.Supp.3d (2015)

2015 WL 268933

Donovan was aware of his parents' call to Boll, given that the search and confiscation of Plaintiff's property took place only one day after his parents' telephone call to Boll, the Court finds that Plaintiff has made a sufficient showing that there may have been a causal connection for purposes of this motion to dismiss.

**\*21** As to the adverse action requirement, the Supreme Court has held that "prisoners have no legitimate expectation of privacy." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). As a result, many of the district courts in the Second Circuit have found that cell searches, even if conducted for retaliatory reasons, cannot constitute an adverse action for purposes of a retaliation claim. *See, e.g., Yofelfang v. Capra,* 889 F.Supp.2d 489, 509 (S.D.N.Y.2012) ("inmate has no right to be free from searches of any kind, including those alleged to be retaliatory.") (quoting *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005)) (internal quotation marks omitted). Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights. *See, e.g., Amaker v. Fischer,* No. 10–CV–0977A, 2014 WL 4772202, at \*10, 2014 U.S. Dist. LEXIS 136117, at \*22 (W.D.N.Y. Sept.27, 2014); *Phelan v. Hersh,* No. 10–CV–0011 (GLS/RFT), 2011 WL 6031940, at \*6, 2011 U.S. Dist. LEXIS 4252 (N.D.N.Y. Sept.13, 2011).

Based upon the foregoing, the Court finds that Plaintiff's allegations that Donovan confiscated his legal documents and kosher food during a cell search in retaliation for Plaintiff's parents' complaints to Boll the day before states a plausible claim for retaliation and recommends denial of Donovan's motion to dismiss Plaintiff's retaliation claim against him.

### G. Supervisory Liability Claims Against Boll and Haywood

Defendants Boll and Haywood seek dismissal of Plaintiff's Amended Complaint on the grounds that he has failed to allege facts showing the personal involvement necessary for supervisory liability. (Dkt. 37–5 at 12–16.) Plaintiff has alleged that Boll and Haywood, "after learning of the violations of [his] constitutional rights failed to remedy the wrong (Supra at 28); created a custom and policy under

which [his] constitutional rights were violated (Supra at 29–30, 35, 38, 42–43); and, was (sic) grossly negligent in that they failed to adequately supervise the subordinates whom (sic) also violated my said rights." [15] (Dkt. No. 24 at ¶ 54.) According to Plaintiff, Boll and Haywood learned of the violation of his constitutional rights through several letters written to their office, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55.

[15]    Paragraph 8 of Plaintiff's Amended Complaint, cited in Plaintiff's supervisory liability claim, references his parents' telephone call to Boll on May 9, 2013. *Id.* at ¶ 28. Paragraph 29 (Paragraph 30 is void) deals with the cell search and Donovan taking Plaintiff's legal mail and kosher food. *Id.* at ¶¶ 29–30. Paragraph 35 contains allegations regarding the destruction of the microwave by Potter. *Id.* at ¶ 35. Paragraph 38 references Plaintiff's Article 78 proceeding against Boll for failing to stop the unspecified reckless retaliation, despite knowledge of the facts; refusal to address the destruction of Plaintiff's legal papers and confiscation of his kosher food in retaliation for his parent's contacting Boll; and destruction of the microwave by Potter. *Id.* at ¶ 38. Paragraphs 42 and 43 allege Haywood's refusal to comment on the findings of her investigation of Dobbs, Maher, and Goppert regarding Plaintiff's missed court deadline, and refusal to do anything after learning of the retaliation by Maher, Dobbs, Goppert, and Donovan. *Id.* at ¶¶ 42–43.

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citation and internal quotation marks omitted). Conclusory allegations that a supervisory official was aware of alleged constitutional violations and failed to remedy them fail to state a claim for supervisory liability. [16] *See Carter v. Artuz,* No. 95CIV2362CSHKNF, 95CIV4785CSHKNF, 1999 WL 350868, at \*4, 1999 U.S. Dist. LEXIS 8338, at \*11 (S.D.N.Y. June 1, 1999). Furthermore, Plaintiff's wholly conclusory claims that Boll and Haywood, as a supervisory officials, created a custom and policy under which Plaintiff's constitutional rights were violated, are legally insufficient to state a claim under any of the categories identified in *Colon. See Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at \*19, 2011 U.S. Dist. LEXIS 64466, at \*56 (S.D.N.Y. June 17, 2011)

("While personal involvement of a supervisor may be established by showing that [she or] he created a policy or custom under which the violation occurred ..., conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement.") (internal citations omitted). Likewise, conclusory allegations that a supervisory official has failed to train or properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement for a supervisory liability claim. *See Pettus,* 554 F.3d at 300; *Bridgewater,* 832 F.Supp. at 348; *White,* 2010 WL 624081, at *6.

16    District courts in the Second Circuit have held that supervisory liability for failure to remedy constitutional violations after learning of them applies only to ongoing violations, not those which can no longer be remedied. *See, e.g., Bridgewater,* 832 F.Supp.2d at 348 (citing *Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 2735868, at *7, 2008 U.S. Dist. LEXIS 52408, at *18 (S.D.N.Y. July 10, 2008)).

### 1. *Haywood*

**\*22** In addition to the conclusory assertions that fail to state a claim, Plaintiff has alleged that Haywood conducted an investigation into the actions of Dobbs, Maher, and Goppert in withholding his amended complaint from the mail and: (1) stated in a letter to Plaintiff (not included as an exhibit to the Amended Complaint) that she would not comment on Plaintiff's concerns; (2) and when Plaintiff returned Haywood's letter with a demand that she amend it consistent with his demand that an additional investigation be conducted, she refused to accede to the demand. *Id.* at ¶¶ 42–43, 56. Plaintiff also claims that Haywood failed to act on Maher, Dobbs, and Goppert's retaliatory conduct in withholding his mail when she learned of it. *Id.* at ¶¶ 42–43.

Plaintiff has acknowledged that Haywood conducted an investigation of Maher, Dobbs, and Goppert's conduct with regard to the missed filing deadline. *Id.* at ¶ 42. However, his Amended Complaint does not include allegations showing the facts and circumstances surrounding the investigation by Haywood, i.e., whether it was undertaken in response to his direct complaints to her or as a part of her designated duties in the Office of Counsel. Although Plaintiff has included numerous exhibits as a part of his Amended Complaint, he has

neither included the letter from Haywood in which she allegedly refused to comment on his complaint, nor has he alleged any specific detail as to its content.

Plaintiff has not alleged facts showing that there was any action Haywood could have taken to remedy the missed filing deadline for the amended complaint by the time she became aware of it. *See Bridgewater,* 832 F.Supp.2d at 348. Plaintiff has not alleged that he attempted to remedy his inability to file the amended complaint in a timely manner by seeking an extension with the district court on the grounds that his amended complaint had been held for a security review. *See Waters v. Sunshine,* No. 07 Civ. 4753(DLI)(LB), 2009 WL 750217, at *6, 2009 U.S. Dist. LEXIS 22445, at *16–19 (E.D.N.Y. Mar. 19, 2009) (plaintiff has not suffered a constitutional deprivation of access to court if he has other avenues available to bring his claims before the court).

Furthermore, a complaint that fails to state a claim for the underlying unlawful conduct also fails to state a claim against supervisory officials with respect thereto. *Delaney v. Zaki,* No. 9:13–CV–0648 (DNH/TWD), 2014 WL 4966914, at *8, 2014 U.S. Dist. LEXIS 137611, at *17 (N.D.N.Y. Sept.2, 2014) (citing *Alston v. Bendheim,* 672 F.Supp.2d 378, 388–89 (S.D.N.Y.2009); *Clarke v. Sweeney,* 312 F.Supp.2d 277, 298 (D.Conn.2004) ("As there was no underlying deprivation of constitutional rights, accordingly, there can be no supervisory liability ....").

Plaintiff has failed to state a claim for denial of access to court against Maher, Dobbs, and Goppert and, therefore, has failed to state a supervisory liability claim in connection therewith. Plaintiff has failed to alleged facts plausibly showing that his underlying claim for denial of access to court in the federal court action was non-frivolous in nature. His only claimed injury is his inability to file the amended complaint in a timely manner. *See Lewis,* 518 U.S. at 348–349. Furthermore, Plaintiff has failed to describe the underlying claims in his Amended Complaint well enough for the court to determine whether they have any arguable basis in fact or law. *See Christopher,* 536 U.S. at 415–16. In fact, he has not described the claims at all.

**\*23** Plaintiff has likewise failed to state a claim against Maher, Dobbs, and Goppert for interference with legal mail in that as with his claim for denial of access

to court, he has failed to allege "actual injury" to a non-frivolous claim. *See Davis,* 320 F.3d at 351 (to state a claim for denial of access to court based upon interference with legal mail, a plaintiff must allege that the interference hindered efforts to pursue a legal claim, i.e., caused actual injury such as the dismissal of an otherwise meritorious claim). While Plaintiff contends that Maher, Dobbs, and Goppert violated his constitutional rights by opening his legal mail outside of his presence, an isolated instance of mail tampering is generally insufficient to establish a constitutional violation. *See Davis,* 320 F.3d at 351. Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with incoming mail." *Id.* (citation and internal quotation marks omitted).

Nor has Plaintiff stated a claim for retaliation against Maher, Dobbs, and Goppert. Plaintiff has alleged in conclusory fashion that the failure to send out his amended complaint was in retaliation for unspecified grievances and lawsuits he had filed against the facility. *Id.* at ¶ 62. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13. Therefore, Plaintiff cannot be found to have stated a supervisory liability claim against Haywood for failure to take action with respect to Maher, Dobbs, and Goppert's alleged retaliation. *See Delaney,* 2014 WL 4966914, at *8.

Given the conclusory nature of Plaintiff's failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Haywood, the Court recommends that those supervisory claims be dismissed without prejudice. In addition, given Plaintiff's failure to state claims against Haywood for allegedly refusing to accede to his demand for an additional investigation of the withholding of his amended complaint, and failing to take action with respect to Maher, Dobbs, and Goppert's allegedly retaliatory conduct, the Court recommends that Plaintiff's those claims against Haywood be dismissed without prejudice.

### 2. Boll

Plaintiff has alleged generally that Boll learned of the violation of his constitutional rights through several letters written to the Office of Counsel, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55. However, the only communications specifically identified

by Plaintiff are the phone call from Plaintiff's parents on May 9, 2013, and a June 11, 2013, letter from Plaintiff regarding the withholding of his amended complaint from the mail, to which Boll responded on July 2, 2013 (Dkt. No. 24 at 68). Furthermore, Plaintiff has failed to allege facts identifying the grievances, and lawsuits from which Boll allegedly learned of the violations of his constitutional rights and facts from which her awareness can be inferred. [17]

[17]    Plaintiff's parents' call to Boll occurred prior to Donovan's alleged taking of Plaintiff's legal papers and kosher food (May 10, 2013) and Potter's alleged breaking of the microwave (May 18, 2013). (Dkt. No. 24 at ¶¶ 29, 35.) Therefore, the call cannot be found to have placed Boll on notice of those incidents.

**\*24** Plaintiff has alleged that the subject matter of his parents' May 9, 2013, telephone call with Boll included harassment by Potter and the withholding of his amended complaint by Maher, Dobbs and Goppert. *Id.* at ¶ 28. Plaintiff has failed to describe the specific harassing conduct by Potter that was complained of by his parents in their call with Boll. [18] However, given the temporal proximity between Potter's refusal on May 6, 2013, to allow Plaintiff to go to the law library for copying and notary services necessary to mail out his brief in a timely manner, the Court can infer that incident was raised in the May 9, 2013, telephone conversation. *Id.* at ¶¶ 6–7, 28.

[18]    It is well-established that verbal harassment alone is insufficient to support a constitutional claim. *See Feldman v. Lyons,* 852 F.Supp.2d 274, 280 (N.D.N.Y.2012).

Even if complaints were made to Boll concerning the May 6, 2013, law library incident and the withholding of the amended complaint, Plaintiff has failed to state a supervisory liability claim against her with respect to his denial of access to court claim. As with his claim regarding the amended complaint withheld from mailing, [19] the only injury alleged by Plaintiff with regard to the May 6, 2013, law library incident was his failure file his supplemental brief in a timely manner. Furthermore, as noted above, Plaintiff's Amended Complaint does not describe the underlying claims in his Article 78 proceeding as required to state a claim for denial of access to court and interference with legal mail. *See Christopher,* 536 U.S. at 415–16; *Davis,* 320 F.3d at 351. Therefore, the Court finds that Plaintiff has failed to state a supervisory liability

claim against Boll with regard to his denial of access to court arising out of the May 6, 2013, law library incident and the withholding of his amended complaint from the mail.

19    The Court's analysis of Plaintiff's supervisory liability claim against Haywood relating to the withholding of Plaintiff's amended complaint from the mail applies to the same claim against Boll.

The Court has concluded that Plaintiff has stated a claim for retaliation against Potter with regard to the May 6, 2013, law library incident. In addition, the Court has inferred that the May 6, 2013, incident was raised by Plaintiff's parents in their May 9, 2013, telephone conversation with Boll. It also appears, given Boll's reference in her July 2, 2013, to a claim by Plaintiff in his June 11, 2013, letter to Boll concerning denial of access to the law library, that Boll had been made aware of and investigated the incident and found Plaintiff had not been denied access to the law library. (Dkt. No. 254 at 68.) Reading the allegations in the Amended Complaint liberally, as it must do, and construing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has stated a supervisory liability claim against Boll with regard to Plaintiff's retaliation claim against Potter in connection with the May 6, 2013, law library incident.

In light of the foregoing, the Court recommends that Plaintiff's conclusory failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Boll, as well as supervisory liability claims with regard to Plaintiff's denial of access to court, interference with mail, and improper opening of mail claims be dismissed without prejudice. The Court recommends that Boll's motion to dismiss be denied as to Plaintiff's supervisory liability claim against her with respect to Potter's alleged retaliation in connection with the May 6, 2013, law library incident.

### H. Retaliation Claims Against Boll and Haywood

**\*25** Plaintiff has alleged in wholly conclusory terms that Boll and Haywood had a custom, policy and practice of ordering retaliation against inmates whose parents called the DOCCS Office of Counsel on behalf of their children. (Dkt. No. 24 at ¶ 29.) Wholly conclusory claims of retaliation "can be dismissed on the pleadings alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Therefore, the Court recommends that

Plaintiff's retaliation claims against Boll and Haywood be dismissed without prejudice.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) (Dkt. No. 37) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED,** that Defendant Potter and Graziano's motion to dismiss Plaintiff's retaliation claims against them arising out of the May 6, 2013, law library incident, on the grounds that the claim is duplicative of a claim being asserted against Potter in *Guillory v. Morris,* 9:13–CV–0378 (NAM/TWD) (N.D.N.Y.) be denied without prejudice; and it is further

**RECOMMENDED,** that Plaintiff's Amended Complaint **BE DISMISSED WITHOUT PREJUDICE** as to the following claims: (1) First Amendment denial of access to courts, interference with legal mail, and retaliation claims against Defendants Maher, Dobbs, and Goppert for failure to exhaust; (2) First Amendment denial of access to courts claim against Defendants Potter and Graziano for failure to state a claim; (3) First Amendment retaliation claim against Defendant Potter arising out of the destruction of the microwave oven in Plaintiff's housing unit; (4) First Amendment claim for retaliation against Defendant Graziano for failure to state a claim; (5) supervisory liability claim against Defendant Graziano for failure to state a claim; (6) supervisory liability claims against Defendant Haywood for failure to state a claim; (7) supervisory liability claims against Defendant Boll for generally failing to remedy wrongs, creating and allowing to continue customs and policies under which under which constitutional practices occur, and failure to supervise and monitor subordinates for failure to state a claim; (8) supervisory liability claim against Defendant Boll in connection with Plaintiff's denial of access to court claims against Defendants Potter and Graziano relating to the May 6, 2013, law library incident for failure to state a claim; (9) supervisory liability claim against Defendant Boll with regard to Plaintiff's denial of access to court, interference with legal mail, and improper opening of legal mail claims against Defendants Maher, Dobbs, and Goppert in connection with the amended complaint withheld from mailing to the court, for failure to state a

claim; and (10) retaliation claims against Haywood and Boll for failure to state a claim; and it is further

**RECOMMENDED,** that Plaintiff be granted leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust administrative remedies and/or for failure to state a claim; and it is further

 **\*26 RECOMMENDED,** that Defendants' motion to dismiss for failure to state a claim be denied as to the following claims: (1) Plaintiff's retaliation claim against Defendant Potter arising out of the May 6, 2013, law library incident; (2) Plaintiff's retaliation claim against Defendant Donovan with regard to taking Plaintiff's legal papers and kosher food; and (3) Plaintiff's supervisory liability claim against Defendant Boll with regard to Plaintiff's retaliation claim against Potter with regard to the May 6, 2013, law library incident; and it is hereby

**ORDERED,** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Dec. 11, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 268933

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 64533
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

[1]    The website maintained by the New York State Department of Corrections and Community Supervision lists plaintiff's name as "Jacolby." *See* http:// nysdoccslookup.doccs.ny.gov/GCA00P00/ WIQ3/WINQ130. Plaintiff spells his first name as "Jocolby" in both his complaint and amended complaint. Dkt. Nos. 1, 10. The caption has been amended to reflect this alternate spelling; however, the plaintiff will continue to be referred to as "Jacolby" consistent with his listing on the DOCCS website.

Jacolby WALLACE, a/k/

a Jocolby Wallace [1], Plaintiff,

v.

C.O. FISHER, Watertown

Corr. Facility, Defendant. [2]

[2]    By decision and order dated June 4, 2014, defendants Gayne, McArdle, and the New York State Department of Corrections were dismissed from this action. Dkt. No. 17.

No. 9:13–CV–1208 (GTS/CFH).
|
Signed Jan. 5, 2015.

**Attorneys and Law Firms**

Jacolby Wallace, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Cathy Y. Sheehan, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendant.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Jacolby Wallace ("Plaintiff") against the above-captioned New York State correctional officer ("Defendant") asserting claims of excessive force

and retaliation, are (1) Defendant's motion to dismiss Plaintiff's Amended Complaint for failure to state a claim, and (2) United States Magistrate Judge Christian F. Hummel's Report–Recommendation recommending that Defendant's motion be denied. (Dkt.Nos.23, 28.) Neither of the parties has filed an objection to the Report–Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.)

When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.: see also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

Here, based upon a careful review of this matter, the Court can find no clear error with Magistrate Judge Hummel's Report–Recommendation. (Dkt. No. 5.) Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Report–Recommendation is accepted and adopted in its entirety for the reasons stated therein.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 28) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 23) is ***DENIED.***

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2015 WL 64533

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Jacolby Wallace ("Wallace"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant Fisher, a DOCCS employee, violated his rights under the First and Eighth Amendments. Compl. (Dkt. No. 1); Am. Compl (Dkt. No. 10). Presently pending is defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 23. Wallace did not respond. For the following reasons, it is recommended that defendant's motion be denied.

## I. Background

The facts herein are in the light most favorable to Wallace as the non-moving party. See subsection ll(A) infra. At all relevant times, Wallace was an inmate at Watertown Correctional Facility ("Watertown").

On August 29, 2013, Wallace was released from the Special Housing Unit ("SHU"). [2] Am. Compl. at 5. Upon returning to his cell, Wallace noticed that most of his hygiene products and all his food were missing from his locker. *Id.* Wallace filed an inmate claim sheet to obtain reimbursement for the items. *Id.* His claim was denied because the facility stated that Wallace's locker was not "secured before he left to go to work." *Id.* Wallace filed an appeal but was again denied. *Id.*

[2]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**\*2** On September 10, 2013, while Wallace was in the law library preparing to file another appeal, various non-party corrections officers went to Wallace's dorm and searched his locker. Am. Compl. at 5. The officers found a picture Wallace had drawn that they felt was gang related. *Id.* As a result, the officers filed a Tier III misbehavior report against Wallace, which was later reduced to Tier

II. *Id.* Wallace believed that the officers filed this ticket in retaliation for the claim he filed. *Id.* Wallace then gathered documents to file a 42 U.S.C. § 1983 claim. *Id.*

On September 13, 2013, Wallace was heading to the law library to receive assistance with filing the lawsuit. Am. Compl. at 5. On his way, defendant Correctional Officer Fisher ("Fisher") stopped and searched Wallace. *Id.* Fisher found the filing papers and asked "why do you have paperwork to the U.S. Marshal with a [correctional officer's] name on them?" *Id.* Wallace did not respond and Fisher said, "you better tell me what you are going to do with these papers or I am going to kno[ck] your teeth out." *Id.* Wallace was fearful and did not respond, thus, Fisher "made" Wallace place his hands in his pockets, grabbed him by the back of the neck, and escorted Wallace, along with three other correctional officers, to a dark draft room. *Id.* Fisher assaulted Wallace while the other correctional officers observed and did not intervene. *Id.* When Wallace returned to his dorm later that day, he realized his paperwork was never returned to him. *Id* . at 6. After this incident, several employees at Watertown attempted to deter Wallace from filing grievances against the correctional officers. *Id.* This action followed.

## II. Discussion [3]

[3]    By decision and order dated June 4, 2013 the court ordered: (1) plaintiff's initial IFP application be denied and his renewed IFP application granted; (2) plaintiff's claims against Gayne and McArdle dismissed without prejudice; (3) defendants Gayne and McArdle dismissed without prejudice; (4) plaintiff's claims against DOCCS dismissed with prejudice; (5) plaintiff's motion for a preliminary injunction denied as moot; and (6) plaintiff's excessive force and retaliation claims against Fisher survived *sua sponte* review and required a response. Dkt. No. 17. Accordingly, the only remaining causes of action are those alleged against Fisher.

Wallace contends that his Eighth Amendment rights were violated when Fisher used excessive force against him in an unprovoked assault. *See generally* Am. Compl. Wallace also claims that his First Amendment rights were violated when Fisher assaulted him in retaliation for preparing to file a lawsuit. *Id.* Fisher contends that Wallace has failed to state a claim. Dkt. No. 23–1 at 4.

## A. Legal Standard

Pursuant to the Federal Rules, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b) (6). When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff ['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*3** Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims

that are not consistent with the *pro se* litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). It follows that,

> the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's paper in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau,* No. 07–CV–0464, 2008 WL 4693153, at *6 & n. 41 (N.D.N.Y. Oct. 22, 2008) (collecting cases). [4]

4   All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

## B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth

2015 WL 64533

Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*4** The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to the plaintiff, Wallace has plausibly alleged an Eighth Amendment claim against Fisher. Wallace contends that Fisher was questioning him about the nature of his legal paperwork and when he did not respond, Fisher forcefully escorted Wallace to a draft room where he went on to physically assault Wallace. Taking Wallace's account of the events as true, and regardless of the seriousness of the

injuries suffered, Fisher's use of force against Wallace was unprovoked and exercised solely to produce harm; thus, it was malicious. *Blyden,* 186 F.3d at 263; *Hudson,* 503 U.S. at 9–10. Fisher was alleged to have assaulted Wallace not to maintain order and safety, but to inflict harm in retaliation for Wallace's actions filing a lawsuit. Wallace did not present any threat to Fisher, therefore there was no need for the application of force under this set of facts. As such, the alleged force is a malicious act and a *per se* violation of the Eighth Amendment. *Blyden,* 186 F.3d at 263. Therefore, Wallace has plausibly alleged that Fisher violated his Eighth Amendment constitutional rights.

**\*5** Accordingly, defendant's motion on this ground should be denied.

### C. First Amendment

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008). This objective test is applied even when the plaintiff is not subjectively deterred, in that he continues to file lawsuits or grievances. *Gill,* 389 F.3d at 381.

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

Here, Wallace has plausibly alleged a First Amendment retaliation claim against Fisher. First, Wallace was in the process of filing a lawsuit pursuant to 42 U.S.C. § 1983 and; therefore, was engaged in constitutionally-protected conduct. *Bounds v. Smith,* 430 U.S. 817, 821 (1977) (holding that prisoners have a constitutional right of access to the courts). Second, Wallace alleged that Fisher assaulted him which is sufficient to satisfy the second prong of the analysis. *See Smith v. Rosati,* No. 10–CV–1502 (DNH/DEP), 2013 WL 1500422, at *14 (N.D.N.Y. Feb. 20, 2013) (holding that an assault by a correctional officer is sufficient adverse action for a First Amendment retaliation claim) (citation omitted);

*see also Rivera v.. Goord,* 119 F.Supp.2d 327, 339–40 (S.D.N.Y.2000). Finally, Wallace alleged a causal connection between Fisher's assault and his lawsuit. After Fisher saw and questioned Wallace about his legal papers, Fisher threatened to use force against Wallace seemingly for bringing lawsuits against fellow corrections officers. Temporal proximity, and thus a causal connection, were pled because the alleged retaliatory conduct occurred immediately after Fisher learned of Wallace's intent to engage in constitutionally-protected conduct. *Barclay,* 477 F.Supp.2d at 588. Therefore, Wallace has alleged a First Amendment retaliation claim against Fisher.

**\*6** Accordingly, defendant's motion on this ground should be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion to dismiss (Dkt. No. 23) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.D.N.Y.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

DATE: Sept. 16, 2014.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 64533

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 95 of 203
Sharpe v. Taylor, Not Reported in F.Supp.2d (2009)
2009 WL 1743987

2009 WL 1743987
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dawson SHARPE, Plaintiff,

v.

Justin TAYLOR, et al., Defendants.

No. 9:05–CV–1003 (GTS/GHL).
|
March 26, 2009.

West KeySummary

1   **Prisons**
    👉 Clothing and grooming;bedding and
    sleeping conditions

    **Sentencing and Punishment**
    👉 Sanitation

    Prisoner's complaint alleging that correctional
    officer violated his constitutional rights by
    washing dirty mop heads with his laundry
    stated an Eighth Amendment conditions of
    confinement claim based on the failure to
    provide adequate clothing. Prisoner alleged
    that because the dirty mop heads were
    washed with his laundry, he suffered a
    skin rash. Prisoner's primary care physician
    instructed that a memorandum be issued
    instructing that dirty mop heads should
    not be washed in the same machines as
    prisoners' clothes because he was concerned
    about the prisoner's "contact with pernicious
    chemicals." Correctional officer allowed
    porters to wash dirty mop heads in
    the prisoner washing machine. U.S.C.A.
    Const.Amend. 8; 42 U.S.C.A. § 1983.

    5 Cases that cite this headnote

**Attorneys and Law Firms**

Dawson Sharpe, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Heather R. Rubinstein, Esq., of Counsel,
Syracuse, NY, for Defendants.

*REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Glenn
T. Suddaby, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Dawson
Sharpe alleges that employees of the New York State
Department of Correctional Services ("DOCS") violated
his civil rights by repeatedly washing dirty mop heads
with his clothing, physically attacking him, depriving
him of medications, issuing false misbehavior reports,
and threatening to harm him if he filed any grievances.
(Dkt. No. 35.) Currently pending before the Court is
Defendants' motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56. (Dkt. No. 68.) For
the reasons that follow, I recommend that Defendants'
motion be treated solely as a motion for judgment on
the pleadings, granted in part, and denied in part without
prejudice to the later filing of a subsequent motion for
summary judgment supported by a proper Statement of
Material Facts and admissible evidence [1].

[1]   Because this case has been pending for 3.5 years, I
      am reluctant to recommend allowing Defendants the
      opportunity to move again for summary judgment.
      However, the possibility that some claims could be
      disposed of without the need for expending the court
      and community resources required for a trial suggests
      that denying portions of the motion without prejudice
      is the most efficient resolution.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**
The operative complaint (Dkt. No. 35) alleges that:

Defendant Coco, a correctional officer at Gouverneur
Correctional Facility, "ordered that dirty mop heads be
washed and dr[ied] in the same washing machine used for
[Plaintiff's] towels, sheets, pillow cases, underwear, and
clothing" from 2002 to 2004. (Dkt. No. 35 at ¶ 9.)

On September 20, 2004, Plaintiff's primary care physician referred him to a dermatologist for treatment of a severe rash. (Dkt. No. 35 at ¶ 4.) The complaint refers to this rash as "htperplastic micropoapular rash of the trunk." *Id.*

On October 7, 2004, Plaintiff saw a dermatologist, who opined that the rash was caused by cleaning materials and the fact that Plaintiff's skin had come "in contact with pernicious chemicals." (Dkt. No. 35 at ¶ 5.) After this consultation, Plaintiff's primary care physician referred him for a biopsy on the rash. (Dkt. No. 35 at ¶ 6.)

On October 19, 2004, Defendant Coco "address[ed] [Plaintiff's] grievance/complaint" by transferring Plaintiff to "another dormitory ... without a misbehavior report [2]." (Dkt. No. 35 at ¶ 10.)

[2]    To the extent that this allegation asserts a retaliation claim against Defendant Coco, I recommend that the Court dismiss the claim *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff has not pleaded facts plausibly suggesting that this transfer was an "adverse action." *See Coleman v. Sutton,* 530 F.Supp.2d 451, 453 (W.D.N.Y.2008) (prisoner failed to state a retaliation claim where he did not allege that conditions into which he was transferred were more onerous than his original placement). *Compare Shine v. Hofman,* 548 F.Supp.2d 112 (D.Vt.2008) (transfer from general population to "close custody").

The biopsy on Plaintiff's rash was performed on October 21, 2004. (Dkt. No. 35 at ¶ 7.) As a result of the biopsy, Plaintiff was diagnosed with "ngiotic dermatitis, subacute type." (Dkt. No. 35 at ¶ 8.)

On November 6, 2004, Defendant Plowman physically assaulted Plaintiff "in retaliation for the above grievance." (Dkt. No. 35 at ¶ 14.) Plaintiff alleges that his "serious back problem was further infuriated" by this attack. (Dkt. No. 35 at ¶ 41.)

On November 9, 2004, Defendant Shareldon physically assaulted Plaintiff "in retaliation for the above grievance." (Dkt. No. 35 at ¶ 14.) Plaintiff alleges that his "serious back problem was further infuriated" by this attack. (Dkt. No. 35 at ¶ 41.)

**\*2** On December 20, 2004, Plaintiff's primary care physician, after reviewing the results of Plaintiff's biopsy,

directed a nurse to issue memoranda to all of the housing units at Gouverneur Correctional Facility advising that dirty mop heads should not be washed in the same machines as inmates' clothes. (Dkt. No. 35 at ¶ 15.)

Sometime before January 21, 2005, Defendant Justin Taylor, the superintendent of the facility, had the posted memoranda removed. (Dkt. No. 35 at ¶¶ 16–17.)

On February 18, 2005, Defendant Sorell allowed porters to wash dirty mop heads in the inmate washing machine. (Dkt. No. 35 at ¶ 18.)

On April 27, 2005, Defendant Sorell, "in retaliation," ordered Plaintiff to perform a work detail. When Plaintiff told her he was medically excused, Defendant Sorell issued a false misbehavior report that resulted in Plaintiff being confined to the SHU and removed from the "RSAT" program. (Dkt. No. 35 at ¶ 19.) Plaintiff alleges that he suffered "prolong[ed] pain and suffering" after this incident [3]. (Dkt. No. 35 at ¶ 42.)

[3]    To the extent that Plaintiff asserts an Eighth Amendment medical care claim arising out of this incident (Dkt. No. 35 at ¶ 42), I recommend that the Court dismiss it *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). The complaint alleges neither any "serious medical condition" nor facts plausibly suggesting that Defendant Sorell was deliberately indifferent to that condition.

On May 3, 2005, Defendant Sorell falsely testified at a disciplinary hearing that she did not know that Plaintiff had a medical excuse. (Dkt. No. 35 at ¶ 20.)

On August 25, 2005, Defendant Hunksy issued a false misbehavior report that resulted in Plaintiff being sent to the SHU. (Dkt. No. 35 at ¶¶ 23–24.) Plaintiff filed a grievance regarding this false misbehavior report. (Dkt. No. 35 at ¶ 23.)

On August 31, 2005, Defendant Theriault told Plaintiff "if you don't stop writing grievances on my officers, I will personally do you bodily harm." (Dkt. No. 35 at ¶ 23.)

On August 31, 2005, Defendant Hunksy issued another false misbehavior report that resulted in Plaintiff being sent to the SHU. (Dkt. No. 35 at ¶¶ 23–24.)

On August 31, 2005, Defendants Theriault and Shareldon physically assaulted Plaintiff while he was handcuffed. (Dkt. No. 35 at ¶ 25 .)

On September 3, 2005, Defendant Plowman removed Plaintiff's prescribed pain medication from Plaintiff's personal property. Plowman claimed that Plaintiff "was on the burn because of the grievances he had written in the facility." Plaintiff did not receive his medication until two weeks later. (Dkt. No. 35 at ¶¶ 26–27.) Plaintiff does not allege that he suffered any injury as a result of not having his medication.

On January 23, 2006, Defendant Theriault told Plaintiff that his "officer will continue to target [Plaintiff] for the grievance [he] wrote because they are human beings." (Dkt. No. 35 at ¶ 29.)

On January 28, 2006, and January 30, 2006, Defendant McDonald issued false misbehavior reports to Plaintiff "in retaliation" for Plaintiff "asserting [his] constitutional rights." (Dkt. No. 35 at ¶ 30.)

On April 25, 2006, Defendant Ball "saw Plaintiff on the walk way ..., called him a trouble maker, verbally harassed him, and threated[ed] to put him in the SHU because of the civil action [Plaintiff] had filed against his colleagues." (Dkt. No. 35 at ¶ 31.) On April 26, 2006, Defendant Ball fabricated a misbehavior report and placed Plaintiff in the SHU. (Dkt. No. 35 at ¶ 32.)

*3 On April 26, 2006, while Plaintiff was being processed into the SHU, Defendant Monnely sexually harassed Plaintiff, fondled Plaintiff's anus, and said "if you make any sudden moves I will thr[ow] you to the ground and stomp you out." (Dkt. No. 35 at ¶ 33.)

Plaintiff alleges that all of the events described in the complaint are "retaliatory actions against the plaintiff to dehumanize him and discourage him from exercising his Constitutional Rights." (Dkt. No. 35 at ¶ 35.) Plaintiff alleges he suffered "extreme emotional distress" as a result of "[t]he constant threats" to him [4]. (Dkt. No. 35 at ¶ 22.)

[4]    Plaintiff's complaint also makes the following allegations about individuals not named as defendants: (1) Officer Devito and a civilian cook fabricated a misbehavior report on November 6, 2004, which resulted in Plaintiff being placed in the

SHU (Dkt. No. 35 at ¶ 11); (2) Lt. Don held a biased Tier II hearing on November 9, 2004, which resulted in Plaintiff being placed in the SHU (Dkt. No. 35 at ¶ 12); (3) unnamed people "maliciously destroyed" Plaintiff's typewriter in retaliation for filing a grievance (Dkt. No. 35 at ¶ 13); (4) unnamed sergeants who were supposed to investigate incidents involving Plaintiff "used intimidating tactic[s] to scare some witnesses into not wanting to testify" for Plaintiff (Dkt. No. 35 at ¶ 21); (5) an unnamed sergeant instructed his subordinates to keep Plaintiff locked in a double-bunk cubicle (Dkt. No. 35 at ¶ 28); and (6) unnamed correctional officers called Plaintiff a troublemaker and a nigger. (Dkt. No. 35 at ¶ 41.)

Plaintiff requests an injunction removing him from Gouverneur Correctional Facility. (Dkt. No. 35 at ¶ 36.) In addition, he requests $5 million in compensatory damages and $5 million in punitive damages. (Dkt. No. 35 at ¶ 45.)

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) Plaintiff's allegations that Defendants Theriault, Ball, and Monnely threatened or verbally and/or sexually harassed him do not state a claim for retaliation; (2) Plaintiff has not stated an Eighth Amendment conditions of confinement claim against Defendants Coco and Sorell regarding the dirty mop heads or, in the alternative, that there is no triable issue of material fact on this issue; (3) Plaintiff's allegations that Defendants Sorell, Hunsky, McDonald, and Ball issued false misbehavior reports to him do not state a claim for retaliation or, in the alternative, that there is not triable issue of material fact on this issue; (4) Plaintiff's allegations that Defendants Coco and Sorell washed dirty mop heads with his clothing and that Defendant Plowman removed medication from his personal property do not state an Eighth Amendment claim of inadequate medical care; (5) Plaintiff's complaint is too conclusory to state any claim; (6) Plaintiff has failed to allege sufficient personal involvement by Defendant Taylor; (7) Plaintiff's excessive force claims should be dismissed; and (8) they are entitled to qualified immunity. (Dkt. No. 68–5.)

**C. Deficiencies in Defendants' Statement of Material Facts and Evidence**

Defendants move for summary judgment. As the moving parties, they bear the initial burden of showing, through

the production of admissible evidence, that no genuine issue of material fact exists and they are entitled to judgment as a matter of law. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after they have met this burden is Plaintiff required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Federal Rule of Civil Procedure 56 and Local Rule 7 .1(a)(3) provide the procedural guidelines for meeting this initial burden.

Local Rule 7.1(a)(3) requires parties moving for summary judgment to file and serve a Statement of Material Facts. This statement "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Facts that are not in the Statement of Material Facts need not be considered. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000). The rule thus puts the onus on the parties to marshal the evidence that supports the motion. *Id.* A district court has no duty, on a motion for summary judgment, to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *accord, Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–72 (N.D.N.Y.2003) (Hurd, J.). "Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a)3 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way-thus facilitating its judgment of the necessity for trial.' " *Jackson v. Broome County Correctional Facility,* 194 F.R.D. 436, 437 (N.D.N.Y.2000) (*citing Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995)).

**\*4** Defendants' Statement of Material Facts informs neither Plaintiff nor the Court of the evidence supporting Defendants' arguments. It does not set forth each material fact about which Defendants claim there exists no genuine issue. Rather, it is little more than a list of exhibits. It states, in full:

1. During all times relevant, the plaintiff Dawson Sharpe was a New York State inmate being housed at Gouverneur Correctional Facility (hereinafter "Gouverneur"). See Amended Complaint, Docket No. 35.

2. Employees at Gouverneur responded to three (3) separate grievances filed by plaintiff regarding the allegation that mopheads were being improperly washed in the dorm washing machine. See Exhibit A annexed hereto.

3. One (*sic*) June 19, 2007, plaintiff was deposed by Maria Moran, AAG in regard to the allegations in his complaint. Plaintiff's deposition transcript is annexed hereto as Exhibit B.

4. On August 31, 2005, plaintiff was the subject of an inmate misbehavior report drafted by defendant Honsky. See Exhibit C annexed hereto.

5. On January 28, 2006, plaintiff was the subject of an inmate misbehavior report drafted by defendant McDonald. See Exhibit D annexed hereto.

6. On January 30, 2006, plaintiff was the subject of a second inmate misbehavior report drafted by defendant McDonald. See Exhibit E annexed hereto.

(Dkt. No. 68–3.) This Statement of Material Facts does not set forth any facts that are material to the dispute at hand. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). None of the issues in this lawsuit hinge on where Plaintiff is housed, whether employees responded to Plaintiff's complaints, the date of Plaintiff's deposition or the identity of the attorney who conducted it, or the mere fact that Plaintiff was the subject of misbehavior reports. Therefore, Defendants' Statement of Material Facts does not comply with Local Rule 7.1(a)(3).

Local Rule 7.1(a)(3) clearly states that the "*[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*" (Emphasis in original.) This Court has denied motions for summary judgment based solely on the deficiency of Statements of Material Facts nearly identical to the Statement filed here. *See e.g. Lynch v. Cook,* No. 02–CV–1526, 2006 WL 839 543 (N.D.N.Y. Mar.29, 2006) (McAvoy, J.).

As noted above, in the absence of a proper Statement of Material Facts, this Court has no duty to perform

an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). And although Second Circuit precedent clearly states that district court must grant special solicitude to *pro se* civil rights plaintiffs, liberally construing their pleadings and loosely applying procedural rules, I owe no such duty to Defendants, who are represented by counsel.

**\*5** Even if I were inclined to go beyond the bounds of duty and perform an independent review of the record to find proof of the lack of a factual dispute, I would be hampered by the fact that Defendants have not produced an iota of admissible evidence. Motions for summary judgment must be supported by admissible evidence. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." Charles Alan Wright, et al., 10A *Fed. Practice & Procedure* 3d § 2722 (2005). Here, none of the exhibits to the Statement of Material Facts is accompanied by *any* affidavit, much less an affidavit by a person through whom the exhibits could be admitted into evidence [5].

[5]     Although Plaintiff's deposition includes a statement by the court reporter certifying that the transcript is accurate, the statement is not signed.

In light of Defendants' failure to file a proper Statement of Material Facts or any admissible evidence, I will treat their motion as an attack on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### D. Summary of Plaintiff's Response to Defendants' Arguments

Plaintiff's response to Defendants' motion essentially reiterates the allegations of the complaint. (Dkt. No. 72.) The only significant difference is that in his opposition to Defendants' motion, Plaintiff argues that Defendant Taylor is liable because of his response or lack of response to Plaintiff's grievances about the mop heads being washed with inmates' clothing. Plaintiff has also provided affidavits from two other inmates who have been housed at Gouverneur Correctional Facility. (Dkt. Nos. 70 and

71.) These inmates share Plaintiff's concerns about dirty mop heads being washed with inmates' clothing.

## II. APPLICABLE LEGAL STANDARD

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on a plaintiff's complaint, such a motion is functionally the same as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(c) motion for judgment on the pleadings] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief maybe granted. [6] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Federal Rule of Civil Procedure 12(c) motions for judgment on the pleadings.

[6]     The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2) (B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*6** The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b) (6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that

a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [7] or (2) a challenge to the legal cognizability of the claim. [8]

[7]     See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[8]     See *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest .... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ]." ) [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4– 5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under

Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion—one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [9] The main purpose of this rule is to "facilitate a proper decision on the merits." [10] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [11]

[9]     *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512[citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

[10]     *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

[11]     *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) ( McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y.

2009 WL 1743987

June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[12] However, it is well established that even this liberal notice pleading standard "has its limits."[13] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[14]

[12]    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

[13]    2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

[14]    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary

affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 [15] (2007). [16] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

[15]    All citations to the *Bell Atlantic* decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

[16]    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable

2009 WL 1743987

conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id*.

**\*7** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic*).[17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded pro se litigants).[18]

[17]    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly requires ... that the complaint's* '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( *"We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

[18]    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c] [1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Bell Atlantic*—that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

[19]    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by

prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [20] This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

[20] *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[21] *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. [24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [26]

[22] "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading—which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

[23] *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

[24] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also*

Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

25    Yang v. New York City Trans. Auth., 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); Advanced Marine Tech. v. Burnham Sec., Inc., 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

26    Cuoco, 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; see, e.g., See Rhodes v. Hoy, 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying pro se plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); Thabault v. Sorrell, 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying pro se plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing—were substantive and not formal in nature, rendering repleading futile) [citations omitted]; Hylton v. All Island Cob Co., 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying pro se plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence—were substantive and not formal in nature, rendering repleading futile); Sundwall v. Leuba, 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying pro se plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

*8    However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently

observed),[27] it does not completely relieve a pro se plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[28] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even pro se civil rights plaintiffs must follow.[29] Stated more plainly, when a plaintiff is proceeding pro se, "all normal rules of pleading are not absolutely suspended."[30]

27    Sealed Plaintiff v. Sealed Defendant # 1, No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of pro se litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; see also Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

28    See Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in Haines v. Kerner, 404 U.S. 519 [1972], did not save pro se complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); accord, Shoemaker v. State of Cal., 101 F.3d 108 (2d Cir.1996) (citing Prezzi v. Schelter, 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of Prezzi v. Schelter, 469 F.2d 691, within the Second Circuit]; accord, Praseuth v. Werbe, 99 F.3d 402 (2d Cir.1995).

29    See McNeil v. U.S., 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); Faretta v. California, 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006) (pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) (pro se status "does not exempt a party from compliance with

relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if its mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

30    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Retaliation Claims Based on Comments, Threats, and Harassment

The complaint alleges that several Defendants retaliated against Plaintiff by verbally harassing him, making threats, and sexually harassing him. Defendants argue that these allegations fail to state a claim. (Dkt. No. 68–5 at 2–4.)

*1. Comments, Threats, and Verbal Harassment*

The complaint describes four occasions on which various Defendants threatened Plaintiff. First, it alleges that on August 31, 2005, Defendant Theriault told Plaintiff "if you don't stop writing grievances on my officers, I will personally do you bodily harm." (Dkt. No. 35 at ¶ 23.) Second, it alleges that on January 23, 2006, Defendant Theriault told Plaintiff that his "officer [s] will continue to target [Plaintiff] for the grievance [he] wrote because they are human beings." (Dkt. No. 35 at ¶ 29.) Third, it alleges that on April 25, 2006, Defendant Ball "saw Plaintiff on the walk way ..., called him a trouble maker, verbally harassed him, and threated[ed] to put him in the SHU because of the civil action [Plaintiff] had filed against his colleagues." (Dkt. No. 35 at ¶ 31.) Fourth, it alleges that on April 26, 2006, Defendant Monnely[31] said "if you make any sudden moves I will thr[ow] you to the ground and stomp you out." (Dkt. No. 35 at ¶ 33.)

31    Defendants refer to this officer as "Marnell" in their memorandum of law (Dkt. No. 68–5 at 2–4), but refer to her in the answer to the complaint as "Monnely." I have used the spelling listed in the complaint, the answer, and the docket.

I have construed the complaint as asserting retaliation claims against Defendants Theriault, Ball, and Monelly based on these allegations. Defendants argue that these allegations fail to state a claim. Specifically, Defendants

argue that "[i]t is clear that claims of verbal harassment alone do not state a cause of action under § 1983." (Dkt. No. 68–5 at 2.)

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the plaintiff engaged in constitutionally protected speech or conduct; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). Defendants argue, essentially, that Plaintiff has not pleaded facts sufficient to plausibly suggest that Defendants took adverse action.

**\*9** Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered. *See, e.g., Hepworth v. Suffolk County,* No. 2:02–cv–6473, 2006 WL 2844408, at \*8–9 (E.D.N.Y. Sept.29, 2006) (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment" rights). Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim. *See, e.g., Bartley v. Collins,* No. 95 Civ. 10616, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (stating that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes,* 239 F.3d at 493, for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's "alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] d[id] not give rise to a First Amendment retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at \*7 (S.D.N.Y. May 16, 2002) (allegation that defendant made statement which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' " was insufficient to state retaliation claim).

2009 WL 1743987

*Bumpus v. Canfield,* 495 F.Supp.2d 316, 326 (W.D.N.Y.2007) (allegation that correctional officer "chastised" prisoner and said that he was "getting tired of" prisoner filing grievances insufficient to state a retaliation claim).

Here, viewed in context, Defendant Theriault's alleged threats were sufficiently specific that, if the facts alleged were proved by evidence, a reasonable jury could find that Defendant Theriault retaliated against Plaintiff. The complaint alleges that on August 25, 2005, Plaintiff filed a grievance against Defendant Hunsky. (Dkt. No. 35 at ¶ 23.) Six days later, Defendant Theriault told Plaintiff that if he did not "stop writing grievances, I will personally do you bodily harm." *Id.* Plaintiff alleges that on that same day, Defendant Theriault did, in fact, attack him. (Dkt. No. 35 at ¶ 25.) In light of this history, Defendant Theriault's statement five months later that his "officers will continue to target [Plaintiff] for the grievances [he] wrote because they are human beings" (Dkt. No. 35 at ¶ 29) was neither vague nor unspecified. Therefore, the complaint states a claim that Defendant Theriault's threats constituted retaliation and I recommend that Defendants' motion be denied as to this claim.

**\*10** The complaint also states a cause of action for retaliation against Defendant Ball. Defendant Ball's threat that he was going to put Plaintiff in the SHU was fairly specific. Moreover, Plaintiff alleges that Defendant Ball did, indeed, put Plaintiff in the SHU the very next day. (Dkt. No. 35 at ¶ 32.) Accordingly, I find that the complaint alleges that Defendant Ball's threat was sufficiently specific in context to state a claim for retaliation and I recommend that Defendants' motion be denied as to this claim.

Defendant Monnely's comment that "if you make any sudden moves I will thr[ow] you to the ground and stomp you out" (Dkt. No. 35 at ¶ 3 3) was made in the context of processing Plaintiff into the SHU. Even liberally construed, the context of Defendant Monnely's comment does not plausibly suggest that it was sufficiently specific or related to constitutionally protected activity to state a claim for retaliation. Therefore, I recommend that Plaintiff's claim regarding this comment be dismissed.

2. *Sexual Harassment*

The complaint alleges that on April 26, 2006, while Plaintiff was being processed into the SHU, Defendant Monnely sexually harassed Plaintiff and fondled Plaintiff's anus. (Dkt. No. 35 at ¶ 33.) Defendants argue that Plaintiff has failed to state a claim against Defendant Monnely. (Dkt. No. 68–5 at 2–4.) Defendants are correct.

Sexual abuse of a prisoner by a corrections officer may, in some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. For example, "severe or repetitive sexual abuse of an inmate by a prison officer" may be actionable under the Eighth Amendment, as may situations where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir.1997) (holding that allegation that correctional officer touched inmate's penis on one occasion and pressed against him sexually on another occasion, while "despicable," was insufficient to state Eighth Amendment claim). *See also Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk insufficient to give rise to constitutional claim); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that correctional officer grabbed inmate's penis during pat frisk insufficient to state constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368 (S.D.N.Y.2001) (allegation that, on several occasions, correctional officer squeezed inmate's genitalia while pat-frisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Williams v. Keane,* No. 95 Civ. 0379, 1997 WL 527677, at \* 11 (S.D.N.Y. Aug. 25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmates genitals during pat frisk failed to state constitutional claim).

**\*11** The allegations here are virtually indistinguishable from the events described in *Boddie.* Therefore, I recommend that the claim against Defendant Monnely be dismissed.

**B. Conditions of Confinement Claim Regarding Dirty Mop Heads**

Plaintiff alleges that Defendants Coco and Sorell violated his constitutional rights by washing dirty mop heads with inmates' laundry, thus causing him to suffer a skin rash. (Dkt. No. 35 at ¶¶ 9, 18.) I have construed the complaint as asserting an Eighth Amendment conditions of confinement claim against Defendants Coco and Sorell. Defendants argue that Plaintiff has failed to state a constitutional claim or, in the alternative, that there is no triable issue of material fact on this issue. (Dkt. No. 68–5 at 4–5.) As discussed above, due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions, I will address only Defendants' argument that Plaintiff has failed to state a constitutional claim.

Generally, to state a claim of inadequate prison conditions, a plaintiff must allege facts plausibly suggesting two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious* such that the prisoner was denied the minimal civilized measure of life's necessities; and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). There is not a static test for Eighth Amendment conditions of confinement claims: the conditions must be evaluated in light of contemporary standards of decency. *Blissett v. Coughlin,* 66 F.3d 531, 537 (2d Cir.1995) (*citing Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Defendants argue, without citation to authority, that Plaintiff's allegations about his skin rash are not "sufficiently serious" to state an Eighth Amendment claim. (Dkt. No. 68–5 at 4–5.)

Prison officials are required to ensure that prisoners receive adequate clothing. *Farmer,* 511 U.S. at 832. The lack of clean clothing raises personal hygiene concerns that may implicate the Eighth Amendment. *See Blissett,* 66 F.3d at 537 (*citing Maxwell v. Mason,* 668 F.2d 361, 363 (8th Cir.1981) (unnecessary deprivation of adequate clothing and bedding violates Eighth Amendment); *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1410–11 (N.D.Cal.1984) (lack of laundry service for months violates Eighth Amendment), *aff'd in part, rev'd in part on other grounds,* 801 F.2d 1080 (9th Cir.1986), *cert. denied,* 481 U.S. 1069 (1987).

Here, the complaint alleges that Plaintiff's primary care physician was sufficiently concerned about Plaintiff's "contact with pernicious chemicals" that he instructed that a memorandum be issued to all of the housing units at the facility instructing that dirty mop heads should not be washed in the same machines as inmates' clothes. (Dkt. No. 35 at ¶¶ 5, 15.) Rather than heeding this advice, Defendant Sorell allowed porters to wash dirty mop heads in the inmate washing machine. (Dkt. No. 35 at ¶ 18.) Liberally construed, the complaint states an Eighth Amendment conditions of confinement claim based on the failure to provide adequate clothing. As discussed below, however, Defendants Coco and Sorell are entitled to qualified immunity.

## C. Retaliation Claims Based on False Misbehavior Reports

**\*12** Plaintiff alleges that Defendants Sorell, Hunsky, McDonald, and Ball issued false misbehavior reports. (Dkt. No. 35 at ¶¶ 19, 23, 24, 30, 32.) I have construed the complaint as asserting retaliation claims against these Defendants. Defendants argue that Plaintiff has failed to state a claim or, in the alternative, has failed to raise a genuine issue of material fact. (Dkt. No. 68–5 at 5–11.) As discussed above, due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions, I will address only Defendants' argument that Plaintiff has failed to state a claim [32].

[32]    On the evidence, Defendants argue that they are entitled to summary judgment because it is undisputed that Plaintiff committed the misconduct charged. (Dkt. No. 68–5 at 9–11.) Defendants rely on *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998). I note that *Hynes* is distinguishable because in that case the prisoner conceded, both at his disciplinary hearing and in his briefs before the district court, that he was guilty of the disciplinary charges. *Hynes,* 143 F.3d at 657.

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01–CV–0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in

constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

To state a claim for retaliation, a plaintiff must plead facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

"A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (*citing Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) and *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)).

The complaint states a retaliation claim against Defendant Hunsky regarding the August 31, 2005, misbehavior report. Plaintiff alleges that he filed a grievance against Hunsky "for filing a fa[ls]e misbehavior report, dated 8/25/05 [33]." (Dkt. No. 35 at ¶ 23.) Filing a grievance is a constitutionally protected activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Six days later, "[i]n retaliation for asserting my constitutional rights, Officer Hunsky fabricated a second misbehavior report ... resulting in [Plaintiff] being sent to the SHU." (Dkt. No. 35 at ¶ 24.) Filing a false misbehavior report that results in a SHU sentence is an "adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). Plaintiff's allegation that the adverse action took place six days after the protected activity plausibly suggests that there was a causal connection between the two events. Thus, the complaint alleges that Defendant Hunksy issued the second false misbehavior report in retaliation for Plaintiff's filing of a grievance regarding the first false misbehavior report. I therefore recommend that Defendants' motion be denied as to the retaliation claim against Defendant Hunsky

arising from the August 31, 2005, misbehavior report without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence.

[33]   To the extent that Plaintiff's complaint asserts a retaliation claim against Defendant Hunsky regarding the August 25, 2005, misbehavior report, I recommend that the claim be dismissed because the complaint does not assert facts plausibly suggesting a retaliatory motive.

**\*13** Defendants argue that Plaintiff "fails to make a showing in regard to McDonald." (Dkt. No. 68–5 at 5.) Defendants' argument hinges on evidence rather than on Plaintiff's complaint. (Dkt. No. 68–5 at 8–10.) Therefore, as discussed above, I will not address it due to the defects in Defendants' Statement of Material Facts and evidentiary submissions. Very liberally construed, the complaint states a claim against Defendant McDonald for retaliation. The complaint alleges that on January 23, 2006, Defendant Theriault told Plaintiff that his "officer[s] will continue to target [Plaintiff] for the grievance [he] wrote." (Dkt. No. 35 at ¶ 29.) Within the next week, Defendant McDonald issued two misbehavior reports to Plaintiff, which Plaintiff alleges were false. (Dkt. No. 35 at ¶ 30.) These facts plausibly suggest that Defendant McDonald took adverse action against Plaintiff for engaging in constitutionally protected activity. Therefore, I recommend that Defendants' motion be denied without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence.

Defendants argue that the complaint does not allege that Sorell acted in retaliation. (Dkt. No. 68–5 at 5.) The complaint does conclusorily allege that Sorell acted in retaliation. Paragraph 19 states: "Also *in retaliation* on 4/27/05 petitioner was given a Direct Officer to perform a work detail by correction officer Sorell. Upon informing this officer that I have a medical excuse that prohibits me from this task. This officer fabricated a false misbehavior report." (Dkt. No. 35 at ¶ 19, emphasis added.) The complaint further alleges that Defendant Sorell falsely testified at the subsequent disciplinary hearing and that this act, like all of the other acts alleged in the complaint, was "based on *retaliatory* actions against the plaintiff to dehumanize and discourage him from exercising his Constitutional Rights." (Dkt. No. 35 at ¶¶ 20, 35, emphasis added.) However, this conclusory allegation is

not plausibly supported by any facts in the complaint. The complaint alleges that Defendant Sorell washed mop heads with inmates' laundry and that two months later Defendant Sorell ordered Plaintiff to perform a work detail. (Dkt. No. 35 at ¶¶ 18–19.) It does *not* allege that Plaintiff filed any grievances against Defendant Sorell regarding the mop heads or complained about her actions to anyone. Thus, the complaint does not allege that Defendant Sorell took adverse action in response to Plaintiff's exercise of his constitutional rights. Therefore, I recommend that Defendants' motion be granted as to this claim.

Defendants argue that the complaint does not allege that Defendant Ball acted in retaliation. (Dkt. No. 68–5 at 5.) Defendants are correct that the paragraph describing Defendant Ball's behavior merely alleges that Defendant Ball "fabricated a misbehavior report and placed [Plaintiff] in the SHU" without alleging Defendant Ball had a retaliatory motive. (Dkt. No. 35 at ¶ 32.) However, as noted above, Paragraph 35 of the complaint alleges that all of the actions described in the complaint were retaliatory. (Dkt. No. 35 at ¶ 35.) Moreover, as discussed above, the complaint includes facts plausibly suggesting that Defendant Ball retaliated against Plaintiff for constitutionally protected activity. It alleges that Defendant Ball told Plaintiff that he planned to put Plaintiff in the SHU "because of the civil action [Plaintiff] had filed against his colleagues" and that he made good on this threat the very next day. (Dkt. No. 35 at ¶ 31–32.) These facts plausibly suggest that Defendant Ball retaliated against Plaintiff. Therefore, I recommend that Defendants' motion be denied as to this claim.

### D. Eighth Amendment Medical Care Claims

*14 Liberally construed, the complaint may be read as alleging that Defendants Coco, Sorell, and Plowman violated Plaintiff's Eighth Amendment right to adequate medical care. To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Defendants argue that Plaintiff has not alleged that he suffers from a serious medical need and that, even if he had, the complaint does not allege that Defendants were deliberately indifferent to that need.

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Regarding the claims against Defendants Coco and Sorell arising from the washing of the mop heads with inmates' clothing, although the complaint refers to Plaintiff's rash as "cancer-like" (Dkt. No. 35 at ¶ 10), the complaint is conspicuously devoid of any allegations that Plaintiff actually suffered pain or degeneration due to the rash. Moreover, I have not found any federal cases, published or unpublished, classifying this type of rash as a serious medical condition. As to the claim that Defendant Plowman removed medication from Plaintiff's personal property, the complaint does not specify what the medication was or why Plaintiff needed it. Therefore, I find that Plaintiff has not alleged a condition that is "sufficiently serious" to state an Eighth Amendment claim of inadequate medical care.

Even if Plaintiff had alleged a "sufficiently serious" condition, I would find that he has not alleged that Defendants Coco, Sorell, and Plowman acted with deliberate indifference to that need. For a complaint to adequately allege deliberate indifference, an inmate must plead facts plausibly suggesting that (1) a prison medical care provider was aware of facts from which the inference could be drawn the inmate had a serious medical need; and (2) that the medical-care provider actually drew that inference. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d

178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

**\*15** The complaint does not allege that Defendants Coco, Sorell, or Plowman were medical care providers. The complaint does not allege that they witnessed Plaintiff suffering from his rash or any other condition and declined to summon medical personnel. They were under no duty to provide medical care to Plaintiff. As discussed above, Plaintiff's claims against Defendants Coco and Sorell regarding the washing of the mop heads are better stated as conditions of confinement claims. The allegations against Defendant Plowman regarding the removal of Plaintiff's medication do not state any claim [34]. Therefore, I recommend that Defendants' motion be granted as to Plaintiff's Eighth Amendment medical care claims.

[34]    To the extent that Plaintiff asserts a Fourth Amendment claim against Defendant Plowman arising from this incident, I find it to be without merit and recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Skinner, 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) [citations omitted], accord, Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. Hudson v. Palmer 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also* Tinsley v. Greene,

95–CV–1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) (Pooler, J., adopting Report–Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.").

### E. Conclusory Allegations

Defendants argue that "the allegations regarding defendants are completely conclusory, and do not give defendants fair notice of plaintiff's claims." (Dkt. No. 68–5 at 13.) Defendants do not specify which allegations they claim are too conclusory.

Defendants correctly note that "[t]he Second Circuit has repeatedly held that complaints based on violations of constitutional rights must contain more than conclusory allegations to avoid dismissal." (Dkt. No. 68–5 at 13) (*citing* Polur v. Raffe, 912 F.2d 52, 56 (2d Cir.1990) and Barr v. Abrams, 810 F.2d 358, 363 (2d Cir.1987)). Here, Plaintiff's complaint contains more than conclusory allegations, to which Defendants have been able to respond. Therefore, I recommend that Defendants' motion be denied on this ground.

### F. Personal Involvement by Defendant Taylor

Plaintiff alleges that "Superintendent Taylor had a memorandum from the Medical Department that was posted removed ... that would have avoided the prolong[ed] practice of washing dirty mop heads in the inmate[ ] washing machines." (Dkt. No. 35 at ¶ 17.) I have construed the complaint as asserting an Eighth Amendment conditions of confinement claim against Defendant Taylor.

Defendants argue that Plaintiff's "only allegation against defendant Taylor involve[s] the assumption that, as the Superintendent, Taylor was somehow liable. Plaintiff does not allege any wrongdoing in connection with this act; nor does he allege this act in any way violated his Constitutional rights[35]." (Dkt. No. 68–5 at 14.)

[35]    To the extent that Defendants' argument relies on Plaintiff's deposition testimony, I decline to consider it due to the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d

2009 WL 1743987

496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[36] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[37] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[38] In other words, supervisory officials may not be held liable merely because they held a position of authority.[39] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[40]

[36]    *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

[37]    *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

[38]    *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

[39]    *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

[40]    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

**\*16** Here, as discussed above, the complaint states an Eighth Amendment conditions of confinement claim based on Plaintiff's allegation that he developed a rash because dirty mop heads were washed with his clothes. Construed liberally, the complaint alleges that Defendant Taylor personally participated in that violation by removing notices posted at the direction of Plaintiff's primary care physician warning about the

dangers of washing dirty mop heads with inmates' clothing. Therefore, I find that the complaint sufficiently alleges personal involvement by Defendant Taylor and I recommend that Defendants' motion be denied without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence[41].

[41]    Plaintiff's opposition to Defendants' motion appears to assert that Defendant Taylor was personally involved because he responded to Plaintiff's grievances. Those allegations do not appear in the complaint, and I decline to address them at this time.

### G. Eighth Amendment Excessive Force Claims

The complaint alleges that Defendants Plowman, Shareldon, and Theriault physically assaulted Plaintiff. (Dkt. No. 35 at ¶¶ 14, 25.) I have construed the complaint as asserting an Eighth Amendment excessive force claim against these Defendants. Defendants argue that Plaintiff has failed to state an Eighth Amendment excessive force claim against these officers because "taking [P]laintiff's allegations as true for purposes of this motion only, [P]laintiff has failed to allege anything more than a *de minimus* use of force[42]." (Dkt. No. 68–5 at 17.)

[42]    To the extent that Defendants' argument relies on Plaintiff's deposition testimony, I decline to consider it in light of the deficiencies in Defendants' Statement of Material Facts and evidentiary submissions.

An Eighth Amendment claim of excessive force "has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (*citing Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)).

Defendants argue, essentially, that Plaintiff has not pleaded sufficient facts to plausibly establish the objective element. "[T]here are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. To prevail on a claim based on the conditions of his confinement, a prisoner must show 'extreme deprivations,' ... However, no such showing of extreme injury is required when the claim is

that prison officials used excessive force." *Sims, 230 F.3d 14 at 21.*

Here, Plaintiff has pleaded harm arising from the November 6, 2004, attack by Defendant Plowman and the November 9, 2004, attack by Defendant Shareldon. Plaintiff alleges that each of these incidents "further infuriated" his "serious back problem." (Dkt. No. 35 at ¶ 41.) Therefore, Plaintiff has pleaded the objective element as to the November 2004 attacks by Defendants Plowman and Shareldon.

Plaintiff has not pleaded the objective element as to Defendants Theriault and Shareldon regarding the August 31, 2005, attack. Nowhere in the complaint does Plaintiff allege that he was harmed by this incident. Therefore, I recommend that Defendants' motion be granted and that Plaintiff's Eighth Amendment excessive force claims against Defendants Theriault and Shareldon arising from the August 31, 2005, incident be dismissed.

 **\*17** Plaintiff has not sufficiently pleaded the subjective element as to any of the defendants. "The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct." *Sims, 230 F.3d at 20.* "[W]hether conduct was "wanton" turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (citing *Hudson, 503 U.S. at 7).* Plaintiff does not even cursorily allege that Defendants Plowman or Shareldon acted wantonly. Absent from the complaint are any facts plausibly suggesting that Defendants Plowman and Shareldon acted wantonly. Rather, the complaint simply alleges that these Defendants "physically assaulted" Plaintiff. (Dkt. No. 35 at ¶ 14.) Therefore, I recommend that Defendants' motion be granted and that Plaintiff's Eighth Amendment claims against Defendants Plowman and Shareldon arising from the November 2004 incidents be dismissed.

### H. Qualified Immunity
Defendants argue that they are entitled to qualified immunity. Defendants argue that they did not violate any clearly established constitutional rights because "none of [P]laintiff's allegations, even if true, rise to the level of Constitutional violations." (Dkt. No. 68–5 at 20.) Even if there were constitutional violations, Defendants argue,

"it would not have been clear to a reasonable person that the actions by defendants as alleged by plaintiff violated plaintiff's Constitutional rights. No reasonable person in defendants' shoes would have thought those actions violated any clearly established right of the plaintiff." (Dkt. No. 68–5 at 20–21.) Defendants do not break down their qualified immunity argument by defendant or cause of action. Other than a statement of law, these quotes comprise the entirety of Defendants' qualified immunity argument.

I will discuss the application of the doctrine of qualified immunity to the following claims, which I have found sufficient to withstand Defendants' arguments on the constitutional merits: (1) the Eighth Amendment conditions of confinement claim against Defendant Coco arising from the washing of inmates' clothing with dirty mop heads; (2) the Eighth Amendment conditions of confinement claim against Defendant Taylor for removing the memoranda from Plaintiff's physician; (3) the Eighth Amendment conditions of confinement claim against Defendant Sorell arising from the washing of inmates' clothing with dirty mop heads; (4) the retaliation claim against Defendant Hunsky arising from the August 31, 2005, misbehavior report; (5) the retaliation claims against Defendant Theriault arising from the August 31, 2005, and January 23, 2006, threats; (6) the retaliation claims against Defendant McDonald arising from the January 2006 misbehavior reports; (7) the retaliation claim against Defendant Ball arising from the April 25, 2006, threat; and (8) the retaliation claim against Defendant Ball arising from the April 26, 2006, misbehavior report.

 **\*18** "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith, 781 F.2d 319, 322 (2d Cir.1986)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 815 [1982] ).* As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton, 380 F.3d 57, 68–69 (2d Cir.2004)* [citations omitted], *accord, Higazy v. Templeton, 505 F.3d 161, 169, n. 8 (2d Cir.2007)* [citations

omitted]. Courts may exercise their sound discretion in deciding which of the two prongs should be addressed first, in light of the circumstances in the particular case at hand. *Pearson v. Callahan,* ——U.S. ——, ——, 129 S.Ct. 808, 817, 172 L.Ed.2d 565 (2009).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211(1992). [43] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted]. [44] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [45]

[43] *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[44] *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[45] *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

I find that Defendants Coco and Sorell are entitled to qualified immunity against the Eighth Amendment conditions of confinement claims arising from the washing of inmates' clothing with dirty mop heads. As discussed above, the facts, viewed in the light most favorable to Plaintiff, state an Eighth Amendment conditions of confinement claim. However, this right was not defined with sufficient specificity that a reasonable officer, upon washing mop heads with inmate clothing, would have understood that his or her actions violated inmates' constitutional rights. Therefore, I recommend that Defendants' motion be granted as to these claims.

**\*19** As to the remaining claims, I find that Defendants are not entitled to qualified immunity because the facts viewed in the light most favorable to Plaintiff state constitutional claims, the rights in question were defined with 'reasonable specificity', the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 68) be **GRANTED IN PART** and **DENIED IN PART.**

**RECOMMENDED** that Defendants' motion be granted as to the following claims: (1) all claims against Defendant Monnely; (2) the retaliation claim against Defendant

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 114 of 203

Hunsky arising from the August 25, 2005, misbehavior report; (3) the retaliation claim against Defendant Sorell arising from the April 2005 misbehavior report and disciplinary hearing testimony; (4) the Eighth Amendment medical care claims against Defendants Coco, Sorell, and Plowman; (5) the Eighth Amendment excessive force claims against Defendants Plowman, Shareldon, and Theriault; and (6) the Eighth Amendment conditions of confinement claims against Defendants Coco and Sorell arising from the washing of dirty mop heads with inmates' clothing.

**RECOMMENDED** that Defendants' motion be **denied** as to the following claims without prejudice to the filing of a subsequent motion for summary judgment properly supported by a Statement of Material Facts and admissible evidence: (1) the retaliation claim against Defendant Theriault arising from the August 31, 2005, threat; (2) the retaliation claim against Defendant Theriault arising from the January 23, 2006, threat; (3) the retaliation claim against Defendant Ball arising from the April 25, 2006, threat; (4) the retaliation claim against Defendant Hunsky arising from the August 31, 2005, misbehavior report; (5) the retaliation claims against Defendant McDonald arising from the January 2006 misbehavior reports; (6) the retaliation claim against Defendant Ball arising from the April 26, 2006, misbehavior report; and (7) the Eighth Amendment conditions of confinement claim against Defendant Taylor.

**RECOMMENDED** that the Court *sua sponte* dismiss: (1) any Fourth Amendment claim against Defendant Plowman arising from his removal of Plaintiff's medication from Plaintiff's personal property; (2) any retaliation claim against Defendant Coco arising from his transfer of Plaintiff to another dormitory; and (3) any Eighth Amendment medical care claim against Defendant Sorell arising from the April 2005 misbehavior report.

**RECOMMENDED** that the Court find that the complaint asserts the following claims, which Defendants have not addressed and which are sufficiently well pleaded to withstand *sua sponte* review: (1) a retaliation claim against Defendant Plowman arising from the November 6, 2004, physical attack; (2) a retaliation claim against Defendant Shareldon arising from the November 9, 2004, physical attack; (3) retaliation claims against Defendants Theriault and Shareldon arising

from the August 31, 2005, physical attack; and (4) a retaliation claim against Defendant Plowman arising from the removal of Plaintiff's medication from his personal property on September 3, 2005.

**\*20** **ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day)**. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [46]

[46]   *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at \* 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their

2009 WL 1743987

strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1743987

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1459740
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jason HOFELICH, Plaintiff,

v.

Superintendent Robert ERCOLE, Deputy
Superintendent R. Cunningham, Sgt. Strasser,
Sgt. Lonczak, Sgt. Centanni, C.O. Gadaway,
C.O. Flora, Grievance Civilian Supervisor
Mike Henn, C.O. B. Wilson, Defendants.

No. 06 Civ. 13697(PKC).
|
April 8, 2010.

West KeySummary

1    **Constitutional Law**
        👉 Prisoners

    **Prisons**
        👉 Threats, Intimidation, and Harassment;
    Abusive Language

Alleged threat by inmate grievance supervisor
to inmate that inmate would "end up with
trauma that [was] irreversible" if he continued
to file grievances against prison staff did
not constitute adverse action against inmate
because no facts established that a single
threat from supervisor would have been
enough to deter an inmate of ordinary
firmness from exercising his constitutional
rights. Inmate, who filed 190 grievances
during a single year of incarceration, did
not provide information regarding the date,
time, or place of the alleged threat, nor any
information about the supervisor's authority
that would have deterred an ordinary inmate
from continuing to file grievances after a
single threat, despite ample opportunity for
discovery.

Cases that cite this headnote

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Jason Hofelich brings this civil rights action
pursuant to 42 U.S.C § 1983, claiming that defendants
violated his constitutional rights. On January 11, 2010,
by Memorandum and Order (the "Memo & Order") I
granted summary judgment in favor of all but two of
the moving defendants, Robert Ercole and Patrick Henn.
See *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL
184453 (S.D .N.Y. Jan. 11, 2010). On January 25, 2010,
defendants Ercole and Henn moved for reconsideration of
this decision. (Docket No. 47.) Plaintiff, proceeding *pro se,*
has not filed any opposition. For the reasons stated below,
I have reconsidered my prior ruling and grant summary
judgment in favor of defendants Ercole and Henn. In
addition, plaintiff's claims against defendant Corrections
Officer Wilson, who has not been served with process, are
dismissed without prejudice.

DISCUSSION

I. *Defendants Ercole and Henn*
The standards for relief under Local Civil Rule 6.3
and Rule 59(e), Fed.R.Civ.P. are "identical." *Griffin
Indus., Inc. v. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368
(S.D.N.Y.1999). "Local Civil Rule 6.3 elaborates on
Fed.R.Civ.P. 59(e) and provides a vehicle for a party to
call the court's attention to facts or controlling decisions
it believes the court overlooked in reaching its prior
decision." *Truong v. Charles Schwab & Co., Inc.,* 07 Civ.
8085(SHS), 2009 WL 464452, at \*1 (S.D.N.Y. Feb. 24,
2009) (quotation marks and footnote omitted).

"In moving for summary judgment against a party who
will bear the ultimate burden of proof at trial, the
movant's burden will be satisfied if he can point to
an absence of evidence to support an essential element
of the nonmoving party's claim." *Goenaga v. March of
Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).
Conclusory assertions contained in an affidavit or verified
pleading, are not sufficient to create a genuine issue of
fact. *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d
Cir.2004).

Because I assume the parties' familiarity with the facts as set forth in the Memo & Order, I will discuss only those facts that are necessary to decide the defendants' motion. Plaintiff alleges that defendant Ercole told him that "if [plaintiff] continued to write and report complaints, [he would] never go home but receive a new sentence on a set-up." (Amended Petition, attached to an incorporated into the Amended Complaint, at 5.) Plaintiff's complaint does not provide any details regarding the date, time or place when this threat was allegedly made, and plaintiff did not come forward with evidence to supplement this allegation in response to the defendants' summary judgment motion. Plaintiff also alleges that defendant Henn "told [plaintiff] himself that if [he] continue[d] to write the Warden, Deputy Warden and security supervisors up [plaintiff will] end up with trauma that is irreversible." (*Id.* at 2.) As with the other alleged threat, after full and fair discovery plaintiff has been unable to provide information regarding the date, time or place of the alleged threat.

**\*2** It is undisputed that during the time period relevant to plaintiff's action, beginning in or about March 2006 and ending in or about March 2007 (Am.Compl.II. C.), plaintiff filed approximately 190 grievances. (Declaration of Rebecca Loren ("Loren Decl.") ¶ 5.) It is also undisputed that during approximately the same time, plaintiff filed 95 appeals to the Central Office Review Committee, which renders final administrative decisions under the New York State Department of Correctional Services Inmate Grievance Program. (Declaration of Karen Bellamy ¶¶ 1, 5.)

a. *Plaintiff Did Not Suffer Any Adverse Action*
To state a First Amendment retaliation claim, a plaintiff must show, "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N .A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Whether something is an adverse action is an objective inquiry. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* (quotation marks omitted).

In the Memo & Order, I concluded that an alleged threat "from the superintendent of the correctional facility in which a prisoner is incarcerated that the prisoner would be set up and receive a new sentence," and a threat from an individual who worked at the corrections facility in an inmate grievance capacity "that plaintiff would receive irreversible trauma if he continued to file grievances about specific corrections personnel," were sufficient to deter an inmate of ordinary firmness from exercising his or her First Amendment rights. In reaching that conclusion, I recognized that "[c]ase law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton,* No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at \*23 (S.D.N.Y. May 29, 2007)) (Report and Recommendation). However, in addressing the issue of whether a similarly situated individual of ordinary firmness would be deterred from exercising his constitutional rights, I failed to give any consideration whatsoever to the plaintiff's non-stop filing of 190 grievances. Plaintiff's own actions are not controlling on the "ordinary firmness" standard, but they are not irrelevant. Also, I did not focus plaintiff's failure to come forward with evidence as to the time, place, circumstances or context for the two alleged threats after he had a full and fair opportunity to conduct discovery.

Plaintiff alleges that defendant Henn was an "Inmate Grievance Supervisor" at Green Haven Correctional Facility ("Green Haven"). But plaintiff has not come forward with evidence regarding the scope of Henn's authority at Green Haven or other information about Henn's status that bears on whether a single harsh threat from him would have deterred an inmate of ordinary firmness from exercising his or her constitutional rights. Had the single threat been of such significance that it would deter an inmate of ordinary firmness, one would expect that plaintiff would, at the least, be able to set forth—after a full opportunity to conduct discovery—the approximate date, month or season of the year when it was made. In response to the defendants' motion, plaintiff has come forward with nothing other than the original allegation of the verified Amended Complaint. Nothing in his deposition fills the missing gaps. (Partial Transcript of the Deposition of Jason Hofelich, taken on December 22, 2006, ("Tr.") at 128:3–4, 130:11–20, 180:2–10, 183:12–19, 185:12–186:22, attached as Exhibit D to

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 118 of 203

the Declaration of Assistant Attorney General Julinda Dawkins, dated May 15, 2009.)

**\*3** Plaintiff alleges that defendant Ercole threatened him with "a new sentence on a set-up." As with the alleged threat from defendant Henn, plaintiff has not provided any details regarding the alleged threat from Ercole. [1] In addition, drawing all reasonable inferences in plaintiff's favor, plaintiff has alleged that Ercole threatened to have him accused, tried, convicted and sentenced on a false charge. Malicious prosecutions occur in society and it is plausible that corrections personnel could make a false accusation of a crime that led to a prosecution, conviction and a new sentence. While prison disciplinary proceedings are commonplace, there is no evidence proffered by plaintiff that any prisoner was prosecuted for any crime committed while imprisoned based on the complaint of corrections personnel. There is no basis to conclude that they are common. Nor is there a single example provided of such a prosecution arising out of Green Haven that was falsely and maliciously instituted by corrections personnel. In the absence of such evidence and without even a recollection of the approximate date, a prisoner of "ordinary firmness" would not be deterred by such an empty threat and, as noted, the plaintiff in this case was not.

[1]    At his deposition, plaintiff testified about an incident which he believed occurred in April 2006. According to plaintiff: "[Ercole] mentioned that my parole, he's going to make sure I max out." (Tr. at 96:7–100:12.) Ensuring a prisoner serves the full term of his lawfully imposed sentence, however, is not the same as threatening to "set-up" a prisoner for a new, unlawful prison sentence, and does not add context to the threat that plaintiff actually alleged in his Amended Complaint.

I also note that during the relevant time period, the plaintiff filed multiple grievances in each and every month, from March 2006 to March 2007, totaling approximately 190 separate grievances. (Loren Decl. Ehx. A.) Although this shows that subjectively, plaintiff was not deterred from filing grievances, it also bears on whether a reasonable jury could find that a "similarly situated individual of ordinary firmness" would have been deterred from exercising his or her constitutional rights. Because the "ordinary firmness" standard is an objective test, the fact that plaintiff was not deterred from exercising his constitutional rights is not dispositive. *Gil v.*

*Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). However, the fact that plaintiff was not deterred from filing grievances is some evidence that a similarly situated prisoner of ordinary firmness would not have been deterred. *Smith v. Yarrow,* 78 Fed. App'x 529, 541 n. 8 (6th Cir.2003) (unpublished) ("The [ordinary firmness] inquiry is more objective than subjective. However, it does seem that the fact that Plaintiff proceeded with the lawsuit offers some probative evidence that the conduct was not a sufficient deterrent under the objective standard."). In response to the defendants' motion, plaintiff has not come forward with any evidence that he is a person of unusual firmness. *Keenan v. Daniel,* 63 Fed. App'x 180, 182 (6th Cir.2003) (unpublished order) ("Though the test for the deterrent effect of any retaliation is objective, not subjective, we note that the revised evaluation did not prevent [plaintiff] from filing another grievance contesting the revised evaluation, and there is no indication that [plaintiff] is a person of unusual firmness.") (internal citation omitted).

**\*4** Finally, the threats occurred, if at all, in a prison, and not, for example, in an office. The Second Circuit has recognized that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 493 (quotation marks omitted) (alteration in original).

Therefore, in the face of the defendants' summary judgment motion, the plaintiff was obliged to come forward with evidence that would allow a reasonable jury to conclude that Ercole's and Henn's threats were adverse actions. This he failed to do. Viewing the evidence most favorably to plaintiff, no reasonable fact finder could find in his favor on this claim.

## II. *Corrections Officer Wilson*

Corrections Officer Wilson is not represented by the Attorney General, and did not move for summary judgment along with the other defendants. In the Memo & Order I noted that it was unclear whether defendant Wilson had been served with a summons and the Amended Complaint, and I directed the Attorney General to clarify Wilson's status by February 1, 2010. (Memo & Order at 2, n. 1.) By letter dated January 28, 2010, the Attorney General confirmed that defendant Wilson has never been served. (Docket No. 49.) On January 29, 2010, I issued an order by memo endorsement stating:

"Unless plaintiff shows good cause otherwise by February 26, 2010, the claim against Officer Wilson will be dismissed without prejudice for failure to serve under Rule 4(m) within 120 days." (*Id.*) Plaintiff has not responded to that order.

Rule 4(m), Fed.R.Civ.P., states that if "a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Plaintiff filed his Amended Complaint on or around March 21, 2007, and has not served Wilson. Therefore, pursuant to Rule 4(m), plaintiff's claims against Corrections Officer Wilson are dismissed without prejudice. CONCLUSION

For the reasons stated above, defendants Ercole and Henn's motion for reconsideration (Docket No. 47) of my prior order in *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL 184453 (S.D.N.Y. Jan. 11, 2010) is GRANTED.

I grant summary judgment in favor of defendants Ercole and Henn on plaintiff's First Amendment retaliation claim.

Plaintiff's claims against Corrections Officer Wilson are DISMISSED WITHOUT PREJUDICE.

Defendants are directed to serve plaintiff with copies of all unreported decisions cited in this Memorandum and Order, and in *Hofelich v. Ercole,* 06 Civ. 13697(PKC), 2010 WL 184453 (S.D.N.Y. Jan. 11, 2010).

The Clerk is directed to enter judgment in favor of all defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1459740

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1544629

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tolliver v. Skinner, S.D.N.Y., August 10, 2017

2007 WL 1544629
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK)(GWG).
|
May 29, 2007.

**Attorneys and Law Firms**

George Lunney, Elmira, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York, NY, for Defendants.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

*TABLE OF CONTENTS*

| | | |
|---|---|---|
| I. | BACKGROUND ................... | 2 |
| | A. Facts ...................... | 2 |
| | B. Procedural History .............. | 5 |
| II. | APPLICABLE LAW ............... | 8 |
| | A. Standard of Review on Summary Judgment Motions ............... | 8 |
| | B. Exhaustion ................ | 10 |
| | 1. PLRA .............. | 10 |
| | 2. New York's Inmate Grievance Program% i .......... | 11 |
| III. | DISCUSSION ................... | 12 |
| | A. Eighth Amendment Claim Relating to Food in the SHU .............. | 12 |
| | B. Eighth Amendment Claim of Excessive Force ........ | 16 |
| | 1. Exhaustion ................. | 16 |
| | 2. Merits ................... | 21 |
| | C. Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items ..................... | 26 |
| | 1. Laundry Services .............. | 2 7 |
| | 2. Plumbing Problems and Failure to Provide Personal Hygiene Items ..... | 28 |
| | 3. Personal Involvement .................. | 30 |
| | D. First Amendment Retaliation Claims .............. | 30 |

|   |   |   |   |
|---|---|---|---|
| 1. | *Law Governing First Amendment Retaliation* ........... | | 31 |
| 2. | *Claims against Fischer* ............... | | 32 |
| 3. | *Claims against Blot* .............. | | 34 |
| | a. | Exhaustion of Claims Against Blot% i ......... | ........... 34 |
| | b. | *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals,* ........... 37 *and Recreation* ........... | |
| | | i. | Adverse Action........................................... | 38 |
| | | ii. | Causal Connection.................................... | 40 |
| | c. | *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior* ........... 41 *Report* ............... | |
| | d. | *The Merits of Lunney's Allegation that Blot Threatened Physical* ........... 43 *Violence* .............. | |
| | e. | *The Merits of Lunney's Allegation of Retaliatory Assault* ..... ........... 45 | |
| 4. | *First Amendment Claim Against Frazier* .......... | | 47 |
| 5. | *First Amendment Claim Against Brereton* ........ | | 47 |
| E. | *Unfiled Grievances* ............... | | 4 8 |
| F. | *Fourteenth Amendment Due Process Claims* .......... | | 50 |
| 1. | *Law Governing Disciplinary Proceedings* .......... | | 50 |
| 2. | *Written Disposition of Disciplinary Hearing* .......... | | 51 |
| Conclusion ........................ | | | 55 |

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

## I. *BACKGROUND*
The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to

2007 WL 1544629

allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24, 2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under Fed.R.Civ.P. 56(e).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

**\*2** Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/ Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2.

On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton,[1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

1   This officer is identified as Lieutenant "Brureton" in the complaint.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See* Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

**\*3** Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that on, one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

### B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights

under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brereton,* 2005 WL 121720, at \*16 (S.D.N.Y. Jan.21, 2005) (*"Lunney I"*), *adopted by,* 2005 WL 433285, at \*1 (S.D.N.Y. Feb.23, 2005).* Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at \*16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous sub-standard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.;* (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff

2007 WL 1544629

with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims.[2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

[2]    *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement,

filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

## II. *APPLICABLE LAW*

A. *Standard of Review on Summary Judgment Motions*
Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,*

477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

### B. *Exhaustion*

#### 1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"-that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that

his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

> First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

### 2. New York's Inmate Grievance Program

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See* Hemphill, 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases).

### III. DISCUSSION

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

### A. Eighth Amendment Claim Relating to Food in the SHU

Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable,

inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on one occasion he and other inmates "became ill after eating," *see Id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id.* at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted,

Case 9:16-cv-01343-GTS-TWD Document 25 Filed 02/02/18 Page 127 of 203
Lunney v. Brureton, Not Reported in F.Supp.2d (2007)
2007 WL 1544629

Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what we're supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or food that posed an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in correcting the problems with the food" and that he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer,* 2004 WL 766433, at *6 (S.D.N.Y. Apr.12, 2004) ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies.") (citing *Hernandez v. Coffey,* 2003 WL 22241431, at *3 n. 4 (S.D.N.Y. Sept.29, 2003) (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov.1, 2005) ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

**\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside agencies and D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

### B. *Eighth Amendment Claim of Excessive Force*

Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32. [3]

[3]     Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The

2007 WL 1544629

retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

### 1. *Exhaustion*

Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to any instance of excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see* Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

**\*9** The first question is whether administrative remedies were in fact "available" to Lunney. *Brownell,* 446 F.3d at 311 (citing *Hemphill,* 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738; *accord Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see Hemphill,* 380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the

alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See Hemphill,* 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See Hemphill, e.g.,* 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a living hell"); *McCullough v. Burroughs,* 2005 WL 3164248,

at *4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at *4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

**\*10** Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ]" this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining" about such force. Each merely noted that there had been some such documentation. For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did

not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question. [4]

4    Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g., Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also Dukes v. Doe,* 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf. Pauling v. Sec'y of Dep't of Interior,* 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See Jones v. Bock,* --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

Lunney v. Brureton, Not Reported in F.Supp.2d (2007)
Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 130 of 203
2007 WL 1544629

### 2. Merits

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e)(1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised" where Frazier had grabbed" him and that he had a "couple [of] black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74; *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14,

21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at \*5 (S.D.N.Y. June 20, 2006) (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind.").

**\*12** In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated

2007 WL 1544629

to any 'good-faith effort to maintain or restore discipline.' ") (citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.' " *See id.* Both these circumstances are present in Lunney's case, however.

**\*13** In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face turn red. 2001 WL 476070, at *13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or "nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at *1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where (1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New*

York, 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); Johnson v. City of New York, 2006 WL 2354815, at *5 (S.D.N.Y. Aug.14, 2006) (citing cases).

### C. Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. See Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, see Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." Id. To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting Rhodes, 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." Wilson, 501 U.S. at 302-03.

### 1. Laundry Services

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. See Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." See Lunney I, 2005 WL 121720, at *8 (citing Green v. Ferrell, 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted

to wash their clothes in sinks and were provided with laundry detergent)); Benjamin v. Fraser, 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), aff'd in relevant part and vacated in part, 343 F.3d 35 (2d Cir.2003). The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." See Lunney I, 2005 WL 121720, at *8. Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. See generally Benjamin, 161 F.Supp.2d at 178-79. That Lunney asserts he was without soap for eight days and had a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

### 2. Plumbing Problems and Failure to Provide Personal Hygiene Items

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." See Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." See id. (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." See Id. ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." See id.

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. See Trammell v. Keane, 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting Farmer, 511 U.S. at 837) (alterations in original); Fernandez

*v. Armstrong,* 2005 WL 733664, at *5-6 (D.Conn. Mar.30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at *4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

### 3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.' " *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,*

58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

### D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at *11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

### 1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)

("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

### 2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S.

officials in Albany, New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

**\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25. [5]

5    Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally Davidson v. Donnelly,* 2004 WL 1941349, at *3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no

evidence on reason for transfer and prison officials gave reasons).

### 3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

#### a. *Exhaustion of Claims Against Blot*

As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and

tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g). More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

> **\*19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill,* 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases). [6]

[6]   The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. *See, e.g., Hepworth v. Suffolk County,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); *McCullough,* 2005 WL 3164248, at *3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20** Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[ ] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in

original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"* ); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006) (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004) (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law. [7]

[7]   While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096011, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that upon arrival to the SHU, he immediately complained about the conditions of his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances. [8]

8   Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

### c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003-approximately six months after he left the SHU-"stemmed from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges.⁹ *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

9   This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23** Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

### d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h), and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney

Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare Hepworth,* 2006 WL 2844408, at *8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); *Brown v. Coughlin,* 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); *Thaddeus-X,* 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with Bartley v. Collins,* 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); *Cruz v. Hillman,* 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24** Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write

grievances. In other words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

### e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible evidence supporting [his] claim" on this point. *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted). [10]

---

[10] Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See Smith v. Woods,* 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd,* 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); *Gill v. Riddick,* 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); *Malik'El v. New York State Dept. of Corr. Servs.,* 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

> [d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot then proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim. [11]

[11]  Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

### 4. *First Amendment Claim Against Frazier*

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus,

defendants must be denied summary judgment as to the claim against Frazier.

### 5. *First Amendment Claim Against Brereton*

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

### E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See* Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42 U.S.C. § 1983. *See Cancel,* 2001 WL 303713, at \*3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); *Fernandez,* 2005 WL 733664, at \*9; *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)).

**\*26**  It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. *Green v. Phillips,* 2006 WL 846272, at \*11-12 (S.D.N.Y. Mar.31, 2006) (quoting *Cancel v. Goord,* 2001 WL 303713, at \*4 (S.D.N.Y. Mar.29, 2001)); *accord Rivera v. Pataki,* 2005 WL 407710, at \*17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g., Brownell,* 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

### F. *Fourteenth Amendment Due Process Claims*
As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one the Court dismissed on the merits in its original ruling, *see Lunney I,* 2005 WL 121720, at \*14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim. [12]

[12]    The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not

raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

### 1. *Law Governing Disciplinary Proceedings*
A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz,* 380 F.3d at 654 (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

**\*27**  There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

### 2. *Written Disposition of Disciplinary Hearing*
As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition.

In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23. [13]

[13]  Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act a[s] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape.

Nor does he allege that the written decision contained any information that was not on the tape.

**\*28**  In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at *13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at *2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at *6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at *13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at *11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any failure to provide Lunney with a written disposition of the result of his disciplinary hearing in a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at 23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus,

defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

**\*29** Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

### Conclusion

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their

motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [14]

[14]   Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn*, 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 1544629

---

2006 WL 2844408
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

William HEPWORTH, Plaintiff,
v.
SUFFOLK COUNTY, Suffolk County Correction
Officers Steven Campitello and George Campatella,
Sergeant Allen, Suffolk County Correction Officers
who worked yards 4 and 5 on the 7am to 3pm tour
and yard 1-2-3 on August 5, 2002, Defendants.

No. 2:02-CV-6473 ENV/ETB.
|
Sept. 29, 2006.

**Attorneys and Law Firms**

William Hepworth, Fishkill, NY, pro se.

John Wyman Cobb, Cobb & Cobb, Esqs., Tuxedo, NY,
for Plaintiff.

Robert A. Caccese, Suffolk County Attorney's Office,
Hauppauge, NY, for Defendants.

ORDER

VITALIANO, D.J.

**\*1** On May 5, 2005, defendants moved for summary
judgment on two grounds: (i) plaintiff's failure to exhaust
administrative remedies; and (ii) plaintiff's failure to state
a claim cognizable under 42 U.S.C. § 1983. By order
dated April 6, 2006, District Judge Dora Irizarry referred
the motion to Magistrate Judge E. Thomas Boyle. On
August 1, 2006, Magistrate Judge Boyle issued a report
and recommendation recommending that the Court deny
defendants' motion for summary judgment. Defendants'
have not subsequently filed objections.

When reviewing a magistrate's report and
recommendation, this Court "may accept, reject, or
modify, in whole or in part, the findings and
recommendations...." 28 U.S.C. § 636(b)(1)(C). When,
as here, no timely objection has been made to the
report and recommendation, this Court "need only satisfy

itself that there is no clear error on the face of the
record." Urena v. New York, 160 F.Supp.2d 606, 609-10
(S.D.N.Y.2001) (quoting Nelson v. Smith, 618 F.Supp.
1186, 1189 (S.D.N.Y.1985)).

After careful review of all the evidence in the
record, this Court finds Magistrate Boyle's report and
recommendation to be correct, comprehensive, well-
reasoned, and free of any clear error. The Court, therefore,
adopts the report and recommendation in its entirety as
the opinion of the Court. Accordingly, for the reasons
stated therein, defendants' motion for summary judgment
is denied.

Counsel are directed to submit a joint pre-trial order, in
accordance with this Court's individual motion practices
and rules, by October 29, 2006. A final pre-trial conference
will be held on November 3, 2006 at 11 a.m. in Courtroom
# 6 of the United States Federal Courthouse, located at
225 Cadman Plaza East, Brooklyn, New York 11201.

SO ORDERED.

*REPORT AND RECOMMENDATION*

E. THOMAS BOYLE, Magistrate J.

Plaintiff William Hepworth ("Hepworth") brings this civil
rights action under 42 U.S.C. § 1983 ("Section 1983")
alleging that Corrections Officer Steven Campitello and
others used unreasonable and excessive force against him
at Riverhead Correctional Facility. Defendants now move
for summary judgment pursuant to Federal Rules of Civil
Procedure 56(c) seeking to dismiss the complaint on two
grounds: (1) failure to exhaust administrative remedies;
and (2) failure to state an actionable claim under Section
1983.

I. *BACKGROUND*

A. *The Alleged Assaults*
Hepworth was an inmate at the Suffolk County
Correctional Facility in Riverhead from May 25, 2002
through April 16, 2003. (Pl.'s Rule 56.1 Statement ¶ 1;
Defs.' Rule 56.1 Statement ¶¶ 1, 5.) Hepworth alleges that
on or about August 5, 2002, while he was in custody,
a fight broke out among inmates in one of the exercise
yards. (Pl.'s Am. Compl. ¶ 8.) Plaintiff alleges that he

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

was involved in the altercation, but was nevertheless subject to disciplinary actions. (*Id.*) Plaintiff alleges that at the time of the fight, he was seized and handcuffed by the correction officer defendants. (*Id.*) According to Hepworth, defendant Steven Campitello ("Campitello"), a corrections officer, grabbed him around the throat and said "this is what happens to people who testify against corrections officers," in apparent reference to events that occurred in 1991, when plaintiff testified in federal court as a witness against other corrections officers employed by Suffolk County. (*Id.* ¶¶ 9-10.) Plaintiff alleges that he was then beaten by defendant Campitello and other officers, and as a result, suffered severe bodily injuries including bruising and contusions to the face, head, body, legs, ribs and shoulders, a wound to the right wrist, two black eyes, two broken teeth, and nerve damage to the right hand. (*Id.* ¶¶ 10-14.) Plaintiff further alleges that following the August 5, 2002 incident, he was "subject to a campaign of harassment and assault," including physical assaults by defendant Campitello on or about September 28, 2002 and October 22, 2002; verbal threats to plaintiff and his wife at the visitor's room at the Riverhead Correctional Facility on or about September 7, 2002; and threats to plaintiff that if defendant Campitello was disciplined, plaintiff would be beaten or killed. (*Id.* ¶ 14.)

**\*2** Plaintiff states that on August 6, 2002, he filled out a grievance form concerning the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.) However, according to plaintiff, when he gave the form to an officer to be submitted, the officer ripped it into pieces and threw it in the trash can, telling plaintiff that he could not file a complaint, and that if plaintiff tried to do it again, he would get another beating. (*Id.*) Plaintiff states that he was frightened by the threat so he did not attempt to file another in-house grievance, but he wrote letters of complaint to the United States Attorney General, the New York State Attorney General, the New York State Police Headquarters, the Inspector General of the New York State Department of Correctional Services, the Special Counsel of the State of Correction Executive Department, and the New York State Grievance Committee for the Tenth Judicial District. (*Id.* ¶¶ 6-7; Pl.'s Am. Compl. ¶ 16.) Plaintiff states that he also contacted the Suffolk County Correctional Facility's Internal Affairs Bureau ("SCCF Internal Affairs Bureau") to file a complaint, and that he was interviewed and photographed by the SCCF Internal Affairs Bureau. (Pl.'s Aff. ¶ 4.)

**B.** *New York Department of Correctional Services Grievance Procedures*

In their motion for summary judgment, defendants contend that Hepworth failed to exhaust his administrative remedies. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Defs.' Mem. in Supp.") at 1.) In support of their motion, defendants submitted an affidavit from Donna Ketonen ("Ketonen"), Executive Officer of the Grievance Evaluation Unit at the Suffolk County Correctional Facility, explaining the correctional facility's grievance procedures. (Affidavit of Donna Ketonen, dated March 21, 2005 ("Ketonen Aff.").) Ketonen states that prisoners who seek administrative review of a grievance are directed to follow the procedures set forth in the Suffolk County Correctional Facility Rules & Regulations book (the "Rules book"), which prisoners receive upon entering the jail. (*Id.* ¶ 3. *See also* Booking Sheet Receipt, annexed as Exh. A. to Affirmation of Arlene S. Zwilling, dated March 23, 2005 ("Zwilling Aff.").) The Rules book directs inmates with a complaint or problem to first attempt to get it resolved with the officer assigned to the inmate's housing unit. (Suffolk County Correctional Facility Rules & Regulations, annexed as Exh. B to Zwilling Aff., at 15-16.) If that effort is unsuccessful, the inmate may request and will receive a grievance form to fill out. (*Id.*) The Rules book states that the grievance will be investigated and the inmate will receive a written determination from the grievance coordinator within 5 business days. (*Id.*) If the inmate is not satisfied with the grievance coordinator's decision, the inmate may appeal to the Chief Administrative Officer, and, if still unsatisfied, to the State Commission of Correction. (*Id.*) Ketonen stated in her affidavit that Hepworth filed no grievances pursuant to the Inmate Grievance Program in the period May 25, 2002 through April 16, 2003. Defendants argue that because plaintiff submitted no evidence that he prepared the grievance, plaintiff has failed to raise a factual issue regarding his attempt to file a grievance. (Defs.' Mem. at 4.) However, plaintiff alleges that a corrections officer ripped up the grievance and threw it away. The destruction of the grievance by a corrections officer is a plausible explanation for plaintiff's failure to submit the grievance as evidence. [1] Defendants submitted no affidavits from corrections officers disavowing plaintiff's verison of events.

1    Defendants also note, in their effort to argue that plaintiff failed to submit evidence as to the existence of the grievance, that the statement in plaintiff's counsel's affidavit "is not evidence that there was a grievance, since his attorney has no personal knowledge of the grievance." (Defs.' Mem. at 4.) While this may be so, defendants have apparently overlooked plaintiff's own affidavit, which clearly sets forth the circumstances surrounding plaintiff's attempt to file a grievance about the August 5, 2002 incident. (Pl.'s Aff. ¶ 5.)

**\*3** Regardless, plaintiff does not dispute that he did not file any grievances with the correction facility-the essence of plaintiff's claim is that when he attempted to file a grievance about the August 5, 2002 incident, he was prevented from doing so and threatened not to make another attempt to file a grievance. Plaintiff states that he heeded the threat, and instead wrote letters of complaint to government officials removed from the internal grievance process. In opposition to defendant's motion, plaintiff submitted a copy of a letter dated August 23, 2002, addressed to "To Whom it May Concern," detailing the August 5, 2002 incident. (Declaration of John Cobb, dated April 12, 2005 ("Cobb Decl."), Exh. 8.) Plaintiff states that this is a copy of the letter of complaint he sent to the aforementioned governmental officials. (Pl.'s Aff. ¶ 7.) Plaintiff also submitted a letter dated October 1, 2002 to Sheriff Tisch of the Suffolk County Sheriff's Office from Alan J. Croce, Chairman/Commissioner of the State Commission of Correction, directing the sheriff's office to investigate Hepworth's complaint of assaults by officers on several occasions. (Cobb Decl., Exh. 9.) Plaintiff states that apart from his interview with the Suffolk County Correctional Facility's Internal Affairs Bureau, nothing resulted from his letters of complaint. (Pl.'s Aff. ¶¶ 4, 8.)

## II. DISCUSSION

A. *Legal Standard for Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to establish

the lack of any factual issues. *See id.* Summary judgment is not appropriate where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party has carried its burden, the party opposing the summary judgment motion must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id.* at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing there is a genuine issue for trial." *Anderson,* 477 U.S. at 248.

By its terms, Rule 56 does not require the district court judge to make any findings of fact. *See Anderson,* 477 U.S. at 250. The only inquiry to be performed is the determination of whether there is a need for trial. *See id.* The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

B. *Availability of Administrative Remedies under the PLRA*

**\*4** The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under Section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement "applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). *See also Woodford v. Ngo,* --- U.S. ----, ----, 126 S.Ct. 2378, 2383, 165 L.Ed.2d 368 (2006). Accordingly, a defendant may raise "failure to exhaust" as an affirmative defense, as defendants here did. (Defs.' Answer to Am. Compl. ¶ 15.)

In 2004, the Second Circuit Court of Appeals issued a series of opinions addressing the PLRA's exhaustion requirement. *See Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (collectively, the "2004 Second Circuit exhaustion cases"). In *Hemphill v. New York* 380 F.3d 680, the Second Circuit held that in some circumstances, despite the exhaustion requirement under the PLRA, "the behavior of the defendants may render administrative remedies unavailable." *Hemphill,* 380 F.3d 680, 686 (2d Cir.2004). The court set forth a three-part inquiry to be applied in cases where a prisoner plausibly seeks to counter defendants' contention that the prisoner failed to exhaust administrative remedies under the PLRA. *Id.* When faced with such circumstances, a district court should examine: (1) whether administrative remedies were in fact "available" to the prisoner; (2) whether the defendants may have forfeited the affirmative defense of non exhaustion by failing to raise or preserve it; or (3) whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop the defendants from raising the plaintiff's failure to exhaust as a defense. *Id.* (citations omitted). Furthermore, the Second Circuit held that "[i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 686 (citing *Giano v. Goord,* 380 F.3d 670). *See also Brownell v. Krom,* 446 F.3d 305, 312 (2d Cir.2006) (finding that special circumstances, specifically, prison officials' erroneous interpretation of administrative regulations, justified prisoner's failure to exhaust administrative remedies).

**\*5** Here, the defendants failed to address *Hemphill* in their memorandum of law in support of their motion for summary judgment, instead arguing simply that Ketonen's affidavit demonstrates that Hepworth never filed any grievances during the period of his incarceration, and, therefore, Hepworth's failure to exhaust his administrative remedies bars his claim. (Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Def.'s Mem. in Supp."), at 2-3.)

In opposition to defendants' motion, plaintiff argues that he attempted to follow the established grievance procedures but was prevented from doing so by prison correction officers. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Mem. in Opp'n"), at 4-5.) Plaintiff also argues that defendants should be estopped from raising failure to exhaust as an affirmative defense (*id.* at 8), and that special circumstances justified plaintiff's failure to comply with administrative procedures (*id.* at 7-8). The standard (and consequences) of plaintiff's claims of unavailability, estoppel, and justification differ. *Hemphill,* 380 F.3d at 688. Accordingly, each argument must be analyzed separately, with the recognition that the same facts may fit into more than one of these categories. *See Giano v. Goord,* 380 F.3d at 677 n. 6 (observing that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between the three categories, i.e., unavailability, estoppel, and justification, because the facts may sometimes fit into more than one category).

### 1. Whether Administrative Remedies Were In Fact Available to the Plaintiff

Where a prison nominally provides grievance procedures that may be utilized by inmates claiming excessive force, and the inmate plaintiff argues that the procedures were effectively unavailable to him because of threats of retaliation, the court must determine whether the ordinary grievance procedures were in fact rendered unavailable. "The test for determining whether ordinary grievance procedures were available to an inmate is an objective test and asks whether a 'similarly situated individual of ordinary firmness' [would] have deemed them available." *Dukes v. S.H.U. C.O. John Doe # 1,* No. 03 Civ. 4639, 2006 WL 1628487, at \*4 (S.D.N.Y. June 12, 2006) (quoting *Hemphill,* 380 F.3d at 688) (brackets in original). To the extent that the court finds that a plaintiff lacked "available" administrative remedies, "the PLRA's exhaustion requirement is inapplicable." *Hemphill,* 380 F.3d at 686. *See also Arnold v. C.O. A. Goetz,* 245 F.Supp.2d 527, 537 (S.D.N.Y.2003) (stating the general principle that "an inmate's technical failure to exhaust administrative remedies before commencing a § 1983 action may be excused where officials prevented him from utilizing a grievance procedure").

Here, defendants argue that the traditional grievance procedures were not rendered unavailable because plaintiff was able to file a complaint with Suffolk County

Correctional Facility Internal Affairs Bureau, in addition to writing letters to state and federal government officials. (Defs.' Reply Mem. of Law at 5.) The Second Circuit explicitly rejected this line of reasoning in *Hemphill*. In *Hemphill*, a case which presented facts similar to those herein, the plaintiff, Hemphill, alleged that while he was incarcerated at a correctional facility in New York, he was assaulted and beaten by corrections officers. *Hemphill*, 380 F.3d 680 at 683-84. Hemphill alleged that he was threatened with further assaults if he reported the beating so he did not file a grievance through the facility's formal grievance program. *Id.* Instead, he wrote a letter to the facility superintendent, and subsequently brought a Section 1983 suit against the correction officers and other defendants. *Id.* The defendants argued since Hemphill sent a letter to the superintendent and subsequently filed suit, he was not sufficiently frightened so as to render normal grievance procedures unavailable. *Id.* at 688. The court rejected this argument, holding:

> **\*6** Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts. This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees.

*Id.*

Here plaintiff alleges that he was physically assaulted in retaliation for previously testifying against corrections officers, and that he was threatened with further violence if he reported anything about the assault. Assuming all inferences in a light most favorable to the plaintiff, it may be that corrections officers impeded plaintiff's attempt to use the grievance process, and that the officers' actions were such that a person of ordinary firmness would be deterred from using the facility's internal grievance process. Therefore, there exists as material issue of fact

as to whether the normal grievance procedures were "available" to Hepworth. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (finding that if the allegation of physical assault and threats of violence are true, it is plausible that a person of ordinary firmness would be deterred from using the grievance process); *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005) (denying summary judgment where issue of fact existed as to whether threats rendered a prison's normal grievance process unavailable to plaintiff); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist. LEXIS 17972, at \*10-11 (W.D.N.Y. Sept.2, 2004) (same); *Palmer v. Goss,* No. 02 Civ. 5804, 2003 U.S. Dist. LEXIS 18103, at \*16-17 (S.D.N.Y.2003) (denying summary judgment where plaintiff took reasonable steps to vindicate his claim through formal grievance procedures, and only "desist [ed] when it appeared to him that [a corrections officer] had intentionally destroyed evidence that supported his version of the incident and significantly deprived him of any possibility of relief through the grievance procedure").

2. *Whether The Alleged Threats Should Estop the Defendants From Raising the Affirmative Defense of Non-Exhaustion*

In *Ziemba v. Wezner,* 366 F.3d 161, the Second Circuit held that in cases under the PLRA, "the affirmative defense of exhaustion is subject to estoppel." *Ziemba,* 366 F.3d 161, 163-64 (2d Cir.2004) (adopting holding of *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001)). To establish equitable estoppel, the party claiming estoppel must demonstrate: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005). In addition, when asserting equitable estoppel against the government, "one must also prove affirmative misconduct." *Id.*

**\*7** Plaintiff alleges that the officer who ripped up the grievance plaintiff filed concerning the August 5, 2002 incident told plaintiff that he could not file a grievance, and that if he attempted to do so again, plaintiff would receive another beating. This officer is unnamed in plaintiff's affidavit, and it is unclear if this officer is one of the "John Doe" defendants in plaintiff's complaint (listed in the caption as "Suffolk County Correction Officers who worked yards 4 and 5 on the 7am to 3pm tour

and yard 1-2-3 on August 5, 2002"). Plaintiff also alleges that defendant Campitello and other officers told him on numerous occasions that if Campitello was disciplined, plaintiff would be beaten or killed. (Pl.'s Am. Compl. ¶ 14(c).) Based on these allegations, a factfinder might conclude that it was reasonable for Hepworth to rely on these threats by Campitello and other officers and refrain from any further attempt to file a grievance concerning Campitello's conduct. If so, Campitello and the other officers would be estopped from raising the defense of non-exhaustion. *McCullough v. T. Burroughs,* No. 04-CV-3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005) (denying summary judgment and finding that defendant may be estopped from raising exhaustion as an affirmative defense where defendant officer allegedly threatened plaintiff with assault if plaintiff filed another grievance against officer); *Martinez v. Richard Augustine,* No. 02-CV-0579, 2004 U.S. Dist. LEXIS 17972, at *10-11 (W.D.N.Y. Sept.2, 2004) (denying summary judgment and finding that defendants may be estopped from raising exhaustion as an affirmative defense where plaintiff alleged that defendant correction officers failed to properly file his grievance appeal). Thus, an issue of material fact exists as to whether defendants are estopped from raising the defense of non-exhaustion, and defendants' motion for summary judgment should be denied.

### 3. *Whether "Special Circumstances" Apply Justifying Failure to Exhaust*

Finally, the Second Circuit has held that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). The effect of such justification is that "though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). If a court finds that a plaintiff's failure to exhaust his remedies was justified, the court must determine where administrative remedies are still available to the plaintiff. *Id.* at 690. If the court finds that the remedies are available, for instance, and that the plaintiff may file an untimely grievance, then the court

must dismiss the complaint without prejudice, subject to reinstatement if the remedies prove to be unavailable. *Id.* If instead the court finds administrative remedies no longer available, then the suit may proceed without recourse to administrative remedies. *Id.*

**\*8** In *Hemphill,* the court recognized that threats of retaliation for using the grievance process might qualify as "special circumstances" that justify an inmate's failure to file a grievance in the manner prescribed, even where the threats did not suffice to render the grievance process actually unavailable, and even if the defendants are not estopped from asserting the defense of non-exhaustion. *Hemphill,* 380 F.3d at 690. The Second Circuit remanded *Hemphill* to the district court for consideration of this issue, directing that "the appropriate standard for determining whether [plaintiff's] fear of retaliation justified his sending a letter to [the superintendent] rather than filing [an internal] grievance is the same as is applicable in cases of retaliation; that is, whether a 'similarly situated individual of ordinary firmness would have been deterred from following regular procedures.' " *Id.* (internal citations omitted). The Court of Appeals directed the district court to consider the interplay between alleged threats and an inmate's decision to write directly to a higher authority rather than filing an internal grievance. *Id.* As the court noted, "[g]iven [the officer's] alleged warning of retaliation, it is arguable that Hemphill may have reasonably concluded that writing directly to the Superintendent involved an acceptable level of risk, whereas filing [an internal grievance] or notifying the immediate supervisors of his purported attackers was too fraught with danger." *Id.*

The circumstances in this case are similar to those present in *Hemphill.* Here, plaintiff alleges that he was under threats that, like those in *Hemphill,* may have justified writing a letter of complaint directly to an external prison authority rather than filing an internal grievance. Upon consideration of the interplay between the alleged threats and the plaintiff's decision to write letters to the Internal Affairs Bureau and other agencies, a factfinder might conclude that a similarly situated individual of ordinary firmness would have been deterred from following regular procedures. *Larry v. P. Byno,* No. 01 CV 1574, 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (finding under similar circumstances that "it cannot be said as a matter of law that special circumstances did not exist").

2006 WL 2844408

Accordingly, defendants' motion for summary judgment should be denied.

### C. *First Amendment Retaliation Claim*

Plaintiff also pleads a First Amendment retaliation claim, based on his allegations that defendant Campitello and other corrections officers retaliated against plaintiff for plaintiff's attempt to file a grievance against Campitello, threatening to beat and kill plaintiff if Campitello was disciplined. Plaintiff claims that the adverse actions were the continued verbal threats by Campitello and other officers that if plaintiff filed a grievance and/or Campitello was disciplined, plaintiff would receive another beating or be killed. Defendants argue that the alleged threats, if made, do not rise to the level of retaliatory conduct. (Defs.' Reply Mem. at 6-7.)

**\*9** "[A] plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (stating that a prisoner's retaliation claim will not survive summary judgment if he does not meet the burden of demonstrating that the conduct was constitutionally protected and that the prison officials' actions were substantially improper retaliation). Only retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 493. In conducting this inquiry, the Second Circuit has advised that courts must approach prisoner claims of retaliation with skepticism and care because they are easily fabricated, and also because of the ease with which virtually any adverse action taken against a prisoner by a prisoner official can be characterized as a constitutionally proscribed retaliatory act, "even those otherwise not rising to the level of a constitutional violation." *Id.*

The first prong of *Dawes* requires a finding that the speech or conduct at issue was protected. *Dawes,* 239 F.3d at 492. An inmate's filing of a grievance is constitutionally protected, and retaliation against a prisoner for pursuing

a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments. *Graham,* 89 F.3d at 80. The third prong of *Dawes* requires that a causal connection exist between the speech and the adverse action. Drawing all inferences in favor of the non-movant, there are sufficient allegations here to permit him to show a causal connection between plaintiff's attempt to file a grievance and the subsequent alleged threats. The real question of fact concerns the second prong of *Dawes,* which requires that the defendant took adverse action against the plaintiff, and that the action was such that it would deter a similarly situated individual of ordinary firmness from exercising his rights. *Dawes v. Walker,* 239 F.3d at 492. While Hepworth argues that the verbal threats deterred him from any further attempts to file grievances, not every unnecessary statement by a prison guard regarding an inmate's exercise of free speech rises to the level of a constitutional violation. *Id.* at 493. Assuming all inferences in favor of Hepworth, however, plaintiff raises a material issue of fact as to whether, under the circumstances plaintiff alleges, a reasonable prisoner would have been deterred from the exercise of his constitutional rights. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (holding that temporal proximity of an allegedly retaliatory act to a prisoner's filing of a grievance may serve as circumstantial evidence of retaliation). If so, the evidence is such that a reasonable jury could find that the officers unconstitutionally retaliated against Hepworth for exercising his First Amendment. Accordingly, defendants' motion for summary judgment on plaintiff's retaliation claim should be denied since there are disputed issues of material facts.

### *CONCLUSION*

**\*10** Based on the foregoing, I recommend that defendants' motion for summary judgment be denied.

### *OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28

U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), and 72(b); *IUE AFF-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.1992), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curium).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2844408

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1289256

🏴 KeyCite Yellow Flag - Negative Treatment
Distinguished by Salvatierra v. Connolly, S.D.N.Y., February 29, 2012

2006 WL 1289256
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark BARTLEY, Plaintiff,
v.
Todd COLLINS; Christopher Pecore;
and Timothy Bates, Defendants.

No. 95 Civ. 10161(RJH).
|
May 10, 2006.

**Attorneys and Law Firms**

Mark Bartley, Stormville, NY, pro se.

Reid Anthony Muoio, Hughes Hubbard & Reed LLP,
New York, NY, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York,
NY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff Mark Bartley ("Bartley") brought claims
pursuant to 42 U.S.C. § 1983 in his third amended
complaint against several defendants employed by
the New York State Department of Corrections
("DOCS"), alleging violations of his First and Fourteenth
Amendment rights not to be retaliated against for the
exercise of his right of access to the courts. Defendants
now move for summary judgment on all claims. For the
reasons set forth below, the Court grants defendants'
motion.

**BACKGROUND**

Unless otherwise indicated, the following facts are
undisputed. [1] Plaintiff Bartley was at all relevant times
a DOCS inmate at Green Haven Correctional Facility
("Green Haven") in New York. (Defs.' 56.1 ¶ 3.)

Defendants Todd Collins ("Collins"), Timothy Bates
("Bates"), and Christopher Pecore ("Pecore") were at all
relevant times correctional officers at Green Haven. *(Id.*
¶¶ 8-10.)

[1]    The facts as herein recited are drawn from defendants'
       Rule 56.1 Statement ("Defs.' 56.1 ¶ ___"), plaintiff's
       response to defendants' Rule 56.1 Statement ("Pl.'s
       56.1 ¶ ___"), Bartley's deposition ("Bartley Dep."),
       and records of disciplinary hearings stemming from
       Todd Collins's April 19, 1995 misbehavior report
       against Bartley ("Schulman Decl. Ex. M" and
       "Schulman Decl. Ex. Q").

At about 2:45 a.m. on April 16, 1995, Scott Turrisi, a
mentally ill inmate at Green Haven, set a fire in his cell in
an apparent suicide attempt. (Defs.' 56.1 ¶ 12.) Bartley
and several other inmates were injured, one of whom died three
days later. *(Id.* at ¶¶ 12, 15; Pl.'s 56.1 ¶¶ 12, 15.) Shortly
after the fire, Bartley, together with another inmate, Felix
Diaz ("Diaz"), began to prepare lawsuits against DOCS
employees for their alleged failure to properly care for
inmates in the events leading up to and after the fire.
(Defs.' 56.1 ¶ 42.)

Bartley, who was known as a jailhouse lawyer, asserts that
prior to the fire, he had a "relatively clean" disciplinary
record. (Pl .'s 56.1 ¶ 60; Bartley Dep. at 99-100.) On the
morning of April 16, 1995, the day of the fire, Bartley and
Diaz circulated a petition among inmates at the prison
clinic in preparation for a lawsuit. (Defs.' 56.1 ¶¶ 42-43.) In
his complaint, Bartley alleged that following that action,
he was retaliated against by defendants. (Third Am.
Compl. ¶¶ 41-49.)

**A. Alleged Retaliation by Collins**

Bartley testified that in the days following the fire, Collins
made false charges against him on two occasions for minor
infractions. (Bartley Dep. at 98-99.) Those misbehavior
reports resulted in Bartley being put in "keeplock"
confinement, [2] thereby denying him access to the law
library for approximately ten days. *(Id.;* Schulman Decl.
Ex. M at 247.) Bartley asserts that this was done to prevent
him from seeking legal redress for injuries resulting from
the prison fire. (Bartley Dep. at 100.)

[2]    When under keeplock confinement, an inmate is
       confined to his cell for 23 hours a day and loses

various privileges.7 N.Y. Comp.Codes R. & Regs. tit. 7, §§ 301.1-301.6.

Prior to April 18, Collins had counseled Bartley for not locking up properly, but had not, to his recollection, written a misbehavior report against him. (Defs.' 56.1 ¶ 45.) On April 18, Collins wrote a misbehavior report against Bartley for allegedly ignoring repeated orders to lock in for a count. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Collins claims that when ordered to return to his cell, Bartley stopped at two cells to talk to people, thereby delaying the count. (Defs.' 56.1 ¶ 47.) Bartley maintains that the charges were false and that any delay was the result of Bartley being in a wheelchair (Schulman Decl. Ex. Q at 5). Collins put Bartley on keeplock status pending a disciplinary hearing on the charges. (Defs.' 56.1 ¶ 47.) After an April 20 hearing that Bartley did not attend, Bartley was found guilty of two of three charges against him and was given a fifteen-day loss of package, commissary, and phone privileges. (Defs.' 56.1 ¶ 46.)

**\*2** On April 19, after Bartley was informed that he was on keeplock, he and Collins had a heated exchange. According to Collins, plaintiff called him a "cocksucker" and a "punk faggot bitch" and threatened to "kick Collins' ass and make problems for him." (Schulman Decl. Ex. Q at 2.) Collins wrote another misbehavior report, and at an April 24th hearing, Bartley admitted to using a hostile tone and calling Collins names, including "cocksucker." *(Id.* at 5.) However, Bartley denied making any threats and alleged that Collins told him he had a "big mouth" because Bartley had told Diaz to bring a lawsuit about the fire. *(Id.* at 6.) Ultimately, Bartley plead guilty to harassment, was found guilty of creating a disturbance, and was declared not guilty of charges of threats and violent conduct. *(Id.* at 3, 8; Schulman Decl. Ex. M at 247.) For the two infractions, Bartley was given 10 days of keeplock. (Schulman Decl. Ex. Q at 8; Schulman Decl. Ex. M at 247.)

In his complaint, Bartley alleges that, in addition to having him placed in keeplock, Collins threatened him by saying that Bartley "better drop" his lawsuit. (Third Am. Compl. ¶ 48.) However, Bartley offers no evidence to support the allegation of a threat except for testimony that "all of these defendants ... [were] bothering me, saying little snide remarks, saying we going to get you, you better drop the suit, and all this other stuff," and that "they told me you better drop the lawsuit, Bartley," where Collins

apparently was among the "they" to whom Bartley was referring. (Bartley Dep. at 104-07.)

### B. *Alleged Retaliation by Bates*

In his complaint, Bartley alleges that in the days following the fire, Bates filed false charges of littering and other minor infractions against him to "punish and deter" him from filing a lawsuit. (Third Am. Compl. ¶ 46.) On April 19, Bates wrote a misbehavior report against Bartley for littering and for obstructing the view inside his cell with a sheet. (Defs.' 56.1 ¶ 57.) Bartley denies the charges but did not attend the resultant disciplinary hearing, where he was found guilty of three of the four charges against him and given a thirty-day loss of privileges. *(Id.;* Pl.'s 56.1 ¶ 57.)

### C. *Alleged Retaliation by Pecore*

Also in his complaint, Bartley alleges that Pecore retaliated against him by telling him, after Bartley and Diaz began preparing lawsuits, "Pataki will have to foot the bill anyway, so he doesn't care what I do" and "you better drop the lawsuit Bartley." (Third Am. Compl. ¶ 47.) Bartley further alleges that Pecore threatened him with serious bodily harm, including death, if Bartley did not discontinue the lawsuit. *(Id.)* However, Bartley provides no evidence of the time, date, place, circumstances, or words employed in the alleged threats of physical violence, save for testimony that "two of the defendants in the present action," who Bartley does not identify, "approached me, accosted me and threatened me physically and verbally of what they would do." (Bartley Dep. at 104.) Pecore affirmatively denies having had any discussions with Bartley after the fire. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

### DISCUSSION

#### A. *The Summary Judgment Standard*

**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 321

(1986); *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case")

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). But an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

Moreover, to survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *Anderson,* 477 U .S. at 256-57; *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002). Where, as here, a plaintiff's case depends in part on his own statements and observations, such statements must " 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(e)).

Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123-24 (2d Cir.2001); *Quinn v. Syracuse Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Neither will "unsubstantiated speculation" suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for

trial." Fed.R.Civ.P. 56(e). With these principles in mind, the Court turns to the merits of the defendants' motion.

**B.** *Bartley's Retaliation Claims*

**\*4** Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (prisoner stated a valid claim under § 1983 by alleging that a prison official filed false disciplinary charges against him in retaliation for his exercise of a constitutional right to file a grievance); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[F]iling of a grievance and attempt to find inmates to represent the grievants ... is constitutionally protected."); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord,* No. Civ. 9:02CV00915, 2005 WL 3531464, at *7 (N.D.N.Y. Dec. 22, 2005) ("[P]laintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity.").

However, courts are to "approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act."); *see also Gill v. Pidlypchack,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.J ., concurring).

In order to sustain a First Amendment retaliation claim, "a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill,* 389 F.3d at 380 (quoting *Dawes,* 239 F.3d at 492). If each of the three elements of a *prima facie* case of retaliation is established, the burden shifts to the defendants "to show that the plaintiff would have received the same punishment even

absent the retaliatory motivation," in which case the plaintiff's claim must fail. *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Freeman v. Goord,* 2005 WL 3333465, at *4 (S.D.N.Y. Dec. 10, 2005) ("Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment ... if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone," as courts "employ a presumption that a prison official's acts to maintain order are done for a proper purpose.") (citations and quotations omitted).

### 1. Constitutionally Protected Conduct

**\*5** Plaintiff asserts that he was retaliated against for engaging in the constitutionally protected activity of circulating a petition in preparation for legal proceedings. Defendants counter that under the Second Circuit's decision in *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996), circulating a petition is not protected conduct.

The circulation of a petition by a prisoner is generally protected by the First Amendment. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967 (1977). However, that right "must be weighed against legitimate safety interests of the prison." *Duamutef,* 98 F.3d at 24 (reiterating the multi-factor test to determine the validity of a regulation that impinges on inmates' constitutional rights as set forth in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).). The *Duamutef* court held that where there was an official grievance procedure available to prisoners and a plaintiff did not claim that his petition contained requests that could not be addressed through that procedure, it was "permissible for prison officials to bar the circulation of petitions." *Id.* at 24 (citing *Nickens v. White,* 622 F.2d 967, 971 (8th Cir.1980), *cert. denied,* 449 U.S. 1018 (1980); *Edwards v. White,* 501 F.Supp. 8, 11-13 (M.D.Pa.1979), *aff'd,* 633 F.2d 209, 212 (3d Cir.1980). The *Nickens* court ruled similarly, relying on the affidavit of a prison superintendent who explained that petitions were banned for security concerns and that alternative means were available for communicating grievances. 622 F.2d at 970.

Courts have noted that even though *Duamutef* held that petitions *could* be banned, the ruling did not forbid petitions. *Farid v. Goord,* 200 F.Supp.2d 220, 236 (W.D.N.Y.2002). Where the defendant asserted that the plaintiff "does not have a right to circulate a petition" but did not reference a rule or regulation that prohibited petitioning, the *Farid* court held that the plaintiff, in circulating a petition, had engaged in protected conduct. *Id.* Defendants here similarly do not identify a prison regulation prohibiting petitioning by prisoners that justifies a limitation of plaintiff's First Amendment rights. In the absence of penitentiary rules proscribing petitioning, plaintiff's activity was constitutionally protected and as such, plaintiff satisfies the first element of his prima facie case of retaliation with respect to all three defendants.

### 2. Adverse Action

Plaintiff alleges that all three defendants took adverse action against him: Collins by verbally pressuring him to not bring legal action and filing misbehavior reports that put him in keeplock and caused him to lose privileges, Bates by filing false charges that cost him privileges, and Pecore by threatening him with physical violence. Defendants maintain that plaintiff's claims are conclusory and do not rise to the level of severity required for the actions to be characterized as adverse.

**\*6** In evaluating what constitutes adverse action, a court should be mindful that " 'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Dawes,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)).

In the prison context, adverse action is defined objectively as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). A subjective definition is not adopted because "it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* If the retaliatory conduct would not deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights, it " 'is simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493).

With respect to his claims that Collins and Pecore issued verbal threats against him, plaintiff does not

survive summary judgment. His deposition testimony that multiple defendants threatened him and encouraged him to abandon his lawsuit is conclusory because it is insufficiently specific with regard to the identification of any one defendant, and does not adequately provide the time, date, place, or circumstances of the alleged remarks. *See, e.g., Gaines v. Artus,* No. 9:04-CV-76, 2006 WL 721618, at *5 (N.D.N.Y. Mar. 20, 2006) (prisoner's § 1983 claim for denial of proper medical care dismissed on summary judgment in part because "[d]uring plaintiff's deposition, he ... could never be specific regarding the individuals allegedly responsible for this substandard care" and therefore "makes only conclusory claims"); *Jasmin v. New York State Dept. of Labor,* No. 98 Civ. 7569, 2000 WL 194774, at *2 (S.D .N.Y. Feb. 17, 2000) (plaintiff's "conclusory deposition testimony that co-worker 'has constantly been harassing me until last week' is utterly insufficient to create an issue of fact for the jury"); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1995) (plaintiff "cannot defeat [a summary judgment] motion by relying on the allegations in his pleading, ... or on conclusory statements") (citations omitted).

Even if plaintiff's deposition testimony were deemed sufficiently specific, verbal threats such as "we going to get you, you better drop the suit,"[3] do not rise to the level of adverse action. *See Dawes,* 239 F.3d at 493 (2d. Cir.2001) ("Not every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' insufficient to state a retaliation claim).

[3] Because plaintiff did not testify to it in his deposition, the Court excludes from consideration the allegation made only in plaintiff's unverified complaint that

Pecore "on at least one occasion, threatened to kill [Bartley] if he did not discontinue this lawsuit." (Third Am. Cmpl. ¶¶ 47.) *See* discussion *infra.*

**\*7** Plaintiff's complaint, although more particular than his testimony with regard to what each defendant allegedly said, does not defeat defendants' motion for summary judgment. Not only does the complaint, like plaintiff's testimony, inadequately plead the time, date, place, or circumstances of the alleged remarks, but because it is unverified, it cannot be relied on as evidence in opposing a summary judgment motion. *Trinidad v. New York City Dept. of Correction,* ---F.Supp.2d ----, 2006 WL 704163, at *6 (S.D.N.Y. Mar. 21, 2006) (Unsworn materials are "an insufficient basis for opposing a motion for summary judgment"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("Unsworn statements are not admissible to controvert a summary judgment motion."); *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991) (to survive summary judgment, "the nonmovant may not rest upon mere allegations in, say, an unverified complaint or lawyer's brief, but must produce evidence which would be admissible at trial to make out the requisite issue of material fact") (citing Fed.R.Civ.P. 56(e)); *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 165 (5th Cir.1991) ("Given that [defendant] has filed a properly supported motion for summary judgment, [plaintiff] cannot rely on the facts in its unverified complaint, but must point to evidence in the record sufficient to establish the alleged facts to avoid summary judgment.")

Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights. *Compare Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (correction officer's issuance of an unfavorable evaluation of prisoner and threat to place him in a Special Housing Unit did not meet the standard of adverse action), *with Gill,* 389 F.3d at 384 (plaintiff's allegation that defendants filed false misbehavior reports against him, resulting in his being sentenced to three weeks of keeplock, constituted a claim of adverse action), *and Wheeler v.. Beard,* No. Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug. 3, 2005) (prisoner plaintiffs alleged adverse action in retaliation claim by claiming that defendants, among

2006 WL 1289256

other things, denying medical treatment and prison-issued undergarments, destroying legal mail and other legal materials, planting contraband in cell to serve as basis for bogus misconduct report, and caused one plaintiff to lose his job).

However, Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days. *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) ( "Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging an adverse action"); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (noting holdings in other cases that nine days' keeplock confinement does not necessarily as a matter of law constitute *de minimis* alleged retaliation).

### 3. Causal Connection

**\*8** Plaintiff alleges that the actions taken by defendants were in retaliation against his engagement in the protected conduct of circulating a petition, while defendants assert that the events were unrelated. To show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations. *See Dawes,* 239 F.3d at 491 ("bald allegations of retaliation" will not suffice; the causal connection must be "sufficient to support the inference that the speech played a substantial part in the adverse action"). Evidence of improper motive may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 WL 2452150, at \*16 (N .D.N.Y. Sept. 30, 2005) (citing *Colon,* 58 F.3d at 872-73).

In *Gayle,* the Second Circuit overruled a district court's grant of summary judgment for defendants in a case in which the plaintiff proffered sufficient evidence to "create a genuine issue of material fact as to whether retaliation was a substantial factor in the DOCS officials' decision to charge and punish" him. 313 F.3d at 683. The *Gayle* court came to its conclusion based on circumstances involving, *inter alia,* the prisoner's receipt of a misbehavior report shortly after filing a grievance; the report's relationship to a discussion the prisoner and a guard held regarding the

grievance, the fact that the prisoner and a guard offered conflicting testimony at a disciplinary hearing regarding what prompted the report; a guard's lack of credibility when testifying at the hearing, and the fact that the hearing (at which the prisoner was found guilty of violating a rule) was administratively reversed. *Id.* at 683-84.

Plaintiff's allegation of a causal connection between his protected act and Collins' second misbehavior report is sufficient, although weaker than that in *Gayle.* The report, which caused plaintiff to be placed in keeplock, came just three days after the date of the prison fire and plaintiff's circulation of a petition, a temporal proximity that may suggest causality. *Colon,* 58 F.3d at 872 ("[T]emporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation.") (citations omitted). Plaintiff's assertion that he had a relatively clean disciplinary record prior to the fire also suggests the possibility of improper motive. *Id.* ("[E]vidence of prior good behavior also may be circumstantial evidence of retaliation.") (citation omitted). However, at the disciplinary hearing regarding the second report, plaintiff was not only found guilty of two of the charges against him but also pled guilty to one of them. In *Pledger,* the court granted a defendant's motion for summary judgment where a plaintiff did not deny the factual foundation of the criticisms made in an allegedly retaliatory negative evaluation by a prison official. 2005 WL 736228, at \*4. Here, plaintiff's acknowledgement of the factual basis of one of the charges made in Collins's second report weakens his claim that the report was retaliatory, but plaintiff did contest the other three charges in the report and was found not guilty of two of them. On balance, the Court concludes that a material issue of fact has been created on the issue of causation.

### 4. Defendants' Justifications for Their Actions

**\*9** Defendants claim that even if plaintiff satisfies the three elements of a prima facie case of retaliation, as plaintiff does with respect to Collins's second misbehavior report, their actions were not unlawful because they would have engaged in them even absent the plaintiff's protected conduct.

Summary judgment should be granted for the defendants if they can show that there is no genuine issue that they would have taken the same action-here, writing a misbehavior report that caused plaintiff to be put in keeplock for ten days-even without retaliatory

motivation. *See, e.g., Gayle,* 313 F.3d at 682; *Graham,* 89 F.3d at 79. In making this determination, the court should employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995), *cert. denied,* 525 U.S. 907 (1998)). "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle,* 313 F.3d at 682 (quoting *Hynes,* 143 F.3d at 657).

Collins wrote his second misbehavior report against plaintiff after plaintiff called him various epithets, which plaintiff later admitted to at a disciplinary hearing. Although Bartley was found not guilty of charges of threats and violent conduct, those charges stemmed from the same behavior for which Bartley was found guilty on two other charges. Between the presumption that Collins acted with a proper purpose and the fact that plaintiff acknowledged engaging in the conduct underlying the charges, Collins satisfies his burden of showing that he would have written the report even if plaintiff had not earlier circulated a petition.

### C. *Qualified Immunity*

Because the claims against defendants are otherwise dismissed, the Court need not address defendants' assertion of qualified immunity.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 1289256

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Evans v. Murphy, W.D.N.Y., March 13, 2014

2008 WL 1990771
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rogelio HEADLEY, Plaintiff,

v.

Brian FISHER, Superintendent of Sing Sing
Correctional Facility, Correction Officers
Simpson, B. Ellis, R. Bethea, T. Rizzuto, K.
Harris, R. Reyes, K. Barrett, Defendants.

No. 06 CV 6331(PAC)(KNF).
|
May 7, 2008.

### ORDER

Honorable PAUL A. CROTTY, District Judge.

**\*1** *Pro se* Plaintiff Rogelio Headley ("Headley"), an inmate formerly housed at New York's Sing Sing Correctional Facility ("Sing Sing"), seeks $5,000,000 in damages against eight Defendants: Brian Fisher ("Fisher"), Superintendent of Sing Sing, and Correction Officers Simpson ("Simpson"), B. Ellis ("Ellis"), R. Bethea ("Bethea"), T. Rizzuto ("Rizzuto"), K. Harris ("Harris"), R. Reyes ("Reyes"), and K. Barrett ("Barrett"), alleging multiple violations of his constitutional and statutory civil rights under 42 U.S.C. § 1983, including his Eighth and Fourteenth Amendment rights as well as allegations of conspiracy and retaliation.

Defendants filed motions to dismiss on February 5, 2007 and December 6, 2007, pursuant to Federal Rules of Civil Procedure 12(b)(1) (failure to exhaust administrative remedies) and 12(b)(6) (failure to state a claim for which relief can be granted).[1] Headley opposed both motions to dismiss the Complaint. Magistrate Judge Kevin Nathaniel Fox issued his Report and Recommendation ("R & R") on February 26, 2008, and Headley filed timely objections to the R & R. Defendants filed no objections.

[1]   The February motion also sought dismissal pursuant to Federal Rule of Civil Procedure 12(b)(5), based

on Headley's failure to serve Defendants Simpson and Rizzuto. Headley subsequently served those two Defendants, thereby mooting the Rule 12(b)(5) motion.

### FACTUAL BACKGROUND [2]

[2]   Unless otherwise noted, the facts are drawn from Headley's Complaint dated August 21, 2006 and from the R & R issued by Magistrate Judge Fox.

During 2004 and 2005, while Headley was housed at Sing Sing in Ossining, New York, he filed of a series of grievance reports about the facility and against certain Correction Officers ("C.O.s"), seven of whom were named as Defendants in a Complaint filed on August 21, 2006. The following are the chief factual points alleged in Headley's Complaint:

(1) The water at Sing Sing was black and undrinkable, exposing Headley to Hepatitis A. Additionally, the ventilation system was not functional and the exhaust fans were inoperable. Headley filed multiple grievances on this matter in 2004 and 2005, but the facility maintained that the water was clean.

(2) On April 21, 2004, CO Barrett prepared a misbehavior report charging Headley with leaving the mess hall without permission. At the relevant hearing, Headley explained that he had permission to leave the mess hall and that he had the requisite escort. The charges against him were subsequently dropped, but not before Headley served twelve days in "keep-lock" confinement.[3]

[3]   As explained in the R & R, "keep-lock" is a disciplinary confinement "in which the prisoner is confined to his own cell and is deprived of almost all contact with the rest of the prison population and participation in the normal routine of the institution." McKinnon v. Patterson, 568 F.2d 930, 936 (2d Cir.1977), see N.Y. Comp.Codes R. & Regs. tit.7, § 301.6.

(3) On April 29, 2004, CO Simpson refused, without explanation, to let Headley use the bathhouse. After a nearby sergeant directed Headley to follow Simpson's orders, Headley claims that Simpson grabbed him, cursed at him, spit in his face, and slapped his face twice. Simpson then pushed Headley into his cell,

where Headley received a blow to his lower hips and back when he hit the side of a locker located in the cell. Simpson threatened Headley and then placed him in keep-lock for sixteen days, where Headley did not receive meals, a shower, or recreation.

(4) On or about May 21, 2004, eighty-eight photographs were taken from Headley during a family visit, and C.O. Ellis and C.O. Bethea strip-searched him and made offensive comments. Ellis slapped Headley in the face and threatened that "something bad" was going to happen if he continued to submit written complaints about Simpson. (Complaint ("Compl.") at 5[4]). For months following that incident, Ellis and Bethea harassed him-pushing and shoving him, searching his cell without producing a search slip, and taking items from his cell after stopping and searching him unjustifiably.

[4]    The pagination in Headley's Complaint does not follow standard numerical order-it begins with pre-printed pages on which he lists the Defendants in the case and continues on with typed pages prepared by Headley on which numbers repeat and/or are missing. For the purposes of this order, the Complaint will be treated as fifteen pages in length, with page numbers beginning on the cover page (page 1) and continuing in numerical order to the signature page (page 15).

**\*2** (5) On or about June 21, 2004, on his way to speak with Correction Lieutenant Siger about the incident with Simpson, CO. Harris searched Headley roughly. Headley reported this incident to Siger (not named as a defendant in the Complaint) but no action was taken.

(6) On August 8, 2004, CO. Rizzuto issued a misbehavior report on Headley for failing to report to work. Based on this report, Headley was placed in keep-lock for six days. The report was ultimately dismissed following a disciplinary hearing where Headley called witnesses who testified that Headley was not in fact scheduled to work on that day.

(7) Finally, on December 14, 2004, CO. Reyes searched Headley and confiscated an envelope given to Headley by another inmate. Headley was placed in keep-lock and charged with

smuggling and unauthorized exchange. Headley claims that a hearing officer convinced him to plead guilty to those charges.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The Complaint purports to be a factual narrative that does not clearly identify constitutional or statutory rights or legitimate legal bases for challenging the Correction Officers' conduct. Magistrate Judge Fox carefully parsed the discursive allegations in Headley's *pro se* Complaint into legal claims, which he then carefully reviewed and analyzed before issuing the R & R. Magistrate Judge Fox's analysis is compelling and the Court adopts the structure of the R & R for the purposes of ruling on the motions to dismiss.[5]

[5]    Magistrate Judge Fox made recommendations on several threshold issues as well as on claims against individual Defendants. Although the Eleventh Amendment would normally bar Headley's claims for money damages against the Correction Officers in their official capacities, Magistrate Judge Fox found that it does not apply here because the claims are made against state officials only in their individual capacities. (R & R at 5.) Magistrate Judge Fox refused to convert the motions to dismiss into motions for summary judgment because Defendants failed to satisfy the requirements of Local Rule 56.2 by not providing notice to Headley, a *pro se* Plaintiff, describing the nature of a summary judgment motion. (R & R at 7-9.) Additionally, Magistrate Judge Fox found that, when taken as true for the purposes of a motion to dismiss, Headley's allegations of exhaustion are sufficient. (R & R at 14.) Finally, Magistrate Judge Fox denied Defendants' motion to dismiss pursuant to the doctrine of qualified immunity because Defendants failed to meet their burden of demonstrating that their conduct did not violate either: (i) the plaintiff's clearly established rights; or (ii) constitutional rights of which a reasonable correction officer would have known. (R & R at 26.) *see Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). Defendants did not object to the Magistrate Judge's R & R. The Court finds no clear error with respect to these recommendations and accordingly adopts them.

## I. Claims Against Facility and Individual Defendants

Magistrate Judge Fox identified nine claims in Headley's Complaint and recommended the dismissal of all claims except the retaliation claims against Simpson and Ellis and the Fourteenth Amendment Due Process claim against Simpson. (R & R 26-27).

### 1. *Water and Ventilation Claim*

The Magistrate Judge recommended dismissal of the water and ventilation claim because Headley failed to allege any facts from which it could be inferred that he suffered actual injury from the alleged contaminated water and inoperable ventilation system. Applying 42 U.S.C. § 1997e, which states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury," Magistrate Judge Fox found that Headley failed to state a physical injury and recommended dismissal of this claim. (R & R 14-15).

### 2. *Claims Against Fisher*

In his Complaint, Headley makes only one mention of Superintendent Brian Fisher: "I brought [the information regarding prison conditions and mistreatment by the Correction Officers] to the Superintendent Fisher...." (Compl. at 9). Magistrate Judge Fox recommended dismissing any and all claims as to Fisher because Headley failed to allege any personal involvement of Fisher in the alleged constitutional violations, a required element of a § 1983 claim against a supervisor. (R & R at 16); *see Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### 3. *Eighth Amendment Claim Against Simpson*

**\*3** Headley claims a violation of his Eighth Amendment rights in Simpson's use of excessive force. Magistrate Judge Fox recommended dismissal of this claim for Headley's failure to allege that Simpson acted with the requisite "wantonness" under the circumstances or that the alleged misconduct involved "unnecessary and wanton infliction of pain" and the use of more than *de minimis* force. (R & R at 18); *see Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000).

### 4. *Conspiracy Claim*

Headley makes vague assertions in his Complaint regarding a conspiracy among the Correction Officers to harass and abuse him. Magistrate Judge Fox recommended dismissal of the conspiracy claim because Headley failed to allege any facts from which it could be inferred that two or more defendants agreed to act in concert to inflict an unconstitutional injury upon him. (R & R at 21); *see Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999).

### 5. *Misbehavior Report Claim Against Rizzuto*

Headley claims that C.O. Rizzuto filed a false misbehavior report against him on or around August 8, 2004. Magistrate Judge Fox recommended that the Court dismiss this claim against Rizzuto because "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." (R & R at 21) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)).

### 6. *Eighth Amendment Claims Against Ellis, Bethea, and Harris*

Headley claims that: (a) Ellis slapped him after a strip search on May 21, 2004; (b) Bethea pushed and shoved him during searches; and (c) Harris conducted a rough search of him on June 21, 2004. Magistrate Judge Fox recommended dismissing these claim's Eighth Amendment violations because Headley's claims do not give rise to a claim of excessive force. (R & R at 24). Magistrate Judge Fox concluded that Headley failed to allege facts from which it could be inferred that the conduct of Ellis, Bethea, and Harris was characterized by "wantonness" or that he suffered an "unnecessary or wanton infliction of pain", involving more than a *de minimis* use of force. (R & R at 24); *see Sims,* 230 F.3d at 21.

### 7. *Due Process and Retaliation Claims Against Reyes and Barrett*

Headley claims that Reyes and Barrett issued misbehavior reports against him when he had done nothing wrong. Magistrate Judge Fox recommended that the Court dismiss the claims against Reyes and Barrett because Headley has no constitutional right to be free from a false misbehavior report and because Headley failed to allege any facts from which it can be inferred that the false

misbehavior report was issued in retaliation for Headley's exercise of any protected right. (R & R at 24).

8. *Fourteenth Amendment Claim Against Simpson*
After the physical altercation in Headley's cell, C.O. Simpson ordered Headley into keep-lock confinement, where Headley claims he remained for sixteen days without meals, a shower, or recreation. Magistrate Judge Fox recommended that Simpson's motion to dismiss this claim be denied because Headley's Due Process claim against Simpson is plausible on its face. Magistrate Judge Fox reasoned that since New York provides procedural due process for each type of segregated confinement, which includes an opportunity to be heard prior to confinement, and because Simpson allegedly locked Headley up without affording him a hearing, Headley's Fourteenth Amendment claim against Simpson survives a motion to dismiss. (R & R at 20).

9. *Retaliation Claim*
**\*4** Headley makes general allegations of retaliation involving all of the named Defendants. Magistrate Judge Fox recommended that the Court grant the motion to dismiss for all Defendants except Simpson and Ellis. The Magistrate Judge found that, regarding the retaliation claim against Simpson, Headley sufficiently alleged a causal connection between a constitutionally protected act (filing a grievance against Simpson) and the retaliation (Simpson putting Headley in keep-lock for sixteen days). (R & R at 23). As for the claim against Ellis, Magistrate Judge Fox found that Headley alleged a causal connection between a constitutionally protected act (filing a grievance against Simpson) and the retaliation (Ellis slapping Headley in the face and stating this is what Headley "get[s] for writing up Simpson."). (R & R at 23). As to all other Defendants, Magistrate Judge Fox found that Headley failed to allege facts from which it could be inferred that their actions were taken in retaliation for a constitutionally protected activity or that Headley suffered any harm as a result of the action. (R & R at 23).

In sum, the Magistrate Judge recommended that the February 5, 2007 motion to dismiss be denied with respect to the retaliation claim against Ellis, and granted with respect to all other claims. Additionally, Magistrate Judge Fox recommended that the December 6, 2007 motion to dismiss be denied with respect to both the Fourteenth Amendment Due Process claim and the retaliation claim

against Simpson, and granted with respect to all other claims. (R & R at 26-27).

## APPLICABLE LAW

In evaluating the Report and Recommendation of a Magistrate Judge, the District Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When a timely objection has been made to the Magistrate Judge's recommendations, the court is required to review the contested portions *de novo*. *See Pizarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). For uncontested portions of the R & R, the court need only review the face of the record for clear error. *See Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003).

## HEADLEY'S OBJECTIONS

On March 12, 2008, Headley filed objections to the dismissal of: (1) the Eighth Amendment claim against Simpson; (2) the Eighth Amendment claim against Ellis; (3) the conspiracy claim; (4) six of the named Defendants from the suit; and (5) the claims against Fisher. The Court reviews the recommendations of Magistrate Judge Fox on these claims *de novo*.

### a. Objections to the Eighth Amendment Claims Against Simpson and Ellis

Headley's Eighth Amendment claims against Simpson and Ellis do not give rise to a claim of excessive force. His claims that Simpson grabbed his shoulder, cursed in his face, slapped him twice and pushed him in his cell do not constitute "unnecessary and wanton infliction of pain." *Sims,* 230 F.3d at 21. Headley's allegations do not demonstrate that Simpson acted maliciously and sadistically to cause harm rather than in a good faith effort to maintain or restore discipline, after Headley was directed by the sergeant 'to do as [Simpson] said to do.' *See Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 1085 (1986) ("the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for

2008 WL 1990771

the very purpose of causing harm" (internal citations and quotation marks omitted)). Headley's excessive force claim against Simpson cannot be sustained; Simpson's motion to dismiss Headley's Eighth Amendment claim is granted.

**\*5** Similarly, Headley failed to allege any facts from which it could be inferred that Ellis's conduct was characterized by wantonness, or that Headley suffered any unnecessary and wanton infliction of pain, involving more than a *de minimis* use of force. *See Sims,* 230 F.3d at 21. Headley objects, claiming that Ellis hit him without justifiable reason, but the lack of justification does not elevate a single slap to the level of excessive force under the Eighth Amendment. Ellis's motion to dismiss the Eighth Amendment claim against him is granted.

#### b. Objection to the Dismissal of the Conspiracy Claim

Headley objects to the recommended dismissal of the conspiracy claim and urges the Court to draw an inference of conspiracy from the actions of the officers. He argues that "[i]t is convincingly clear that the fact that I was not fed for 16 days shows the elements of a prearrange complicity [sic]." (Plaintiff's Objections ("Pl.Obj.") at ¶ 5). The paucity of facts provided by Headley does not satisfy the pleading requirements for a § 1983 conspiracy claim. *See Pangburn,* 200 F.3d at 72 ("To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). As to this objection, the recommendation of Magistrate Judge Fox is adopted and the motion to dismiss the conspiracy claim is granted.

#### c. Objection to the Dismissal of Six of the Defendants [6]

[6] Headley objects to the "dismiss[al] of six (6) defendants from the suit," (Pl. Obj. at ¶ 6), but does not specify which Defendants he is referring to nor does he actually name six Defendants in the objection. Magistrate Judge Fox recommended the dismissal of all claims except two against Simpson and one against Ellis, effectively dismissing Fisher, Bethea, Harris, Barrett, Rizzuto, and Reyes from the case. The Court assumes that Headley refers to those six Defendants in this objection. Further, Headley objects to the dismissal of claims against Brian Fisher in a separate

objection, so claims against Fisher will be analyzed in a separate section here as well, even though Fisher is presumed to be one of the six Defendants Headley refers to in the preceding objection.

Headley fails to adequately allege constitutional or statutory claims against Bethea, Rizzuto, Harris, Reyes and Barrett, making their dismissal from the suit proper. Nothing in the Complaint approaches what is necessary to make out an Eighth Amendment claim against any of these Defendants, and Headley's vague and unsubstantiated claims of conspiracy and retaliation likewise fail to satisfy pleading requirements. *See Ostrer v. Aronwald,* 567 F .2d 551, 553 (2d Cir.1977) ("[C]omplaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed."). The Court adopts the R & R on the claims against these Defendants and dismisses them from the suit.

#### d. Objection to the Dismissal of Claims Against Brian Fisher

The only allegation regarding Fisher that Headley makes in his Complaint is that he sent letters to the attention of the superintendent regarding the alleged mistreatment at Sing Sing. The mere writing of letters to a supervisor, however, is insufficient personal involvement to state a § 1983 claim. *See Hernandez v. Goord,* 312 F.Supp.2d 537, 547 (S.D.N.Y.2004) (plaintiff had no claim where he merely asserted that supervisor received letters of complaint). This Court adopts the recommendation of Magistrate Judge Fox and dismisses all claims against Brian Fisher.

### CONCLUSION

**\*6** The R & R issued by Magistrate Judge Fox is adopted in full. Defendants' motions to dismiss the Fourteenth Amendment and retaliation claims against Simpson and the retaliation claim against Ellis are DENIED. The motions to dismiss all other claims as to all other Defendants are GRANTED. The Clerk of the Court is directed to close out this motion. The order of reference to Magistrate Judge Fox shall continue for further dispositive motions.

SO ORDERED.

2008 WL 1990771

**REPORT AND RECOMMENDATION**

KEVIN NATHANIEL FOX, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY, UNITED STATES DISTRICT JUDGE

**INTRODUCTION**

Plaintiff Rogelio Headley ("Headley"), proceeding *pro se,* brings this action, pursuant to 42 U.S.C. § 1983, for monetary damages against defendants Brian Fisher [1] ("Fisher"), Superintendent of Sing Sing Correctional Facility, and Correction Officers Simpson ("Simpson"), B. Ellis ("Ellis"), R. Bethea ("Bethea"), T. Rizzuto ("Rizzuto"), K. Harris ("Harris"), R. Reyes ("Reyes") and K. Barrett ("Barrett"). On February 5, 2007, the defendants made a motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(1), Fed.R.Civ.P. 12(b)(5) and Fed.R.Civ.P. 12(b)(6), because the plaintiff failed to: (1) serve Simpson and Rizzuto; (2) exhaust his administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e; and (3) state a claim for which relief may granted under 42 U.S.C. §§ 1983 and 1985. Additionally, the defendants contend, the plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment of the United States Constitution. Subsequent to the filing of the defendants' motion to dismiss, the plaintiff served Simpson and Rizzuto, mooting the defendants' motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(5).

[1]    The defendant indicated that the correct spelling of his last name is Fischer. However, the Court will refer to him using the spelling of his name appearing in the complaint.

On December 6, 2007, Simpson and Rizzuto made a motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6), asserting that: (a) the plaintiff failed to exhaust his administrative remedies; (b) the Eleventh Amendment to the United States Constitution bars the plaintiff's claims against them in their official capacities; (c) the doctrine of qualified immunity shields them against the plaintiff's claims; and (d) the complaint fails to state a federal claim upon which relief can be granted. The plaintiff opposed both motions to dismiss the complaint. The motions are addressed below.

**BACKGROUND**

In his complaint, Headley alleges the following:

In 2004 and 2005, when he was an inmate at the Sing Sing Correctional Facility in Ossining, New York, the facility's water was black or dark-brown and undrinkable, causing him to contract Hepatitis A. He filed a grievance about that matter; but the facility maintained the water was clean. Additionally, according to Headley, the ventilation system in the facility was not functional, and the exhaust fans were inoperable.

**\*7** On April 21, 2004, Barrett prepared a misbehavior report, charging Headley with leaving the mess hall without permission. At the hearing, held in connection with that report, Headley explained he did not leave the mess hall without permission because a correction officer escorted him from the mess hall to the package room. Although he was sentenced, unjustifiably, to 12 days of keep-lock [2] confinement, in connection with that misbehavior report, all the charges against him were dropped by the hearing officer.

[2]    Keep-lock is a disciplinary confinement "in which the prisoner is confined to his own cell and is deprived of almost all contact with the rest of the prison population and participation in the normal routine of the institution." *McKinnon v. Patterson,* 568 F.2d 930, 936 (2d Cir.1977), *cert. denied* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *see* New York Compilation of Codes, Rules and Regulations, Title 7 ("7 NYCRR") § 301.6.

On April 29, 2004, Simpson refused to allow Headley to use the bathhouse without explanation. A sergeant, who was in the vicinity, heard the commotion, approached and directed Headley to follow Simpson's order. At that time, Simpson became aggressive, grabbed Headley by the shoulder, cursed at him, spit in his face and slapped his face twice. Simpson spoke disrespectfully to Headley, while escorting him to his cell. Once they reached the cell, Simpson pushed Headley in, causing him to receive a blow to his "lower hips" and "back" by hitting the side of a locker located inside the cell. Simpson also threatened that he would deprive Headley of "everything" and told him he

2008 WL 1990771

was "on the burn for as long as [Simpson is] in the facility." Additionally, Simpson told Headley, if he is "still alive by the time he comes back from vacation," he will let him out. Without receiving a misbehavior report and as retaliation, Headley was placed in keep-lock confinement for 16 days, where he did not receive meals, a shower or recreation. Although Headley asked repeatedly for a sick call slip, the officers refused to notify the sergeant about his requests.

On or about May 21, 2004, 88 photographs were taken from Headley by a correction officer, during his family's visit, but they were not returned to him. After the photographs were seized from Headley, he was strip-searched by Ellis and Bethea. During the strip-search, Ellis made offensive comments about his private parts and she and Bethea laughed at him. When Headley dressed, after the strip-search, Ellis slapped his face and threatened that "something bad" would happen to Headley if he continues to submit written complaints regarding Simpson. Thereafter, Headley filed a grievance report about that incident.

In the following months, Bethea and Ellis continued to harass the plaintiff by stopping and searching him numerous times, without justification. More specifically, Bethea pushed and shoved Headley in order to provoke him, and searched his cell without giving him a search slip. Ellis also stopped and searched Headley unjustifiably, and took items from his packages when she was on duty, during his family's visits.

On or about June 21, 2004, Correction Lieutenant Siger summoned Headley for an interview concerning the April 29, 2004 incident involving Simpson. When Headley reached the disciplinary office to attend the interview, Harris harassed him by searching him roughly. Harris, claiming one of Headley's personal sheets had a drawing on it, confiscated all his sheets, without giving him a receipt. Headley reported this incident to Lieutenant Siger, but no action was taken against Harris.

**\*8** On July 22, 2004, Correction Officer Montalvo stopped Headley, confiscated a bag from him and threw all his food on the floor. On August 7, 2004, during a visit by his family, Correction Officer Horton refused to give the plaintiff a letter, which identified the content of a package Headley had received from his family that day. On August 8, 2004, Rizzuto issued a misbehavior report, charging Headley with failing to report to work,

on a day he was not scheduled to work. Consequently, the plaintiff was placed in keep-lock confinement for six days. As a result of a subsequent disciplinary hearing, that misbehavior report was dismissed. A few days after he was released from a keep-lock confinement, Headley observed Rizzuto and Simpson, in the mess hall, speaking about him and looking at him.

On November 11, 2004, Headley received a letter informing him that he was no longer a mess hall worker. He sent a letter to the Grievance Office and the Superintendent inquiring about the reason his job was terminated. On December 4, 2004, he was reinstated to the mess hall worker position, but Barrett and Correction Sergeant Coulthrust continued to harass him.

On December 14, 2004, after Headley served lunch, Reyes searched him and confiscated an envelope Headley received from an inmate. The plaintiff was placed in keep-lock confinement and charged with smuggling and unauthorized exchange. Headley was convinced by a hearing officer to plead guilty to the charges.

## DISCUSSION

### *Fed.R.Civ.P. 12(b)(1)*

Absent waiver by the State or valid congressional override, the Eleventh Amendment to the United States Constitution bars a damages action against state officials in their official capacities. *See Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107 (1985).* The defendants contend the Eleventh Amendment bars the plaintiff's claims for damages against them in their official capacities; thus, the court lacks subject matter jurisdiction over those of the plaintiff's claims. The plaintiff does not dispute the defendants' contention, but maintains he is suing the defendants in their individual capacities. Therefore, the Court finds that the plaintiff's claims for damages against the defendants, in their official capacities, are barred by the Eleventh Amendment.

### *Fed.R.Civ.P. 12(b)(6)*

A court may dismiss an action, pursuant to *Fed.R.Civ.P. 12(b)(6),* for failure to state a claim upon which relief may be granted, if the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct.

1955, 1974 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Where, as here, the plaintiff is proceeding *pro se,* the court must construe his complaint liberally and "interpret [it] to raise the strongest arguments it suggests." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007).

**\*9** When considering a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007). Additionally, when assessing a motion pursuant to Fed.R.Civ.P. 12(b)(6), "consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters [about] which judicial notice may be taken," as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (internal citation omitted).

Fed.R.Civ.P. 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The determination to convert a motion to dismiss, under Fed.R.Civ.P. 12(b)(6), into a motion for summary judgment, under Fed.R.Civ.P. 56, is within the court's discretion, "and in exercising its discretion the court looks to the substance of the motion." *Ansonia Tenants' Coal., Inc. v. Ansonia Associates,* 163 F.R.D. 468, 470 (S.D.N.Y.1995).

*February 5, 2007 Motion to Dismiss*
The February 5, 2007 motion to dismiss the complaint, made by Fisher, Ellis, Bethea, Harris, Reyes and Barrett, contains the following exhibits: (a) the plaintiffs December 2004 disciplinary package respecting charges contained in

a misbehavior report, issued by Reyes on December 14, 2004; (b) the plaintiff's grievances, dated May 20, May 27, June 29 and September 14, 2004, and the listing of grievances appealed by the plaintiff to the Central Office Review Committee for the Inmate Grievance Program, maintained by the New York State Department of Correctional Services. However, despite including matters outside the pleadings: numerous exhibits pertaining to the plaintiff's disciplinary proceedings and grievances, the February 5, 2007 motion to dismiss did not: (i) include a motion for summary judgment, pursuant to Fed.R.Civ.P. 56; and (ii) provide the notice to the *pro se* plaintiff describing the nature of a summary judgment motion, as required by Local Civil Rule 56.2 of this court. [3] Therefore, the Court will not convert the February 5, 2007 motion to dismiss to a motion for summary judgment.

[3]   Local Civil Rule 56.2 states, in pertinent part: "Any represented party moving for summary judgment against a party proceeding *pro se* shall serve and file as a separate document, together with the papers in support of the motion, a 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' in the form indicated below."

In analyzing the February 5, 2007 motion to dismiss, the Court has considered the following items, which are appended to a declaration of Jennifer L. Johnson, the defendants': (1) Exhibit A, consisting of the plaintiff's December 2004 disciplinary package, because, when he made factual assertions concerning the December 14, 2004 incident in his complaint, the plaintiff incorporated by reference and relied on the misbehavior report charges filed by Reyes, on December 14, 2004, and the disposition of the related disciplinary proceeding; (2) Exhibit B, No. 1, a document entitled "Inmate Grievance Complaint," dated May 22, 2004, because the plaintiff asserted in the complaint that he filed a grievance report in connection with the incident that occurred on May 21, 2004; (3) Exhibit B, No.2, a document entitled "Inmate Grievance Complaint," dated June 21, 2004, because the plaintiff indicated in his complaint that he "grieved all of [his] complaint[s] to the Commissioner of Corrections;" (4) Exhibit B, No. 4, a document entitled "Inmate Grievance Complaint," dated September 10, 2005; and (5) Exhibit B, No. 4, a document entitled "Sing Sing Correctional Facility Inmate Grievance Program," dated September 22, 2005, because the plaintiff asserted in the complaint that he filed grievances in 2005 concerning the safety of the water in the facility, and that the facility answered

his concerns. All other documents, submitted by the defendants as part of Exhibit B, were disregarded by the Court because they pertain to the facts neither asserted nor relied upon, by the plaintiff, in the complaint.

*December 6, 2007 Motion to Dismiss*

**\*10** The December 6, 2007 motion to dismiss, made by Simpson and Rizzuto, contains the following: (i) a notice of motion to dismiss; (ii) a declaration by Inna Reznik, with Exhibits A-C; (iii) a declaration by Karen Bellamy, with Exhibit A; (iv) a "Notice to *pro se* litigants opposing motion to dismiss or motion for summary judgment"; and (v) a memorandum of law. Local Civil Rule 56 .2 requires a defendant to provide notice to a *pro se* litigant opposing a motion for summary judgment informing that "[t]he defendant in this case has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure." The defendants misnamed the notice to *pro se* litigant, required by Local Civil Rule 56.2, as a "Notice to *pro se* litigants opposing motion to dismiss." In that notice, the defendants state: "The defendants in this case have moved to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure or for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure."

However, in their notice of motion, the defendants indicate only that they move for "an order pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure." Neither the defendants' notice of motion nor their memoranda of law provide notice to the plaintiff that their motion is one for summary judgment, pursuant to Fed.R.Civ.P. 56. In fact, the defendants contend, in their memorandum of law, that "courts routinely consider extrinsic material on a motion to dismiss for nonexhaustion, without first requiring conversion pursuant to Rule 12(b) or (c)." Moreover, the defendants maintain, "[b]ecause the exhaustion issue is an integral part of a prisoner's claim, the Court may refer to materials outside of the complaint" when determining, on a Fed.R.Civ.P. 12(b)(6) motion, whether the plaintiff exhausted administrative remedies. Accordingly, the Court will not convert the defendants' December 6, 2007 motion to dismiss to a motion for summary judgment.

In analyzing the December 6, 2007 motion to dismiss, the Court did not consider the defendants' Exhibit A, appended to the declaration of Karen Bellamy, which is a listing of the plaintiff's appeals filed between October

28, 1992, and November 7, 2007, because it contains a matter outside of the complaint, which was not included by reference or relied upon by the plaintiff in his pleadings. However, the Court did consider the following material, appended to the declaration of Karen Bellamy, the defendants': (a) Exhibit A, a document entitled "I.G.R.C.," dated September 15, 2004, the plaintiff's handwritten grievance concerning the incident that occurred on August 8, 2004; and (b) Exhibit B, a document entitled "Grievance Form," dated August 10, 2004, the plaintiff's handwritten grievance concerning the incident that occurred on August 7, 2004. The Court did not consider other documents, contained in the defendants' Exhibits A and B, which are appended to the declaration of Inna Reznik, because they pertain to facts neither asserted nor relied upon by the plaintiff in the complaint.

*Exhaustion of Administrative Remedies*

**\*11** PLRA provides, in pertinent part, that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[F]ailure to exhaust is an affirmative defense under the PLRA, and [ ] inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 921 (2007). In order to exhaust administrative remedies properly, an inmate needs to do no more than comply with prison grievance procedures and "[t]he level of detail necessary in a grievance to comply with the grievance procedures" is determined by the prison grievance process and varies from claim to claim. *Id.* at 922-23. "As a general matter, if a complaint contains both [exhausted] and [unexhausted] claims, the court proceeds with the [exhausted claims] and leaves [the unexhausted claims]." *Id.* at 924.

In this judicial circuit, a three-part inquiry is used to determine whether an inmate exhausted available administrative remedies: (1) whether administrative remedies were available to the inmate; (2) whether the defendants forfeited the affirmative defense of non-exhaustion by failing to raise it; and (3) whether the defendants' own actions, inhibiting the inmate's exhaustion of remedies, may estop the defendants from raising non-exhaustion as a defense. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). If the

court finds that administrative remedies were available to the prisoner and not pursued and further, that the defendants are not estopped and have not forfeited their non-exhaustion defense, then it "should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (citation omitted).

The defendants contend the plaintiff "did not fully grieve all of the allegations that he asserts against Officers Bethea, Ellis, Harris, Reyes and Barrett," because: (i) "complaints to the Commissioner of Corrections do not equate with the exhaustion of administrative remedies;" and (ii) "any letter plaintiff may have written to the Superintendent also does not constitute the exhaustion of his administrative remedies." The defendants concede that the following claims are exhausted: (a) May 21, 2004 allegations against Ellis and Bethea regarding a strip search; (b) June 21, 2004 rough search allegations against Harris; (c) allegations that Barrett singled out Headley for searches and issued an erroneous misbehavior report against him; and (d) 2005 allegations concerning the state of the water and ventilation system at Sing Sing. Furthermore, the defendants contend, although the plaintiff filed a grievance against Rizzuto for being placed in keep-lock confinement without receiving compensation, after Rizzuto issued an August 2004 misbehavior report, his grievance did not complain about "Rizzuto coming to plaintiff's cell, accusing him of skipping work, writing up a misbehavior report, and placing him in keeplock, as alleged in the Complaint."

 **\*12** The plaintiff contends he appealed fully the grievances against Simpson, Ellis, Bethea, Harris, Reyes and Barrett, but did not file a grievance against Fisher, because "as chief executive officer he is responsible for the actions of his subordinates." Moreover, the plaintiff asserts, he exhausted the matters related to the incident preceding the strip search by Ellis and Bethea, because he brought them to the attention of Fisher and Commissioner Goord. The plaintiff maintains, he exhausted his claim against Rizzuto properly because he filed a grievance and appealed the decision related to that grievance. According to the plaintiff, if his "complaint sought back pay why would [he] keep appealing when the facility agreed to give it to [him]." The plaintiff contends, his appeal was based on Rizzuto's filing of "false disciplinary charges in retaliation of [his] writing up [ ] Simpson and other officers." The plaintiff asserts that,

under the circumstances, it "would not have been wise for [him] to file another grievance after hearing Simpson and Rizzuto talk of retaliation in the Mess hall."

*New York's Inmate Grievance Program*
The New York Department of Correctional Services defines grievance as:

> [A] complaint, filed with an [Inmate Grievance Program] IGP clerk, about the substance application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services, or any of its program units, or the lack of a policy, regulation, procedure or rule. A letter addressed to facility or central office is not a grievance.

7 NYCCRR § 701.2.

The Inmate Grievance Program Procedure ("IGPP") requires an inmate to file the complaint within 21 calendar days of an alleged occurrence, either on an inmate grievance complaint form or on plain paper. 7 NYCCRR § 701.5(a)(1). IGPP informs that "[i]n addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, i.e. specific persons/areas contacted and responses received." 7 NYCCRR § 701.5(a)(2).

Once an inmate files a complaint, IGPP mandates that the Inmate Grievance Resolution Committee ("IGRC"): (1) resolve a grievance informally, within 16 calendar days after the filing of a grievance; and (2) if no resolution is reached, conduct a hearing to answer the grievance or make a recommendation to the superintendent. 7 NYCCRR § 701.5(b). IGPP also outlines the procedures to be followed if the grievant or any direct party wishes to appeal to the superintendent, or to the central office review committee ("CORC"). *See* 7 NYCCRR §§ 701.5(c) and (d). "If no appeal is filed upon denial by the IGRC, it will be presumed that the grievant or direct party accepts the committee's recommendation. An exception to this appeal time limit may be approved by the IGP supervisor under section 701.6(g) of this Part." 7 NYCCRR § 701.5(c) (1). Additionally, IGPP provides for expedited review of grievances alleging: (i) violations of department policy

regarding strip searches or strip frisks; and (ii) employee harassment. *See* 7 NYCRR §§ 701.10 and 701.8.

**\*13** The plaintiff does not contest that New York administrative remedies were available to him. He contends he exhausted them properly, except for the claim concerning the retaliation conversation Simpson and Rizutto had in the mess hall, because administrative remedies were unavailable for that conduct. The Court finds that, taken as true, the alleged conversation between Simpson and Rizzuto was reasonably perceived as a threat of retaliation by the plaintiff; thus constituting a "special circumstance" that justifies his failure to exhaust that claim.

The plaintiff indicates, with respect to the incident preceding his strip search, he brought the matter to the attention of Superintendent Fisher and Commissioner Goord. While the defendants are correct that a letter to Superintendent Fisher and Commissioner Goord does not satisfy the IGP grievance requirements, the plaintiff also described the occurrence in his May 22, 2004 grievance, thus satisfying the IGP content requirement.

When taken as true, for the purpose of a motion to dismiss, the plaintiff's allegations that he exhausted grievances in connection with the claims alleged in his complaint, without more, are sufficient to demonstrate he complied with the IGP's requirements. Therefore, for the purpose of the motion to dismiss, the Court finds that the plaintiff's claims are exhausted.

### Deficient Water and Ventilation Claims

The defendants contend the plaintiff's allegations that: (a) prisoners generally catch cold easily in a crowded prison; and (b) he was once exposed to the Hepatitis A virus, without any claim of a current Hepatitis A condition, suggest that the plaintiff failed to assert an actual injury caused by the alleged water or facility ventilation system deficiencies.

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e. The plaintiff alleges, in connection with the deficiencies in the facility's water and ventilation systems, that he "was subjected to being in a housing unit without proper ventilation" and that "he drank a lot of water

that was contaminated." However, the plaintiff fails to assert any facts from which it could be inferred that he suffered an injury from the allegedly contaminated water and improper ventilation. The plaintiff's allegations, that in June 2006, a physician told him that he was exposed to Hepatitis A in 2004 and that Hepatitis A "comes from drinking dirty water," are not sufficient to state that he suffered an injury, when the plaintiff also alleges that, in June 2006, the same physician assured him "the virus left [his] system" and no other symptom is alleged to have been experienced by the plaintiff as a result of the water he consumed and ventilation system deficiencies he endured. Therefore, the plaintiff failed to state a claim based on the alleged deficiencies in the water and ventilation systems.

### Claims Against Fisher

**\*14** The doctrine of respondeat superior may not be used in a section 1983 action to impose liability on a supervisory official for a constitutional violation(s) committed by his subordinates. *See Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). To establish a section 1983 claim, a plaintiff must show a supervisory defendant's personal involvement in committing the violation by evidence of his: (a) direct participation in the alleged constitutional violation; (b) failure to remedy the wrong, after being informed of it through a report or appeal; (c) creation of an unconstitutional policy, based on which the violation occurred; (d) grossly negligent supervision of the wrongdoers; or (e) deliberate indifference to the rights of the plaintiff manifested by a failure to act on information indicating that constitutional violations were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Fisher contends the plaintiffs "bare allegation that he had somehow 'brought [his claims]' " to his attention is not sufficient to demonstrate Fisher's personal involvement in any alleged constitutional violations. Moreover, according to Fisher, the plaintiff failed to allege that Fisher had a direct and personal responsibility for the purportedly unlawful conduct of his subordinates.

The plaintiff asserts Fisher failed to remedy the unlawful conduct after he was informed about it numerous times by the plaintiff, both through the appeals of his grievances and "a detailed letter explaining how the officers were retaliating against [him]." According to the plaintiff, Fisher "exhibited 'deliberate indifference' to the rights of inmates by failing to act on information documented and

brought to [his] attention indicating that unconstitutional acts were occurring."

The plaintiff does not allege that Fisher participated directly in any of the alleged constitutional violations or that he created an unconstitutional policy, based on which the violations occurred. The only allegation the plaintiff makes in his complaint against Fisher: "I brought this to the Superintendent Fisher," is not adequate to demonstrate Fisher's personal involvement in the alleged wrongdoing. Although the plaintiff, in his opposition to the instant motion, asserted that "his letters should have placed Mr. Fisher on notice of the conduct of his officers," he made no factual allegations in his complaint from which it could be inferred that Fisher actually received his letters or was aware of them. Moreover, the plaintiff failed to assert any facts in his complaint from which it could be inferred that Fisher acted with deliberate indifference to the alleged violations or that he was grossly negligent in supervising other defendants. The plaintiff's assertion that he appealed fully the decisions on his grievances demonstrates that Fisher did not act with a deliberate indifference, but, rather, in accordance with the IGP's procedure. Therefore, the plaintiff's claims against Fisher cannot be maintained.

*Claims Against Simpson*

**\*15** Simpson contends the plaintiff's allegations, that he: (i) slapped Headley twice and pushed Headley into his cell; (ii) "spoke to him disrespectfully and cursed in his face so loud that Plaintiff felt spit on his face;" and (iii) "engaged in offensive comments and name calling" do not give rise to a claim of excessive force. Moreover, although the plaintiff alleged that Simpson stated he would deprive Headley of everything and have him "on the burn" for as long as he was in the facility, the plaintiff failed to state a Fourteenth Amendment Due Process claim against Simpson because Headley made no allegations that it was Simpson who kept the plaintiff in keep-lock confinement for 16 days or denied Headley his due process rights.

The plaintiff contends, in his opposition to the defendants' motion, Simpson acted "wantonly" and "with sadistic and malicious intent to cause harm" when he slapped him twice on the face, pushed him with force and watched him hit his "lower hips" and "back" and fall. As a result of Simpson's conduct and his threats, the plaintiff asserts, he was placed in keep-lock confinement where he was deprived of meals, a shower and recreation, in violation

of his Eighth Amendment right to be free from cruel and unusual punishment. Moreover, the plaintiff asserts, Simpson's failure to issue a misbehavior report deprived him of a hearing, a violation of due process.

*Eighth Amendment Claim Against Simpson*
The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments,' U.S. Const. amend. VIII, including the 'unnecessary and wanton infliction of pain.' " *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 [1976] ). To establish a claim, under the Eighth Amendment, for excessive use of force, a plaintiff must demonstrate first that the defendant acted with the necessary level of culpability, shown by actions characterized by "wantonness" under the circumstances of the challenged conduct. *Id.* at 21. Whether conduct is "wanton" depends on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 999 (1992). Additionally, the plaintiff also has the burden of showing that the alleged misconduct involved "unnecessary and wanton infliction of pain," and the use of more than *de minimis* force. *See Sims,* 230 F.3d at 21-22. Not every unnecessary push or shove violates an inmate's constitutional rights, and an allegation of a *de minimus* use of force "will rarely suffice to state a constitutional claim." *Id.* at 22.

The plaintiff alleges Simpson grabbed his shoulder, started cursing in his face, slapped his face twice and pushed him in his cell, causing Headley to "hit [his] lower hips on the side of the locker along with [his] back." Notwithstanding the petitioner's lack of clarity with respect to the exact body part with which he came into contact with his cell locker, the plaintiff failed to present facts from which it could be inferred that he suffered any pain or injury as a result of his hitting the locker. The plaintiff also failed to assert any facts that would give rise to an inference that Simpson used excessive force when he "pushed" the plaintiff into his cell. Although the plaintiff alleged that he "received a serious blow to my lower back and hips," such an allegation does not approach what is required to set forth an Eighth Amendment claim that excessive force was used. The plaintiff's allegations do not demonstrate that Simpson acted as he did maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore

2008 WL 1990771

discipline, after the plaintiff was directed by the sergeant "to do as [Simpson] said to do." Therefore, the plaintiffs excessive use of force claim against Simpson cannot be sustained.

*Fourteenth Amendment Due Process Claim Against Simpson*

**\*16** In order to establish a due process violation, a plaintiff must show that: (1) he possessed a liberty interest; and (2) the deprivation of that liberty interest occurred without due process of law. *See Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). An inmate's liberty interest is implicated by prison discipline only if the discipline "imposes [an] atypical and significant hardship on the inmate in relation of the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995). Both duration and conditions of confinement are factors to be considered by a court when determining whether a confinement rises to the level of "atypical and severe hardship." *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004).

The plaintiff alleges, and Simpson does not dispute, that, subsequent to the April 29, 2004 incident, he was in keep-lock confinement "for 16 days without receiving a misbehavior report" and that during that time, he "received no meals, no shower, no recreation, not a thing while [in keep-lock confinement]." Simpson contends the plaintiff failed to allege it was "Simpson who kept him in keeplock [confinement] for sixteen days or denied him his due process rights" and, moreover, "to the extent plaintiff's allegations attempt to state due process claims, his complaint fails and should be dismissed."

Although proceeding *pro se,* the plaintiff presented all his allegations chronologically, starting with the his 2004 complaints about the facility's water quality. The plaintiff's allegation of a 16-day keep-lock confinement follows immediately after his description of the April 29, 2004 incident involving Simpson. That the plaintiff used a passive mode to indicate he was in keep-lock confinement for 16 days, rather than an active mode stating that Simpson kept him in keep-lock confinement for 16 days, does not affect the clarity of the plaintiff's allegation, that his 16 days in keep-lock confinement followed as a result of the April 29, 2004 altercation with Simpson. Simpson failed otherwise to oppose the plaintiff's due process claim.

Keep-lock confinement need not be based on a misbehavior report. *See* 7 NYCRR §§ 301.6 and 301.7. A failure to issue such a report, before discipline is imposed, does not demonstrate a violation of due process. However, New York provides procedural due process for each type of segregated confinement, including admission "to a special housing unit for any reason," which includes an opportunity to be heard, prior to confinement. *See* 7 NYCRR Part 301. The plaintiff does not allege that he had an opportunity to be heard prior to being placed in keep-lock confinement for 16 days. It can be inferred reasonably from the plaintiffs allegation, that he was confined without having a misbehavior report issued to him, and that he did not receive an opportunity to be heard before he was placed in keep-lock confinement for 16 days. Thus, the plaintiffs allegation, that he was placed in keep-lock confinement without an opportunity to be heard, is plausible on its face. Consequently, it is sufficient to raise his right to relief above the speculative level.

**\*17** The plaintiff possesses a liberty interest in receiving meals during his confinement. Failing to receive meals during a 16-day keep-lock confinement represents an "atypical and severe hardship" on an inmate. The Court must accept the plaintiff's factual allegations that he did not receive meals, showers, recreation or other things during his keep-lock confinement, as true and draw all reasonable inferences in the plaintiff's favor. Therefore, the Court finds that the plaintiff has stated a due process claim because he possessed a liberty interest of which he was deprived without due process of law. Accordingly, granting Simpson's motion to dismiss the Fourteenth Amendment Due Process claim made against him is not warranted.

*Conspiracy Claim*

In order to establish a section 1983 conspiracy claim, a plaintiff must demonstrate: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on him; and (2) "an overt act [was] done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). "[C]omplaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977).

The defendants contend "[a] conspiracy may not be assumed" and the plaintiff failed to allege conspiracy in

his complaint. The plaintiff asserts his allegations that Simpson: (a) threatened him and placed him in keep-lock confinement for 16 days; and (b) "later spoke to [ ] Rizzuto and made comments about [him], "should be more than enough for this Court to presume that a conspiracy was taking place."

The only conspiracy allegation in the plaintiff's complaint is that a small group of officers conspired against him. The plaintiff failed to allege any facts from which it could be inferred that two or more defendants agreed to act in concert to inflict an unconstitutional injury upon him. The paucity of facts provided by the plaintiff militates in favor of granting the defendants' motion with respect to this claim.

*Misbehavior Report Claim Against Rizzuto*

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). The defendants contend: (i) the plaintiff does not challenge the disciplinary hearing he received based on a misbehavior report issued to him by Rizzuto; and (ii) "to the extent that Plaintiff alleges that the misbehavior report was false," that allegation, by itself, does not state a due process claim. The Court agrees. Although the plaintiff did not allege explicitly that the misbehavior report issued by Rizzuto was false, that fact can be inferred from the plaintiff's allegation that the misbehavior report was dismissed. Inasmuch as a prisoner generally has no constitutional right to be free from being accused falsely in a misbehavior report, the plaintiff's claim against Rizzuto, concerning the misbehavior report, without more, cannot withstand the defendants' motion to dismiss.

*Retaliation Claims*

**\*18** An inmate has a constitutionally protected right to file grievances, U.S. Const. amend. I, and prison officials may not retaliate against an inmate for exercising that right, *Colon,* 58 F.3d at 872. To establish a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) his speech or conduct was constitutionally protected; (2) a defendant took an adverse action against him; and (3) a casual link between the protected speech or conduct and the adverse action exists. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). An inmate asserting a First Amendment retaliation claim must allege either that his speech was chilled or that he

suffered some other harm, including the adverse action of being placed in keep-lock confinement for a period of weeks. *See id.* at 383. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

The defendants maintain the plaintiffs "only allegations even suggesting retaliation are those plaintiff states against [ ] Ellis dated May 21, 2004, [ ] and the vague comments plaintiff alleges [ ] Harris made during a pat frisk conducted on June 21, 2004." According to the defendants, the plaintiff failed to claim any injury resulting from those actions and "the allegations of retaliation stated against other defendants are based solely in assumption and speculation."

For his part, the plaintiff asserts he alleged a retaliation claim adequately because he alleged that Ellis, by hitting him and stating "this is for CO. Simpson," retaliated against him for filing a grievance against Simpson. Moreover, the plaintiff contends, he also alleged a retaliation claim against: (i) Simpson, concerning the April 29, 2004 incident, because Simpson placed him in keep-lock confinement to retaliate for the plaintiff's attempt to speak with Simpson's supervisor; and (ii) Rizzuto, concerning the August 8, 2004 misbehavior report, because that report was issued in retaliation for the plaintiff's act of filing a grievance against Rizzuto's friend, Simpson.

The plaintiff's allegations show he engaged in a constitutionally protected activity: filing a grievance against Simpson. The plaintiff alleged Ellis took an adverse action against him when she slapped him and told him that was what he "get[s] for writing up CO. Simpson;" thus showing a causal connection between her conduct and the plaintiff's constitutionally protected filing of a grievance against Simpson. The plaintiff also alleged that, when he attempted to speak to Simpson's supervisor, after Simpson refused to explain to him why he was not allowing him to go to the bathhouse, on April 29, 2004, Simpson took adverse action against him by placing him in keep-lock confinement for 16 days. Based on these facts, the Court finds that the plaintiff made sufficient allegations to support retaliation claims against Ellis and Simpson. However, the plaintiff failed to allege a retaliation claim against Rizzuto for issuing the August 8, 2004 misbehavior report. This is so because

2008 WL 1990771

he did not allege facts in his complaint from which it could be inferred that Rizzuto's misbehavior report was issued in retaliation for the plaintiff's exercise of any constitutionally protected activity or that Headley suffered any harm as a result of the misbehavior report.

*Eighth Amendment Claims Against Ellis, Bethea and Harris*

 **\*19** The defendants contend the plaintiff's allegations that: (a) Ellis slapped him after a strip search, on May 21, 2004; (b) Bethea pushed and shoved him during searches; and (c) Harris conducted a rough search of him on June 21, 2004, do not give rise to a claim of excessive use of force. Moreover, according to the defendants, the plaintiff's allegation, that Ellis made offensive comments, is not sufficient to state a constitutional claim under section 1983.

The Court agrees. The plaintiff failed to allege any facts from which it could be inferred that the conduct of Ellis, Bethea and Harris, during the May 21, 2004 strip search and during other searches was characterized by wantonness or that he suffered an unnecessary and wanton infliction of pain, involving more than a *de minimis* use of force. Therefore, allowing the plaintiff to prosecute Eighth Amendment claims against Ellis, Bethea and Harris is not warranted.

*Due Process and Retaliation Claims Against Barrett and Reyes*

According to the defendants, the plaintiff's allegations, that Barrett and Reyes issued misbehavior reports to him when he did not do anything wrong, do not support a due process claim. The defendants maintain the plaintiff does not allege he was denied procedural due process in connection with the misbehavior reports issued to him by Barrett and Reyes or that these reports were written in retaliation for the plaintiff's exercise of any protected right.

The plaintiff's allegation, that he "did not do anything wrong" when Barrett and Reyes issued misbehavior reports to him, is of no import because an inmate has no constitutional right to be free from a false misbehavior report. *See Boddie,* 105 F.3d at 862. Moreover, Headley failed to allege any facts from which it can be inferred that Barrett and Reyes issued misbehavior reports to him in retaliation for his exercise of any protected right.

Accordingly, the plaintiff's due process and retaliation claims against Barrett and Reyes cannot be maintained.

*Qualified Immunity*

The doctrine of qualified immunity shields state officials from civil actions for damages for discretionary acts performed in the course of their duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). The threshold question in a qualified immunity determination is "whether the alleged facts demonstrate that a defendant violated a constitutional right." *Iqbal,* 490 F.3d at 152. If a violation of the plaintiff's constitutional right is demonstrated, a court must then determine "whether that right was clearly established at the time of the challenged action-that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Id.* A right is clearly established if: "(1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable [person in the defendant's position] [would] have understood from the existing law that [his] conduct was unlawful.' " *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (citation omitted). "A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Iqbal,* 490 F.3d at 152. Qualified immunity is an affirmative defense and "the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Varrone v.. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997).

 **\*20** Ellis contends "to the extent that plaintiff's allegations suggest only that an Officer was doing his or her job, with no factual allegations to suggest that the conduct at issue was malicious or based on retaliatory intent, qualified immunity applies ." Simpson contends, concerning the plaintiff's claim respecting the use of excessive force against him, "he would have not reasonably believed that he violated Plaintiff's Eighth Amendment rights" because "not every push or shove amounts to an Eighth Amendment violation."

As set forth above, the plaintiff made sufficient allegations that: (1) Simpson violated his Fourteenth Amendment

Due Process rights; and (2) Simpson and Ellis retaliated against him for exercising his First Amendment rights. However, the defendants failed to meet their burden of demonstrating that their conduct did not violate either: (i) the plaintiff's clearly established rights; or (ii) constitutional rights of which a reasonable correction officer would have known. Contrary to the defendants' contentions, the plaintiff alleged that the defendants' conduct was based on retaliatory intent. Even assuming that the plaintiff failed to allege the defendants' conduct "was malicious or based on retaliatory intent," such a failure does not relieve the defendants of the obligation of showing that the elements of their qualified immunity affirmative defense exist. Moreover, Simpson does not allege he is shielded from liability to the plaintiff for damages, by the doctrine of qualified immunity, with respect either to the Fourteenth Amendment Due Process claim or the First Amendment claim Headley has asserted against him. Accordingly, no basis exists, on the record before the Court, for granting the defendants' motion pursuant to the doctrine of qualified immunity.

**RECOMMENDATION**

For the reasons set forth above, the Court recommends that the February 5, 2007 motion to dismiss be denied with respect to the retaliation claim against Ellis and granted with respect to all other claims. Furthermore, the Court recommends that the December 6, 2007 motion to dismiss be denied with respect to: (i) the Fourteenth Amendment Due Process claim against Simpson; and (ii) the retaliation claim against Simpson, and granted with respect to all other claims.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Crotty. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 470 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1990771

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2822199
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Harold VERLEY, Plaintiff,

v.

Dr. Lester N. WRIGHT, Chief Medical
Officer and Associate Commissioner
of the New York State Department of
Correctional Services, et. al., Defendants.

No. 02 Civ. 1182(PKC).
|
Sept. 27, 2007.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, U.S.D.J.

**\*1** Plaintiff Harold Verley, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against Dr. Lester N. Wright, Dr. Carl J. Koenigsmann and Dr. Steven Weinstein, each of whom is employed by the New York State Department of Corrections ("DOCS") as a physician (collectively, the "State Defendants"). Also named as defendants are Corrections Physician Services, Inc., ("CPS") and Prison Health Services, Inc., ("PHS") (collectively, the "Corporate Defendants"). Verley suffers from hepatitis C and contends that defendants have violated his rights under the Eighth and Fourteenth Amendments by withholding treatment with deliberate indifference to his medical needs. Plaintiff seeks injunctive, declaratory and monetary relief.

The State and Corporate Defendants now move for summary judgment in their favor. I conclude that plaintiff has failed to administratively exhaust his remedies as to all claims against the State Defendants, with the exception of his claim against defendant Wright for denial of interferon/ribavirin treatment and his claim against defendant Koenigsmann for denial of the referral to a nutritionist and hepatologist. As to defendant Wright, plaintiff has raised a triable issue of fact on the deliberate indifference claim against him; however, I conclude that the claim is barred by the doctrine of qualified immunity. As to defendant Koenigsmann, plaintiff has failed to come

forward with evidence which would permit a reasonable factfinder to conclude that he acted with deliberate indifference to plaintiff's medical needs. Plaintiff's claims for money damages against the State Defendants in their official capacities are also barred by sovereign immunity. Plaintiff's claims for declaratory and injunctive relief are deemed moot because of his transfer from the Green Haven Correctional Facility ("Green Haven") to a different facility and because he has received the treatment he initially sought.

The Corporate Defendants do not assert that the exhaustion requirement applies to them. However, plaintiff has failed to come forward with evidence which would permit a reasonable factfinder to find in his favor as against the Corporate Defendants.

For the reasons more fully explained below, summary judgment is granted dismissing plaintiff's claims.

BACKGROUND

A. *Procedural Background*
Defendants, with the exception of Wright and Koenigsmann, moved pursuant to Rule 12(b)(1), (2), and (6), Fed.R.Civ.P., to partially dismiss the Complaint. (Docket # 13, 20, 28) The motions were referred to Magistrate Judge Debra C. Freeman.

In a Report and Recommendation dated January 22, 2004 (the "R & R"), Magistrate Judge Freeman recommended that the Court dismiss all claims against defendants Glenn S. Goord, Charles E. Greiner, Donald Stevens, Dr. Thomas Rush, Dr. Michael Antonelle, Vincent Marrone, Dr. Rosensweig and Phillip Marron, but deny the motion to dismiss claims against defendants CPS and PHS; the Magistrate Judge also recommended denial of Verley's motion to amend certain portions of the Complaint. (Docket # 90) Despite twice seeking extensions of his time to object to the R & R, no objections were received from plaintiff. The Corporate Defendants timely filed objections. On June 2, 2004, I issued an Order which adopted in its entirety the R & R of Magistrate Judge Freeman. (Docket # 94)

**\*2** In their submissions on the present motion, the Corporate Defendants have annexed a "Second Amended Complaint" ("SAC"). (Corp. Defs. Rule 56.1 Stmt. Exh. A) Plaintiff sought and received permission to file a SAC,

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 176 of 203
Verley v. Wright, Not Reported in F.Supp.2d (2007)
2007 WL 2822199

(Docket # 107) but the SAC does not appear to have been filed with the Clerk. On the motions, all parties direct their arguments to the SAC and I will therefore consider it the operative pleading and deem it to have been filed.

A. *Background*

Since 1990, plaintiff has been incarcerated within DOCS. In late 1996, physicians at Green Haven, where plaintiff was then located, noted elevated enzyme levels in plaintiff's blood. (Johnson Dec. Exh. E) Following testing in 1997, plaintiff was told that he was likely infected with the hepatitis C virus ("HCV"). (Verley Dec. ¶ 34) HCV is a chronic, viral liver disease. (Verley Brief in Opp. Exh. R; Johnson Dec. Exh. I-1) No broadly effective treatment for HCV exists, although the most successful treatments are a regimen of interferon, ribavirin or some combination thereof. (Verley Brief in Opp. Exh. N; Johnson Dec. Exh I-1)

Plaintiff contends that his "medical provider," a physician assigned to provide medical services to inmates, told him that he should "consider" undergoing a liver biopsy, the most accurate method of testing for HCV, in order to confirm the diagnosis. Plaintiff claims that he was denied a biopsy for over a year, despite having obtained several referrals for one from his medical provider at Green Haven. (Verley Exh. I at 12-17) Verley underwent a liver biopsy on October 6, 1998, which resulted in a finding of "Chronic Hepatitis, Consistent with Hepatitis C, Grade 2, Stage 2." (Verley Exh. I at 20) On or about December 26, 1998, Dr. Thomas Rush, an Infectious Disease Control Specialist at Green Haven, ordered that plaintiff begin combination interferon/ribavirin ("IR") therapy immediately. [1] (Verley Dep. 41-42; Defs. 56.1 ¶ 15)

[1]  In plaintiff's "Declaration in opposition to the defendant's motion for summary judgment," plaintiff states that it was a Dr. Malvarosa, not Dr. Rush, who referred him for IR therapy. In other filings by plaintiff, he asserts that Dr. Rush ordered the referral. Although contradictory, it is immaterial which physician actually issued the referral as it is undisputed that plaintiff was referred for IR therapy.

On February 12, 1999, plaintiff was denied participation in an IR therapy program by defendant Wright, the Associate Commissioner and Chief Medical Officer of DOCS, on the basis that plaintiff did not satisfy the preconditions set forth in the 1998 preliminary protocol (the "1998 Protocol") which governed treatment of HCV within DOCS. (Johnson Dec. Exh. I-4, Q; Johnson Dec. Exh. A, Wright Dec. ¶ 8) The 1998 Protocol was the precursor to the Clinical Practice Guideline on Hepatitis C (the "Guideline") which went into effect on March 31, 1999. (Johnson Dec. Exh. I-5) The 1998 Protocol and the Guideline provide that treatment must be not be given to anyone with "evidence of active substance (alcohol or drug) use during the past two years." (Johnson Exh. I-4 ¶ 2; Exh. I-5 at 3)

Plaintiff was found guilty of two disciplinary violations relating to two separate instances of drug use which occurred in November of 1998. (Johnson Dec. Exhs. K, J) The first incident occurred on November 13, 1998 when a search of plaintiff's cell resulted in the confiscation of five small bags of a substance later determined to be marijuana. (Johnson Dec. Exh. K) Plaintiff was charged with, and pled guilty to, drug possession in violation of prison regulations. (*Id.*) Prior to this incident, plaintiff had been twice tested for drugs and tested negative both times. (Johnson Dec. J "Hearing Transcript" at 17) As a result of this disciplinary violation, plaintiff was placed on a list of inmates subject to random drug testing which he underwent on November 24, 1998. (Johnson Dec. Exh. J) The test resulted in a finding that Verley's urine was "positive for contraband," namely cannabinoid. (*Id.*) A second test confirmed the first result. (*Id.*) In response to the test results, plaintiff was charged with, and pled guilty to, use of a controlled substance in violation of prison regulations. The fact that plaintiff had not been free from drug use for two years as the 1998 Protocol required caused Wright to deny him IR therapy. (Johnson Dec. Exh. Q)

**\*3**  Plaintiff filed a grievance challenging the denial of IR therapy, pursuing the claim through the DOCS grievance procedure and culminating in an Article 78 proceeding in New York Supreme Court. (Verley Aff. Exh. L) In a Decision and Order dated May 1, 2000, Justice Judith A. Hillery concluded "that Dr. Wright demonstrated a deliberate indifference to petitioner's serious medical needs" by denying him IR therapy. (*Id.* at 5) She ordered that plaintiff be immediately enrolled in IR therapy.

Thereafter, plaintiff was admitted to IR therapy but did not respond favorably to the treatment. In August 2001, Rush recommended that plaintiff be given a new

type of Interferon treatment called Pegelated Interferon ("PegIntron"), upon its approval by the Food and Drug Administration ("FDA"). (Verley Dep. 57) Plaintiff alleges that PegIntron therapy was approved by the FDA but, despite his repeated requests, he was denied access to it by Wright. (SAC ¶ 24; Verley Dep. 58) Plaintiff contends that the initial denial of IR therapy, delay in his receipt of medical treatment and the denial of PegIntron, combined to result in his suffering additional ills, including loss of hearing. (Verley Dep. 49; 51-52) In addition to claiming that Wright acted with deliberate indifference toward plaintiff's specific medical condition, he alleges that Wright improperly failed to develop a tracking system or other procedure to monitor inmates with chronic illnesses (the "Monitoring Claim"). (SAC ¶ 25; Verley Dep. 61-63)

Plaintiff also contends that in May 2001, Koenigsmann, Facility Health Services Director at Green Haven, improperly denied him access to the services of a hepatologist, dermatologist and nutritionist on the basis that he had already seen a gastroenterologist ("GI"). (Verley Dep. 72, 74-75; Verley Dec. 61-62) He claims that Koenigsmann denied him a follow-up appointment with the GI, despite a referral for the appointment from his medical provider. (Verley Dep. 75; Johnson Dec. Exh. E "Def" 234) Plaintiff contends that the real reason for the denial of medical treatment by Koenigsmann was a desire to have plaintiff transferred to another facility.

In October 2001, plaintiff complained to Dr. Steven Weinstein, an outside medical consultant at Green Haven, about back pain he believed was attributable to an old gun shot wound and "HCV related neuropathy." (SAC ¶ 35) Following testing, Weinstein determined that Verley had no apparent nerve damage. Plaintiff asserts that Weinstein reached this conclusion by ignoring prior tests which showed nerve damage. (Pl. "Statement of Disputed Factual Material Issues of Fact" ¶ 4) Plaintiff contends that Weinstein's report "was based on personal opinion, not sound medical information." (*Id.*) When plaintiff questioned the diagnosis, Weinstein allegedly became verbally abusive toward plaintiff. (*Id.* ¶ 25; Verley Dep. 76) Plaintiff alleges that Weinstein deliberately disregarded any indication that plaintiff may have experienced pain or nerve damage "out of spite" and personal dislike of plaintiff. (SAC ¶ 36)

**\*4** Defendant CPS is a corporate entity which in February 1998 contracted with DOCS to provide off-site review of referrals of DOCS inmates to medical specialists. [2] (CPS 56.1 Stmt. ¶¶ 20-21) According to the terms of the contract, CPS was to "provide or arrange for the provision of all medically necessary specialty physician services ... and to manage the delivery of hospital service to the [inmate] Population ...." (CPS 56.1 Stmt. ¶ 23, Exh. I § 1) As part of its services, CPS engaged in a process of preadmission certification to determine "whether the inpatient care proposed by a physician is appropriate and required" and conducted reviews of patient care. (CPS 56.1 Exh. I § 3.G) If CPS declined to permit a patient to be seen by a specialist, despite a referral from the patient's physician, DOCS could require a review by a committee of two DOCS representatives and two CPS representatives, all of whom are physicians or health professionals. (*Id.*) CPS did not provide direct care to DOCS inmates. (CPS Stmt. ¶ 34) Verley appears to contend that CPS was, at least partially, responsible for denying him both the IR therapy and the PegIntron treatments and that these decisions by CPS were motivated by its desire to save money. (Verley Dep. 86; 100-02; SAC ¶ 37) As a result of the denial of the referrals to see specialists, plaintiff contends that he has suffered a "compromised liver," hearing difficulties and joint and muscle pain. (Verley Dep. 119)

[2]     Defendant PHS is the successor to CPS which was the entity active at the time of plaintiff's allegations, CPS 56.1 Stmt. ¶ 20. I will therefore discuss the allegations as they relate to CPS. The SAC refers to CPS as "Corrections Physician Health Services, Inc." but it appears from defendants' 56.1 statement that the correct name is Corrections Physician Services.

## DISCUSSION

### A. *Summary Judgment Standard*
Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the

outcome of the suit under the governing law ....“ *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but neverthe less "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

**\*5** An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Rule 56(c), Fed.R.Civ.P. In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

Plaintiff has been served with the requisite "Notice to Pro Se Litigants Opposing Summary Judgment" required by Local Rule 56.2. A *pro se* party's submissions are to be read liberally, a requirement that is especially strong in the summary judgment context, where a *pro se* plaintiff's claims are subject to a final dismissal. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.") However, a party's *pro se* status does not alter

the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, \*9 (S.D.N.Y. Aug. 25, 2004).

### B. *Claims Against the State Defendants*

#### a. *Failure to Exhaust*
The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.,* was enacted in an effort to address the large number of prisoner complaints filed in federal court. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002) (The PLRA is intended to "reduce the quantity and improve the quality of prisoner suits.") The PLRA does not itself create any substantive rights but "claims covered by the PLRA are typically brought under 42 U.S.C. § 1983 ....“ *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 919 (2007). Under the provisions of the PLRA, "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any ... correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is intended to afford "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter,* 534 U.S. at 524-25. The Supreme Court has made clear that "the PLRA's exhaustion requirement applies to all inmate suits about prison life." *Id.* at 532. Within the Second Circuit, failure to exhaust administrative remedies is an affirmative defense and the defendant therefore bears the burden of proving that claims have not been exhausted. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Where a complaint contains claims which are exhausted and claims which have not been properly exhausted, the Court must dismiss only the unexhausten claims and not the complaint in its entirety. *Bock,* 127 S.Ct. at 924.

**\*6** DOCS has a well-established, three-step, administrative procedure for inmate grievances called the inmate grievance program ("IGP"). N.Y. Correction Law § 139 (2003). First, an inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") at his facility. 7 N.Y.Codes R. & Reg. ("NYCRR") § 701.5(a)(1). Absent mitigating circumstances, in order to be timely, a grievance must be filed within 21 days of the alleged incident. 7 NYCRR § 701 .5(a)(1). If the

Case 9:16-cv-01343-GTS-TWD   Document 25   Filed 02/02/18   Page 179 of 203
Verley v. Wright, Not Reported in F.Supp.2d (2007)
2007 WL 2822199

IGRC is unable to resolve the dispute to the satisfaction of the grievant, a hearing must take place within 16 days of the IGRC's receipt of the grievance. § 701.5(b)(2) After receiving a response from the IGRC, an inmate has seven days in which to appeal to the superintendent of his facility. § 701.5(c) (1). If the IGRC does not respond to an inmate's initial grievance, the inmate may still appeal to the superintendent. § 701.8. Finally, the inmate may appeal the decision of the superintendent to the Central Office Review Committee ("CORC") within seven days of receiving the decision. § 701.5(d)(1)(i). The CORC "consists of the deputy commissioner and counsel, deputy commissioner for correctional facilities, deputy commissioner for program services, deputy commissioner for administrative services, and the deputy commissioner and chief medical officer, or their designees expressly authorized to act for them." § 701.5(d)(2)(i). An inmate may attend a hearing or appeal a grievance unaided or aided by a member of staff or an other inmate. 7 NYCRR § 701.6(a).

The State Defendants contend that plaintiff has failed to exhaust his administrative remedies in regard to the claims against Weinstein, the claim against Koenigsmann as it pertains to the dermatology referral, the claims against Wright in relation to plaintiff's biopsy and denial of HCV retreatment with PegIntron and the Monitoring Claim. Plaintiff's claims against Wright relating to the denial of IR therapy and against Koenigsmann for declining to permit him to see a nutritionist and hepatologist are indisputably exhausted.

Plaintiff appears to contend that the PLRA applies only to administrative remedies "as are available" and there are "no remedies available to exhaust any medical issue" which renders such an issue "ungrievable." Plaintiff also claims that physicians cannot be compelled to comply with the final determination regarding the IGP complaint and thus a grievance proceeding cannot afford a meaningful remedy. Further, plaintiff contends that because of the "diversity of opinions amongst District Court Judges, as to whether the exhaustion requirement, as applied by DOCS, is more of a punative mechanism or fair mechanism for redress of wrongful acts ... there are material issues which should go before trial." (Pl. Brief in Op. at 21)

Verley acknowledged at his deposition that he did not file a grievance in regard to the Monitoring Claim and there is

no evidence in the record that such a grievance was filed. (Verley Dep. 64-65) Accordingly, the Monitoring Claim is unexhausted and is dismissed.

**\*7** In regard to Verley's claims against Koenigsmann as they relate to the dermatology referral, Verley testified at his deposition that he did submit a grievance relating to that claim. (Verley Dep. 72) However, there is no record of such a grievance being filed. (Johnson Dec. Exh. P) While Verley did file a grievance against Koenigsmann regarding the denial of a referral to a hepatologist and nutritionist, he did not include the dermatological referral in the grievance and that claim is therefore unexhausted. (Johnson Dec. Exh. G) In response to defendants' evidence, plaintiff failed to come forward with evidence that he exhausted his dermatological claim. His conclusory assertion that he exhausted the claim, without more, is insufficient to raise a triable issue of fact.

As to claims against Wright, it appears from the record that plaintiff only filed a grievance relating to the denial of the referral for IR therapy. (Johnson Dec. Exh. H, P) Accordingly, any other claim against Wright, including those claims relating to the delay in plaintiff's biopsy or the denial of PegIntron, has not been exhausted.[3] Plaintiff's claims against Weinstein are also unexhausted as plaintiff failed to file any grievance relating to Weinstein's alleged deliberate indifference to either his gunshot wound or his "HCV related neuropathy."

[3]      Even had plaintiff's claim regarding the delay in his receipt of a biopsy been exhausted, there is no evidence in the record that Wright was personally involved in plaintiff's biopsy or its timing. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Rather, the determination was made by plaintiff's treating physicians. Plaintiff may not under § 1983 pursue a theory of respondeat superior to hold Wright liable for actions of plaintiff's treating physicians. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986).

This is not a case where the claim is perceived to be unexhausted simply because plaintiff did not name in his grievance a party who he has now sued. *See Block,* 127 S.Ct. at 923. These are claims which have not been the subject of grievance proceedings.

2007 WL 2822199

In *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), the Second Circuit summarized its holdings in a series of cases as requiring that a three-part inquiry be undertaken when a prisoner counters a defendant's argument that he or she failed to exhaust. First, the court considers whether administrative remedies were "available" to the prisoner. *Id.* (citing *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Second, the court inquires whether the defendants failed to preserve a non-exhaustion argument by failing to raise the issue or preserve it. *Hemphill,* 380 F.3d at 868 (citing *Johnson v. Testman,* 380 F .3d 691 (2d Cir.2004)). Third, the court looks to whether the defendant's own actions inhibited the inmate's exhaustion of remedies, and if so, whether the actions estopped one or more defendant from raising non-exhaustion. *Hemphill,* 380 F.3d at 868 (citing *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004)). If, after considering these three questions, the court finds that administrative remedies were available to the plaintiff, and that defendants are not estopped and have not forfeited their non-exhaustion claims, but that the plaintiff still failed to exhaust, the court considers whether plaintiff plausibly alleges "special circumstances" that justify the prisoner's failure to comply with the exhaustion requirements. *Id.*

**\*8** Here, plaintiff has failed to demonstrate that the administrative remedies were not, in fact, "actually available to him." *Hemphill,* 380 F.3d at 686. It is sheer speculation that meaningful relief, such as a transfer to another correctional facility with different medical staff and access to other medical facilities, could not have been afforded. Moreover, the Supreme Court has noted that the exhaustion requirement is a legislative mandate that has several important purposes, beyond the direct availability of relief to the prisoner. *Woodford v. Ngo,* 126 S.Ct. 2378, 2385-88 (U.S. June 22, 2006). DOCS has a meaningful grievance procedure which was fully available to plaintiff.

The State Defendants have preserved their exhaustion argument. Exhaustion arguments were timely raised on the motion to dismiss and in both the Answers to the SAC and the original Complaint. (Doc. # 22, 116 ¶ 32)

Finally, there is no evidence in the record that defendants have inhibited plaintiff from administratively exhausting his remedies or used coercive pressure to induce plaintiff not to file a grievance. Rather, the record before the Court indicates that plaintiff was able to file at least seven grievances during his incarceration at Green Haven.

(Johnson Dec. Exh. P) There is no evidence of undue delay in the handling of plaintiff's grievances. *See Manos v. Decker,* 2005 WL 545215 (S.D.N.Y. Mar. 7, 2005). The grievance filed in relation to the denial of IR therapy was filed on February 18, 1999 and finally decided by CORAC less than two months later on April 7, 1999. (Johnson Dec. Exh. H) Similarly, the grievance relating to the referrals for a nutritionist and hepatologist was filed on August 8, 2001 and decided by the Superintendent less than a month later. (Johnson Dec. Exh. G) There is also no evidence of "special circumstances" which would excuse plaintiff's failure to exhaust his administrative remedies.

Accordingly, the Monitoring Claim, all claims against Weinstein, the dermatology claim against Koenigsmann and all claims against Wright with the exception of the claim relating to the initial denial of IR therapy are dismissed on exhaustion grounds.

### b. *The Eleventh Amendment*

In prohibiting suits against states, the Eleventh Amendment confirms two presuppositions of constitutional proportion: "first, that each State is a sovereign entity in our federal system; and second, that [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996) (alteration in original; citations and quotations omitted). "Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability. Rather, it provides an immunity from suit." *Federal Maritime Com'n v. South Carolina State Ports Authority,* 535 U.S. 743, 766 (2002). Sovereign immunity may be abrogated by Congressional action, *see Seminole,* 517 U.S. at 55, or a state may waive its immunity provided it does so in an unequivocal fashion, *see Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1 (1985), *CSX Transportation, Inc. v. New York State Office of Real Property Services,* 306 F.3d 87, 95 (2d Cir.2002). Section 1983 does not abrogate a state's Eleventh Amendment immunity and there has been no waiver for section 1983 claims on the part of the State of New York. *See Quern v. Jordan,* 440 U.S. 332 (1979). Absent waiver or abrogation, sovereign immunity extends to all agencies and officials sued in their official capacity because the State is the real party in interest. *See F.D.I.C. v. Meyer,* 510 U.S. 471, 484-86 (1994); *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Suits asserting official capacity claims against employees of DOCS and its facilities have been held to be

Case 9:16-cv-01343-GTS-TWD    Document 25    Filed 02/02/18    Page 181 of 203
Verley v. Wright, Not Reported in F.Supp.2d (2007)
2007 WL 2822199

subject to the State's Eleventh Amendment immunity. *See, e.g., Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (Commissioner of DOCS and officials of Attica).

**\*9** The SAC reflects that all of plaintiff's claims against the State Defendants are asserted against them in their individual and official capacities. (SAC ¶¶ 9-12) Plaintiff's claims for injunctive or declaratory relief and his claims against the State Defendants in their personal capacities are not barred by the Eleventh Amendment. *See id.* at 101-02 (citing *Hafer v. Melo,* 502 U.S. 21, 27-31 (1991); *Kostok v. Thomas,* 105 F.3d 65, 69 (2d Cir.1997)). Plaintiff's claims for money damages against the State Defendants in their official capacities are dismissed.

### c. *Claims for Injunctive and Declaratory Relief*

Subject matter jurisdiction requires that there be an actual controversy "at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citing *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975)). According to the Second Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (citing *Prins,* 76 F.3d at 506). While the issue of mootness was not raised by any party, the Court may nonetheless consider it *sua sponte. See Prins,* 76 F.3d at 506. [4]

[4]    The issue of mootness was considered by Magistrate Judge Freeman in her R & R, adopted by this Court on June 2, 2004. However, because Magistrate Judge Freeman's R & R was addressed to the original complaint and plaintiff again seeks declaratory and injunctive relief in the SAC, I will consider the issue of mootness anew.

Plaintiff seeks "a preliminary injunction permanently enjoining defendant's [sic], their agents, employees, assigns, and other persons acting in concert with them or their behalf" from "making plaintiff's Hepatitis C treatment contingent upon other factors than sound medical practice and science" as well as compelling the State Defendants to "promulgate new Hepatitis C treatment guidelines consistent with prevailing professional norms, establish and maintain an adequate pain management regiment ... and to establish a uniformity and systematic system of prison health care." (SAC "Wherefore Clause" A-C) During the events

giving rise to this case, plaintiff was incarcerated at Green Haven. On February 18, 2003, Verley was transferred to the Fishkill Correctional Facility ("Fishkill"). (Doc. # 50) On April 30, 2003, Verley was again transferred to the Auburn Correctional Facility ("Auburn"). (Doc. # 74) He was then transferred to Marcy Correctional Facility ("Marcy"), Doc. # 140, then to Mohawk Correctional Facility ("Mohawk"), Doc. # 146, and finally back to his current location at Marcy, Doc. # 158. To the extent that plaintiff seeks injunctive and declaratory relief directed at officials at Green Haven, those claims are now moot as plaintiff is no longer incarcerated at the Green Haven facility. Thus, the claim for injunctive and declaratory relief against Koenigsmann and Weinstein, who are based at Green Haven, is dismissed.

The claim for injunctive and declaratory relief is not moot against Wright who is a state-wide DOCS official. However, to the extent that the claims for injunctive and declaratory relief seek to have Wright implement a "uniform and systematic" method of tracking and treating inmates suffering from HCV, those claims are part of the Monitoring Claim which is unexhausted and, hence, are dismissed.

**\*10** Plaintiff also seeks an injunction enjoining Wright from "making plaintiff's Hepatitis C treatment contingent upon other factors than sound medical practice and science ...." As a result of the Article 78 proceeding before Justice Hillery, plaintiff received a full course of IR therapy. Plaintiff has failed to come forward with any evidence that there is "a likelihood that he ... will be injured in the future," in respect to the receipt of IR therapy or any other medical treatment. *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). Any threat of injury to plaintiff is, at this time, merely hypothetical, which is insufficient to warrant injunctive or declaratory relief. *See O'Shea v. Littleton,* 414 U.S. 488, 494-96 (1974) (injunctive relief); *Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998) (declaratory relief). Summary judgment is granted dismissing all of plaintiff's claims against Wright seeking declaratory and injunctive relief.

### C. *Verley's Eighth Amendment Claims Against the State Defendants and the Corporate Defendants*

According to established law, "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth

Amendment," *See Helling v. McKinney,* 509 U.S. 25, 31 (1993). The Cruel and Unusual Punishments Clause of the Eighth Amendment requires that prison officials ensure that inmates receive adequate medical care. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994). However, "not every lapse in medical care is a constitutional wrong." *Salahuddin,* 467 F.3d at 279. An inmate does not state a cognizable Eighth Amendment claim by merely disagreeing with prison officials about what constitutes appropriate medical care. *See Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970 F.2d 896 (2d Cir.1992). Rather, a prison doctor's judgment regarding treatment is presumed valid absent proof that it was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Richardson v. Blanchette,* 2006 WL 496010, *7 (D.Conn. Mar. 1, 2006) (citation and quotation omitted).

In the context of the denial of medical care, the actions of a prison official violate the Eighth Amendment only where two requirements, one objective and one subjective, are satisfied. *Farmer,* 511 U.S. at 834. The alleged deprivation of adequate medical care must be objectively "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). In determining whether a deprivation of medical care is "sufficiently serious," courts consider whether the inmate was, in fact, deprived of medical care and whether there was harm, or is likely to be harm, from the alleged deprivation. *See Farmer,* 511 U.S. at 844-47; *Helling,* 509 U.S. at 32-33.

The second requirement for an Eighth Amendment violation, the subjective component of the inquiry, focuses upon whether the prison official acted with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 300. A culpable state of mind may be demonstrated by proof that a prison official acted with deliberate indifference to an inmate's health needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate indifference may be shown where the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer,* 511 U.S. at 837. Therefore, a prison official must be subjectively aware of the risk to the inmate that the official's conduct creates; it is insufficient for a plaintiff to demonstrate

that a prison official was incorrect in his belief that an inmate is not at risk or that the belief itself was unsound under the circumstances. *See Salahuddin,* 467 F.3d at 281 ("The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.").

a. *Claims Against Wright*

**\*11** The State Defendants concede that HCV is a serious medical condition. (Mem. at 16); *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). In regard to harm caused by the denial of medical treatment for his HCV, Verley has asserted that he suffered hearing loss and was told by Rush that his HCV had worsened by virtue of the initial denial of IR therapy. (Verley Dep. 39-41) Therefore, interpreting all facts in plaintiff's favor, I conclude that he has satisfied the first prong of the Eighth Amendment inquiry. The question now becomes whether Wright acted with a "sufficiently culpable state of mind," *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), in denying plaintiff IR therapy.

In *Johnson v. Wright,* 412 F.3d 398, the Second Circuit reversed the district court's grant of summary judgment to defendants, including defendant Wright, in a case where the plaintiff, an HCV sufferer, contended that defendants had acted with deliberate indifference toward his medical needs by denying him ribavirin against the recommendation of his treating physicians. *See* 412 F.3d at 404-05. The evidence was that on a single occasion, the plaintiff had tested positive for marijuana and on this basis was denied the drug regimen despite the unanimous view of his treating physicians. *See id.* The Second Circuit concluded that a reasonable jury could conclude that Wright and the other defendants had acted with a sufficiently culpable state of mind "by reflexively following the [Hepatitis C Primary Care Practice] Guideline's substance abuse policy" to deny plaintiff ribavirin therapy. *Johnson,* 412 F.3d at 406.

Here, Wright acted against the recommendation of plaintiff's treating physician, Rush, who had recommended plaintiff for IR therapy. In deciding to deny plaintiff IR therapy, Wright stated that there was "no detectable progression of plaintiff's Hepatitis C" although the "basis" on which he denied Verley's treatment was that "Verley had not been free from illicit drug abuse

a period of two years" as required under the 1998 Protocol. [5] (Wright Dec. ¶¶ 8, 17-18) Wright stated that Verley's drug use, specifically the two 1998 disciplinary citations for marijuana possession and use, caused him to conclude that Verley was "not committed to taking personal responsibility for assisting in his proposed course of treatment" and might "hinder or negatively impact the treatment." (Wright Dec. ¶¶ 16, 18) However, there is no indication in the record that there were any other legitimate compliance concerns regarding Verley's ability to adhere to the IR therapy treatment regimen. Verley has persistently sought treatment for his HCV. Further, when he was placed on a 24 week IR therapy treatment schedule which failed to yield results, Verley requested to continue on the 48 week treatment cycle, again evincing his commitment to receiving treatment despite potential side effects of IR therapy. (Verley Dep. 57)

[5]    While "[a]n individual defendant is not liable under § 1983 absent personal involvement," *Rivera v. Goord,* 253 F.Supp.2d 735, 747 (S.D.N.Y.2003), plaintiff has produced sufficient evidence that Wright was personally involved in the denial of the referral for IR therapy. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004).

This case presents facts different from those in *Johnson* in that Wright reviewed plaintiff's medical file prior to denying him IR therapy. However, both here and in *Johnson,* Wright denied an inmate medical treatment in reliance on prison protocol without consideration of the degree to which the inmate was non-compliant with the protocol. Here, there is evidence that would permit a reasonable factfinder to conclude that Wright did not act with a sufficiently culpable state of mind in denying plaintiff IR therapy. However, in view of *Johnson,* I conclude that a reasonable factfinder could find in Verley's favor. There is no evidence in the record before the Court that Wright balanced plaintiff's medical and disciplinary record against the recommendation of plaintiff's treating physician and then exercised his considered medical judgment to deny plaintiff IR therapy. Further, there is no indication that Wright even believed that he had the discretion to depart from the 1998 Protocol. Indeed, the language of the 1998 Protocol is mandatory, stating that there "*must* be no evidence of active substance (alcohol or drug) use during the past two years" in order for an inmate to receive IR therapy. (Johnson Dec. Exh. I-4) (emphasis added) Applying *Johnson* to these facts, there is a triable issue of fact as to whether Wright, in denying plaintiff

IR therapy, acted with deliberate indifference to plaintiff's medical needs.

### b. *Claims Against Koenigsmann*

**\*12**  The inquiry as to Koenigsmann turns on whether he acted with a "sufficiently culpable state of mind" in denying Verley consultations with specialists, including a nutritionist and hepatologist. These consultations were recommended in response to plaintiff's request by Dr. Bendheim, plaintiff's medical provider, on May 31, 2001. (Johnson Dec. Exh. E at DEF 234) While Koenigsmann did not follow Verley's treating physician's recommendation of a referral, he did so on the basis of his own medical judgment rather than in reflexive compliance with any prison medical policy. Koenigsmann denied plaintiff's request to see a specialist on the basis that plaintiff was seeing both Infectious Disease and Gastrointestinal Specialists. (*Id.;* Koenigsmann Dec. ¶ 10) He also relied on the fact that "there was no indication in [Verley's] medical records that the Infectious Disease consultant felt [Verley] needed to see a heptaologist," that Verley's condition was stable and that "there was no available retreatment approved by the FDA for patients" in Verley's circumstance who had failed to respond to IR therapy. (Koenigsmann Dec. ¶ 10) It was Koenigsmann's "professional judgment" that there was "no sound medical basis for granting Verley's May 31, 2001, request" to see a hepatologist. (*Id.* ¶¶ 10-11) Similarly, Koenigsmann concluded that, because Verley's weight had been managed without consulting a nutritionist, *Id.* ¶¶ 17-20; Johnson Dec. Exh. E at 244, Verley's health did not require a nutritional consultation. (Koenigsmann Dec. ¶ 22)

Plaintiff has failed to raise a triable issue of material fact as to the second prong of the deliberate indifference inquiry as to his claims against Koenigsmann. There is substantial evidence in the record that Koenigsmann reviewed plaintiff's file and made an independent medical determination that it was unnecessary for Verley to visit a specialist in light of the care that he was already receiving. *Cf. Johnson,* 412 F.3d at 404. Disagreement with a physician's decision, whether that decision is erroneous or not, is insufficient to support a finding of deliberate indifference. *See United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) ("[D]ifference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983."). There is insufficient evidence in the record before

me to permit a reasonable factfinder to conclude that Koenigsmann knew of or disregarded an excessive risk to plaintiff's health or safety. *See Farmer,* 511 U.S. at 837. Summary judgment is therefore granted dismissing the claims against Koenigsmann.

### c. *Claims Against the Corporate Defendants*

Plaintiff contends that "CPS and PHS' delay and denial of medical treatment to serious medical need constitutes a violation of the Eighth and Fourteenth Amendment[s] to the United States Constitution." (SAC ¶ 46) Although it is unclear from the face of the SAC precisely what medical treatment plaintiff alleges that he was denied by CPS and PHS, it appears that Verley contends that CPS denied him the PegIntron treatment and alternative treatment for HCV, specifically milk thistle. (Verley Dec. 102; 107) However, Verley concedes that no referral for a consultation regarding PegIntron was ever submitted to CPS. (Verley Dep. 108) There is no evidence in the record that a referral for alternative HCV treatment was ever submitted to CPS. While plaintiff contends that there are documents which "would have established the allegations" (Verley Dep. 102), plaintiff was offered a reasonable opportunity to conduct discovery and those documents are not part of the record before the Court. Therefore, even assuming that the first prong of the deliberate indifference inquiry were satisfied, there would be no basis on which a reasonable factfinder could conclude that the subjective component of the deliberate indifference inquiry is satisfied. Summary judgment is therefore granted to the Corporate Defendants.

### D. *Qualified Immunity*

**\*13** The State Defendants contend that even if plaintiff has evidence of the denial of a constitutional or federally protected right by a state actor, the state actor is protected by the defense of qualified immunity. I need only consider the defense as to Wright, as it is only as to him that the claim would otherwise survive. "The doctrine of qualified immunity protects state actors sued in their individual capacity from suits for monetary damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Baskerville v. Blot,* 224 F.Supp.2d 723, 737 (S.D.N.Y.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). In

considering whether defendant is protected by qualified immunity, a court "must first determine whether the facts alleged, taken most favorably to plaintiffs, demonstrate a violation of a constitutional right. Having already determined that they do, [the court] must turn to the second prong of the qualified immunity analysis and determine whether the defendants' actions violated clearly established constitutional rights of which a reasonable person would have known." *Zieper v. Metzinger,* 474 F.3d 60, 67 (2d Cir.2007) (internal citations omitted). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The Second Circuit has stated that the right of prisoners to be free from deliberate indifference to serious medical needs under the Eighth Amendment is a clearly established right. *See LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998).

On a motion for summary judgment, dismissal of claims against a defendant on grounds of qualified immunity is appropriate only if "the evidence is such that, even when it is viewed in the light most favorable to the plaintiff [ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *McKenna v. Wright,* 2004 WL 102752, \*8 n. 9 (S.D.N.Y. Jan. 21, 2004) (citation omitted), *aff'd,* 386 F .3d 432 (2004). A government official's actions are objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995) (citing *Malley,* 475 U.S. at 341). Whether or not a government official acts reasonably is determined by the state of the law applicable at the time of the alleged acts. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). Therefore, if reasonable medical professionals could disagree as to whether Wright's actions were unlawful under the then-applicable law, summary judgment in favor of Wright is appropriate. *Lennon,* 66 F.3d at 421. The "ultimate legal determination whether ..." a government actor "... should have known he acted unlawfully is a question of law better left for the court to decide." *Id.*

**\*14** In a qualified immunity analysis, the court should first define the clearly established right which is allegedly

violated by a defendant's conduct. The defense of qualified immunity was not before the Second Circuit in *Johnson v. Wright,* 412 F.3d at 406 n. 4. Thus, it was not necessary for the Court to define a right as clearly established within the meaning of *Saucier v. Katz,* 533 U .S. 194, 202 (2001), and other cases. It may be tempting to read *Johnson* as holding that there is a clearly established right not to be denied HCV treatment based solely upon isolated instances of drug use during a specific time period and in contravention of the recommendations of treating physicians, but I am not convinced that is a fair reading of the case which arose in the context of a single reported instance of marijuana use. If I were to assume that the foregoing is the clearly established right, then it was not established until *Johnson* which was not decided until 2005, long after the events at issue in this case. To avoid doubt, I will also examine qualified immunity through the lens of the broader right which was clearly established at the time of the operative events-a right to be free from inadequate medical care.

The Court must next determine whether a rational factfinder could conclude that it was objectively reasonable for Wright to believe that by following the 1998 Protocol, he acted in a fashion that was not deliberately indifferent to plaintiff's rights. At the time that Wright denied plaintiff IR therapy, a reasonable prison official would have known that "inadequate medical care can give rise to an Eighth Amendment constitutional violation where prison officials are deliberately indifferent to an inmate's serious medical needs." *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). However, a reasonable prison medical official would not necessarily have known that denying plaintiff treatment in reliance on the 1998 Protocol would constitute deliberate indifference to plaintiff's medical needs. The 1998 Protocol required that candidates for IR therapy have been drug-free for two years because consuming drugs which are metabolized through the liver may adversely impact treatment and drug abuse raises concerns that a participant may not be compliant with the conditions of treatment. (Wright Dec. ¶ 10; Johnson Dec. Exh. I-4) According to defendants' expert, Mark Korsten, the guidelines in place in 1998-1999 "reflect the generally accepted standards of care in relation to the diagnosis and treatment of Hepatitis at that time," including "the then-prevailing view that substance abuse, whether or not involving intravenous drug use, warranted withholding of drug therapy for Hepatitis C ...." (Johnson Dec. Exh D, Korsten Dec. ¶ 3-4) Wright's treatment of plaintiff, in addition to being in compliance with the applicable prison regulations, did not result in any "departure from accepted standards of care ...." (*Id.,* tab D-2 ¶ 6) Plaintiff has presented no evidence to the contrary. Because reasonable prison medical officials could have concluded that Wright's denial of plaintiff's referral for IR therapy pursuant to the policy then in effect at Green Haven was not unlawful, Wright is protected by qualified immunity.

*CONCLUSION*

**\*15** Defendants Wright, Koenigsmann, Weinstein, Corrections Physician Services and Prison Health Services motions for summary judgment are granted. All other claims having been previously dismissed, the Clerk shall enter judgment in favor of defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2822199

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4181385
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raheem FORD, Plaintiff,
v.
Daniel MARTUSCELLO, Jr.; et al., Defendants.

Civil Action No. 9:14-CV-1566 (DNH/DEP)
|
Signed 07/20/2017

**Attorneys and Law Firms**

RAHEEM FORD, 98-A-3051, Fishkill Correctional
Facility, P.O. Box 1245, Beacon, NY 12508, pro se.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
OF COUNSEL: C. HARRIS DAGUE, ESQ., Assistant
Attorney General, The Capital, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1**  This is a civil rights action brought by *pro se* plaintiff
Raheem Ford, a prison inmate, against New York State
Department of Corrections and Community Supervision
("DOCCS") employees pursuant to 42 U.S.C. § 1983. In
the claims that remain pending in the action, Ford asserts
that (1) he was the victim of excessive force, (2) he was
retaliated against for having engaged in protected activity,
(3) he was denied due process, and (4) the superintendent
and captain of security of the prison facility in which
the relevant events occurred are liable for the underlying
violations based on their supervisory roles.

Now that discovery is closed, defendants have moved
for partial summary judgment requesting dismissal of
plaintiff's retaliation cause of action and plaintiff's
supervisory liability claims against the superintendent and
captain of security. For the reasons set forth below, I
recommend that the motion be granted.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in the
custody of the DOCCS. Dkt. No. 1 at 1. Although he
is currently housed in the Fishkill Correctional Facility
("Fishkill"), at the times relevant to his claims in
this action, plaintiff was an inmate in the Coxsackie
Correctional Facility ("Coxsackie") located in Coxsackie,
New York. Id.

Plaintiff was transferred into Coxsackie in April 2011.
Dkt. No. 56-12 at 40. Between August and November of
2011, plaintiff filed grievances against several corrections
officers employed at the facility. Dkt. No. 1 at 3-4, 10; Dkt.
No. 56-12 at 45-49.

On the morning of December 1, 2011, plaintiff was placed
together with another prisoner in a "kennel type cages
[sic]" in the southeast yard of the prison, where the two
performed "callisthenic type exercises." Dkt. No. 1 at 4;
Dkt. No. 56-12 at 54. As he exercised, plaintiff chanted a
"verbal cadence" in a normal tone of voice to keep himself
in rhythm. Dkt. No. 1 at 4; Dkt. No. 56-12 at 56-57.

During that time, defendant Sean King, a correctional
officer, was stationed in a security booth and responsible
for monitoring the prisoners in the southeast yard. Dkt.
No. 1 at 4; Dkt. No. 56-12 at 55-56, 59. Defendant King
watched television while observing the yard. Dkt. No. 1
at 4; Dkt. No. 56-12 at 59. Because of the noise level in
the yard, however, defendant King was unable to hear the
television. Dkt. No. 1 at 4-5; Dkt. No. 56-12 at 59. To
remedy the issue, defendant King entered the yard and
"directed everyone in the yard ... to be quite [sic]." Dkt.
No. 1 at 5; see also Dkt. No. 56-12 at 59. Plaintiff believed
that defendant King's request was "unreasonable" and
informed him that it was his and other prisoners' right to
have one-hour of recreation time, which includes "time to
talk and express themselves." Dkt. No. 1 at 5; see also Dkt.
No. 56-12 at 59. Plaintiff ignored defendant King's order
and continued chanting during his workout. Dkt. No. 1 at
5; Dkt. No. 56-12 at 63.

 **\*2**  When recreation was over, defendant King instructed
plaintiff to enter a stairwell, whereupon he threatened
plaintiff that he would " 'not see th[e] yard for the duration
of [his] stay in F-3' " if he did not remain quiet the next
time he went to recreation. Dkt. No. 1 at 6; see also
Dkt. No. 56-12 at 69-70. According to plaintiff, he did

not respond to defendant King and continued to walk around defendant King, entering a walkway leading to F-1 Division dayroom. Dkt. No. 1 at 6; Dkt. No. 56-12 at 70, 74. Upon entering the dayroom, defendant King asked plaintiff whether plaintiff had heard him, and when plaintiff answered, defendant King charged at plaintiff, grabbed his coat, spun him around, and then pushed him backward. Dkt. No. 1 at 6-7; Dkt. No. 56-12 at 74, 77-78, 79-81. Defendant D. Williams, a correctional officer, was seated at a desk in the F-1 Division dayroom while this was occurring, and defendant F. Cowan, a third correctional officer, stood at the end of the room blocking the doorway leading to a stairwell. Dkt. No. 1 at 6-7; Dkt. No. 56-12 at 76-77. In plaintiff's complaint, he alleges that, as defendant King was pushing him backwards, defendant Cowan struck him in the face with a baton and defendant Williams also joined in the assault. Dkt. No. 1 at 7. At his deposition, however, plaintiff testified that he does not remember anything after defendant King pushed him up against the corner of the room. Dkt. No. 56-12 at 84-85, 96-97.

During the course of the incident, plaintiff sustained a fractured jaw, broken facial bones, and a fractured or broken eye socket, and required medical attention from personnel at the Regional Medical Unit, which is the medical facility at Coxsackie, as well as emergency treatment at the Albany Medical Center Hospital. Dkt. No. 1 at 7; Dkt. No. 56-12 at 97-98, 100-03.

In his complaint, plaintiff alleges that defendants King, Cowan, and Williams are members of "The Order of Brotherhood" ("Brotherhood"), described by plaintiff as a vigilante-type group of corrections employees who terrorize prisoners and target, inter alia, those who complain regarding corrections staff members. Dkt. No. 1 at 3, n.1. Plaintiff believes defendants King, Cowan, and Williams targeted him on December 1, 2011, on behalf of the Brotherhood in retaliation for his filing of grievances against other correctional officers.[2] Dkt. No. 1 at 3-4, 8.

## II. PROCEDURAL HISTORY

This action was commenced in the United States District Court for the Southern District of New York on December 23, 2014. Dkt. No. 4 at 1-2. The following day, the case was transferred to this district based upon the fact that Coxsackie is located within the Northern District of New York. As originally

pleaded, the defendants named in plaintiff's complaint are Superintendent Daniel Martuscello, Jr., Deputy Superintendent of Security Christopher Miller, Captain Shanley, Sergeant J. Baczkowski, Commissioner Hearing Officer Eric Gutwein, First Deputy Superintendent Leclair, and Correctional Officers Sean King, D. Williams, F. Cowan, and Bellawa. Dkt. No. 1 at 1-2.

On April 9, 2015, the court issued an order granting plaintiff's request for leave to proceed in forma pauperis and, pursuant to 28 U.S.C. §§ 1915(e), 1915(A), sua sponte dismissing certain causes of action asserted in his complaint. Dkt. No. 12. Although the remaining defendants thereafter filed a partial motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court denied the motion on December 22, 2016. Dkt. Nos. 31, 52, 54. Following the issuance of those two court orders, the following four claims remain pending in the action: (1) excessive use of force and/or failure to intervene under the Eighth Amendment asserted against defendants King, Williams, Cowan, Gutwein, and Bellawa; (2) retaliation under the First Amendment asserted against defendants King, Williams, and Cowan; (3) violation of due process under the Fourteenth Amendment asserted against defendants Gutwein and LeClair; and (4) supervisory liability asserted against defendants Martuscello and Shanley. Dkt. No. 12 at 11. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering and his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 13.

**\*3** On November 14, 2016, defendants moved for the entry of partial summary judgment dismissing certain of plaintiff's claims. Dkt. No. 56. In particular, defendants have requested dismissal of (1) plaintiff's retaliation claim asserted against defendants King, Williams, and Cowan; and (2) plaintiff's supervisory liability claims asserted against defendants Martuscello and Shanley. Dkt. No. 56-3. At his request, plaintiff's time to oppose defendants' motion was extended on three occasions. Dkt. Nos. 59, 61, 64. Plaintiff was informed on the third occasion that it would be his "FINAL extension of time to respond" to the motion. Dkt. No. 64.

By letter dated May 10, 2017, plaintiff wrote to the court inquiring concerning the status of the motion papers that, he alleged, were submitted in opposition to defendants' motion on March 14, 2017. Dkt. No. 65. In response,

the court provided plaintiff with a courtesy copy of the docket sheet in the matter, which, *inter alia*, reflected that the court had not received any opposition papers from plaintiff. Dkt. Entry Dated May 15, 2017. Plaintiff again wrote to the court, by letter dated May 22, 2017, claiming that his opposition papers were sent to the court and defendants' counsel but hypothesizing that the opposition papers must have been intercepted by correctional officers at Fishkill. Dkt. No. 66. In light of plaintiff's claims and in deference to his *pro se* status, plaintiff was granted one final opportunity to oppose defendants' motion, on or before June 30, 2017. Dkt. No. 67. Despite that extension, the court has received no papers from plaintiff in response to defendants' motion.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

### III. DISCUSSION

#### A. Failure to Oppose Defendants' Motion

Before turning to the merits of defendants' motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose the motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendants' motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district

courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, despite having been provided numerous opportunities to do so, plaintiff has not responded to defendants' motion. The motion was properly filed by the defendants, and defendants, through their motion, have met their burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendants have met their burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that determination of whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).

**\*4** Because defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendants' motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the court grant defendants' motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond to a Local Rule 7.1(a)(3) Statement. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura*

v. Public Serv. Comm'n, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, Dkt. Nos. 56-1, 57 at 2, and he has failed to do so, I recommend that the court deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d at 137.

B. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. Retaliation

In his complaint, plaintiff states his belief that the assault allegedly perpetrated by defendants King, Williams, and Cowan on December 1, 2011, was in retaliation for the grievances he filed between April and December 2011 against correctional officers at Coxsackie, and that the dispute over the volume of plaintiff's voice while engaged in recreation in the yard was fabricated in order to mask the true motivation for the beating. Dkt. No. 1 at 3-4. In their motion, defendants contend that the record is devoid of any evidence providing the requisite connection between plaintiff's filing of grievances, which they acknowledge constituted protected activity, and the alleged assault, which they also presumably acknowledge, constitutes adverse action. Dkt. No. 56-3 at 4-6.

When a prison official takes adverse action against an inmate that is motivated by the prisoner's exercise of a constitutional right, including the free speech of the First Amendment, the official may be held accountable for unlawful retaliation in an action brought pursuant to 42 U.S.C. § 1983. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution and federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, ... courts must approach such claims "with

skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To prove a claim of retaliation under section 1983, a plaintiff must establish that (1) he engaged in protected activity, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.). The focus of defendants' motion is on the third element of the controlling test, which examines the relationship between the protected activity asserted by plaintiff and the adverse action allegedly taken in response to that protected activity. Dkt. No. 56-3 at 4-6.

 **\*6** In order to avoid summary judgment, plaintiff must establish a genuine dispute of material fact with respect to whether his filing of grievances against prison officials at Coxsackie was a "substantial or motivating factor" in the alleged assault administered by defendants King, Williams, and Cowan. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The record now before the court includes plaintiff's concession that, prior to December 1, 2011, he did not submit any written grievances concerning defendants King, Williams, or Cowan. Dkt. No. 56-12 at 73, 140-41. In addition, with respect to plaintiff's allegation in his complaint that defendants King, Cowan, and Williams are members of the Brotherhood, a group that targets prisoners who file grievances against corrections staff, Dkt. No. 1 at 3 n.1, all three of those defendants have provided affidavits in which they disavow both affiliation with or knowledge of the Brotherhood and unequivocally state that, on December 1, 2011, they had no knowledge of any grievances previously written by plaintiff against any member of the correctional staff at Coxsackie. Dkt. No. 56-5 at 2; Dkt. No. 56-7 at 2; Dkt. No. 56-8 at 2.

The evidence in the record that counters these statements includes plaintiff's allegations in his complaint that he "belie[ves]" he was targeted by the Brotherhood for

his grievances and that defendants King, Williams, and Cowan are members of that organization. Dkt. No. 1 at 3-4. Similarly, at his deposition, when asked if defendant King is a member of the Brotherhood, plaintiff answered, "I would believe so." Dkt. No. 56-12 at 134. In relevant part, plaintiff also testified as follows regarding his allegations against the defendants who are allegedly members of the Brotherhood:

> Q: Has [defendant King] ever told you that he is a part of the brotherhood?
>
> A: No. He never said.
>
> Q: What about officer Williams?
>
> A: No. But I know how they work. Officers in [Coxsackie], they take directions from other officers of that group to retaliate against a person that they want. King is in a very good position to get at somebody because he's an escort officer.

*Id.* at 134-35. Significantly, plaintiff admitted at his deposition that he did not "know for a fact" that anyone in the Brotherhood instructed defendants King, Williams, or Cowan to retaliate against him by assaulting him following recreation on December 1, 2011. *Id.* at 139-40.

Many courts examining allegations of retaliation motivated by a prisoner's grievances filed against prison officials who are not named defendants in a lawsuit have concluded that, standing alone, such allegations fail to support a retaliation claim absent further evidence from which a reasonable factfinder could conclude that the requisite nexus between the protected activity and adverse action exists. *See, e.g., Quick v. Minale*, No. 16-CV-0807, 2016 WL 6124495, at *7 (N.D.N.Y. Oct. 20, 2016) (Sannes, J.) ("Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the [defendants] is insufficient for a retaliation claim." (citing cases)). As one court has noted, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, No. 09-CV-3135, 2011 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)); *accord, Guillory v. Ellis*, No. 11-CV-0600, 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.).

Having carefully reviewed the available record, I find no evidence, other than plaintiff's sheer speculation

concerning the Brotherhood and defendants' membership in the organization, from which a reasonable factfinder could determine that the alleged assault committed by defendants King, Williams, and Cowan against plaintiff on December 1, 2011, was motivated by his filing of grievances against other prison officials at Coxsackie. Accordingly, I recommend that defendants' motion with respect to plaintiff's retaliation claim be granted.

### D. Plaintiff's Supervisory Claims

**\*7** Plaintiff's claims against defendant Martuscello, the superintendent at Coxsackie, and defendant Shanley, the captain of security at the facility, arise from a single paragraph in plaintiff's complaint, which provides as follows:

> Upon information and belief, plaintiff states that the actions of defendant #6, 7 and 8 was believe to had been the act of retaliation, and that defendants ## 6, use the yard situation as his opportunity to avenge plaintiff, and that defendant ## 7 and 8, were stooges following orders of defendant #6. These Brotherhood members basically had cardblanc to run ramped around the facility, because **DANIEL MARTUSCELLO, Jr.,** Superintendent, (hereinafter known as "Defendant #1"), and **SHANLEY,** Captain of Security, turned a blind eye to what his correctional officers/staff were doing in the facility to prisoners.

Dkt. No. 1 at 8 (emphasis and errors in original). Defendants seek dismissal of the claims asserted against defendants Martuscello and Shanley based on the absence of any record evidence that supports a finding that those individuals were personally involved in the underlying constitutional violations. Dkt. No. 56-3 at 6-8.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the

Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994).

Plaintiff alleges that defendants Martuscello and Shanley are liable for the underlying constitutional violations caused by other named defendants because, in their roles as supervisors at Coxsackie, they failed to prevent defendants from abusing inmates. Dkt. No. 1 at 8. It is well established that a supervisor cannot be held liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior.*" *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. [3] *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), rev'd on other grounds sub nom. Ashcroft v. Iqbal, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

**\*8** It is uncontradicted that neither defendant Martuscello nor defendant Shanley had any direct involvement in the December 1, 2011 incident. Dkt. No. 56-9 at 2; Dkt. No. 56-10 at 2. Both of those supervisory defendants also deny possessing any reason to believe that plaintiff or any other inmate at Coxsackie faced a substantial risk of serious harm at the hands of staff at Coxsackie before the incident December 1, 2011. *Id.*

During his deposition, plaintiff testified that he wrote to defendant Shanley after the incident involving defendants King, Cowan, and Williams, but that he did nothing to protect plaintiff. Dkt. No. 56-12 at 133. Although defendant Shanley apparently responded to plaintiff in writing and "verbally," *id.* at 135, supervisory officials may only be liable for failing to cure a constitutional violation after learning about it if it was ongoing and they had a reasonable opportunity to prevent future violations. *See, e.g., Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it.").

It is true that the plaintiff testified that he notified both defendant Shanley and defendant Martuscello, prior to the incident on December 1, 2011, "about [the] group of officers [in the Brotherhood] and the stuff that [was] going on in [Coxsackie]." Dkt. No. 56-12 at 136; *see also id.* at 137 (testifying that he spoke with and wrote to defendant Martuscello "about the same thing ... with those officers targeting [him] with different things in the facility"). Such vague allegations, however, are not sufficient to place supervisors on notice of an ongoing practice of widespread abuse and establish a necessary causal link between the supervisor and an underlying constitutional violation. While some courts have held that a prisoner can establish the requisite link between the supervisory official and an underlying constitutional violation by showing "a history of widespread abuse that put the supervisor on notice of the need to correct the unconstitutional practices, and that he failed to do so," *Green v. Herbert*, 677 F. Supp. 2d 633, 637-38 (W.D.N.Y. 2010) (citing cases), a plaintiff's notice to the supervisory officials must alert them to "obvious, flagrant, rampant and ... continu[ing]" violations, "rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). In this case, as alleged by plaintiff, he only notified defendants Shanley

and Martuscello of vague allegations of harassment by correctional officers. Dkt. No. 56-12 at 136, 137. In light of the contentious nature of the prison environment, such non-specific and inarticulate complaints cannot be enough to give rise to notice of widespread abuse.

Accordingly, because I find that there is no evidence in the record from which a reasonable factfinder could conclude that defendants Shanley and Martuscello were personally involved in the underlying incident on December 1, 2011, I recommend that those individuals be dismissed.

## IV. SUMMARY AND RECOMMENDATION

The record now before the court fails to demonstrate the existence of a genuine dispute of material fact surrounding plaintiff's retaliation claim against defendants King, Williams, and Cowan or his supervisory liability claims asserted against defendants Shanley and Martuscello. Accordingly it is hereby respectfully

**\*9** RECOMMENDED that defendants' motion (Dkt. No. 56) be GRANTED, and that plaintiff's retaliation cause of action asserted against defendants King, Williams, and Cowan and all claims against defendants Shanley and Martuscello be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [4] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Slip Copy, 2017 WL 4181385

Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    Following the incident, plaintiff was issued a misbehavior report charging him with violating various prison rules. Dkt. No. 1 at 8; Dkt. No. 56-12 at 111. The proceedings that followed the issuance of that misbehavior report form the basis of plaintiff's procedural due process claim. Dkt. No. 1 at 8-10; Dkt. No. 56-12 at 111-32. Because the procedural due process claim is not at issue in defendants' partial summary judgment motion, I have not recounted the facts associated with that cause of action.

3    Subsequent to issuance of the Second Circuit's decision in *Colon*, the Supreme Court addressed the question of supervisory liability in its decision in *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009). Although the issue has been discussed in several relatively recent decisions, the Second Circuit has yet to squarely address the impact of *Iqbal* upon the categories of supervisory liability addressed in *Colon. See*, *e.g., Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citation omitted)); *see also Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) ("*Iqbal* has, of course, engendered conflict within our Circuit without the continuing vitality of the supervisory liability test set forth in [*Colon*,] ... but the fate of *Colon* is not properly before us[.]").

4    If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.



**User Name:** Jill Bowden Levy
**Date and Time:** Friday, February 2, 2018 12:09:00 PM EST
**Job Number:** 60664356

## Document (1)

1.  *Harnage v. Brighthaupt, 2016 U.S. Dist. LEXIS 72535*
    **Client/Matter:** -None-
    **Search Terms:** 2016 US Dist 72535
    **Search Type:** Natural Language
    **Narrowed by:**

    | Content Type | Narrowed by |
    | --- | --- |
    | Cases | -None- |

 Neutral
As of: February 2, 2018 5:09 PM Z

## *Harnage v. Brighthaupt*

United States District Court for the District of Connecticut

June 3, 2016, Decided

Civil No. 3:12cv1521(AWT)

**Reporter**
2016 U.S. Dist. LEXIS 72535 *

JAMES A. HARNAGE, Plaintiff, v. BRIGHTHAUPT, et al., Defendants.

**Prior History:** *Harnage v. Brighthaupt, 2012 U.S. Dist. LEXIS 180046 (D. Conn., Dec. 20, 2012)*

## Core Terms

inmate, cell, notary, prison, notarize, services, contraband, retaliation, summary judgment motion, summary judgment, asserts, genuine issue of material fact, grievances, nonmovant, searches, notice, staff, retaliatory, contends, alleges, substantive due process, constitutional right, similarly situated, legal materials, adverse action, disciplinary, discipline, violations, belonging, shakedown

**Counsel:** **[*1]** James A. Harnage, Plaintiff, Pro se, Suffield, CT.

For Brighthaupt, Warden, sued in their individual and official capacities, Mollin, Lieutenant, sued in their individual and official capacities, Johnson, Captain, sued in their individual and official capacities, Watson, Captain, sued in their individual and official capacities, Danya Baker, Captain, sued in their individual and official capacities, Bryan Vigars, Captain, sued in their individual and official capacities, John J. Bernard, Lieutenant, sued in their individual and official capacities, Boufard, Counselor Supervisor, sued in their individual and official capacities, Johnson, Disciplinary Coordinator, sued in their individual and official capacities, Santoprietro, C.O., sued in their individual and official capacities, Hogan, C.O., sued in their individual and official capacities, Faraci, C.O., sued in their individual and official capacities, Christiaello, C.O., sued in their individual and official capacities, Robert Dicosmo, C.O., sued in their individual and official capacities, Wright, Lieutenant, sued in their individual and official capacities, Goncalvez, C.O., sued in their individual and official capacities, Tardiff, **[*2]** C.O., sued in their individual and official capacities, St. Pierre, C.O.,

sued in their individual and official capacities, Mulligan, C.O., sued in their individual and official capacities, Defendants: Robert S. Dearington, LEAD ATTORNEY, Attorney General's Office - Sherman St (Htfd), Hartford, CT; Matthew B. Beizer, Attorney General's Office, MacKenzie Hall, Hartford, CT.

**Judges:** Alvin W. Thompson, United States District Judge.

**Opinion by:** Alvin W. Thompson

## Opinion

### RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, James Harnage ("Harnage"), who is incarcerated within Connecticut's correctional system, brings this civil rights action pro se pursuant to *42 U.S.C. § 1983*. Because of the number of claims and defendants in this action, the claims have been separated into three groups. The claims at issue in the instant motion are the remaining claims in Counts Six, Seven and Eight of the plaintiff's Complaint (Doc. No. 1).[1] Harnage alleges in these three counts that defendants, who are current or former officials of the Connecticut Department of Correction ("DOC"), have violated his constitutional rights by engaging in retaliation, by denial of his right to equal protection, by denial of his right to petition the government to redress **[*3]** grievances, and by violating his *Fourth Amendment* right to be free from unreasonable search and seizure and his right to substantive due process.

The defendants have moved for summary judgment on

---

[1] On February 12, 2014, the court granted the defendants' Motion to Dismiss as to some of the claims in these counts. See Ruling on Motion to Dismiss in Part (Doc. No. 42).

2016 U.S. Dist. LEXIS 72535, *3

the remaining claims in Counts Six, Seven, and Eight. The remaining defendants in those claims are, in Count Six, John Bernard ("Bernard"); in Count Seven, Jon Brighthaupt ("Brighthaupt"), Lauren Powers ("Powers"), Michael Davis ("Davis"), Danya Baker ("Baker"), Bryan Vigars ("Vigars"), Bernard, and Robert DiCosmo ("DiCosmo"); and in Count Eight, Brighthaupt, Powers, Davis, Baker, Vigars, and DiCosmo. For the reasons set forth below, the defendants' motion is being granted.

## I. FACTUAL BACKGROUND[2]

Harnage was an inmate at Cheshire Correctional Institution ("Cheshire CI") during the time of the events at issue, which occurred in March 2012. While at Cheshire **[*4]** CI, Harnage filed numerous grievances and lawsuits regarding prison conditions and the actions of various staff members.

Count Six

Defendant Bernard was a correctional lieutenant at Cheshire CI, where his duties included notarizing legal documents for the inmate population. Bernard was one of several notaries at the facility. When Bernard received inmate request forms requesting the services of a notary, he would sort the requests by inmate housing units, and then visit the housing units and notarize the inmates' documents. Bernard would witness the inmate sign the document and then would sign it himself and affix the notary seal. Bernard states that he never read the actual content of the legal documents he notarized. Harnage disputes this and contends that on the day in question, Harnage saw Bernard read an affidavit being brought to be notarized.

Harnage states that on March 21, 2012, Bernard was the notary who provided notary service in response to numerous inmate requests. A series of inmates were attempting to have duplicate copies of an affidavit notarized; the affidavit had been prepared by Harnage in connection with a challenge to DOC's strip search policy. Bernard notarized **[*5]** the affidavit of the first inmate in line, Thomas Rasmussen ("Rasmussen"). Harnage contends that Bernard then reviewed the affidavit from the second inmate in line

_____

[2] The facts are taken from the defendants' Local Rule 56(a)1 Statement (Doc. No. 121-2) and attached exhibits and Harnage's Local Rule 56(a)2 Statement (Doc. No. 139-2) and affidavit (Doc. No. 139-4) with attached exhibits.

("Arroyo") and refused to notarize it after he realized it was the same document as Rasmussen's. Harnage suggested that Arroyo write on the affidavit that Bernard had refused to notarize it. A copy of Arroyo's affidavit is attached as an exhibit to Harnage's opposition, and it includes a handwritten note that states "Lt. Bernard refused to sign and notar[ize] this Affidavit," with the signature "David Arroyo" and date "3-21-2012." (Arroyo Aff., Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp."), Ex. 13, Doc. No. 139-3.)[3] Two other inmates have corroborated Harnage's statements regarding Bernard's refusal to provide notary services. Inmate Charles Marshall ("Marshall"), who was Harnage's cellmate at the time, stated:

> The notary, John J. Bernard (Bernard), notarized the first inmate[']s affidavit and, after reading the second inmate[']s affidavit, and noting it was identical to the first inmate[']s affidavit; refused to notarize the affidavits belonging to any of the other inmates.
>
> I watched as Harnage received the affidavits **[*6]** back from the inmates after informing them to write on the document that the notary had refused notarization thereof, and the inmates dated and signed the affidavits before sliding them through the cell door.

(Marshall Aff., Pl.'s Opp. Ex. 17, Doc. No. 139-3, at ¶¶ 8-9. See also Robinson Aff., Pl.'s Opp. Ex. 18, Doc. No. 139-3, at ¶¶ 8-9.) Harnage states that as Bernard began to leave the housing unit, Harnage called out to him from his cell and told him he had several documents he needed notarized. The plaintiff alleges specifically that "Bernard refused to notarize an affidavit and fee waiver for the plaintiff himself." (Compl. Doc. No. 1, at ¶ 114.) He asserts that Bernard "shook his head and said 'no, I am not notarizing anything for you, you have to write to Captain Baker' and then left the unit." (Pl.'s Aff., Pl.'s Opp. Ex. 1, Doc. No. 139-3, at ¶ 63.) Harnage asserts that several days later, Bernard attempted to intimidate Marshall by telling him that "if you know what is good for you, you wouldn't get involved in Harnage's legal actions." (Pl.'s Aff. at ¶ 66.)

_____

[3] Three other inmates who state that their affidavits were not notarized by Bernard also wrote notes to that effect on **[*7]** their affidavits. (See Walker Aff., Pl.'s Opp. Ex. 14, Doc. No. 139-3, at 2 ("Notary refused to sign on March 21st 2012"); Wilmoth Aff., Pl.'s Opp. Ex. 15, Doc. No. 139-3 ("Would not notarize document on 21 March 2012"); Espinoza Aff., Pl.'s Opp. Ex. 16, Doc. No. 139-3 ("Lt. Bernard refused to sign [t]his Affidavit.").

Count Seven

Defendant DiCosmo worked at Cheshire CI as a correction officer. As part of his duties, DiCosmo conducted routine cell shakedowns, which he describes as follows:

In a routine cell shakedown, staff searches a cell for contraband. Staff searches the entire cell, including inmate property, outside the presence of the inmate(s) who live(s) in that cell. If staff discovers any contraband during the shakedown, staff confiscates the contraband and writes a disciplinary report if necessary.

When conducting a cell shakedown, I look through bags, boxes, under mattresses, the cell lockers, and any other area where inmates can keep contraband. . . .

Routine cell searches are conducted randomly in the unit. (DiCosmo Aff., Defs.' Mem. in Supp. Summ. J. ("Defs.' Mem."), Ex. B, Doc. No. 121-4, at ¶¶ 4-6.)

On March 21, 2012, DiCosmo conducted a routine cell shakedown in Harnage's cell. **[*8]** The plaintiff was not present during the cell search. During the search of Harnage's cell, DiCosmo discovered a habeas petition of inmate Matthew Robinson ("Robinson"). The Cheshire Inmate Handbook (the "Inmate Handbook") states that "[c]ontraband is anything not authorized to be in [an inmate's] possession," and that inmates "are prohibited from having in [their] possession any item belonging to another inmate . . . includ[ing] legal materials." (Handbook, DiCosmo Aff. Ex. 2, Doc. No. 121-4, at 8.) Possession of another inmate's legal materials was classified as possession of Contraband Class B.

Harnage admits that Robinson's habeas petition was in his cell but asserts that he "reasonably believed that the reference to 'legal materials' was to identify purchased property items like legal books, to which an inmate can claim ownership in, and not to 'legal documents' that are part of the public record and may be owned by any inmate who acquired them." (Pl.'s Aff. at ¶ 94.)

Harnage disputes the assertion that the search of his cell was a "routine cell shakedown." He asserts that the search was instead done to retaliate for Harnage's attempts to have inmates sign affidavits for use in litigation against DOC.

**[*9]** Count Eight

Based on DiCosmo's finding of Robinson's habeas petition in Harnage's cell, DiCosmo issued a disciplinary report ("DR") to Harnage for Contraband Class B. Harnage pled not guilty to the DR. A hearing was held on April 18, 2012. Harnage was present, but he denies that he had the opportunity to present his case at the hearing. The hearing officer found Harnage guilty of possession of Contraband Class B based on Harnage's admission that he had another inmate's paperwork in his possession. The hearing officer imposed sanctions on Harnage.

Harnage states that on his way to the initial review of the DR issued by DiCosmo, Harnage spoke with defendant Vigars, who

informed me that . . . Brighthaupt, Powers, Davis, Baker, and Bernard had all met with him, after being notified by Bernard that I was having inmates sign affidavits; and they had agreed that a cell search should be conducted and if I was found to be in the possession of a legal document with another inmate's name on it, I would be given a ticket for the possession of their personal property.

(Pl.'s Aff. at ¶ 105.)

Harnage asserts that "[n]ews of the retaliatory cell search, the statements to Marshall that he should not get involved **[*10]** in my legal work, and the issuance of a [DR] ticket to me[] quickly made its way through the housing unit." (Pl.'s Aff. at ¶ 81.) He further asserts that:

As a direct result, [inmate Kevin] Walker became concerned that staff would start retaliating against him and; after receiving notice from the office of the Claims Commissioner that he had been habeased to testify at a hearing regarding the strip searches, wrote to the Claims Commissioner indicating that he had changed his mind about testifying in the proceeding.

As a result of Mr. Walker's letter, the Claims Commissioner used his withdrawal as an excuse to deny me the testimony of any and all inmates at the hearing, and, as a result, made a finding that I had not submitted any evidence that strip searches were improperly performed.

(Id. at ¶¶ 82-83.)

## II. **LEGAL STANDARD**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to

which there is no such issue warrant judgment for the moving party as a matter of law. *Fed. R. Civ. P. 56(a)*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues **[*11]** to the jury. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)*. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224*.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*. A material fact is one that would "affect the outcome of the suit under the governing law." Id. Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. See *Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)*.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)*(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990))*. However, the inferences drawn **[*12]** in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir. 2007)* (quoting *W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990))*. Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252*.

Finally, the nonmoving party cannot simply rest on the

allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See *Celotex Corp., 477 U.S. at 324*. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock, 224 F.3d at 41*, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)*(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock, 224 F.3d at 41*. If the nonmovant fails to meet this burden, summary judgment should be granted. **[*13]** The question then becomes whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. See *Anderson, 477 U.S. at 248, 251*.

## III. DISCUSSION

### A. Retaliation

Harnage asserts multiple claims of retaliation by various defendants in Counts Six, Seven, and Eight.

In a § 1983 retaliation claim, "[t]he plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)* (citing *Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977))*.

> If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct. Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham, 89 F.3d at 79* (internal citation and quotation marks omitted). A "finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," id., for two reasons. First, because of the "ease with which claims of retaliation may be fabricated," the court "examines

prisoners' [*14] claims of retaliation with skepticism and particular care." *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)*. Second, courts "have been cautioned to recognize that prison officials have broad administrative authority." *Graham, 89 F.3d at 79*.

Harnage's claims cannot survive summary judgment under the Mount Healthy test if he does not meet the burden of demonstrating genuine issues of material fact with respect to the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant[s] took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009)*.

1. Notary Services

In Count Six, Harnage alleges that defendant Bernard refused to provide notary services to him in retaliation for his filing of grievances and lawsuits against other officers. The defendants contend that defendant Bernard did not refuse to notarize Harnage's document, and that even if he did, his alleged refusal to provide notary services was de minimis and did not constitute an adverse action. Although Harnage has created a genuine issue as to whether Bernard refused to notarize Harnage's document, that issue is not as to a material fact.

Harnage meets his burden with respect to showing that he engaged [*15] in constitutionally protected conduct. His filing of a grievance is constitutionally protected. See *Graham, 89 F.3d at 80* ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the *First* and *Fourteenth Amendments* and is actionable under *§ 1983.*").

The second requirement is that Harnage demonstrate that he suffered an adverse action. "[I]n the prison context we have previously defined 'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004)* (quoting *Davis v. Goord, 320 F. 3d 346, 353 (2d Cir. 2003))*.

Harnage contends that the denial of notary services was adverse because it would, and in fact did, deter a similarly situated individual from exercising his right to access courts and to redress grievances. Specifically, Harnage contends that "Kevin Walker, who witnessed the denial of notary services, cell search, and ticket,

wrote a letter to the Claims Commission saying he did not want to participate in [Harnage's] hearing. . . . The Claims Commissioner used Walker's letter to excuse [Harnage's] remaining witnesses from testifying." (Pl.'s Opp. at 7.) This assertion [*16] does not suffice to create a genuine issue of material fact as to whether the alleged denial of notary services constituted an adverse action under the standard set forth in Davis v. Goord.

In Brown v. Gerth, the court considered a similar claim from an inmate plaintiff and held that:

> Defendant's denial of notary services on September 19 for Plaintiff's unrelated lawsuit is not sufficiently adverse to deter a reasonable person from continuing to utilize the prison grievance procedure. This is particularly apparent when viewed in light of the fact that the lawsuit in question was actually filed on September 20. Plaintiff suffered, at most, a temporary limitation on his ability to obtain notary services.

*No. 2:06-CV-62, 2007 U.S. Dist. LEXIS 97875, 2007 WL 2480526, at *7 (W.D. Mich. June 6, 2007)*, report and recommendation adopted, *No. 2:06-CV-62, 2007 U.S. Dist. LEXIS 64567, 2007 WL 2500235 (W.D. Mich. Aug. 29, 2007)*. Here, likewise, Harnage admits that the fee waiver he sought to have notarized was in fact filed in court and granted. At most, then, the defendants delayed, but did not deny, Harnage's receipt of notary services.

Harnage has not created a genuine issue of material fact as to whether he suffered an adverse action when Bernard allegedly refused to provide him with notary services. Therefore, the motion for summary judgment [*17] is being granted as to this claim.

2. Cell Search

In Count Seven, Harnage alleges that defendants Bernard, Baker, and Vigars conspired to retaliate against Harnage for filing grievances and lawsuits by ordering defendant DiCosmo to conduct a search of Harnage's cell for legal work and records belonging to Harnage. He alleges that they did so under the authority of Brighthaupt, Powers, and Davis, who sanctioned the conduct. (See Compl. at ¶¶ 60-62.)

Harnage fails to provide evidentiary support for the allegation that the search that was conducted was not a routine cell search, as the defendants contend. Harnage admits that he was not present for the cell search. He stated during his deposition that he knew DiCosmo did

2016 U.S. Dist. LEXIS 72535, *17

not search other areas of his cell "[b]ecause nothing else [other than the legal materials] was touched. When you live in a 12 x 8 room . . . you become very familiar when your items are moved and when they are not," and because "officers don't go in and search a cell and return everything to their neat and tidy arrangement that they were originally found in." (Pl.'s Aff. at ¶ 70.) Harnage's assertions are too speculative to create a genuine issue of material fact.

Moreover, many courts **[*18]** in the Second Circuit have concluded that a retaliatory cell search is insufficient to support a *First Amendment* retaliation claim. These courts "have reasoned that under *Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)*, a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right." *Battice v. Phillip, No. CV-04-669 (FB (LB), 2006 U.S. Dist. LEXIS 53407, 2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006)*. See also, e.g., *Walker v. Keyser, 98 Civ. 5217, 2001 U.S. Dist. LEXIS 15429, 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001)* ("[R]etaliatory searches are not actionable under *§ 1983*."); *Bey v. Eggleton, 96 Civ. 3302, 1998 U.S. Dist. LEXIS 3147, 1998 WL 118158, at *4 (S.D.N.Y. Mar. 17, 1998)* ("A search of an inmate—even for retaliatory reasons—does not implicate a constitutional right."); *Gadson v. Goord, 96 Civ. 7544, 1997 U.S. Dist. LEXIS 18131, 1997 WL 714878, *7 (S.D.N.Y. Nov. 17, 1997)* ("[S]earches of cells implicate no constitutional rights, even if the search is arbitrary or retaliatory in nature.").

Thus, even if Harnage could demonstrate a retaliatory motive for the search, his claim would be legally insufficient. Therefore, the motion for summary judgment is being granted as to this claim.

3. Disciplinary Report for Contraband Class B

Harnage contends that he satisfies the first requirement of a retaliation claim in Count Eight "because he exercised his *First Amendment* Right to freedom of speech when he provided legal assistance to a fellow inmate." **[*19]** (Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J., Doc. No. 139-1, at 12.) However, Harnage has "no constitutional right to provide legal assistance to other inmates." *Hayes v. Arnone, No. 3:12-CV-1697 MPS, 2013 U.S. Dist. LEXIS 161367, 2013 WL 6017334, at *6 (D. Conn. Nov. 13, 2013)* (quoting *Shaw v. Murphy, 532 U.S. 223, 225, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001))*. See also *Fields v. Connecticut Dep't of Correction, No. 3:04 CV 1245 HBF, 2006 U.S. Dist.*

*LEXIS 44396, 2006 WL 1806184, at *2 (D. Conn. June 29, 2006)* (same). Furthermore, while Harnage correctly asserts that "[p]rison officials cannot prohibit prisoners from helping each other with legal matters if the prison provides no reasonable alternative forms for legal assistance" (Pl.'s Opp. at 13), here, prison officials did not *prohibit* Harnage from providing such assistance. Rather, they issued a disciplinary report because he possessed material that was contraband. Harnage has thus failed to meet his burden of creating a genuine issue of material fact with respect to the first requirement of the Mount Healthy test.

Even if Harnage could meet his burden under the Mount Healthy test, summary judgment would still be appropriate if the defendants then met their burden of showing that Harnage would have been disciplined even in the absence of the protected conduct. See **[*20]** *Graham, 89 F.3d at 81*. "Once the burden shifts to the defendants, [plaintiff's] presentation creates a triable issue of fact unless the defendants proffer an alternative basis for disciplining [plaintiff] that would apply to him even if his version of events were true." Id. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)*. Here, the defendants have articulated a legitimate, non-retaliatory reason for the disciplinary action, i.e., Harnage's possession of another inmate's property.

Therefore, the motion for summary judgment is being granted as to this claim.

**B. Equal Protection**

In Count Six, Harnage contends that Bernard violated his equal protection rights by denying him notary services.

The *Equal Protection Clause* protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same. See *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439-40, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)*. To state an equal protection claim, the plaintiff must allege facts **[*21]** showing that he was treated differently from similarly situated individuals and that the

2016 U.S. Dist. LEXIS 72535, *21

reason for the different treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000)* (quoting *LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980))*. Alternatively, Harnage could assert an equal protection claim based on a "class of one" theory. To prevail on an equal protection "class of one" claim, the plaintiff must establish (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)*. The plaintiff must allege an "extremely high" level of similarity with the person to whom he is comparing himself. *Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005)*, overruled on other grounds, *Appel v. Spiridon, 531 F. 3d 138 (2d Cir. 2008)*. The plaintiff's circumstances must be "prima facie identical" to the other person's. *Id. at 105*. "[W]hen conducting rational basis review [the court] will not overturn such government action unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." **[*22]** *Kimel v. Florida Bd. of Regents, 528 U.S. 62, 84, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000)* (internal citation, quotation marks, and alterations omitted).

Harnage contends that he is similarly situated to inmate Rasmussen, who received notary services when Harnage did not. He contends that the two are prima facie identical in that both were inmates waiting in the same line for notary services on the same day and both asked Bernard to notarize affidavits. In Dugar v. Coughlin, the court rejected the plaintiff's claim that the prison's failure, inter alia, to provide notary services five days a week violated his equal protection rights. The court held that "the law is clear . . . that prisoners are not constitutionally entitled" to such services. *613 F. Supp. 849, 854 (S.D.N.Y. 1985)*. "Moreover, the restrictions which are placed on prisoners' access to the courts do not rise to the level of an equal protection violation as they do not deprive prisoners of 'an adequate opportunity to present [their] claims fairly.'" Id. (quoting *Ross v. Moffitt, 417 U.S. 600, 616, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974))*. "[T]he fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required" under the *Equal Protection Clause. Ross, 417 U.S. at 616*. Here, likewise, Harnage has not alleged facts that rise

to the level of an equal protection violation, even assuming, arguendo, that **[*23]** he and Rasmussen are similarly situated. Therefore, the motion for summary judgment is being granted as to this claim.

## C. *Fourth Amendment* Search and Seizure

In Count Seven, Harnage claims that the defendants violated his *Fourth Amendment* right to be free from unreasonable search and seizure when DiCosmo conducted the search of his cell. "[T]he *Fourth Amendment* proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)*. Harnage concedes that "[a] convict has no expectation of privacy in his prison cell," *Willis v. Artuz, 301 F.3d 65, 66 (2d Cir. 2002)*, but argues that the facts of this case are different from those in Hudson and Willis. He argues that Willis and Hudson both involved random cell searches but here the cell search was not random, but retaliatory. However, he points to no authority for the proposition that in certain circumstances the *Fourth Amendment* proscription against unreasonable searches does apply within the confines of the prison cell. Therefore, the motion for summary judgment is being granted as to this claim.

## D. Substantive Due Process

In Count Eight, Harnage asserts claims for violations of his substantive due process rights under the *Fourteenth Amendment*. Substantive due process protects individuals against government action that is arbitrary, see *Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)*, or **[*24]** oppressive in a constitutional sense. See *DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)*.

Harnage claims that defendants Brighthaupt, Powers, Davis, Baker, Vigars, and Dicosmo violated his substantive due process rights because he did not have notice that "legal materials" include legal documents. Government conduct violates a plaintiff's *Fourteenth Amendment* right to substantive due process only where it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)*. "Constitutional violations do not, in and of themselves, 'shock the

conscience' for the purposes of substantive due process." *Roman v. Velleca, No. 3:11CV1867 VLB, 2012 U.S. Dist. LEXIS 136946, 2012 WL 4445475, at *10 (D. Conn. Sept. 25, 2012)*. As the court explained in Roman, "where factual allegations shock the conscience only insofar as they constitute specific constitutional violations, plaintiffs may not seek redress under substantive due process." Id. Here, Harnage has asserted a *First Amendment* retaliation claim based on the same conduct that is the basis for his substantive due process claim, i.e., the seizure of another inmate's property from Harnage's cell and the issuance of a DR for Harnage's possession of contraband.

> Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort **[*25]** of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim.

*Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)* (internal citation and quotation marks omitted). Because the *First Amendment* is the source of constitutional protection against the sort of behavior complained about by Harnage, his substantive due process claim is not cognizable.

To the extent that Harnage's substantive due process claim is that he was not given adequate notice of what conduct was prohibited, it fails on the merits. "[C]ourts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct." *Leitzsey v. Coombe, 998 F. Supp. 282, 289 (W.D.N.Y. 1998)*. "The underlying rationale for such holdings is that inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice of the actions that could subject them to discipline." Id. In Chatin v. Coombe, the court's approach to determining whether the statute at issue was unconstitutionally vague was as follows:

> [A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides **[*26]** explicit standards for those who apply it.

*186 F.3d 82, 87 (2d Cir. 1999)* (internal citation omitted). The same approach is applicable to the prison regulations at issue here.

As to the first prong, Harnage did have notice of the rules prohibiting his conduct. The defendants state, and Harnage does not dispute, that the Inmate Handbook is issued to inmates when they arrive, and that Harnage received a copy of it. The Inmate Handbook provides inmates with rules regarding what constitutes contraband and states that inmates "are prohibited from having in [their] possession any item belonging to another inmate . . . [which] include[s] legal materials." (Defs'. R. 56(a)(1) Statement, Doc. No. 121-2, at ¶ 33.) This rule is sufficiently clear as to give notice of what is prohibited. See *Klimas v. Lantz, No. 3:08CV694 WWE, 2012 U.S. Dist. LEXIS 117819, 2012 WL 3611018, at *7 (D. Conn. Aug. 21, 2012)* (granting summary judgment where Administrative Directive at issue "gives reasonable notice of the proscribed speech). Also, the Administrative Directive states that possession of contraband is an offense that may result in discipline.

Harnage argues that the term "legal materials" is vague and ambiguous because

> [a] person of ordinary intelligence could reasonably believe that the reference to 'legal materials' was to **[*27]** identify purchased property items such as legal books rather than 'legal documents' that are part of public record and may be owned by any inmate who acquired them. A person of ordinary intelligence could reasonably believe that a habeas petition is a legal document rather than property, and therefore does not qualify as 'legal materials' or contraband.

(Pl.'s Opp. at 15-16.) However, the Inmate Handbook clearly states that contraband is any item belonging to another inmate, whether or not the document is "legal material." So Harnage was on notice that it was contraband. Moreover, given the language in the Inmate Handbook and the fact that the Inmate Handbook was provided to Harnage, no reasonable finder of fact could conclude that the existence of an ambiguity in the language can fairly be said to shock the contemporary conscience.

As to the second prong, DOC had sufficiently explicit standards for the staff who were applying the rules. Enforcing the provision does not require the exercise of discretion. If the item belongs to another inmate, it is contraband. In addition, a supervisor reviews and signs off on the disciplinary report before staff delivers the report to the inmate. Then, **[*28]** DOC's procedures give the inmate the opportunity to present evidence at a hearing prior to any ruling on the disciplinary report, and

2016 U.S. Dist. LEXIS 72535, *28

the inmate can appeal a guilty finding to the district administrator's office. Thus, "the [Administrative] Directive limits any unfettered discretion on the part of prison staff by providing for procedures for review of the decision to reject correspondence by the Unit Administrator." *Klimas v. Lantz, No. 3:08CV694 WWE, 2012 U.S. Dist. LEXIS 117819, 2012 WL 3611018, at *7 (D. Conn. Aug. 21, 2012)*.

Therefore, the motion for summary judgment is being granted as to this claim.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. No. 121) is hereby GRANTED. Summary judgment shall enter in favor of the defendants with respect to all of the remaining claims in Counts Six, Seven, and Eight.

It is so ordered.

Dated this 3rd day of June, *2016*, at Hartford, Connecticut.

/s/ Alvin W. Thompson

United States District Judge

---

End of Document

Jill Bowden Levy