UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WONDER WILLIAMS,

                                        Plaintiff,
                                                            9:16-CV-1343
v.                                                          (GTS/TWD)

KEVIN HESSE, et al.,

                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

WONDER WILLIAMS
Plaintiff, *pro se*
10-A-0102
Sullivan Correctional Facility
Box 116
Fallsburg, New York 12733

HON. LETITIA JAMES                        JORGE A. RODRIGUEZ, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

        Wonder Williams ("Plaintiff") commenced this *pro se* civil rights action pursuant to 42

U.S.C. § 1983 on November 9, 2016.  (Dkt. No. 1.)  Plaintiff claims Kevin Hesse ("Hesse")

retaliated against him for filing grievances against Hesse and other corrections officers.  Plaintiff

also alleges Brian Chuttey ("Chuttey"), Donnelly, Fagan, Harold Graham ("Graham"), Quinn,

and Robinson are liable as supervisors because they knew of Hesse's conduct and failed to take action to correct it.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 40.)  Plaintiff has responded in opposition to the motion, and Defendants have replied.  (Dkt. Nos. 47, 48-2,[1] 53.)  Moreover, Plaintiff moved for sanctions against Defendants alleging they failed to preserve video evidence relevant to Hesse's retaliation.  (Dkt. No. 48.)   Defendants opposed the motion.  (Dkt. No. 52.)

 For reasons explained below, the Court recommends granting in part and denying in part Defendants' motion for summary judgment and denying Plaintiff's motion for sanctions with leave to renew.

## I.    BACKGROUND

At all times relevant to this action, Plaintiff was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed at Auburn Correctional Facility ("Auburn") within the Special Housing Unit ("SHU").  (Dkt. No. 1 at ¶ 1.[2]) Generally, Plaintiff's claims center on four separate incidents that took place between December 2, 2013, and February 21, 2014.  To that end, as explained more fully below, Plaintiff claims Hesse withheld attorney contact information, purposefully lost legal documents, denied notary

---

[1]  Several documents relevant to Plaintiff's response to Defendants' motion for summary judgment were mistakenly docketed as "Exhibits" to Plaintiff's Motion for Sanctions at Dkt. No. 48-2.  Specifically, the following papers were docketed incorrectly: Plaintiff's response to Defendants' statement of material facts (Dkt. No. 48-2 at 49–50), Plaintiff's affidavit in opposition to Defendants' motion for summary judgment, *id*. at 51–62, and exhibits A-N of Plaintiff's affidavit, *id*. at 63–157.

[2]  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

services, and spit in Plaintiff's face because Plaintiff filed grievances against Hesse and other

corrections officers.

### A.    Attorney Contact Information Incident

According to Plaintiff, on December 2, 2013, Hesse was making law library rounds in the

SHU.  (Dkt. No. 48-2 at 51.[3])  Plaintiff stopped Hesse and asked for "yellow pages" or a "legal

book or listings that contained the names of practicing attorneys in New York, their services, and

contact information."  *Id.*  Hesse asked him, "what for?" and Plaintiff responded he needed to

hire a lawyer for litigation.  *Id.* at 51–52.  Hesse then refused to provide Plaintiff with a copy of

the yellow pages.  *Id.* at 52.  Plaintiff asked Hesse, "so it's cause of my complaints . . . that you

won't look into that for me?"  (Dkt. No. 40-4 at 49; Dkt. No. 48-2 at 52.)  Hesse responded, "you

got the picture now."  (Dkt. No. 48-2 at 52.)

Hesse denies he refused to provide Plaintiff with attorney contact information.  (Dkt. No.

40-5 at ¶ 7.)  Plaintiff mentioned this incident in a grievance letter, which was consolidated into

AUB-64134-13 and filed with the Inmate Grievance Program ("IGP") on December 24, 2013.

(Dkt. No. 48-2 at 69, 77–78.)

### B.    Loss of Legal Documents Incident

Plaintiff claims Hesse approached Plaintiff's cell during his law library rounds on

December 3, 2013.  (Dkt. No. 48-2 at 53.)  Hesse began questioning Plaintiff about grievances

Plaintiff had filed.  *Id.*  During this conversation, Hesse asked Plaintiff, "why the fuck are you

tryna make waves, writing grievances and shit? [ ] You're pissing me and alot of people off."  *Id.*

(unaltered text).  Hesse continued, "Remember you gotta go through me to send and receive shit

---

[3] Page references to documents identified by docket number are to the numbers assigned by the
CM/ECF docketing system maintained by the Clerk's Office.

from the law library. [ ] Keep fucking around and your important papers gonna come up lost or destroyed . . . don't be stupid." *Id.* (unaltered text).  After this conversation, Plaintiff gave Hesse legal documents ("notarized sworn affidavits, legal civil claims and documentary evidence, etc.") for copying.  *Id.*  Hesse took these documents and left Plaintiff's cell.  *Id.*

On December 4, 2013, an unknown corrections officer was making law library rounds in the SHU.  *Id.* at 54.  Plaintiff asked about the status of his documents, but the officer did not have the original documents or any copies.  *Id.*  The officer had no knowledge of the documents Plaintiff gave Hesse the previous day.  *Id.*

On December 9, 2013, Hesse was making law library rounds in the SHU.  *Id.*  Plaintiff stopped Hesse to ask about the documents he gave Hesse on December 3, 2013, as he had not yet received the copies or originals.  *Id.* at 54–55.  Hesse told Plaintiff, "all that shits gone." *Id.* at 55 (unaltered text).  He stated "he made certain that all of [Plaintiff's] legal paperwork and materials sent with him . . . got intentionally 'lost' because [Plaintiff] had pissed him off due to all of [Plaintiff's] grievances/complaints against him and the law library."  *Id.*  Hesse continued,

> What? Do I look like a joke, did I look like I was kidding when I told you that I was gonna fucking lose your paperwork . . . besides, I did someone a favor, cause that shit looked to me like some sort of civil complaint or something . . . take all this as a lesson learned and chill with the write-ups and complaints.

*Id.* (unaltered text).  Another inmate in the SHU witnessed this incident and executed a declaration.  *Id.* at 55, 80–81.

Hesse denies he threatened to lose and subsequently destroyed Plaintiff's documents. (Dkt. No. 40-5 at ¶ 8.)  Plaintiff filed grievances about the above incidents, which were consolidated and assigned grievance number AUB-64134-13.  (Dkt. No. 48-2 at 64–78.) Plaintiff wrote letters to Chuttey, Graham, Quinn, and Robinson, and claims he spoke with

Chuttey, Donnelly, Graham, and Robinson about the incidents. (Dkt. No. 1-1 at 3–17; Dkt. No. 48-2 at 54–57.)

### C.    Notary Services Incident

It is undisputed that, on January 27, 2014, Plaintiff asked Hesse to notarize documents for him and Hesse refused to do so. (Dkt. No. 48-2 at 57–58; Dkt. No. 40-5 at ¶¶ 9, 12.) The parties' versions of facts differ as to the reason Hesse refused to notarize Plaintiff's documents.

According to Plaintiff, he stopped Hesse during law library rounds and asked Hesse to notarize his documents. (Dkt. No. 48-2 at 57.) Plaintiff claims he handed Hesse a complete set of documents and Hesse refused to notarize the documents in retaliation for Plaintiff's grievances. *Id.* at 57–58. At his deposition, Plaintiff testified Hesse said, "I'm not doing it" because of "all those fucking grievances." (Dkt. No. 40-4 at 108–13.) Plaintiff also claims Donnelly was present for this incident and "stood by smiling and encouraged the behavior." (Dkt. No. 48-2 at 57.)

According to Hesse, the documents Plaintiff provided for notarization were "incomplete, and the set of documents did not have all of its pages." (Dkt. No. 40-5 at ¶ 10.) Hesse claims he did not notarize Plaintiff's documents because Notary Publics are not allowed to notarize incomplete documents. *Id.* at ¶¶ 11–12.

Plaintiff filed a grievance about this incident. (Dkt. No. 48-2 at 58, 83–88.) He also claims he spoke with Graham, Chuttey, and Fagan about this incident. (Dkt. No. 40-4 at 115–22; Dkt. No. 48-2 at 58–59.)

### D.    Spitting Incident

On February 21, 2014, Plaintiff asserts Hesse came to his cell in the SHU in an "angry and threatening manner." (Dkt. No. 48-2 at 59.) The two spoke through Plaintiff's cell door.

5

(Dkt. No 40-4 at 125–26.)  Hesse told Plaintiff to stop writing grievances and pursuing already filed grievances.  (Dkt. No. 48-2 at 59.)  He threatened Plaintiff, saying he would have Plaintiff "fucked up real bad" when Plaintiff was returned to "population or whenever the opportunity presented itself."  *Id.* (unaltered text).  Hesse continued, "I'm gonna show you how I deal with your kind, porch monkey," and then "threatened to kill . . . [Plaintiff] if [Plaintiff] wrote anymore grievances or complaints on him again."  *Id.* (unaltered text).

Hesse then "camel-spit" a "large wad of tobacco chew spit and bodily fluid" into Plaintiff's face and right eye.  *Id.*  After Hesse left, Plaintiff told the area supervisor about the incident, who told Plaintiff to "just stop writing grievances against staff."  *Id.* at 60.  As a result of Hesse spitting in his eye, Plaintiff suffered extreme pain and burning in his right eye and was unable to see out of his eye for six hours.  *Id.*  Another inmate in the SHU witnessed this incident and executed a declaration.  *Id.* at 60, 99–100.

Hesse denies threatening Plaintiff and spitting in Plaintiff's face.  (Dkt. No. 40-5 at ¶ 14.)  Plaintiff filed a grievance about this incident.  (Dkt. No. 48-2 at 90–97.)  Plaintiff also sent letters about the incident to Chuttey, Fagan, Robinson, Quinn, and Graham, and claims he told Robinson and Graham about the incident during their SHU rounds on February 24, 2014.  (Dkt. No. 1-1 at 32–46; Dkt. No. 48-2 at 61.)

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment may be granted only if the submissions of the parties taken together "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 273.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[4]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."

---

[4]  The Court finds Plaintiff's complaint is properly verified.  (Dkt. No. 1 at 18.)

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted).  "To defeat

summary judgment, . . . nonmoving parties may not rely on conclusory allegations or

unsubstantiated speculation."  *Id*. (citation and quotation marks omitted).  "At the summary

judgment stage, a nonmoving party must offer some hard evidence showing that its version of

the events is not wholly fanciful."  *Id*. (citation and quotation marks omitted).  "Statements that

are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly

supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d

Cir. 1999).

     In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is

proceeding *pro se*, the Court is obliged to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14

F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by

evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93-

CV-5981 (WHP/JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v.

Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[5]

    **B.**    **Exhaustion of Administrative Remedies**

     Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought

with respect to prison conditions under section 1983 of this title or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

---

[5]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

Here, Defendants initially argued Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim stemming from the attorney contact information incident. (Dkt. No. 40-11 at 6–10.) Defendants contended that Plaintiff failed to file a grievance about any incidents occurring on December 2 or December 3, 2013. *Id.* at 9. Plaintiff subsequently provided documentation of Grievance AUB-64134-13, which references said incidents. (Dkt. No. 48-2 at 73–78.) CORC denied this grievance on May 21, 2014, approximately two and one half years before Plaintiff commenced the present action. (Dkt. No. 40-10 at 3; Dkt. No. 48-2 at 64; *see* Dkt. No. 1.) Defendants subsequently withdrew their exhaustion argument. (Dkt. No. 53 at 4 n.1.)

Accordingly, the Court recommends denying Defendants' motion for summary judgment on exhaustion grounds.

### C.    First Amendment Retaliation

#### 1.    *Legal Standards*

Retaliation claims find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380–81 (2d Cir. 2004).  Central to such claims is the notion that, in a prison setting, prison officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights.  *Id.* at 381–83.  However, as the Second Circuit has repeatedly cautioned, such claims are easily incanted and prone to abuse, as inmates often attribute adverse actions to retaliatory animus.  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Courts must therefore approach retaliation claims with "skepticism and particular care."  *Id.*  Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz*, 534 U.S. at 506; *see also Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (N.D.N.Y. Mar. 31, 2009) ("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate Plaintiff has engaged and the adverse action taken against him or her, as well as the evidence tending to link the two.  When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

To establish a *prima facie* First Amendment retaliation claim, the plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and

the adverse action." *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).  It is well settled that

the filing of prison grievances is a constitutionally protected activity under the First and

Fourteenth Amendments.  *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v.*

*Kelly*, 854 F.2d 584 (2d Cir. 1988)).

   "Adverse action" for purposes of a retaliation claim has been defined as "retaliatory

conduct that would deter a similarly situated individual of ordinary firmness from exercising . . .

constitutional rights . . . .  Otherwise the retaliatory act is simply *de minimis* and therefore

outside the ambit of constitutional protection."  *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.

2003) (citing *Dawes*, 239 F.3d at 493).  This is an objective test, so an adverse action may be

found even if the plaintiff himself was not subjectively deterred from exercising his rights.  *Gill*,

389 F.3d at 381.  However, "[i]n making this determination, the court's inquiry must be 'tailored

to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners

may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken

against them is considered adverse.'"  *Davis*, 320 F.3d at 353 (quoting *Dawes*, 239 F.3d at 493

(quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999))).

   An inmate bears the burden of showing "the protected conduct was a substantial or

motivating factor" in the defendant's decision to take action against the plaintiff.  *Graham*, 89

F.3d at 79.  In evaluating whether a causal connection exists between the plaintiff's protected

activity and a prison official's actions, "a number of factors may be considered, including: (i) the

temporal proximity between the protected activity and the alleged retaliatory act; (ii) the

inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv)

statements by the defendant concerning his motivation."  *Baskerville v. Blot*, 224 F. Supp. 2d

723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872–73).  "The causal connection must be

sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

### 2.    Application

Hesse primarily argues he is entitled to summary judgment because Plaintiff cannot establish his act of filing grievances was a substantial motivating factor in any of Hesse's conduct. (Dkt. No. 40-11 at 10–14; Dkt. No. 53 at 5–8.) Plaintiff, on the other hand, argues he has presented sufficient evidence to raise issues of fact as to each of his claims. (Dkt. No. 47 at 7–14.)

Here, IGP records establish Plaintiff filed nineteen grievances between January 16, 2013, and December 2, 2013. (Dkt. No. 48-2 at 105–07.) At his deposition, Plaintiff testified that five of these grievances (filed on October 9, October 16, October, 18, October 28, and November 5, 2013) involved Hesse and the law library.[6] (Dkt. No. 40-4 at 30–45.) Plaintiff filed grievances against Hesse about the attorney contact information incident and loss of legal documents incident. (Dkt. No. 48-2 at 69–78.) These grievances were stamped as filed with the IGP on December 24, 2013. *Id.* at 68. On January 30, 2014, Plaintiff filed a grievance about the notary services incident. *Id.* at 84–85.

Given this factual backdrop, the Court finds the temporal proximity between Plaintiff's act of filing grievances and each of Hesse's actions supports a finding of a causal connection. Specifically, the attorney contact information and the loss of legal documents incidents occurred less than two months after Plaintiff filed five grievances against Hesse. The notary services

---

[6] Neither party has submitted copies of these grievances to the Court.

incident occurred approximately one month after the IGP consolidated Plaintiff's grievances about the loss of legal documents incident.  Further, the spitting incident occurred less than one month after Plaintiff filed a grievance about the notary services incident.  Thus, the temporal proximity of the grievances with each adverse action supports an inference of retaliation.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between plaintiff's protected conduct and an adverse action was "sufficient to support an inference of a causal connection").

Moreover, Plaintiff has provided detailed evidence of statements Hesse made concerning his motivation during each incident.  As to the attorney contact information incident, Plaintiff claims that, after Hesse refused to provide him with the yellow pages, he asked Hesse, "so it's cause of my complaints . . . that you won't look into that for me?"  (Dkt. No. 1 at ¶ 21; Dkt. No. 40-4 at 48–50; Dkt. No. 48-2 at 52.)  Hesse responded, "you got the picture now."  (Dkt. No. 1 at ¶ 21; Dkt. No. 40-4 at 48–50; Dkt. No. 48-2 at 52.)  With respect to the loss of legal documents incident, Plaintiff asserts Hesse questioned Plaintiff about previously filed grievances, told Plaintiff his grievances were angering Hesse and other people, and threatened to lose or destroy his documents if Plaintiff did not stop writing grievances.  (Dkt. No. 1 at ¶¶ 2–4; Dkt. No. 40-4 at 58–62; Dkt. No. 48-2 at 53.)  Plaintiff contends Hesse said he lost Plaintiff's documents because he was angry about Plaintiff's grievances.  (Dkt. No. 1 at ¶ 13; Dkt. No. 40-4 at 75–79; Dkt. No. 48-2 at 55.)  Specifically, Plaintiff maintains Hesse stated, "take all this as a lesson learned and chill with the write-ups and complaints."  (Dkt. No. 1 at ¶ 14; Dkt. No. 48-2 at 55.)

As to the notary services incident, Plaintiff claims Hesse refused to notarize Plaintiff's documents because of "all those fucking grievances."  (Dkt. No. 40-4 at 108–13) (unaltered text).  With respect to the spitting incident, Plaintiff asserts that, prior to spitting on him, Hesse told

Plaintiff to "stop writing complaints and to not pursue any filed grievances any further." (Dkt. No. 1 at ¶ 37; Dkt. No. 48-2 at 59.) Plaintiff contends Hesse threatened to kill Plaintiff if he grieved Hesse again and then spat chewing tobacco into Plaintiff's eye. (Dkt. No. 1 at ¶¶ 37–38; Dkt. No. 40-4 at 124–25; Dkt. No. 48-2 at 59.)

In support of his claims, Plaintiff submitted a verified complaint, his deposition testimony, and a sworn declaration. (Dkt. Nos. 1, 47-1, 48-2.) Plaintiff further provided the declaration of an inmate who witnessed the December 9, 2013, incident and the declaration of a different inmate who witnessed the spitting incident. (Dkt. No. 48-2 at 80–81, 99–100.) Plaintiff's testimony and these declarations provide specific details and are not "conclusory allegations." *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). Based upon the evidence in the summary judgment record, a reasonable jury could find Hesse was substantially motivated to act because of Plaintiff's grievances. *See Cole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *26 (N.D.N.Y. Aug. 25, 2016) (denying summary judgment when "immediately before [assaulting the plaintiff], the [defendant] stated, 'Happy Anniversary' in reference to prior assaults and a lawsuit that resulted from those assaults . . . . Plaintiff also testified [the defendant] told him that the assault was 'payback' for grievances."); *see also Morgan v. Luft*, No. 9:15-CV-0024 (GTS/DJS), 2017 WL 9511158, at *6 (N.D.N.Y. June 22, 2017). Therefore, the Court finds a genuine issue of material fact exists regarding each of Plaintiff's First Amendment Retaliation claims.

To the extent Hesse argues Plaintiff has only alleged retaliation in a conclusory fashion with respect to the notary services incident, the Court disagrees. Hesse contends Plaintiff's deposition testimony is the only evidence he made any statement regarding his motivation during

14

this incident.  (Dkt. No. 53 at 5–6.)  At Plaintiff's deposition, Plaintiff testified Hesse stated he

would not notarize Plaintiff's documents because of "all those fucking grievances."  (Dkt. No.

40-4 at 109) (unaltered text).  This statement is absent from Plaintiff's verified complaint, sworn

declaration, and grievance about the incident.  (*See* Dkt. No. 1 at ¶ 29; Dkt. No. 48-2 at 57–58,

84–85.)  Hesse therefore asserts Plaintiff's testimony is contradictory and the Court should

discredit Plaintiff's deposition testimony under *Jeffreys v. City of New York*.  (Dkt. No. 53 at 5–

6.)

    The Court declines to apply *Jeffreys* to assess Plaintiff's credibility.  The Second Circuit

noted in *Jeffreys* that the Court is allowed to make an assessment of the plaintiff's credibility in

the "*rare circumstance* where the plaintiff relies almost exclusively on his own testimony, much

of which is contradictory and incomplete."  *Jeffreys*, 426 F.3d at 554 (emphasis added) (holding

summary judgment was appropriate where plaintiff's testimony about being thrown out of a

window by police officers contradicted plaintiff's multiple prior statements, medical records and

officer testimony).  While Plaintiff failed to mention Hesse's statement in his complaint or

grievance, this omission is not as drastic as the contradictions in *Jeffreys*.

    Further, Plaintiff testified about Hesse's statements while under oath at his deposition

during the discovery phase of litigation, which is distinguishable from situations in which a

plaintiff makes allegations for the first time in response to summary judgment.  *See Hayes v.

New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) (finding a genuine dispute of

fact was created by plaintiff's deposition testimony taken "long before" defendants filed for

summary judgment); *cf. Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 577–78 (2d

Cir. 1969) (holding summary judgment was appropriate where the only dispute of material fact

came from a declaration submitted in response to a summary judgment motion).  Furthermore,

Plaintiff is proceeding *pro se*. While an attorney may have chosen to include Hesse's statements about this incident in the complaint, the Court will not hold a *pro se* plaintiff to the same level of responsibility as a licensed attorney. *See Shariff v. Poole*, 689 F. Supp. 2d 470, 476 (W.D.N.Y. 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

Hesse also argues he is entitled to summary judgment with respect to the notary services incident because he would have refused to notarize Plaintiff's documents regardless of any retaliatory motivation. (Dkt. No. 40-11 at 11–13; Dkt. No. 53 at 5.) If a plaintiff makes the appropriate showing of retaliation, a defendant may still avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir. 2003) (defendant may be entitled to summary judgment upon showing that the alleged retaliatory action would have taken place even without the improper motivation). However, summary judgment is not appropriate if there is a genuine issue of material fact as to whether the action actually would have taken place regardless of retaliatory motivation. *Id.* at 288–89; *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Here, it is undisputed Hesse refused to notarize Plaintiff's documents. Hesse claims "the documents [P]laintiff provided . . . were incomplete, and the set of documents did not have all of its pages." (Dkt. No. 40-5 at ¶ 10.) Hesse contends he did notarize the documents because Notary Publics are not permitted to notarize incomplete documents. *Id.* at ¶¶ 11–12. Plaintiff claims that he provided Hesse with a complete set of documents for notarization. (Dkt. No. 1 at ¶ 29; Dkt. No. 40-4 at 104–06; Dkt. No. 48-2 at 57–58.) The Court finds there is a genuine dispute of material fact as to whether Plaintiff handed Hesse a complete set of documents, which

in turn creates a genuine dispute of material fact as to whether Hesse would have taken the same action regardless of any retaliatory motivation.

In sum, based on the foregoing, the Court recommends denying summary judgment on Plaintiff's First Amendment retaliation claims against Hesse.

### D.    Supervisory Liability

#### 1.    Legal Standards

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977) (citations omitted). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate . . . a prison superintendent in a § 1983 claim") (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[7]

"Fundamentally, for a supervisor to be liable under Section 1983, there must 'of course' have 'been an underlying constitutional deprivation' by a subordinate, *Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir. 1999), and a 'causal link' between the supervisor's conduct and the violation of the plaintiff's civil rights." *Nicholson v. Fischer*, No. 13-CV-6072 (FPG/MWP), 2018 WL 2009432, at *5 (W.D.N.Y. Apr. 28, 2018) (citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002)).

### 2.    *Application*

#### a.    Chuttey

On December 3, 2013, Plaintiff claims he spoke with Chuttey about Hesse's threat to destroy his legal documents.  (Dkt. No. 48-2 at 54.)  Plaintiff wrote Chuttey a letter about the incident after Chuttey instructed him to do so.  (Dkt. No. 1-1 at 3.)  Plaintiff wrote to Chuttey again on December 9, 2013, and informed him Hesse said he destroyed Plaintiff's legal documents.  *Id.* at 15.  On February 3, 2014, Plaintiff claims he spoke with Chuttey about Hesse and Donnelly's actions during the notary services incident.  (Dkt. No. 48-2 at 58–59.)  During their conversation, Plaintiff asserts he asked Chuttey if he had received Plaintiff's previous letters and Chuttey responded that he had.  *Id.* at 59.  On February 22, 2014, Plaintiff wrote to

---

[7]  The Second Circuit has thus far not determined whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Chuttey about the spitting incident.  (Dkt. No. 1-1 at 39.)  At his deposition, Plaintiff testified he

did not receive a response to any of his letters to Chuttey.  (Dkt. No. 40-4 at 65, 75, 91, 133.)

There are no responses from Chuttey in the summary judgment record.  The Court finds

nothing in the record showing Chuttey responded to, investigated, or took other action with

respect to any of Plaintiff's complaints.  Even if Chuttey did acknowledge receipt of the letters

Plaintiff sent in December 2013, a defendant's "receipt of a letter or grievance, without

personally investigating or acting thereon, is insufficient to establish personal involvement."

*Burns v. Fischer*, No. 13-CV-486 (LEK/CFH), 2014 WL 1413387, at *5 (N.D.N.Y. Feb. 3,

2014) (internal citations omitted); *see also Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB),

2012 WL 2754859, at *10 (N.D.N.Y. July 9, 2012) ("It is well settled that receipt of letters or

grievances, by itself, does not amount to personal involvement." (citing *Vega v. Artus*, 610 F.

Supp. 2d 185, 199 (N.D.N.Y. 2009)).  Therefore, the Court recommends granting Chuttey's

motion for summary judgment.

b.    Donnelly

Plaintiff contends he spoke with Donnelly about Hesse on December 21 and December

22, 2013.  (Dkt. No. 48-2 at 56.)  In response, Donnelly "shrugged his shoulders and stated that

he was not getting involved."  *Id.*  Plaintiff also claims Donnelly was present for the notary

services incident.  According to Plaintiff, "Donnelly . . . did not correct [Hesse's] retaliation nor

stop the wrongdoing.  In fact, [Donnelly] stood by smiling and encouraged the behavior."  *Id.* at

57.

There are no responses from Donnelly in the summary judgment record.  The Court finds

nothing in the record showing Donnelly responded to, investigated, or took other action

regarding Plaintiff's verbal complaints from December 21 and December 22, 2013.  *See Gates v.*

*Goord*, No. 99-CV-1378 (PKC), 2004 WL 1488405 at *8–9 (S.D.N.Y July 1, 2004) (granting defendant summary judgment on a supervisory liability claim where plaintiff only claimed he had conversations with defendant and wrote letters about a constitutional violation).  However, the Court finds there is a genuine issue of fact as to whether Donnelly directly participated in the alleged constitutional violation during the notary services incident, as Plaintiff claims Donnelly was present and encouraged Hesse.  *See Colon,* 58 F.3d at 873.  Therefore, the Court recommends denying Donnelly's motion for summary judgment as to Plaintiff's supervisory liability claim related to the notary services incident and granting the motion for summary judgment in all other respects.[8]

c.    Fagan

On February 5, 2014, Plaintiff asserts he spoke with Fagan about issues with Hesse and Donnelly, in particular, the notary services incident.  (Dkt. No. 40-4 at 122; Dkt. No. 48-2 at 58.)  On February 22, 2014, Plaintiff wrote to Fagan about the spitting incident.  (Dkt. No. 1-1 at 42.)

At his deposition, Plaintiff testified he did not recall receiving a response from Fagan. (Dkt. No. 40-4 at 133.)  There are no responses from Fagan in the summary judgment record and there is no evidence Fagan took any action with respect to either of Plaintiff's complaints.  Even accepting Plaintiff did speak with Fagan and wrote to him about the incident, a defendant's "receipt of a letter or grievance, without personally investigating or acting thereon, is insufficient to establish personal involvement."  *Burns*, 2014 WL 1413387, at *5; *Guillory*, 2012 WL

---

[8]  Plaintiff has seemingly advanced a new basis for his supervisory liability claim against Donnelly in his affidavit submitted in opposition to Defendants' motion for summary judgment. For the first time, Plaintiff contends Donnelly was the area supervisor who responded to his cell after Hesse spat on Plaintiff and told Plaintiff to stop writing grievances against the staff.  (Dkt. No. 48-2 at 60.)  Defendants have not addressed this issue in any of their motion papers and Plaintiff failed to address this issue in his memorandum of law.  Accordingly, the Court finds this is not a basis to hold Donnelly liable as a supervisor.

2754859, at *10.  Therefore, the Court recommends granting Fagan's motion for summary judgment.

### d.    Graham

Plaintiff wrote to Graham on December 5 and December 9, 2013, about the loss of legal documents incident.  (Dkt. No. 1-1 at 7–11.)  On December 26, 2013, Plaintiff claims he spoke to Graham about Hesse's actions and Donnelly's failure to supervise Hesse.  (Dkt. No. 48-2 at 57.)  According to Plaintiff, Graham stated he had received Plaintiff's letters.  *Id.*  Additionally, Plaintiff alleges he spoke to Graham on either January 28 or January 29, 2014, about Hesse and Donnelly, specifically the notary services incident.   (Dkt. No. 40-4 at 116; Dkt. No. 48-2 at 58.)  Plaintiff asserts he again asked if Graham had received Plaintiff's letters, and Graham responded he had.  (Dkt. No. 48-2 at 58.)

On February 22, 2014, Plaintiff wrote to Graham about the spitting incident.  (Dkt. No. 1-1 at 32–33.)  On February 24, 2014, Plaintiff contends he stopped Graham (who was with Robinson) during his rounds and told him about the spitting incident.  (Dkt. No. 48-2 at 61.)   At his deposition, Plaintiff stated he did not recall receiving a response from Graham in reference to any of the letters he sent.  (Dkt. No. 40-4 at 90, 134.)

Plaintiff's letters to Graham regarding Hesse's conduct, absent a response, investigation or action by Graham, are insufficient to show personal involvement for purposes of supervisory liability.  *See Burns*, 2014 WL 1413387, at *5; *Guillory*, 2012 WL 2754859, at *10.  Therefore, the Court recommends granting Graham's motion for summary judgment.

### e.    Quinn

Plaintiff wrote to Quinn about the loss of legal documents incident on December 9, 2013.  (Dkt. No. 1-1 at 17.)  Plaintiff also wrote to Quinn about the spitting incident on February 22,

2014.  (Dkt. No. 1-1 at 45.)  Plaintiff testified at his deposition he did not recall receiving a response from Quinn.  (Dkt. No. 40-4 at 91–92, 132.)  He further testified Quinn "didn't do anything" about Hesse's conduct.  *Id.* at 144.  There are no responses from Quinn in the summary judgment record and there is no evidence Quinn took any action with respect to either of Plaintiff's complaints.  Therefore, the Court recommends granting Quinn's motion for summary judgment.  *See Burns*, 2014 WL 1413387, at *5; *Guillory*, 2012 WL 2754859, at *10.

        f.      Robinson

Plaintiff wrote to Robinson about the loss of legal documents incident on December 9, 2013.  (Dkt. No. 1-1 at 13.)  On December 20, 2013, Plaintiff claims he spoke with Robinson about the attorney contact information incident and the loss of legal documents incident.  (Dkt. No. 48-2 at 56.)  Plaintiff wrote to Robinson about the spitting incident on February 22, 2014.  (Dkt. No. 1 at 36.)  On February 24, 2014, Plaintiff contends he stopped Robinson (who was with Graham) during his rounds and told him about the spitting incident.  (Dkt. No. 48-2 at 61.)

Plaintiff testified at his deposition he did not recall receiving a written response from Robinson in reference to either letter.  (Dkt. No. 40-4 at 90, 134.)  There are no responses from Robinson in the summary judgment record, and the Court finds nothing in the record showing Robinson responded to, investigated or took other action with regard to Plaintiff's written or verbal complaints.  Therefore, the Court recommends granting Robinson's motion for summary judgment.  *See Burns*, 2014 WL 1413387, at *5; *Guillory*, 2012 WL 2754859, at *10.

III.    MOTION FOR SANCTIONS

As noted above, Plaintiff moved for sanctions against Defendants because he argues they failed to preserve video and audio evidence of the alleged retaliatory conduct.  (Dkt. No. 48.)[9] To that end, Plaintiff contends he provided notice to Defendants of his potential civil lawsuit but Defendants allowed video tapes of his interactions with Hesse to be destroyed.  In support of his motion, Plaintiff has provided multiple letters he wrote to the supervisors at Auburn Correctional Facility immediately after each relevant incident directing them to preserve video evidence in anticipation of future litigation.  (Dkt. No. 48-2 at 1-39.)

Defendants responded asserting DOCCS is not on notice of a prisoner's lawsuit regarding "conditions of confinement" until the day the lawsuit is filed in federal court.  (Dkt. No. 52 at 9-13.)  Defendants also argue the videos were destroyed according to DOCCS policy—that deletes surveillance videos on a 14-day automatic loop—thus, sanctions are inappropriate because Plaintiff cannot establish the requisite intent to destroy evidence.  *Id*. at 14-15.[10]

In the first instance, there is no support for Defendants' propsed rule regarding the duty to preserve evidence for cases regarding "conditions of confinement."  The single case Defendants rely upon does not so hold but rather discusses the clarity with which a prisoner must notice DOCCS regarding a future lawsuit.  *See McIntosh v. United States*, No. 14-cv-7889, 2016 WL

---

[9] Plaintiff has filed similar motions in previous cases in this district.  *See* Dkt. No. 79, *Williams v. Lane*, 9:13-CV-965 (BKS/DJS); Dkt. No. 62, *Williams v. Novak*, 9:16-CV-1211 (GTS/TWD).

[10]  According to Defendants, Plaintiff cited the wrong standard with respect to whether sanctions are appropriate.  (Dkt. No. 52 at 8.)  To that end, Defendants correctly note Rule 37 of the Federal Rules of Civil Procedure was amended in 2015 and changed the level of culpability required to justify sanctions.  However, the requests to preserve evidence in this case were sent to Defendants in 2014, *i.e*., before the amendment.  Therefore, it is an open question as to what standard applies to Plaintiff's motion.  *See McIntosh v. United States*, No. 14-cv-7889, 2016 WL 1274585, at *35 (S.D.N.Y. Mar. 31, 2016) (applying the pre-amendment standard to consider motion for sanctions).  Here, because the Court ultimately denies Plaintiff's motion as premature, the Court expresses no opinion as to the appropriate standard required to impose sanctions.

23

1274585, at *35 (S.D.N.Y. Mar. 31, 2016) ("[T]he Court is not prepared to say that Plaintiff's allusion to 'future litigation' is per se enough to establish notice."). More importantly, Defendants' argument would create a paradoxical situation where DOCCS would never have a duty to preserve evidence in a "conditions of confinement" case because the prisoner would have to initiate litigation within fourteen days of the alleged incident—subjecting their lawsuit to dismissal on exhaustion grounds.

Nevertheless, the resolution of Plaintiff's motion for sanctions is not relevant to this motion for summary judgment as even without the video and audio evidence the court finds there is a dispute as to the material facts regarding each of the alleged retaliatory actions. Rather, Plaintiff's motion is more appropriately handled as a motion *in limine* before trial. Accordingly, Plaintiff's motion for sanctions is denied without prejudice.

## IV.    CONCLUSION

Based on the foregoing, the Court recommends Defendants' motion for summary judgment be granted in part and denied in part. In sum, if the District Court accepts and adopts the above recommendations, Plaintiff's First Amendment retaliation claims against Hesse and Plaintiff's supervisory liability claim against Donnelly related to the notary services incident will remain for trial. Furthermore, the Court denies Plaintiff's motion for sanctions with leave to renew before trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 40) be **DENIED** in part as it relates to Plaintiff's First Amendment retaliation claims against Hesse and his supervisory liability claim against Donnelly with respect to the notary services incident; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** in all other respects; and it is further

**ORDERED** that Plaintiff's motion for sanctions (Dkt. No. 48) is **DENIED** with leave to renew; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 19, 2020
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant Richard
Pflueger, a corrections officer, violated his First Amendment
rights by refusing to allow him to attend religious services.
The defendant now moves for summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the
plaintiff was in keeplock because of an altercation with prison
guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with one hour
for recreation. (Affidavit of Anthony Annucci dated Dec. 1,
1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine that
the inmate's presence at the service would create a threat to
the safety of employees or other inmates. (Schneider Aff. ¶
3). The standard procedure at Green Haven is for the captain's
office to review all requests by inmates in keeplock to attend
religious services. (Schneider Aff. ¶ 3). Written approval is
provided to the inmate if authorization is granted. (Affidavit
of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.")
¶ 5). The inmate must then present the appropriate form to
the gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked

Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir.1995); Richardson v. Selsky, 5

F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255; Vann v. City of New York, 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. Anderson, 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." ' Matsushita Electric Industrial Co., 475 U.S. at 587 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)); Montana v. First Federal Savings & Loan Association, 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro*

*se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

## Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 9:03–CV–1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen M. Kerwin, Esq., Assistant Attorney
General, of Counsel, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court in this *pro se* prisoner civil
rights action are Defendants' motion for summary judgment
(Dkt. No. 80), and United States Magistrate Judge David
E. Peebles's Report–Recommendation that recommends that
Defendants' motion be granted and Plaintiff's Complaint
be dismissed in its entirety (Dkt. No. 85). Plaintiff has
timely filed Objections to the Report–Recommendation.
(Dkt. No. 86.) For the reasons set forth below, the Report–
Recommendation is accepted and adopted in its entirety,
Defendants' motion is granted and Plaintiff's Complaint is
dismissed.

## I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against
twenty-two (22) individuals currently and/or formerly
employed by the New York State Department of Correctional
Services, at various correctional facilities. Generally, in his
Complaint, Plaintiff alleges that his rights under the First
and Eighth Amendments were violated when (1) certain
Defendants had him transferred in retaliation for grievances
that he had filed, (2) certain Defendants issued false
misbehavior reports against him in retaliation for grievances
that he had filed, and (3) certain Defendants deprived him of

the opportunity to engage in outdoor exercise on two separate
occasions. (*See generally* Dkt. No. 1.)[1]

On September 29, 2006, District Judge Lawrence E. Kahn
issued a Memorandum Decision and Order dismissing
(1) Plaintiff's claims for equitable relief due to Plaintiff's
release from incarceration, which mooted this claim, and
(2) Plaintiff's claims against the CORC and all of the
individual defendants in their official capacities on Eleventh
Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion for summary
judgment seeking dismissal of all of Plaintiff's claims against
them. (Dkt. No. 80.) Generally, Defendants' motion is
premised on the following three grounds: (1) certain
Plaintiff's claims are procedurally barred based upon his
failure to exhaust available administrative remedies with
regard to those claims (2) no reasonable factfinder could
conclude that the issuance of misbehavior reports or the
transfer to different facilities were *caused* by Plaintiff's
filing of grievances; and (3) no reasonable factfinder
could conclude that Plaintiff was subjected to cruel and
unusual punishment based on being denied certain exercise
opportunities. (*Id.*) On February 1, 2008, Plaintiff filed a
response in opposition to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles issued a
Report–Recommendation recommending that Defendants'
motion be granted, because (1) certain of Plaintiff's claims
were not properly exhausted, and (2) no reasonable factfinder
could rule in Plaintiff's favor on any of his claims. (Dkt.
No. 85.) Familiarity with the grounds of the Report–
Recommendation is assumed in this Decision and Order. On
March 20, 2009, Plaintiff filed his Objections to the Report–
Recommendation. (Dkt. No. 86.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report–
Recommendation
 **\*2** When specific objections are made to a magistrate
judge's report-recommendation, the Court makes a "de
novo determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[2]
When only general objections are made to a magistrate
judge's report-recommendation, the Court reviews the report-
recommendation for clear error or manifest injustice. *See*

*Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

## B. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se.*[4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[7]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[8]

## III. ANALYSIS

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report–Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report–Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court.[9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for

Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

*4 Furthermore, as explained in Magistrate Judge Peebles' Report–Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34–35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report–Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report–Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a

conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

*5 Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01–CV–0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report–Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report–Recommendation (Dkt. No. 85) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid–State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid–2003. [2]

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the "CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* *Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Failure to Exhaust Remedies*

**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996),

imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914–15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91–92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. [5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.);

*see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels

may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697–98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id* . § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46 and pp. 109–111. [7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into

the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis. [8]

### C. *Retaliation*

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus;

courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and 🔖 *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a 🔖 section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See* 🔖 *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

### 1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,*

477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also* 🔖 *Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13–29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
|---|---|---|---|
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor". [9] | Dismissed (no hearing held) |
| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |

| | | | |
|---|---|---|---|
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |
| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/Inmate Disciplinary Program |

F N9. While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19–21, 24–25, 59–61 and 116–18.

F N10. While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20–21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

F N11. Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80–8) Exh. B. The allegedly

retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation.[12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

### 2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons.[13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7–10, 32–46; Knapp–David Aff. (Dkt. No. 80–22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.*

Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim of unlawful retaliation under the First Amendment is established. *Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492–93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp–David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35–42, 45 and pp. 18–19, 79–81, 88–89, 91–92, 94–95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp–David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp–David Decl. (Dkt. No. 80–22) ¶¶ 2–7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp–David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions."[14] *Id.* ¶ 3. In that declaration defendant Knapp–David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id .* Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp–David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted.[15]

D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S–Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47–48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 2323–2324 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971) (en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47–48; Prack Aff. (Dkt. No. 80–30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80–30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding

that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise—with no access to indoor exercise area);

*Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876–877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*

The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128–131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630–31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which

was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80–26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996) (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL

PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

## Footnotes

1    On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2    On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3    *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

4    *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at *12–13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at *1–4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

5    *Krug v. County of Rennselaer,* 04–CV–0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant is not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?"* 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The

Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6      *See* McNeil v. U.S., 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); McKaskle v. Wiggins, 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); Faretta v. California, 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se*] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7      Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8      *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; Harvey v. Morabito, 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2– 3; Singleton v. Caron, 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); Govan, 289 F.Supp.2d at 295; Butler v. Weissman, 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); DeMar v. Car–Freshner Corp., 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); Costello v. Norton, 96–CV–1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); Squair v. O'Brien & Gere Eng'rs, Inc., 96–CV–1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also* Monahan v. N.Y. City Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9      The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report–Recommendation. (Dkt. No. 85, at 8–14.) Accordingly, the Court will not repeat this thorough analysis.

10   *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96–2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11   *See also* 🚩 *Sostre v. McGinnis,* 442 F.2d 178, 187–92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12   In addition, in his Objections to the Report–Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13   "Under 🚩 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04–CV–0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing 🚩 *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14   "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

15   *See, e.g.,* 🚩 *Carini v. Austin,* 06–CV–5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16   To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings." *Chaney,* 2008 WL 5423419 at *7 (citing 🚩 *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1   In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2   Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5    In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7    In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80–8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8    In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11–12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 54 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendents of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6–7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

it appears that these decisions have ***not*** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the ***Second*** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05–CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

12   No explanation is offered for the failure to include an affidavit for that defendant.

13   It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03–CV–6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80–8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp–David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See* *Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552–53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| ***Date of Transfer*** | ***Transferee Facility*** |
| --- | --- |
| 5/7/01 | Mohawk Correctional Facility |

| | |
|---|---|
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

14   In her declaration, Knapp–David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp–David Decl. (Dkt. No. 80–22) ¶ 9. Knapp–David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp–David Decl. (Dkt. No. 80–22) ¶ 9 and Exh. B.

15   In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80–8) ¶¶ 5, 9–11.

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 47 of 164

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)

|

Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**

N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-A-9212, Five
Points Correctional Facility, Caller Box 119, Romulus, NY
14541.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, 615 Erie Boulevard West,
Suite 102, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Ass't
Attorney General, Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1**  *Pro se* plaintiff Ronnie Cole has commenced this action
asserting civil rights claims arising out of his confinement in
the custody of the New York State Department of Corrections
and Community Supervision ("DOCCS") pursuant to 42
U.S.C. § 1983. Plaintiff's claims, which are multi-faceted,
arise out of events occurring at two separate DOCCS
facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For the
reasons set forth below, I recommend that defendants' motion
for summary judgment be granted in part, but otherwise
denied.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff is
serving a sentence for robbery, possession of stolen property,
criminal possession of a weapon, and promoting prison
contraband. Dkt. No. 45-15 at 1. Plaintiff's claims, however,
arise out of his previous confinement at the Walsh Regional
Medical Unit ("Walsh") and the Upstate Correctional Facility
("Upstate"). [3] *Id.* at 2.

A. Use of Force Incidents at Walsh
On October 29, 2013, defendant Corrections Officer Anthony
M. Durante entered plaintiff's room to conduct a strip frisk
of plaintiff and a search of his area. Dkt. No. 29-1 at 15. [4]
At the time, plaintiff was in his pajamas and seated in his
wheelchair. Dkt. No. 45-3 at 27. Plaintiff maintains that
defendant Sergeant John A. Wagner followed Durante into
plaintiff's room in the E-Wing and blocked the door. [5] *Id.*
Plaintiff asserts that he attempted to comply with Durante's
orders and began to unbutton his shirt. *Id.* at 29. Plaintiff
claims that Durante said "Happy Anniversary," and struck
plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff
maintains that defendant Stephen M. LoRusso entered the
room and joined defendants Durante and Wagner as they
repeatedly hit, kicked, and punched plaintiff in the head, face,
and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and
LoRusso then pulled plaintiff out of his wheelchair, lifted him
overhead, and "slammed" him into the floor causing plaintiff
to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's
urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were
applied and the assault terminated when the medical staff and
other officers entered the room. Dkt. No. 45-3 at 57-59.

**\*2**  Defendant Durante, by contrast, has executed a sworn
affidavit in which he denies having assaulted the plaintiff. [6]
*See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims
that plaintiff became agitated during the search and began
swinging his closed fists at Durante. *Id.* Plaintiff struck
Durante on the right side of his head and Durante responded
by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell
backwards into a locker. *Id.* Durante avers that a violent
struggle ensued during which plaintiff bit him and grabbed
his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 48 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

### B. Facts Related to Plaintiff's Medical Treatment at Walsh [8]

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of

Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

### C. Facts Related to Medical Treatment at Upstate

Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a "one on one" watch, he refused to accept meals or medication,

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 49 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. Id. at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. Id. at 14.

### 1. Medications and Supplies

**\*4** From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. Id. at 64, 69.

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and

medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. Id. Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." Id. at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." Id. Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." Id. The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. Id. Plaintiff refused the catheter change and said he would wait for a new one to arrive. Id. The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. Id. Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. Id. On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." Id. at 12.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 50 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

**\*5** On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges. [11] Dkt. No. 45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges. [12] *Id.* at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf,

requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

**\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 51 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. <u>Dkt. No. 45</u>. Plaintiff filed his response in opposition to the motion on December 28, 2015. <u>Dkt. No. 54</u>. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S.

at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Publ. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 52 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit. [14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right

to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to *section 1983* in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, ___ F.3d ____, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams*, plaintiff alleged that on December 31, 2012, while confined in the

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 53 of 164

Downstate Correctional Facility ("Downstate"), his personal items were searched, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/ or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams*, 2016 WL 3729383, at *5-6. Although not the centerpiece of its decision in *Williams*, the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at *7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

## 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. According

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 54 of 164

to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

**\*10** Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See* Brownwell, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See* Ross, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed "to advise plaintiff of his ability to ask for an extension". *Brooks*

v. Rock, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." Hemphill, 380 F.3d at 688 (citing Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

### C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis*. Dkt. No. 45-16 at 15-16.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 55 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. [16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also* *Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord* *Hudson*, 503 U.S. at 8; *see also* *Wright*, 554

F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition that defendants used forced against him for reasons unrelated

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 56 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh. [17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See* Wilkins, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections

officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See* Wright, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting accounts given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia,* Anderson, 477 U.S. at 255, 106 S. Ct. 2513). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

#### D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." Knowles v. N.Y. City Dep't of Corrs., 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." Henry v. Dinelle, No. 10-CV-0456, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

1. Legal Standard Governing
Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255,

268 (2d Cir. 2009); *Price v. Reilly*, 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment,

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 58 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

[the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent,* 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni,* No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted,* 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge,* No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids. [18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch, he was examined by defendant Mara, received medications

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 59 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

**\*16** While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods,* No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at \*13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87-CV-7812, 1992 WL 310792, at \*2 (S.D.N.Y. Oct. 21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.SC.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord,* 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord,* 2012 WL 3104884, at \*7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical condition deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue,* No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at \*12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

**\*17** In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted,

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 60 of 164

and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

#### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2

at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at *5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at *5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

#### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights.[19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 61 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings. [20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

#### 1. Liberty Interest

**\*19** As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 62 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' "

*Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in an SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary,[22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20**  The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff*, the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 63 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

false accusations at a disciplinary hearing. *Freeman*, 808
F.2d at 953.

#### b. November 2013 Hearing

##### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due
process rights were violated during the first hearing is a nullity
due to the subsequent reversal of the resulting determination
and commencement of a second hearing. Dkt. No. 45-16 at 25.
In support of that position, they rely upon the Second Circuit's
decisions in *Horne v. Coughlin*, 155 F.3d 26 (2d Cir. 1998).
The underlying facts in *Horne* are strikingly similar to those
in the case at bar. In that case, a first disciplinary hearing
was conducted on December 19, 1984, resulting in a finding
of guilt and a sentence of one year of SHU disciplinary
confinement. *Horne*, 155 F. 3d at 28. That determination
was ultimately reversed in May 1985. *Id.* A second hearing
was conducted on May 9, 1985. *Id.* At the conclusion of
that hearing, plaintiff was again found guilty and sentenced
to serve three hundred days in SHU confinement, although
that penalty was administratively modified to six months of
SHU confinement. *Id.* Plaintiff in that case was credited with
all of the time served as a result of the first hearing, and
was released thirteen days after the modification on May 28,
1985, after having served six months of SHU confinement,
including the time spent as a result of the first hearing. 23
*Id.* Under these circumstances, the Second Circuit concluded
that it was unnecessary to address plaintiff's procedural due
process claims arising out of the first hearing since "it became
a nullity." *Id.* at 31.

**\*21** In this matter, as in *Horne*, the record establishes that
plaintiff was confined in the SHU as a result of penalties
imposed following the November 2013 hearing, and remained
in SHU confinement until and after the second hearing
commenced on March 20, 2014, at which he was again found
guilty. Accordingly, based upon the Second Circuit's decision
in *Horne*, it is unnecessary to determine whether plaintiff was
afforded due process in connection with his first hearing, and
his claims against defendant Corey are subject to dismissal on
this basis.

##### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing
was not rendered a nullity, for purposes of the plaintiff's
procedural due process claims, I will address his substantive
arguments. In connection with the first hearing, plaintiff
claims that defendant Corey precluded him from questioning
witnesses and improperly removed him from the first hearing.
Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues
that Hearing Officer Corey's failure to call an inmate, nurses,
and Imam Muhammad violated his Fourteenth Amendment
rights. *Id.* Plaintiff claims that Muhammad was present in
his room after the assault, and would have offered testimony
concerning his injuries. Dkt. No. 45-3 at 109-110.

##### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support
of his procedural due process claim with regard to the
first hearing is a deprivation of his right to call witnesses.
While the Fourteenth Amendment guarantees an inmate's
right to call witnesses and present evidence in his defense
before being deprived of a cognizable liberty interest, that
right is not without bounds; the law requires only that an
inmate be permitted to present witness testimony only where
"permitting him [or her] to do so will not be unduly hazardous
to institutional safety or correctional goals." *Hill v. Selsky*, 487
F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418
U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a
witness can be denied on the basis of irrelevance or lack of
necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30
(2d Cir. 1991). "Prison officials may be required to explain, in
a limited manner, the reason why witnesses were not allowed
to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The
burden is not upon the inmate to prove the official's conduct
was arbitrary and capricious, but upon the official to prove
the rationality of his position." *Fox v. Coughlin*, 893 F.2d
475, 478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff
to call defendants Peterson and Judway as witnesses. Dkt.
No. 45-9 at 42. On November 20, 2013, defendant Corey
completed the required Form 2176 with an explanation of
his decision not to call RN Hart, RN Schram, and Imam
Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 64 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

that Hart, Schram, and Muhammad did not witness the alleged assault, and were not involved in the incident that precipitated the hearing. *Id.* The fact that plaintiff was not present to execute the witness interview form reflecting the hearing officer's denial of plaintiff's request to call those three witnesses does not give rise to a due process violation. [24] "[A]s long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing." *Brooks v. Rock,* No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

**\*22** Defendant Corey's decision not to call the requested witnesses was reasonable. It is clear from plaintiff's testimony that those witnesses were not present during the alleged assault, and the record of plaintiff's injuries and treatment adequately addressed their scope and extent. *See Wolff,* 418 U.S. at 466 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Finally, a careful review of the record does not suggest that the result of plaintiff's hearing would have been any different had defendant Corey permitted these witnesses to testify. *See Lewis v. Murphy,* No. 12-CV-0268 (NAM/CFH), 2014 WL 3729362, at *13 (N.D.N.Y. July 25, 2014) (holding that the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results).

### bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and lower courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra,* 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim,* No.

02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland,* No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling,* No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia* *Wolff,* 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "belligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see* *Ponte,* 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also* *Pearson v. Callahan,* 555

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 65 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson*, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy*

*v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 66 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or

her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at \*8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith,

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 67 of 164

Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' " [26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a

"substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

### 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584,

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 68 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus.

*See, e.g.,* 🔖 *Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

### 3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as was discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

 **\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012,

plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I.* These defendants were not named as defendants in *Cole I*, and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

### 4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff has failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 69 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

dismiss plaintiff's retaliation cause of action as against these two defendants.

### I. Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [ 42 U.S.C.] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28** It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly

participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

#### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

#### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 70 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

#### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore*, No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

#### 4. Defendants Danforth and Sharma

**\*29** Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly,

for the reasons set forth in Part III(I)(3) above, I recommend that the portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

#### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 71 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See* Bolden v. Alston, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

### K. ADA Claims [28]

**\*30** Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See* Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.*, 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.*, No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole II*"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord*, 2009 WL 2601369, at \*8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State United Teachers*, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 72 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013); *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007), *cert denied*, 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

> **\*31** (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord*, *Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

> the nature of the forum and the importance of the claim in the

prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise issue now presented – that is, whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 73 of 164

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[ section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.). [29]

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy

Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

**\*33** To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions."

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 74 of 164

*Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

IV. SUMMARY AND RECOMMENDATION

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante.[30]

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because,

even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend a finding that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5394752

## Footnotes

1    The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the relevant incidents. In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the plaintiff's party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). To the extent that plaintiff's deposition testimony is at odds with his memorandum of law or submissions in his statement of facts, the court will follow the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

2    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

3    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

4    The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

5    Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

6    That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

7    Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

8    In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

9    The record does not indicate what prescribed medications were administered.

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

11    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

12    Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

13    All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

14    Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 ¶18.

15    The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

16    This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

17    The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

18    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

19    Defendants have not submitted any argument in response to this claim.

20    Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post*.

21    In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

22    Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

23    That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne*, in which it stated:

> It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all credited to the service of his eventually six – month sentence. As a result his 6 months were completed and he was released from SHU thirteen days after the six – month sentence was imposed on May 28, 1985 [sic]. Thus, the six months to which *Horne* was ultimately sentenced was the only time he spent in the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

24    Plaintiff does not dispute that he received the form. While the record does not clearly establish when plaintiff received the form, he was provided with the form at some point, as is evidenced by the fact that it was annexed as an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

25    The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

26    In their motion, defendants do not dispute that plaintiff suffered adverse actions.

27    The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

28    Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

29    To be sure, the immunity afforded under 🚩 section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which 🚩 section 24 would not afford protection. 🟨 *Ierardi*, 119 F.3d at 188-89.

30    As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 78 of 164

2017 WL 9511158
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Derrick MORGAN, Plaintiff,

v.

LUFT, Correctional Officer, Greene Correctional
Facility and Sergeant Farrell, Correctional
Officer, Greene Correctional Facility, Defendants.

Civ. No. 9:15-CV-0024 (GTS/DJS)
|
Signed 06/22/2017

**Attorneys and Law Firms**

DERRICK MORGAN, 13-R-3119, Franklin Correctional
Facility, P.O. Box 10, Malone, New York 12953, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of
the State of New York, OF COUNSEL: CHRISTOPHER J.
HUMMEL, ESQ., Assistant Attorney General, The Capitol,
Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On January 9, 2015, *pro se* Plaintiff Derrick Morgan
commenced this civil rights action, pursuant to 42 U.S.C. §
1983, asserting claims arising from when he was incarcerated
at Greene Correctional Facility ("Greene") while in the
custody of the Department of Corrections and Community
Supervision ("DOCCS"). Dkt. No. 1, Compl. Plaintiff's
remaining claims are: (1) a First Amendment retaliation claim
and an Eighth Amendment excessive force claim against
Defendant Luft; and (2) First Amendment retaliation claims
against Defendant Farrell. *See* Dkt. No. 5. Presently before the
Court is Defendants' Motion for Summary Judgment pursuant
to FED. R. CIV. P. 56. Plaintiff has filed a Response, Dkt.
Nos. 68, Pl.'s Resp. & 70, Pl.'s Suppl. Resp., and Defendants
have filed a Reply, Dkt. No. 69, Defs.' Reply. In his Response,
Plaintiff requests that the Court reopen discovery under
FED. R. CIV. P. 56(d). *See* Dkt. No. 68-1. For the reasons
that follow, it is recommended that Defendants' Motion be
**granted in part** and **denied in part**. [1]

**I. BACKGROUND**

Plaintiff arrived at Greene sometime in the Fall or Winter of
2013. Dkt. No. 64-2, Affirm. of Christopher Hummel, dated
Oct. 14, 2016, Ex. A, Dep. of Derrick Morgan, dated Nov. 13,
2015 ("Pl.'s Nov. Dep.") at p. 9. Plaintiff was housed in the
E-1 dormitory, which is on the medical floor, because he has
a heart condition. *Id.* Plaintiff states that he has had multiple
heart attacks and has seven stents in his heart. Hummel
Affirm., Ex. B, Dep. of Derrick Morgan, dated Aug. 11, 2016
("Pl.'s Aug. Dep.") at p. 7.

Plaintiff was a representative on the Inmate Grievance
Resolution Committee. Pl.'s Nov. Dep. at pp. 11-12. On
June 14, 2014, Plaintiff filed a grievance against Defendant
Correction Officer Luft. *Id.*, Ex. A. In the grievance, Plaintiff
asserted that certain inmates had complained to him of
statements made by Luft that he was planning to set an inmate
up either by planting a weapon in someone's cube or by
punching himself in the face. *Id.* Plaintiff states that certain
inmates felt threatened by these statements and asked that he
file a grievance as the dorm representative. Pl.'s Nov. Dep. at
pp. 11-12.

On June 28, 2014, at approximately 8:40 a.m., Luft informed
Plaintiff that he was being moved to another dormitory and
told him to pack up his possessions. *Id.* at p. 21; Dkt. No. 64-4,
Decl. of Ryan Luft, dated Oct. 11, 2016, at ¶ 6. According
to Luft, Plaintiff became very upset when he learned that he
was being moved and demanded to know the reason why. Luft
Decl. at ¶ 7. While Plaintiff admits that he did not want to
move, he also states that he had no problem moving. Pl.'s Nov.
Dep. at p. 22. Plaintiff informed Luft that he had no draft bags
for moving his possessions, and Luft ordered Plaintiff to go
to Draft Process to obtain bags. Luft Decl. at ¶ 8.

**\*2** The parties' accounts diverge at this point. Defendant
Luft states that he let Plaintiff out of the dormitory, and that
while Plaintiff was in the porch area of the dormitory, he
observed Plaintiff bend over, grab his chest, and fall to the
ground. Luft Decl. at ¶ 10. Plaintiff, on the other hand, claims
that, as he was exiting his cube, Luft ordered him to stand
against the wall and spread his legs in order that he could
search him. Pl.'s Nov. Dep. at p. 24; Compl. at p. 7. Plaintiff
complied, but Luft ordered Plaintiff to spread his legs further
out, although Plaintiff had spread his legs as far as he could.
Compl. at p. 7. Luft began searching Plaintiff's pockets and
removed Plaintiff's asthma pump and nitroglycerine, which

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 79 of 164

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

he threw onto the floor. Pl.'s Nov. Dep. at p. 24. Luft then kicked Plaintiff's legs out from under him, and Plaintiff fell to the ground. *Id.* At the same time that he kicked Plaintiff's legs, Plaintiff also claims that Luft pushed him up against the wall, causing him to scrape his elbow. *Id.* at pp. 29-30. Plaintiff was on floor, and Luft ordered him to get up, which Plaintiff claimed he was unable to do. *Id.* at p. 26. Four other officers, whom Plaintiff was unable to identify, arrived and began joking with Luft. *Id.* at pp. 26-28. As Plaintiff was lying on the floor, he began to experience chest pains. *Id.* at pp. 26-27. Plaintiff claims that Luft then made a crude joke in which he offered to put his penis in Plaintiff's mouth. *Id.* at p. 25. Luft entirely denies Plaintiff's version of the events. Luft Decl. at ¶¶ 14-16.

The parties agree that after Plaintiff complained of chest pains, a nurse was summoned who examined Plaintiff, administered nitroglycerine from Plaintiff's self-carry supply, and transported him to the infirmary. Pl.'s Nov. Dep. at p. 32; Luft Decl. at ¶¶ 10-11. Luft states that he immediately called for a medical response, and that Nurse Aidan O'Connor arrived within minutes, Luft Decl. at ¶¶ 10-11, whereas Plaintiff estimates that Nurse O'Connor arrived approximately ten minutes after he had first fallen to the ground, Pl.'s Nov. Dep. at p. 31.

At the infirmary, Plaintiff reported that his chest pain had lessened, but requested a second dose of nitroglycerine, which Nurse O'Connor administered. Dkt. No. 64-5, Decl. of Aidan O'Connor, dated Sept. 12, 2016, at ¶ 5. After the second dose of nitroglycerine, and within approximately a half-hour of when he first experienced the chest pains, Plaintiff's pain subsided. *Id.*; Pl.'s Nov. Dep. at p. 32. Plaintiff refused to have an EKG or to be transported to the hospital for further evaluation and signed a Refusal of Medical Examination and/ or Treatment form. O'Connor Decl. at ¶ 7. Plaintiff explains that he did not want to go to the hospital if the nitroglycerine relieved his pain, Pl.'s Nov. Dep. at pp. 32-33, and asked that he be allowed to return to the dormitory, O'Connor Decl. at ¶ 7.

Aside from his complaints of chest pain, the only other injury Nurse O'Connor noted was a "superficial abrasion to his left elbow which [he] treated by cleaning the area." O'Connor Decl. at ¶ 5. As far as his physical injuries, Plaintiff claims that in addition to the scrape on his elbow, he had a bruise on his shin. Pl.'s Nov. Dep. at pp. 29-30. He states that both of these injuries healed within a couple days and did not cause any lasting scars or pains. *Id.* at p. 30.

On July 1, 2014, Plaintiff filed a grievance alleging that he had been assaulted by Luft on June 28, 2014. Dkt. No. 64-1, Defs.' Rule 7.1 Statement of Material Facts ("Defs.' SMF") at ¶ 36. [2] On July 22, 2014, Plaintiff advised the Inspector General's Office that he had been assaulted by Luft. *Id.* at ¶ 38. Defendant Sergeant Farrell was assigned to investigate Plaintiff's grievance, and on July 25, 2014, he escorted Plaintiff to the infirmary in order to have pictures taken. Pl.'s Aug. Dep. at pp. 11-12; O'Connor Decl. at ¶ 14. As they were walking to the infirmary, Plaintiff alleges that Farrell stated "you just fucked up. I'm tired of good white people going down by motherfuckers like you. We will get you for this. You nothing but a pussy, you motherfucker." Compl. at p. 9. Plaintiff claimed that he was concerned that Farrell might try to set him up with a fabricated misbehavior report or by planting a weapon in his cell. *Id.* at pp. 9-10. O'Connor examined and took pictures of Plaintiff and noted no evidence of any injuries. O'Connor Decl. at ¶ 14.

**\*3** Plaintiff filed a grievance against Farrell on July 25, 2014, complaining of Farrell's comments. Pl.'s Aug. Dep., Ex. 1. Plaintiff alleges that Farrell continued to harass him. On one occasion when Plaintiff was sent to Albany Medical Center on account of his heart condition, Plaintiff claims that Farrell sarcastically asked him if he was having any chest pain. Compl. at p. 10. On other occasions, Plaintiff alleges that Farrell made comments such as "My day will be better when you are dead." *Id.* On December 7, 2014, Plaintiff alleges that Farrell stated "Your time is coming. If we can kill you'll [sic] on the outside and get away, what makes you think that it can't happen with you." *Id.* at p. 11. Farrell denies having made any threatening or harassing statements to Plaintiff at any time. Dkt. No. 64-3, Decl. of Mark Farrell, dated Oct. 14, 2016, at ¶ 4.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 80 of 164

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

(1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. Scott v. Coughlin, 344 F.3d at 289 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) and Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994), accord, Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Claims Against Defendant Farrell

#### 1. Legal Standard

**\*4** "[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996). To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citing Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (citing Dawes v. Walker, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "that the protected conduct was a substantial or motivating factor" for the defendant's actions. Graham v. Henderson, 89 F.3d at 79. To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 81 of 164

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (stating that a defendant may successfully meet this burden by demonstrating that the "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report").

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### 2. Analysis

The basis of Plaintiff's claims against Defendant Farrell is the series of verbal threats and harassment that Farrell allegedly made against Plaintiff in retaliation for filing a grievance against Defendant Luft on June 28, 2014. Plaintiff specifically alleges that: (1) on July 25, 2014, Farrell stated "You just fucked up. I'm tired of good white people going down by motherfuckers like you. We will get you for this. You nothing but a pussy, you motherfucker," Compl. at p. 9; (2) on one occasion when Plaintiff was sent to Albany Medical Center for his heart condition, Farrell sarcastically asked, "Any chest pain? Any chest pain?," *id.* at p. 10; (3) in the mess hall, Farrell would make comments such as "My day will be better when you are dead" or "I was hoping that red dot was you,"

*id.*; and (4) on December 7, 2014, Farrell stated "Your time is coming. If we kill you'll [sic] on the outside and get away, what makes you think that it can't happen with you," *id.* at p. 11. Although Farrell denies having made any of these statements, Farrell Decl. at ¶ 4, Defendants argue that even if Plaintiff's assertions are accepted as true, he has failed to establish a *prima facie* case of retaliation, on the grounds that (1) Farrell's statements do not constitute adverse action and (2) there is no causal connection between the grievance Plaintiff filed against Luft and Farrell's statements. Dkt. No. 64-6, Defs' Mem. of Law at pp. 8-12. [3]

**\*5** The Court first considers whether Farrell's statements amount to an adverse action; namely, whether they would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d at 353. As the Second Circuit has noted, "it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker*, 239 F.3d at 492-93. "Prisoners may be required ... to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* at 493 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) ). Nonetheless, the case law in this Circuit "reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton*, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (collecting cases). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *but see Ford v. Palmer*, 539 Fed.Appx. 5, 7 (2d Cir. 2013) ("[I]n this context, the vague nature of the alleged threat ... could have enhanced its effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing additional grievances.").

Courts are divided over the level of specificity required before a verbal threat is actionable. *Compare Barrington v. New York*, 806 F. Supp. 2d 730 (S.D.N.Y. 2011) (granting summary judgment on retaliation claim based upon threat that "me and my boys [sic] going to get you" made while holding copy of grievance); *Kemp v. LeClaire*, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 15, 2007) (finding threats that "your day is coming," "you'll be sent to your mother in a black box,"

and "you'll get you black ass kicked" insufficient to support retaliation claim); *Bartley v. Collins*, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237-38 (W.D.N.Y. 2005) (granting summary judgment on retaliation claim based upon statements that there are "no secrets in prison" and that the plaintiff would "have to pay the consequences"), *with Gomez v. Graham*, 2016 WL 8652781, at *13 (N.D.N.Y. June 16, 2016) (finding threat that if the plaintiff proceeded with his grievance, then he "was going to be hurt" sufficient to support retaliation claim); *Quezada v. Roy*, 2015 WL 5970355, at *23 (S.D.N.Y. Oct. 13, 2015) (finding that threat to kill the plaintiff sufficient to support retaliation claim); *Lunney v. Brureton*, 2007 WL 1544629, at *23 (finding threat that "if you don't stop writing grievances I'm going to break your fuckin' neck" sufficient to support retaliation claim).

Given the disparity in the case law, the issue of whether Farrell's alleged verbal harassment of Plaintiff constitutes an adverse action is a close one. Nonetheless, the Court finds that Farrell's statements would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Davis v. Goord*, 320 F.3d at 353, for the following reasons. First, Farrell's alleged statements contain at least two direct threats that are more than mere vulgar or abusive language. On July 25, Farrell stated that they would "get" Plaintiff for filing grievances; on December 7, Farrell stated that Plaintiff's time was "coming" and implied that they could "kill" Plaintiff and "get away" with it. Compl. at pp. 9 & 11. Second, although these threats alone might be insufficient to establish an adverse action, *see Kemp v. LeClaire*, 2007 WL 776416, at *15; *Bartley v. Collins*, 2006 WL 1289256, at *6, the Court must also consider the context in which these threats were made. Particularly significant to the Court's view of these threats is Plaintiff's contention that Farrell conducted an on-going pattern of harassment against him, in which he repeatedly joked about Plaintiff's death. *See* Compl. at p. 10. Although Plaintiff's allegations in this respect are vague and non-specific,—he is unable to recall the specific dates on which Farrell made comments such as "I hope you die," Pl.'s Aug. Dep. at pp. 25-26—and thus are not sufficient to form the basis for a retaliation claim on their own, his allegation that Farrell engaged in a persistent course of harassment, every time he saw him, over approximately six months, *see* Pl.'s

Aug. Dep. at p. 25, certainly makes Farrell's direct threats against him more credible. On this basis, the Court finds that a reasonable factfinder could conclude that Farrell's threats were sufficient to deter a person of ordinary firmness from filing further grievances.

**\*6** The Court next considers whether Plaintiff has sufficiently established a causal connection between the grievance he filed and Farrell's threats. Defendants argue that Plaintiff has not presented any evidence that would explain why Farrell would retaliate against Plaintiff for filing a grievance against Defendant Luft. *See* Defs.' Mem. of Law at p. 10 (citing *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) ). While Defendants are correct that "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant," *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011), in this case, Plaintiff claims that Farrell explicitly connected his threats to the grievance Plaintiff filed against Luft. According to Plaintiff, Farrell stated that they would "get" Plaintiff for filing a grievance against Luft. Compl. at p. 9. Thus, Plaintiff offers direct evidence that Farrell's threats were retaliatory. *See Colon v. Coughlin*, 58 F.3d at 873 (finding that "alleged admission of the existence of a retaliatory scheme" sufficient to create genuine issue of material fact).

Defendants also argue, in conclusory terms, that Farrell is entitled to qualified immunity because he "properly and professionally investigated plaintiff's allegations that he had been assaulted by Luft." Defs.' Mem. of Law at pp. 21-22. However, as outlined above, there are significant issues of material fact that are not appropriately resolved on a motion for summary judgment. The Court therefore cannot determine whether it would have been "objectively reasonable" for Farrell to believe that it did not violate "clearly established" law to threaten Plaintiff after he filed a grievance against Luft. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Accordingly, the Court recommends that Defendants' Motion be **denied** as to Plaintiff's First Amendment retaliation claims against Defendant Farrell.

### B. Claims Against Defendant Luft

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 83 of 164

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

*1. Excessive Force*

a. Legal Standard

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666-67 (1962) (cited in *Tramell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) ). In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986) ]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *503 U.S. at 6-7*. To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999).

The inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. Regarding the objective element, "a *de minimis* use of force will rarely suffice to state a constitutional claim[.]" *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated" regardless of whether a "significant injury" is apparent. *Blyden v. Mancusi*, 186 F.3d at 263 (citing *Hudson v. McMillian*, 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001).

**\*7** With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including

> the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003); *see also* *Hudson v. McMillian*, 503 U.S. at 7. When prison officials are accused of using excessive force, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. at 6-7 (citing *Whitley v. Albers*, 475 U.S. at 320-21). Where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may ... be sufficient evidence of a culpable state of mind." *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997).

b. Analysis

Here, the parties offer widely differing accounts of the events of June 28, 2014. According to Plaintiff, Defendant Luft

*Morgan v. Luft*, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 84 of 164

ordered him to get against the wall and began searching him; Luft then kicked his legs out, causing him to fall to the ground. Pl.'s Nov. Dep. at p. 23. Plaintiff claims that he suffered a scrape to his right elbow and a bruise to his shin. *Id.* at pp. 30-31. Plaintiff also claims that he began to experience chest pains as he was laying on the ground. *Id.* at p. 26. Luft, on the other hand, asserts that Plaintiff fell to the ground after experiencing chest pains; Luft wholly denies that he performed a pat frisk on Plaintiff or in any other way applied force to him. Luft Decl. at ¶¶ 10 & 14.

This factual dispute, however, does not preclude the entry of summary judgment in favor of Defendant, because even if Plaintiff's version of the events is credited, Luft applied no more than *de minimis* force that is not sufficiently serious to constitute an Eighth Amendment violation. Accepting Plaintiff's allegations as true, Luft "kicked [Plaintiff's] legs out from under [him]" during a pat frisk, which caused him to fall and suffer a scrape to his right elbow and bruise to his shin, both of which healed within a "couple days."[4] Pl.'s Nov. Dep. at pp. 24 & 30. No reasonable factfinder could find that such an application of force was more than *de minimis*. A number of district courts in this Circuit have held that similar applications of force during a pat frisk are insufficient to state an Eighth Amendment claim. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 507 (S.D.N.Y. 2012) (finding plaintiff's allegation that guard "pushed her up against a wall" during a pat frisk insufficient to support Eighth Amendment claim);

🔶 *Tavares v. City of New York*, 2011 WL 5877550, at *5-7 (S.D.N.Y. Oct. 17, 2011) (granting summary judgment on inmate's claim that he was subjected to excessive force when he was thrown up against the wall and his legs kicked apart during a pat frisk); *Kalwasinski v. Artuz*, 2003 WL 22973420, at *6-7 (S.D.N.Y. Dec. 18, 2003) (finding that "minor amount of force actually used ... was commensurate with the need to conduct a pat frisk"); 📄 *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) ("[A]lthough kicking an inmate's ankles and feet cannot be condoned, this use of force is *de minimis* and insufficient to rise to the level of a constitutional violation.").

 ***8** Accordingly, because Plaintiff is unable to establish that Luft's actions were objectively serious, the Court recommends that summary judgment be **granted** on his excessive force claim.

### 2. Retaliation

Plaintiff also asserts that Defendant Luft's actions against him were in retaliation for the grievance Plaintiff had filed against him. Compl. at p. 12. Defendants argue that for the same reasons Luft's actions were not objectively serious under the Eighth Amendment, they are also insufficient to constitute adverse action under the First Amendment. Defs.' Mem. of Law at pp. 20-21.

The Court first notes that a physical assault may constitute adverse action under First Amendment even without rising to the level of an Eighth Amendment excessive force violation. *See Flemming v. King*, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."). Nonetheless, even viewed in the most favorable light, Plaintiff's allegations are insufficient to satisfy this lower standard. At most, Plaintiff claims that he was subjected to a rough pat frisk by Luft. As other courts have noted, "pat frisks are an ordinary part of prison life and would not (and do not) deter the average inmate from continuing to exercise his First Amendment rights." *Henry v. Annetts*, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010); *see also Amaker v. Fischer*, 2014 WL 8663246, at *8 (W.D.N.Y. Aug. 27, 2014) ("[P]at frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim.").

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment retaliation claim against Defendant Luft.

### C. Plaintiff's Rule 56(d) Request to Re-Open Discovery

Plaintiff opposes Defendants' Motion under FED. R. CIV. P. 56(d), which provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the Court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Dkt. No. 68-1, Aff. of Derrick Morgan, dated Nov. 21, 2016. Plaintiff appears to request that the Court defer ruling on Defendants' Motion in order that he may seek additional discovery, namely, (1)

"[a]ny and ALL Institutional Claims Filed by the plaintiff at Greene Correction Facility" and (2) "a copy of A-1 dorm log book for the date of June 28th 2014 for the 7X3 tour." *Id.* at ¶ 17. Plaintiff claims that such discovery would show that he "never returned to dorm E-2 from the infirmary, but went to A." *Id.* at ¶ 22(a).

A party seeking additional discovery pursuant to FED. R. CIV. P. 56(d) must file an affidavit explaining "1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and 2) how those facts are reasonably expected to create a genuine issue of material fact; and 3) what efforts the affiant has made to obtain those facts; and 4) why those efforts were unsuccessful." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985).

**\*9** Although Plaintiff has filed an affidavit attempting to comply with FED. R. CIV. P. 56(d), that affidavit fails to show his entitlement to the requested relief. In the first place, the discovery Plaintiff seeks has no relevance to the matters at issue on this Motion. Plaintiff asserts that the discovery would show that after being discharged from the infirmary he collected his property from the "porch" of the E-dormitory and never reentered that dormitory before moving to the A-dormitory. Morgan Aff. at ¶ 22(a). The fact of whether or not Plaintiff reentered the E-dormitory before moving to the A-dormitory has no relevance to the issues of (1) whether Defendant Luft used excessive force and retaliated against Plaintiff or (2) whether Defendant Farrell retaliated against Plaintiff.

Furthermore, Plaintiff admits that he did not attempt to seek this discovery before the discovery deadline in this action expired. *See* Morgan Aff. at ¶ 24 ("This is the first time that the plaintiff is requesting the above-mention [*sic*] documents."). "If a party seeks to reopen discovery after discovery has closed, he must show a good cause." *Justice v. Wiggins,* 2014 WL 4966896, at \*7 (N.D.N.Y. Sept. 30, 2014) (citing *Lore v. City of Syracuse,* 232 F.R.D. 155, 159 (N.D.N.Y. 2005). Here, Plaintiff cannot show good cause for his failure to seek this discovery before the discovery deadline expired.

Accordingly, Plaintiff's request, under FED. R. CIV. P. 56(d), to reopen discovery is **denied**.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **GRANTED in part** and **DENIED in part**; and it is further

**RECOMMENDED**, that if the above recommendation is accepted, that Defendant Luft be **DISMISSED** from this action and this case be deemed trial ready on the First Amendment retaliation claim against Defendant Farrell; and it is further

**ORDERED**, that Plaintiff's Letter-Motion (Dkt. No. 61) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[5] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in Fed. Supp., 2017 WL 9511158

## **Footnotes**

Morgan v. Luft, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 86 of 164

1    Also pending is a Letter-Motion filed by Plaintiff on September 11, 2016, in which he requests a twenty-day extension of time to reply to the Defendants' response to his discovery requests; Plaintiff states that he hopes to resolve Defendants' objections to his discovery demands before filing a motion to compel. Dkt. No. 61. Plaintiff's Response papers to Defendants' Motion contain correspondence between Plaintiff and Defendants' counsel regarding Plaintiff's demands, in which Defendants' counsel maintains his objections to the demands. *See* Dkt. No. 68-2, Aff. of Derrick Morgan, dated Nov. 21, 2016, Exs., Exs. C & D. Plaintiff did not file a motion to compel. Plaintiff's Letter-Motion (Dkt. No. 61) is therefore **denied**.

2    Under Local Rule 7.1(a)(3), on a motion for summary judgment a non-movant must respond to the movant's statement of material facts "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" and "set forth a specific citation to the record where the factual issue arises." N.D.N.Y.L.R. 7.1(a)(3). While Plaintiff has filed a response to Defendants' Statement of Material Facts, it is not properly supported by citations to the record. *See* Dkt. No. 70, Pl.'s Rule 7.1 Statement of Material Facts ("Pl.'s Counter-SMF"). The Court will cite to the facts as set forth in Defendants' Statement of Material Facts when properly supported by the record. *See GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing 📙 *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)

3    The Court notes that Defendants' Memorandum of Law also addresses certain additional alleged incidents of retaliation by Defendant Farrell that occurred after Plaintiff filed his Complaint. *See* Defs.' Mem. of Law at pp. 12-15. Since Plaintiff has not amended his Complaint to include these additional claims, the Court does not address them here.

4    Plaintiff admits that his chest pains were not caused by Luft's application of force, but rather began as he was lying on the ground. Pl.'s Nov. Dep. at p. 26.

5    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against numerous employees of New York State or the Central New York Psychiatric Center ("Defendants"), are Plaintiff's motion to proceed *in forma pauperis,* his motion for a temporary restraining order and preliminary injunction, and his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)[1] For the reasons set forth below, Plaintiff's motion to proceed *in forma pauperis* is granted; his motion for a preliminary injunction is denied; his motion for appointment of counsel is denied; Plaintiff's claims of deliberate indifference to his mental health needs against Defendants Bill, Carver and DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 assault are *sua sponte* dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed without prejudice as a Defendant in this action; the Clerk is directed to issue summonses, and the U.S. Marshal is directed to effect service of process on Defendants Davis, Sill, and Nicolette.

### I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and DeBroize were deliberately indifferent to his mental health needs under the Eighth and/ or Fourteenth Amendments; and (4) Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

### II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

### III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also*

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe

conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicollette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a

'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it.");

*Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant

to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord,* *Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

*Groves v. Davis, Not Reported in F.Supp.2d (2012)*

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure

to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right— without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant

complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C.*

*v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim,

or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED** **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

## Footnotes

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged

numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2    At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3    The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4    *See* 🔖 *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); 🔖 *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5    *See* 🔖 *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); 🔖 *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing 🚩 *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See* 🔖 *Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7    *See* 🔖 *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); 🔖 *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); 🔖 *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." 🔖 *Chance,* 143 F.3d at 702.

9    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. 🔖 *Harrison,* 219 F.3d at 139.

Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see* *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g.,* *Cuoco,* 222 F.3d at 103.

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See* *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2009432
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kenneth NICHOLSON, Plaintiff,

v.

Brian FISCHER, et al., Defendant.

Case # 13-CV-6072-FPG-MWP
|
Signed 04/27/2018
|
Filed 04/30/2018

**Attorneys and Law Firms**

David M. Knapp, Eric J. Ward, Jessica N. Clemente, Ward
Greenberg Heller & Reidy LLP, Rochester, NY, for Plaintiff.

Bernard F. Sheehan, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendant.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

## INTRODUCTION

**\*1** Plaintiff Kenneth Nicholson ("Plaintiff") brings this
Eighth Amendment action pursuant to 42 U.S.C. § 1983
("Section 1983") against three employees of Wende
Correctional Facility: Corrections Officer James Johnson
("Johnson"), Corrections Officer Jason Barrett ("Barrett"),
and Deputy Superintendent of Security Thomas J. Sticht
("Sticht"). ECF No. 38. [1] On January 5, 2018, Defendants
Sticht and Barrett moved for summary judgment. ECF No.
95. For the reasons stated below, Defendants' motion is
GRANTED in part and DENIED in part.

## BACKGROUND [2]

In October 2012, Plaintiff, then an inmate at Sing Sing
Correctional Facility, had a physical fight with two inmates
belonging to the Bloods gang. The inmates slashed Plaintiff
across the face with a sharp object. Plaintiff told prison

officials that the men assaulted him because he dropped out
of the Bloods. ECF No. 102-1 at 14. To separate him from his
attackers, Sing Sing officials placed Plaintiff in involuntary
protective custody and decided to transfer him to Wende
Correctional Facility in January 2013. The New York State
Department of Corrections and Community Supervision's
("DOCCS") Office of Classification and Movement in
Albany, New York, which is responsible for transferring
and classifying roughly 50,000 inmates among more than
50 different correctional facilities, determined that Plaintiff's
transfer to Wende was appropriate and that Plaintiff was
eligible to share a cell with another inmate at Wende—a
practice DOCCS refers to as "double bunking."

According to Defendant Sticht, who was responsible for
overseeing all aspects of security at Wende, once Plaintiff
"was transferred, he was no longer in protective custody" and
his "involuntary protective custody status ... did not follow
him to Wende Correctional Facility." ECF No. 95-1 at 3.
Plaintiff, on the other hand, stated that his protective custody
status followed him to Wende and that he was supposed
to be isolated so that authorities could interview him and
determine if he had any enemies before placing him in a
double bunk cell with another inmate. ECF No. 102-1 at
25. In any event, no one interviewed Plaintiff immediately
upon his arrival at Wende; rather, he was placed into a
double-bunk cell with another inmate, Michael Williams.
According to Sticht, "[p]lacement of incoming inmates in
cells at Wende CF is made by random selection of available
cells. Both inmates were deemed eligible for double bunking
and randomly selected for the cell." *Id.* at 21.

Williams had a history with the Bloods. Specifically, a form
documenting his initial interview at Wende, dated January 7,
2013, states that he had a disciplinary history of gangs and
violence, and his security assessment form, dated January 1,
2013, states that he was a member of the Bloods. *See id.* at
8. Furthermore, one month before Williams was placed in a
cell with Plaintiff, officials placed him in the Special Housing
Unit ("SHU") for four months because of gang activity. *Id.*
Plaintiff also had a documented history of gang involvement:
paperwork from his guidance file, which was accessible to
Wende officials, indicated that Plaintiff was a former Bloods
member and had enemies and prior gang-related charges. *Id.*
Plaintiff's guidance file also revealed that Plaintiff previously
transferred from Great Meadow Correctional Facility in 2011
because prison staff "believed that a portion of [the] inmate
population [knew] that [Plaintiff] had provided confidential

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 98 of 164

Nicholson v. Fischer, Not Reported in Fed. Supp. (2018)

information to prison security regarding Bloods activity." *Id.* at 10.

**\*2** On January 16, 2013, Williams returned to his cell after lunch and threatened to "blow [Plaintiff's] face off" unless Plaintiff asked a corrections officer to move him to a different cell. ECF No. 38 at 15. According to Plaintiff, he immediately left the cell and told Defendant Barrett, who was performing rounds in Plaintiff's cellblock, about Williams's threat. According to Barrett, however, Plaintiff told him that he could no longer live in his cell but refused to tell him why. In any case, all parties agree that Barrett then locked Plaintiff in the shower to secure him and notified his supervisor, Defendant Johnson, of the situation with Williams so that Johnson could investigate. Johnson asked Williams what would happen if he did not move Plaintiff to a new cell, to which Williams responded: "it will be what it is going to be" and that he "would handle his business." ECF No. 102-1 at 9. Johnson moved Williams into a different cell, but Plaintiff heard Johnson joke to Barrett that they should have put Plaintiff back in the cell with Williams and let them "beat the shit out of each other and the best man keeps the cell." *Id.* Neither Barrett nor Johnson made any written notation of the incident. Plaintiff did not ask anyone at Wende to place him in protective custody and nobody offered him protective custody.

According to Wende counselor Robert Skubis, new inmates are supposed to be housed separately from other inmates until a sergeant or higher ranked official conducts a security interview to determine if the new inmate is suitable for general population housing. ECF No. 102-13. According to Defendant Johnson, [3] that initial interview should occur within the first three days of an inmate's arrival. ECF No. 102-1 at 10. No one interviewed Plaintiff until January 20, 2013—five days after he arrived at Wende and several days after his altercation with Williams. Plaintiff's paperwork from that interview indicates that he was involved in gang activity but did not identify any known enemies. *Id.* at 6. The next day, Counselor Skubis interviewed Plaintiff, who alleges that he told Skubis "about his prior altercation with Williams in his cell" and that Williams was in the same prison orientation class with him. *Id.* at 11. Skubis's paperwork documenting that interview indicates that Plaintiff had enemies, but does not mention Williams. ECF No. 95-5 at 4. The form, which Plaintiff signed, reveals that Plaintiff had no concerns for his personal safety. *Id.*

On January 23, 2013, Plaintiff, Williams, and 19 other inmates attended an orientation session in an unsupervised classroom. According to Defendant Sticht, because the orientation program is a "peer run program" that is run by a fellow inmate and not a staff instructor, it "is common to have the inmates in the room without an officer physically present in the room." ECF No. 103-1. During the orientation, Williams and another inmate named Martinez began stabbing Plaintiff with a homemade knife. Williams and Martinez stabbed Plaintiff at least nine times over the course of five to seven minutes, and Plaintiff suffered puncture wounds on both of his hands, his right shoulder, and the back of his head. Plaintiff eventually escaped and alerted a corrections officer, who was posted more than 25 feet away. Officials took Plaintiff to Erie County Medical Center for treatment.

On February 12, 2013, after Plaintiff refused to voluntarily enter protective custody, Wende officials held a hearing to determine if Plaintiff should be placed in involuntary protective custody. During the hearing, Defendant Sticht acknowledged that Plaintiff's "previous record shows prior [involuntary protective custody] placements and gangs," and decided to place Plaintiff in involuntary protective custody.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

*Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court resolves all ambiguities and draws all factual inferences in the nonmovant's favor, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

**\*3** To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998).

## II. Direct Liability Under the Eighth Amendment

Plaintiff argues that Defendants Barrett and Sticht violated the Eighth Amendment by failing to protect him from Williams and Martinez's attack. The Eighth Amendment protects prisoners from cruel and unusual punishment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). It also imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 822 (1994). Officials are not liable for "every injury suffered by one prisoner at the hands of another." *Id.* at 834; *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (explaining that Eighth Amendment liability "entails something more than mere negligence").

Instead, to prove that an official violated the Eighth Amendment, the injured inmate must show that 1) "he is incarcerated under conditions posing a substantial risk of serious harm," and 2) the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834. An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The U.S. Supreme Court set forth a subjective, as opposed to objective, standard for deliberate indifference because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment" under the Eighth Amendment. *Id.* at 838.

The Court need not determine if Plaintiff satisfied the first part of the Eighth Amendment's two-part test—whether he was incarcerated under conditions posing a substantial risk of serious harm—because he has not adduced any evidence to establish that Defendants Barrett or Sticht were deliberately indifferent to his health or safety.

### i. Defendant Barrett

Barrett denies that he was deliberately indifferent to Plaintiff's safety because Plaintiff never told him about Williams's threat and, "more important[ly]," Barrett's actions on the day of the verbal altercation between Williams and Plaintiff would have been the same regardless of whether he knew that Williams threatened Plaintiff. Plaintiff argues that Barrett knew about Williams's threat, and that Barrett's failure to document the verbal dispute between them or to ensure that Plaintiff received protective custody after the incident amounted to deliberate indifference.

Plaintiff's arguments fail for multiple reasons. First, Barrett did not have "authority to conduct investigations" or to "offer an inmate protective custody." ECF No. 95-2. After locking Plaintiff in the shower when he refused to return to his cell with Williams, Barrett did what he was "supposed" to do by notifying his supervisor, Defendant Johnson, "of the situation so that he could investigate." ECF No. 95-2. Plaintiff emphasizes the fact that Barrett "simply ... called his supervisor and left the scene, rather than logging the incident, as required by DOCCS Directive." ECF No. 102-1 at 5. DOCCS rules, however, did not require Barrett to log the incident. Rather, DOCCS Directive Number 4091 provides that officers should log "fights" or other "unusual incidents." *Id.* at 27. Using his discretion, which DOCCS rules allow corrections officers to do, Barrett decided that a verbal disagreement between inmates was not an "unusual incident" that merited documentation.

**\*4** Secondly, Plaintiff unduly focuses on the fact that Barrett did not record the incident in the logbook. After refraining from documenting the incident between Williams and Plaintiff, Barrett did not simply abandon the scene or otherwise fail to act. Far from disregarding any risk to Plaintiff's safety, Barrett secured Plaintiff in a location that was outside of Williams's reach and notified Defendant Johnson of the situation. Johnson, unlike Barrett, had authority to investigate the altercation and take corrective action, which he did by moving Williams to a new cell. Whether Johnson's actions were sufficient to protect Plaintiff is not currently before the Court on this motion. The record

Case 9:16-cv-01343-GTS-TWD Document 65 Filed 02/19/20 Page 100 of 164

indicates that Barrett's reliance on his supervisor was fully reasonable, and Plaintiff has not rebutted that conclusion. Plaintiff clearly disagrees with Barrett's decision, but he cannot explain how it was deliberately indifferent or even negligent. Summary Judgment is therefore GRANTED as to Defendant Barrett.

### ii. Defendant Sticht

Plaintiff argues that, because Defendant Sticht was "responsible for overseeing all aspects of security at" Wende and had access to documents establishing Plaintiff's history with the Bloods, even a "cursory review of documents available to Sticht would have revealed that [Plaintiff] had a history of being attacked by members of the Bloods gang and should not have been placed in general population with Williams." *Id.* at 22. But the Eighth Amendment is only concerned with what Sticht actually knew—not what he *should* have known. Sticht repeatedly avers in sworn statements that he did not know anything about Plaintiff, Williams, or their respective histories with the Bloods before the orientation session attack. *See, e.g.,* ECF No. 103-1 at 2. Although Sticht could access documents describing Plaintiff's history with the Bloods, he had no reason to read them because the DOCCS Office of Movement and Classification was responsible for placing inmates and conducting risk assessments. Sticht testified that he did not learn of Plaintiff's background or his January 16, 2013 verbal altercation with Williams until after the January 23, 2013 attack at the orientation session, at which point Sticht decided to place Plaintiff in protective custody. *Id.* at 12. Nothing in the record rebuts or discredits Sticht's averments. Because it would be impossible for Sticht to disregard a risk that he did not know existed, no reasonable jury could conclude that Sticht was directly liable for an Eighth Amendment violation. Summary Judgment is therefore GRANTED as to Defendant Sticht.

### III. Supervisory Liability

Plaintiff argues that, even if Sticht is not directly liable under Section 1983, he is liable under the statute as a supervisor. Section 1983 imposes liability for conduct that subjects a plaintiff or "causes" him "to be subjected to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) ). There is no *respondeat superior* liability under

Section 1983. *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 324 (W.D.N.Y. 1999). Instead, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages" under Section 1983. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d. Cir. 1977). A supervisor is "personally involved" in the deprivation of a plaintiff's Eighth Amendment rights and therefore liable under Section 1983 if he or she (1) participated directly in the alleged constitutional violation, (2) after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). [4]

**\*5** Fundamentally, for a supervisor to be liable under Section 1983, there must "of course" have "been an underlying constitutional deprivation" by a subordinate, *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), and a "causal link" between the supervisor's conduct and the violation of the plaintiff's civil rights. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). When a Plaintiff raises an allegation under the third *Colon* factor—that the defendant supervisor maintained a custom or policy under which unconstitutional practices occurred—that policy must be the "moving force" behind a constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985). Absent an "affirmative link" between the policy and the "particular constitutional violation" alleged, a policy is too "nebulous" and far "removed from the constitutional violation" to establish supervisory liability. *See id.* at 822. Furthermore, a "single incident" of illegality ... especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993).

Plaintiff argues that Sticht is liable under the third *Colon* factor of creating or continuing a policy under which unconstitutional practices occurred. Specifically, Sticht's

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 101 of 164

Nicholson v. Fischer, Not Reported in Fed. Supp. (2018)

policy "was to impermissibly defer to the determinations of unidentified people in Albany as to whether an inmate was eligible for double-cell housing, and then randomly assign inmates together." ECF No. 102-1 at 6. According to Plaintiff, state regulations required Sticht himself to determine whether Plaintiff was suitable for double-cell housing, but Sticht instead improperly relied on DOCCS Office of Classification and Movement. *Id.* at 19.

Sticht correctly argues that state regulations expressly allow him or his "designee" to make that determination. *Id.* (citing 7 N.Y.C.R.R. § 1701.5(a) ("The deputy superintendent of security or designee shall conduct a risk assessment ...") ). As there "are thousands of violent gang members who are incarcerated throughout NYS DOCCS" and "literally hundreds, and even thousands, of pages of records related to each inmate in DOCCS," it would be extraordinarily difficult for Sticht himself to determine inmates' suitability for double-cell housing. ECF No. 103-1 at 3. DOCCS's Classification and Movement Office exists so Sticht and deputy superintendents of security at other prisons can "help assess, to the extent possible, the risks associated with moving inmates among the various DOCCS facilities." *Id.* at 4. There is evidence that Classification and Movement could have more thoroughly vetted Plaintiff for double-bunk housing, [5] but that does not mean that Sticht's reliance on the office was misplaced. Plaintiff also argues that Sticht's policy [6] of "randomly select[ing] inmates to bunk together" once they were cleared for double-cell housing violated state regulations requiring him to "assess the suitability of double-cell inmates to be placed together in the same cell." ECF No. 102-1 at 21. Additionally, Plaintiff argues that he did not timely receive an intake interview. *Id.* at 10.

Even assuming that Sticht maintained deficient policies for pairing cellmates together, his policies are too disconnected from the underlying alleged unconstitutional conduct to render him liable as a supervisor under Section 1983. The alleged underlying constitutional violation in this case is Defendant Johnson's failure to document the verbal altercation between Williams and Plaintiff, but the policies leading to Williams and Plaintiff's pairing as cellmates are several "steps removed from" Johnson's own conduct and can

hardly be described as the "moving force" behind Johnson's deliberate indifference. *See* Tuttle, 471 U.S. at 819.

**\*6** To illustrate the notable disconnect between Sticht's policies and the alleged Eighth Amendment violation, the Court deduces Plaintiff's line of reasoning as follows: because Sticht had improper policies for matching cellmates, Williams and Plaintiff were unwisely double bunked, which led to their verbal altercation in which Defendant Johnson intervened but failed to document, which resulted in Plaintiff and Williams attending the same orientation session, which resulted in Williams attacking Plaintiff. It is evident from this strained line of reasoning that the relationship between Sticht's cellmate pairing policies and the alleged underlying constitutional violation—Johnson's deliberate indifference to Plaintiff's safety—is attenuated at best, and a far cry from the "affirmative link" that the Supreme Court demanded in *Tuttle*. Johnson's actions are entirely unrelated to any alleged policies that Sticht had for double bunking cellmates. Moreover, a policy cannot "ordinarily be inferred from a single incident of illegality," and a single incident is all that Plaintiff has alleged. *See* Dwares, 985 F.2d at 100. Summary judgement is therefore GRANTED as to Defendant Sticht.

### CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 95) is GRANTED and Defendants Barrett and Sticht are dismissed from this case. The Clerk of Court is directed to update the caption accordingly.

Defendant Johnson is the sole remaining defendant in this case. The parties are directed to appear on May 25, 2018 at 10 AM to set a date for trial.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2009432

# Footnotes

1    Plaintiff's Second Amended Complaint ("SAC") is the operative complaint. The SAC listed additional defendants who have since been dismissed from this case. *See* ECF No. 66 at 1.

2    The following facts are undisputed and are taken from each party's Statement of Material Facts. ECF Nos. 95-1, 102-2.

3    Defendant Johnson has not moved for summary judgment.

4    The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), called the doctrine of supervisory liability into question. The Second Circuit has "not yet determined the contours of the supervisory liability test" in the wake of *Iqbal. See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014). However, courts within the Second Circuit have reached the consensus that the relevant *Coughlin* category here— whether the supervisor created a policy or custom under which unconstitutional practices occurred—is still sound law. *See, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. Jun. 26, 2009); *Joseph v. Fischer*, No. 08 Civ. 2824 (PKC) (AJP), 2009 WL 3321011, at *14 (S.D.N.Y. Aug. 10, 2010).

5    For instance, DOCCS should not have deemed Plaintiff eligible for double bunking in the first place because regulations prohibit individuals weighing over 299 pounds from double cell assignment, and Plaintiff weighed more than 300 pounds when he transferred to Wende. ECF No. 102-1 at 22. Additionally, it appears that DOCCS did not fill out the requisite information sheet documenting its evaluation of Plaintiff for double bunking. *See id.*

6    It is unclear, but ultimately immaterial, whether DOCCS or Sticht randomly selected inmates to bunk together.

---

                                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    6

2014 WL 1413387
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark BURNS, Plaintiff,

v.

Brian FISCHER, Commissioner of N.Y.S. Dept.
of Corrections; Teresa Knapp–David, Director of
Movement and Control, N.Y.S. DOCCS; Daniel
F. Martuscello, Jr., Superintendent, Coxsackie
Correctional Facility; Captain Shanley, Captain,
Coxsackie Correctional Facility; Sgt. Noeh, Sergeant,
Coxsackie Correctional Facility; Schwebler,
Guidance Counselor, Coxsackie Correctional
Facility; and McGlynn, Guidance Counselor,
Coxsackie Correctional Facility, Defendants.[1]

No. 13–CV–486 (LEK/CFH).
|
Signed Feb. 3, 2014.

**Attorneys and Law Firms**

Mark Burns, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Laura A. Sprague, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[2]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

 *1 Plaintiff Mark Burns ("Burns"), an inmate currently in
the custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCCS employees, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments. Compl.
(Dkt. No. 1). Presently pending is defendants' motion to
dismiss certain defendants pursuant to Fed.R.Civ.P. 12(b)(6).
Dkt. No. 22. Burns does not oppose the motion.[3] Dkt. No. 30.
For the following reasons, it is recommended that defendants'
motion be granted in part and denied in part.

**I. Background**

The facts are related herein in the light most favorable to
Burns as the non-moving party. *See* subsection IIA *infra.*
At all relevant times, Burns was an inmate at Coxsackie
Correctional Facility.

While working in the commissary, Burns was struck in the
head by a falling can. Burns Aff. (Dkt. No. 1–1) ¶¶ 16, 30.[4]
Burns immediately reported the accident to an officer in the
commissary. *Id.* ¶ 23. The officer had witnessed the accident
and documented the injury as the result of a "work related"
accident. *Id.* ¶¶ 23, 29–30.

On May 20, 2010, Burns met with defendants Shanley and
Noeth. Burns Aff. ¶¶ 20–25. During the meeting, Shanley
said Burns's wife called and told Shanley that Burns was cut
by another inmate. *Id.* ¶ 21. Burns explained that he had not
been attacked but he was injured in an accident. *Id.* ¶¶ 22,
30. Further, Burns explained that his wife was attempting to
cause him trouble in reaction to recent marital discord. *Id.* ¶
22. By all accounts there were no cuts visible on Burns's body
to suggest he had been attacked. *Id.* ¶¶ 24, 32. Burns informed
Shanley as to the accident that occurred the previous day. *Id.*
¶¶ 22–23.

Also during that meeting, Shanley threatened to transfer
Burns to Involuntary Protective Custody ("IPC") unless
Burns agreed to provide gang and drug information. Burns
Aff. ¶¶ 20–25. In response to Burns's refusal to act
as a "snitch," Shanley told Noeth to write up an IPC
recommendation. *Id.* ¶ 26. The following day, Burns was
served with an IPC order and transferred to a housing unit
that is part of the Special Housing Unit ("SHU"). *Id.* ¶¶ 27–
28. Burns asserts that the IPC recommendation was based on
fabricated events. *Id.* ¶ 33.

Shanley, Noeth, and the commissary officer testified during
a Tier III hearing addressing Burns's IPC status. Burns
Aff. ¶¶ 29–33. The commissary officer supported Burns's
account of the accident. *Id.* ¶ 30. Noeth testified that he
believed Burns's account of the accident and Burns had no
problems with other inmates. *Id.* ¶ 31. Noeth only filed the
IPC recommendation because he was ordered to by Shanley.
*Id.* Shanley acknowledged that there were no witnesses or
documentation as to an attack on Burns but gave false
statements to justify the IPC recommendation. *Id.* ¶¶ 32–33. It

can be inferred that the hearing resulted in approval of Burns's transfer to IPC. *Id.* ¶¶ 28, 33–34.

**\*2** Since May 21, 2010, Burns has been placed in IPC for twenty-three hours a day on keeplock [5] status. Burns Aff. ¶¶ 27–28, 44–45. Burns is housed in cells neighboring general population inmates against IPC guidelines. *Id.* ¶ 39. Despite Burns's IPC status, Burns is in close proximity with dangerous and troublesome inmates, who frequently create an auditory nuisance through the night. *Id.* ¶¶ 40–41, 63–64. While in IPC, Burns is unable to avail himself of a number of programs and services which were previously accessible in general population and DOCCS has failed to provide services which should be available to IPC inmates pursuant to guidelines and directives. *Id.* ¶¶ 46–64.

Among these lack of services, defendants Guidance Counselors Schwebler and McGlynn failed to make required daily rounds. Burns Aff. ¶¶ 55–58. The librarian and religious supervisors failed to make required weekly rounds. *Id.* ¶¶ 49–52. Grievance Supervisors failed to make required daily rounds. *Id.* ¶¶ 57–58. Burns is denied the use of exercise facilities and participation in family reunion programs and facility festivals. *Id.* ¶¶ 53–54, 61–62. Additionally, Burns is only allotted three hours of programming and out of cell recreation time; inmates in general population are afforded up to thirteen hours. *Id.* ¶¶ 46–47.

While in IPC, Shanley and Martuscello repeatedly prompted Burns to provide them with information. Burns Aff. ¶¶ 34, 36, 42, 65. Upon refusing the requests, Shanley and Martuscello responded that Burns would only be released from IPC if Burns relented. *Id.* ¶¶ 34, 42, 65. Furthermore, Shanley and Martuscello threatened Burns with administrative segregation if Burns did not cease filing grievances about his IPC status. *Id.* ¶ 36.

## II. Discussion

Viewing the allegations in the light most favorable to the plaintiff, Burns contends that his First Amendment rights were violated when defendants Shanley, Martuscello, and Noeth retaliated against Burns for being uncooperative in providing gang and drug information. Burns next contends his Eighth Amendment rights were violated by the cruel and unusual conditions of confinement in relation to his IPC status. Burns further contends that his Fourteenth Amendment

due process rights were violated by the reliance on fabricated events to justify his IPC status and confinement.

Defendants move to dismiss on the grounds that (1) in their official capacities, all defendants are entitled to Eleventh Amendment immunity and (2) Burns has failed to allege the personal involvement of defendants Fischer, Knapp–David, Schwebler and McGlynn.

### A. Legal Standard

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009) (quoting *Holmes v. Grubman,* 568 F.3d 329, 335 (2d. Cir2009)). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*3** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (citation omitted).

Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and

any documents incorporated in the complaint by reference."

*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citations omitted). However, there are instances where the court may consider documents outside those previously referenced, including when the documents are only "partially quoted in [the] complaint ...; integral to [the] complaint ...; [or] relied upon ... in drafting the complaint ...." *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (internal quotation marks and citations omitted). Specifically, the following documents may be considered when construing a complaint's pleading sufficiency:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, ... and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Incorp. Village of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (citations omitted).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have

also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

**\*4** *Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

**B. Eleventh Amendment**

Defendants move to dismiss all claims against them in their official capacity. Dkt. No. 22. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman*

*v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Burns seeks monetary damages against defendants for acts occurring within the scope of their duties. Thus, the Eleventh Amendment bar applies and serves to prohibit Burns's claims for monetary damages against all defendants in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

### C. Personal Involvement

Defendants contend that Burns has failed to allege the personal involvement of defendants Fischer, Knapp–David, Schwebler, and McGlynn.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*5** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986))

In this case, Burns does not allege that Commissioner Fischer or Director Knapp–David directly participated in the alleged constitutional violations. Rather, Burns's complaints against these defendants appear to be that they were in positions of power, thus always involved with anything occurring in conjunction with Burns's confinement. However, attempts to establish personal involvement based upon the supervisory roles these defendants occupied are inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Further, to the extent that Burns contends he notified Fischer and Knapp–David of the alleged constitutional violations through grievances and associated appeals, such claims do not sufficiently state the personal involvement of either defendant. Merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Burns does not contend that Fischer or Knapp–David acted on his written complaints. Moreover, Burns does not allege that either Fischer or Knapp–David created a policy or custom under which unconstitutional practices occurred, were grossly negligent in supervising subordinates, or were deliberately indifferent to his rights by failing to act on information indicating unconstitutional acts had occurred. Thus, Burns has failed to establish the personal involvement of Fischer and Knapp–David.

**\*6** As for defendants Schwebler and McGlynn, Burns has sufficiently alleged their personal involvement. Burns alleged that per DOCCS directive, counselors are required to make daily rounds in SHU, where Burns is held in IPC. Burns Aff. ¶¶ 55–58. However, Burns asserts that Schwebler and McGlynn directly participated in the alleged constitutional violations by failing to make the required daily rounds, contributing to Burns's confinement conditions. *See* Colon, 58 F.3d at 873. Thus, Burns has sufficiently established the personal involvement of Schwebler and McGlynn.

Accordingly, defendants' motion on this ground should be granted as to defendants Fischer and Knapp–David and denied as to defendants Schwebler and McGlynn.

### III. Conclusion

For the reasons stated above, it is hereby:

   1. **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 22) be:

A. **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities; (2) personal involvement defense for defendants Fischer and Knapp–David; AND

B. **DENIED** as to the (1) personal involvement defense for defendants Schwebler and McGlynn.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1413387

---

### Footnotes

1   By notice and acknowledgment of receipt of summons and complaint, defendant Noeh indicated that his name is spelled "Noeth ." Dkt. No. 13. The Court considers this as mere error on Burns's part and the latter spelling is used throughout this reportrecommendation.

2   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3   In Burns's response to defendants' motion to dismiss, Burns limits his opposition of the motion to the dismissal of claims against defendants Shanley, Martuscello, and Noeth. Dkt. No. 30 ¶ 9. Defendants did not move to dismiss claims against these three defendants; therefore, the motion is essentially unopposed.

4   Burns filed a Memorandum of Law (Dkt. No. 1–2) containing much of the same content available in his Affidavit.

5   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. COMP.CODES R. & REGS. tit 7, § 301.6.

---

**End of Document**       © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2754859
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, Cleric, Mid–State Correctional
Facility; Kyle Ready, Correctional Officer, Mid–
State Correctional Facility; Theda Kupiec, Senior
Mail Room Supervisor, Mid–State Correctional
Facility; Sheila Marlenga, Facility Steward, Mid–
State Correctional Facility; Maureen Boll, Deputy
Commissioner, Department of Corrections and
Community Supervision; and Brian Fischer,
Commissioner, Department of Corrections
and Community Supervision, Defendants.

No. 9:11–CV–600 MAD/ATB.
|
July 9, 2012.

**Attorneys and Law Firms**

Patrick Guillory, 09–B–0714, Gouverneur Correctional
Facility, Scotch Settlement Road, Gouverneur, New York,
Plaintiff pro se.

Office of The New York State Attorney General, The Capitol,
Albany, New York, for Defendants.

William J. McCarthy, Jr., AAG, of Counsel.


MEMORANDUM–DECISION AND ORDER

DAGOSTINO, J.

I. INTRODUCTION

**\*1** On November 4, 2011, Plaintiff *pro se* filed a motion for a
Temporary Restraining Order ("TRO"), and on December 29,
2011, Plaintiff filed a motion for summary judgment relating
to his civil rights complaint. In his civil rights complaint,
Plaintiff alleges that Defendants subjected him to religious
discrimination, denied him access to courts, and retaliated
against him for exercising his First Amendment Rights. *See*
Dkt. No. 48–1; Dkt. No. 54 at 1.

Magistrate Judge Baxter issued a Report–Recommendation
dated March 22, 2012, recommending that the Court deny
both motions. *See* Dkt. No. 54 at 2. Currently before the Court
are Plaintiff's objections to Magistrate Judge Baxter's March
22, 2012 Report–Recommendation. [1]


II. BACKGROUND

A. Factual Background
In a September 27, 2011 Decision and Order, the Court
dismissed some of Plaintiff s claims "with prejudice" and
some "without prejudice with leave to replead," and allowed
the following claims to proceed without amendment to the
complaint:

(1) Plaintiff's First Amendment Free Exercise Clause and
Religious Land Use and Institutionalized Persons Act
("RLUIPA") [2] claim against Defendant Ready regarding
the events of December 7, 2010;

(2) Plaintiff's First Amendment Free Exercise Clause and
RLUIPA claims against Defendant Ellis regarding the
events of March 20, 2011;

(3) Plaintiff's claim that Defendant Ready denied
Plaintiff the right to attend a religious service
on December 7, 2010 in retaliation for filing a
grievance;

(4) Plaintiff's Equal Protection claim against
Defendant Ready;

(5) Plaintiff's claim that Defendants Kupiec and
Marlenga lost or destroyed Plaintiff's property in
retaliation for filing grievances;

(6) Plaintiff's claim that Defendants Kupiec and
Marlenga interfered with Plaintiff's right to send
and receive mail;

(7) Plaintiff's claim that Defendants Kupiec and
Marlenga denied Plaintiff access to the courts, and

(8) Plaintiff's claims against defendants Fischer and
Boll (except those claims relating to the allegedly
inadequate grievance system).

*See id.* at 41 n. 11. For a more complete discussion of the underlying claims, the Court directs the parties to the Court's September 27, 2011 Decision and Order.

B. Magistrate Judge Baxter's Report–Recommendation

In his Report–Recommendation date March 22, 2012, Magistrate Judge Baxter recommended that the Court deny Plaintiff's motions for summary judgement and for a TRO. *See* Dkt. No. 54 at 2.

Regarding the current motion for a TRO, this is the third of its kind that Plaintiff has filed. *See* Dkt. 35; Dkt. No. 54 at 3 n.3. Magistrate Judge Baxter noted that the Court previously denied Plaintiff's other two motions for injunctive relief based on Plaintiff's transfer from Mid–State Correctional Facility to Gouverneur Correctional Facility. *See* Dkt. No. 54 at 5. Ching to *Day v. Chaplin,* 354 Fed. Appx. 472, 473 (2d Cir.2009), the Court held that an inmate's request for injunctive relief against a particular correctional facility becomes moot upon transfer or discharge to a different correctional facility. As with his previous motions, Magistrate Judge Baxter equally found that Plaintiff's third motion for a TRO is moot. *See* Dkt. No. 54 at 5.

**\*2** Magistrate Judge Baxter based his decision on several factors, including that the motion for injunctive relief was not directed at the original defendants because Plaintiff had been transferred to a new correctional facility, and the " 'new' alleged deprivations" that had occurred after the issuance of the Court's previous order "were over." *See id.* at 5–6. Magistrate Judge Baxter also found that Plaintiff's concerns of possible future retaliation are "too speculative to warrant injunctive relief." *See id.* at 6 (citing *Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, \*2 (W.D.N.Y. Dec. 5, 2011) (other citations omitted)).

As to the motion for summary judgment, Magistrate Judge Baxter's Report–Recommendation recommends that the Court find that there are questions of fact remaining with regards to certain claims, and that Plaintiff has not met his burden entitling him to summary judgment with respect to other claims. *See id.* at 10, 11, 12, 16.

Regarding the claims involving an alleged violation of Plaintiff's First Amendment Free Exercise rights under RLUIPA, Magistrate Judge Baxter recommended, with respect to the December 7, 2010 incident involving Defendant Ready,[3] that "[P]laintiff's own exhibits show that there is a question of fact regarding these issues." *See id.* at 9–

10. With respect to the March 20, 2011 incident involving Defendant Ellis,[4] Magistrate Judge Baxter examined Plaintiff's grievance, and the investigation report of that grievance, which indicated that the Rabbis arrived late for the Purim celebration.[5] *See* Dkt. No. 48–2, Ex. B. Magistrate Judge Baxter concluded that it is clear a question of fact remains regarding Defendant Ellis' conduct, and thus Plaintiff's motion should be denied. *See* Dkt. No. 54 at 11.

Regarding the claims involving retaliation, Magistrate Judge Baxter stated that the "fact that corrective action was taken after a grievance by plaintiff, without more, does not prove that a constitutional or statutory violation occurred." *See id.* Additionally, although an "alleged adverse action occurred in close proximity to the protected conduct," this does not "necessarily prove plaintiff's claim by a preponderance of the evidence." *See id.* at 12 (citing *Davis v. Goord,* 320 F.3d 346, 352–54 (2d Cir.2003); *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, \*17 (W.D.N.Y. Oct. 12, 2011); *Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*16–20 (N.D.N.Y. Mar. 30, 2010)). Accordingly, Magistrate Judge Baxter recommended that the Court find Plaintiff is not entitled to summary judgment on his retaliation claims. *See id .*

Addressing the access to courts/mail claims, Magistrate Judge Baxter noted that a constitutional violation of denying access to the courts requires that Plaintiff show Defendants' conduct was deliberate and malicious, and resulted in injury to Plaintiff. *See id.* at 13–14 (citing *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008)). Magistrate Judge Baxter recommended that the Court find that a question of fact still exists, noting that just because Plaintiff received a reimbursement for the certified mail from Defendant Kupiec does not mean she was responsible for the error. *See id.* at 14.[6] As such, Magistrate Judge Baxter determined that a question of fact exists regarding causation in Plaintiff's access to the courts claim. *See id.* at 15. Magistrate Judge Baxter also came to the same conclusion regarding Plaintiff's claim that Defendant Kupiec destroyed his mail in retaliation for his complaints. *See id.*

**\*3** With respect to the claims made against the supervisory officials, Magistrate Judge Baxter noted that "[p]ersonal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability." *See id.* at 16 (citing

*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)) (other citations omitted). Magistrate Judge Baxter recommended the Court find that, "[b]ecause questions of fact remain regarding the individuals who allegedly committed the violations, and [D]efendants' Boll and Fischer's liability depends on the liability of their subordinates, [P]laintiff has not shown that he is entitled to summary judgment against these two [D]efendants." *See id.* at 17.

C. Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation

Plaintiff filed objections to Magistrate Judge Baxter's March 22, 2012 Report–Recommendation on March 27, 2012, and supplemental objections on April 3, 2012. *See* Dkt. No. 56; Dkt. No. 58. Plaintiff's sixteen objections are as follows: 1) his request for injunctive relief was, in fact, directed at the original Defendants in the complaint; 2) his motion for a TRO is seeking to maintain the status quo regardless of whether the alleged deprivations are new, old, or pending; 3) he was not merely speculating about retaliation after the Court issued its September 27, 2011 Order, after which he was allegedly denied food for 104 hours; 4) he has met his burden for the Court to issue a TRO; 5) Defendants' failure to submit an affidavit in opposition to summary judgment and Defendants' had an adequate opportunity to conduct discovery; 6) the Court is promoting discovery abuse by issuing the Report–Recommendation since Defendants' request for an extension of time was not granted, nor has the pretrial discovery and scheduling order been amended for a continuance; 7) the Report–Recommendation prejudicially advocates for Defendants to be given an extension of time to respond to discovery, to be given an extension of time to respond to the application for summary judgment, and to be given the chance to affix an affidavit to support such extension; 8) summary judgment regarding the retaliation claims against Defendant Ready should be because on the Department of Corrections and Community Supervision ("DOCCS") Office of Counsel's response indicating that corrective action was taken in response to Plaintiff's grievance and this is an admission to malfeasance on Defendant Ready's part; 9) summary judgment should be granted in Plaintiffs favor against Defendant Ellis because the law sets forth that where a non-moving party willfully fails to respond adequately to a properly filed motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute; 10) the Report–Recommendation violates Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation, and the Report–Recommendation fails to support its denial of Plaintiff's motion as to the retaliation claims with any relevant facts; 11) the grievance response received containing an apology from Defendant Kupiec regarding her action of not mailing Plaintiff's Notice of Intention to File a Claim as instructed and the letter from Defendant Kupiec apologizing for destroying Plaintiff's test scores are admissions to his mail claims against Defendant Kupiec; 12) the Report–Recommendation sends the message that Defendants have special privileges with respect to discovery, and Magistrate Judge Baxter will go against his own prior text orders to support such abuse; 13) specifically detailed Defendants Boll and Fischer's personal involvement regarding the liability of their subordinates, and thus there is no question of material fact regarding this issue; 14) granting Defendants' second letter motion for an extension, without an accompanying affidavit, is a double standard and is not in compliance with this Court's rules; and 15) the Report–Recommendation should be reversed in the interest of justice because the Federal Rules of Civil Procedure and the Northern District Local Rules should apply equally to both *pro se* litigants and prisoners, as well as state defendants. *See* Dkt. No. 56 at 3–34; Dkt. No. 58 at 3–7.

**\*4** In his supplemental objections filed on March 21, 2012, Plaintiff claims that he "received some documents from Defendants' Counsel ... which proves that more Jews are being starved throughout the Department of Correction and Community Supervision (DOCCS) when the said individuals file grievances." *See* Dkt. No. 70 at 2. Plaintiff claims that the two emails from DOCCS employees discussing two complaints filed by other inmates at Mid–State regarding issues similar to those in the present matter. *See id.* at Exhibit "A."

III. DISCUSSION

A. Review of a Magistrate Judge's Decision

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objection in made." 28 U.S.C. § 636(b)(1) (2006). However, when a party files "[g]eneral or conclusory objection or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court review those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–

CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B. Injunctive Relief

1. Standard of Review
A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance of hardships tipping decidedly in moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits." ' *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v.. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

2. Application
**\*5** Regarding Plaintiff's current motion, this Court agrees with Magistrate Judge Baxter's finding that Plaintiff has not met his burden showing that he is entitled to injunctive relief. The Second Circuit has repeatedly held that "a transfer from a prison facility moots an action for injunctive relief against

the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *see, e.g., Day v. Chaplin,* 354 Fed. Appx. 472, 473–74 (2d Cir.2009) (other citations omitted). Since the alleged unconstitutional and retaliatory acts occurred while Plaintiff was incarcerated at Mid–State, his transfer to Gouverneur renders his application for a TRO moot.

Moreover, Plaintiff has directed his motion for a TRO to individuals not included in the original complaint, with the exception of Defendants Boll and Fischer. [7] *See* Dkt. No. 35–1 at ¶¶ 4–7. As such, this Court agrees with Magistrate Judge Baxter's finding that "[i]f additional individuals denied [P]laintiff his constitutional right to practice his religion, he may move to supplement his complaint or bring a separate action against individuals at Gouverner." *See* Dkt. No. 54 at 7. Even if Plaintiffs motion for a TRO was directed at Defendants in this action, Plaintiff has failed to establish an imminent threat of irreparable harm or that other serious injury that would result if injunctive relief is not granted because the alleged new deprivations have already occurred.

Finally, Plaintiff's concerns of possible future retaliation are too speculative to warrant injunctive relief, since no imminent threat is posed. *See Smolen v. Dildine,* No. 11–CV–6434, 2011 WL 6030112, *2 (W.D.N.Y. Dec. 5, 2011) (citations omitted).

For the foregoing reasons, Plaintiff's motion for preliminary injunctive relief is denied.

C. Summary Judgment

1. Standard of Review
A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See* Chambers, 43 F.3d at 36 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See* Giannullo v. City of N.Y., 322 F.3d 139, 143 n.5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*6** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting Haines v. Kerner, 303 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." ' *Id.* (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983)). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* (citing Showers v. Eastmond, No. 00 CIV. 3725, 2001 WL 527484, \*2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)).

*2. Application*

*a. Sufficiency of Defendants' response*

In his objection, Plaintiff argues that because Defendants failed to submit an affidavit in support of their response in opposition to summary judgment the Court must grant his

motion. *See* Dkt. No. 56 at 12–15. While not issuing a formal response, Defendants submitted a letter to Magistrate Judge Baxter, stating that Plaintiffs motion for summary judgment is premature and should be denied because they have not had the opportunity to conduct discovery. *See* Dkt. No. 49 at 1.

The Second Circuit has held that,

> a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing " '(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." '

Gurary v. Winehouse, 190 F.3d 37, 43–44 (2d Cir.1999) (quoting Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir.1995)) (other citations omitted). Defendant's response to Plaintiff's motion for summary judgment only consisted of a letter to Magistrate Judge Baxter, citing to case law and Rule 56(f) of the Federal Rules of Civil Procedure, indicating that summary judgment should not be granted because they have not been afforded adequate opportunity to conduct discovery. Defendants failed to attach a Rule 56(f) affidavit to their response, and the letter did not address facts to be sought with additional discovery that would create a genuine issue of material fact. *See* Dkt. No. 49 at 1–2. [8]

Although Plaintiff is correct that Defendants' response was deficient, Plaintiff is still not entitled to summary judgment. Four days before the response deadline, Magistrate Judge Baxter issued a text order providing that "[n]o further submissions are required or allowed...." Clearly, Magistrate Judge Baxter believed, as does the Court, that Plaintiff's motion was premature and fell short of carrying his burden; and, therefore, did not require a formal response. Defendants' failure to comply with Rule 56(f) does not obviate Plaintiff's burden of proof, which he failed to meet. *See* Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004) (holding that "[a]n unopposed summary judgment motion may also fail where the undisputed facts fail " 'to show that the moving party is entitled to judgment as a matter of law" " ' (quotations omitted)); *see also* Giannullo, 322 F.3d at 140–41 (holding that the "non-movant is not required to rebut an insufficient showing").

*b. Religion*

**\*7** Prisoners are certain constitutional protection with regards to the First Amendment Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (quoting 42 U.S.C. § 2000cc–1(a) (2006)); *see e.g., Brown v. Graham,* No. 9:07–CV–1353, 2010 WL 6428251, \*15 (N.D.N.Y. Mar. 30, 2010) (citation omitted). Plaintiff claims that his First Amendment Free Exercise rights under RLUIPA were violated by Defendants Ready and Ellis.

With respect to the incident that occurred on December 7, 2010, involving Defendant Ready's refusal to allow Plaintiff to attend religious services, this Court agrees with Magistrate Judge Baxter's findings that a question of fact remains based on the exhibits Plaintiff submitted. Specifically, the investigation report issued in response to Plaintiffs grievance about the matter indicates that the call-out list for Jewish Services on December 2, 2010 was not distributed following normal procedure. *See* Dkt. No. 1, Ex. L. As a result of this error, the call-out list was hand delivered to housing units, but not the program areas, where Plaintiff was at the time of the incident. *See id.* The report also indicates that there was insufficient evidence "to substantiate any malfeasance by staff" and that there was "no malice intended." *See id.*

Plaintiff asserts that DOCCS Office of Counsel's response, indicating that corrective action was taken regarding this incident, is an admission to unconstitutional acts. *See* Dkt. No. 56 at 17–18. A statement indicating that corrective action was taken is not necessarily the equivalent of an admission to unconstitutional conduct. Additionally, in his objection, Plaintiff claims that the DOCCS Office of Counsel overruled the superintendent's decision regarding the grievance. *See id.* at 18. This claim, however, is untrue. Plaintiff's own exhibit shows that the Central Office Review Committee ("CORC") upheld the decision of the superintendent regarding this grievance, and stated that it had "not been presented with sufficient evidence to substantiate that [Plaintiff] was purposefully denied attendance to the callout or discriminated

against by staff." *See* Dkt. No. 1, Ex. S. Thus, there remains a question of material fact regarding the incidents of December 7, 2010, and Plaintiff's objection regarding the incident is unfounded.

Similarly, regarding the incident that occurred on March 20, 2011, it is clear from Plaintiff's own submissions that a question of fact still remains regarding Defendant Ellis' conduct. Plaintiff claims that the religious services scheduled for March 20, 2011 were intentionally cut short by Defendant Ellis in an expression of anti-Semitic behavior. *See* Dkt. No. 1 at ¶ 65. However, the investigation report in response to Plaintiff's grievance indicates that the Rabbis arrived late for the services, and inmates were sent back to their housing units until they arrived. *See* Dkt. No. 48–2, Ex. D. As such.

**\*8** Based on the foregoing, the Court finds that Plaintiff has failed to establish that there are no issues of material fact and is, therefore, not entitled to summary judgment on this claim.

*c. Retaliation*

The Second Circuit has held that retaliation against a prisoner for filing a grievance is a violation of that prisoner's First Amendment right to petition the government for redress. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). To establish a claim of retaliation, the plaintiff must establish "(1) that the disciplined conduct was constitutionally protected, and (2) that his punishment was motivated, in whole or in part, by his conduct—in other words, that the prison officials' actions were substantially improper retaliation." *Id.* Additionally, there must be a causal connection between the protected activity and the adverse action. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Plaintiff claims he was subjected to several instances of retaliation, including the following: (1) the events of March 20, 2011, for filing an earlier grievance against Defendant Ellis, and CO. Johnston;[9] (2) improperly mailing out Plaintiff's Notice of Intent to File a Claim in retaliation for filing grievances; (3) Defendant Kupiec's destruction of two of Plaintiff's packages in retaliation for filing a Notice of Intent to File a Claim and grievances; and (4) the tearing of

Plaintiff's mail in retaliation for filing grievances. *See* Dkt. No. 48–1 at ¶¶ 20, 22, 23, 97.

Again, Plaintiff has failed to establish that there are no issues of material fact regarding the above mentioned events. Plaintiff has failed to put forth evidence indicating that these events "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). In fact, evidence of the exact opposite exists in that Plaintiff continually filed grievances for acts he thought were in violation of his rights. Plaintiff is merely relying on the fact that these events occurred in close proximity to protected conduct, and such reliance "does not strongly establish [a] causal nexus." *Jackson v. Goord,* No. 06–CV–6172, 2011 WL 4829850, *17 (W.D.N.Y. Oct. 12, 2011).

### d. Access to Courts/Mail Claims

"Under the First Amendment, prisoners have a right to 'the free flow of incoming and outgoing mail.' " *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (quoting *Davis v. Goord,* 320 F.3d at 351). A prisoner's right to send and receive mail can be regulated, if such regulation "is reasonably related to legitimate penological interests." *Id.* (quoting *Rodriguez v. James,* 83 F.2d 8, 12 (2d Cir.1987) (other quotation omitted)). To establish such a claim, it must be shown that "the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008) (citing *Davis v. Goord,* 320 F.3d at 351). Actual injury is established by demonstrating that the plaintiff's efforts in pursuing a nonfrivolous claim were frustrated as a result of the defendant's actions. *See id.* (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996)).

**\*9** With respect to non-legal mail, a "prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, *5 (S.D.N.Y. Mar. 29, 2001) (quoting *Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir.1993)). "In order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Id.* (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999)).

In the present matter, Magistrate Judge Baxter correctly held that Plaintiff has failed to show that no question of fact exists regarding the issue of his legal mail not being sent out as instructed. Plaintiff has not produced any evidence showing that Defendant Kupiec's conduct was deliberate and malicious. Plaintiff states that the apology letter received from Defendant Kupiec was an admission to the error in mailing. *See* Dkt. No. 56 at 25. However, as Magistrate Judge Baxter noted, the fact that Defendant Kupiec responded to Plaintiff's complaint, apologized to Plaintiff for the error, and issued him a reimbursement does not establish that her conduct was deliberate and malicious. *See* Dkt. No. 54 at 14.

Plaintiff also refers to his claim that Defendant Kupiec lost or destroyed his mail, specifically his test scores, in retaliation for grievances filed. *See* Dkt. No. 54 at 15; Dkt. No. 56 at 25. Although Plaintiff may be able to proceed on a claim for interference with incoming non-legal mail by showing that a pattern and practice of interference exists between the two packages that were allegedly destroyed or missing, and the destruction of his test scores, that was not justified by any legitimate penological interest, questions of fact remain as to who committed the violations with respect to the two packages, and with regard to Defendant Kupiec's motive in ripping Plaintiff's mail, as noted by Magistrate Judge Baxter. *See* Dkt. No. 54 at 15.[10]

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly held that questions of fact exist which preclude summary judgment at this time.

### e. Supervisory Officials

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.). There is a sufficient showing of personal responsibility of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to

correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**\*10**  It is well-settled that receipt of letters or grievances, by itself, does not amount to personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009). Further, "[p]rison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint" *Id.* at 199 n.13 (citations omitted); *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997).

Magistrate Judge Baxter correctly held that, because there are remaining questions of fact as to whether any unlawful violations actually occurred, Plaintiff's motion for summary judgment as to Defendants Boll and Fischer must be denied. Moreover, contrary to Plaintiff's assertion, Magistrate Judge Baxter did, in fact, address his claims against Defendants Fischer and Boll and correctly found that summary judgment as to those Defendants was inappropriate at this time. *See* Dkt. No. 54 at 6 n.10, 16–17.

Based on the foregoing, the Court finds that Plaintiff has failed to establish that he is entitled to summary judgment as to Defendants Boll and Fischer.

### f. Other Objections

In his tenth objection, Plaintiff states that the Report–Recommendation is in violation of Local Rule 7.1(a)(1) in that it contains citations to decisions exclusively reported on computerized databases, and copies of those decisions were not affixed to the Report–Recommendation. *See* Dkt. No. 56 at 21–22. By the very language of Local Rule 7.1(a)(1), however, this Local Rule is only applicable to parties, not the court. *See* LOCAL RULES N.D.N.Y. 7.1(a)(1). [11]

With regards to his twelfth objection, Plaintiff is not being "condimed [sic] for taking appropriate action" with respect to dismissing his own Court of Claims action. Magistrate Judge Baxter noted with respect to this claim, that "[i]f an injury exists, there is at least a question of fact regarding the causation of the injury to plaintiff's legal claim." *See* Dkt. No. 54 at 16; Dkt. No. 56 at 29. Plaintiff still has the opportunity to prove this claim at trial.

Plaintiff also objects to Magistrate Judge Baxter "granting" Defendants' second letter motion for an extension. Plaintiff's objection is without merit because, quite simply, Defendant's second letter motion to stay discovery was denied by Magistrate Judge Baxter in a text order dated May 15, 2012.

The Court has reviewed Plaintiff's remaining objections and finds that they are meritless and often quite difficult to comprehend.

## IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Baxter's March 22, 2012 Report–Recommendation is ADOPTED in its entirety for the reasons stated therein; and the Court further

**\*11**  ORDERS that Plaintiff's motions for preliminary injunctive relief (Dkt. No. 35) and for summary judgment (Dkt. No. 48) are DENIED; and the Court further

ORDERS that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2754859

## Footnotes

1    Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation were filed with the Court on March 27, 2012, as well as supplemental objections to the same, filed with the Court on April 3, 2012 and May 21, 2012. *See* Dkt. Nos. 56, 58 & 70.

2    *42 U.S.C. § 2000cc (2006).*

3    On December 7, 2010, Plaintiff was denied attendance to religious services by Defendant Ready despite his name appearing on a call-out list for such services. *See* Dkt. No. 54 at 9–10 (citing Compl. at ¶¶ 37–47).

4    On March 20, 2011 Plaintiff was permitted a scheduled visit with a Rabbi for a Purim celebration, but the service was cut short by Defendant Ellis. *See* Dkt. No. 54 at 10 (citing Compl. ¶ 65). Plaintiff filed a grievance with Mid–State's Superintendent regarding Defendant Ellis' action. *See* Dkt. 48–1 at ¶¶ 19, 20.

5    The Purim celebration commenced upon the arrival of the Rabbis. *See* Dkt. No. 48–2, Ex. B.

6    Magistrate Judge Baxter also noted that Plaintiff filed a motion to dismiss his own complaint with prejudice in his case before the Court of Claims. *See id.* at 14. Magistrate Judge Baxter stated that "Plaintiff cannot ask the Court of Claims to dismiss his action and then blame the defendant for the 'injury' ' if such injury does in fact exist. *See id.* at 15.

7    Magistrate Judge Baxter's Report–Recommendation noted that original Defendants Boll and Fischer are employees of DOCCS, and are not located at any specific facility. *See* Dkt. No. 54 at 5 n.9 (citing Dkt. No. 45 at ¶¶ 40–48). Magistrate Judge Baxter further noted that Plaintiff's claim that Defendants Boll and Fischer approve all transfers—even if true—is not proof that they were responsible for subsequent denials of Plaintiff's religious rights by individuals at Gouverneur. *See* Dkt. No. 54 at 6 n.10.

8    Defendants referenced Rule 56(f) in the response letter to Magistrate Judge Baxter. However, "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985)). As such, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985) (other citations omitted).

9    Plaintiffs grievance number MS–20189–10 was filed in response to Defendant Ellis' and CO. Johnston's refusal to permit Plaintiff to remain in the law library when he was excused from work and/or programs in accordance with the Jewish Holiday. *See* Dkt. No. 1, Ex. F.

10   In a letter from Defendant Kupiec to Plaintiff, Defendant Kupiec apologizes for tearing the test scores because she mistook them for advertisements that could not be forwarded. *See* Dkt. No. 48–2, Ex. S.

11   * * *

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1488405
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gregory GATES, Plaintiff,

v.

Glenn GOORD; Lester Write; Wayne Strack;
John Doe; R. Kirkatrict; St. Agnes Hospital;
William Walsh; John Doe; Wayne Barkley;
H. Klages; T. Hunter; Dr. Sass; G. Bhat; Dr.
Loinaz; G. Stinson; D. Artuz; R. Broaddu; Floyd
Bennet; A. White; A. Rabideau; R. Doane;
Hans Walker; Gregory Matthew; Anthony
Graeffo; C. Coyne; Dr. Kooi; John Sherifdan; K.
Torobley; Dr. Holloway; B. Lucas; J. Richard;
K. Fleury; Karen McDonald, Defendants.

No. 99 Civ. 1378(PKC).
|
July 1, 2004.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Gregory Gates, a former inmate in the New
York State Department of Corrections ("DOCS"), brought
this action in February, 1999, alleging that DOCS officials
violated his rights under the First, Eighth, and Fourteenth
amendments of the U.S. Constitution. As a result of a
previous motion to dismiss discussed below, the only claims
that remain are those alleging Eighth Amendment violations
relating to medical treatment while Gates was incarcerated
in DOCS facilities. Defendants move for summary judgment
against these claims pursuant to Rule 56, Fed.R.Civ.P. For the
reasons explained below, defendants' motion is granted in part
and denied in part.

*Background*

After dismissal of the entire Complaint for failure to state
a claim, Gates filed an Amended Complaint in July, 2000
("AC") alleging constitutional violations, pursuant to 42
U.S.C. § 1983. In a Report and Recommendation ("R &
R") dated August 29, 2001, Magistrate Judge Frank Maas
recommended to Judge Richard Berman, to whom this case

was then assigned, that significant portions of the Amended
Complaint be dismissed. No objections were filed to the R &
R and Judge Berman adopted it in full. The R & R concluded
that all but eight of the defendants should be dismissed from
the action, and that damages from those eight defendants were
unavailable for actions taken in their official capacities. (R &
R at 25) In total, the R & R dismissed 27 defendants, including
two John Does, and dismissed in their entirety Gates's claims
alleging unlawful retaliation.

The remaining allegations implicate Gates's claim that
defendants are liable for Eighth Amendment violations,
stemming from their alleged deliberate indifference to his
medical needs. Gates claims that while walking across the
Fishkill Correctional Facility's ("Fishkill") recreational area,
he slipped on a large patch of ice. (AC ¶ 37) He alleges that
his fall was due to Fishkill's negligence. (AC ¶ 79) Upon
subsequent arrival to St. Agnes Hospital, Gates contends
that he was told that he had a break in his fibula. (AC ¶
39) A metal plate was attached to the fibula, and Gates
was informed that he would receive follow-up treatment,
including treatment for ligament tears. (AC ¶¶ 41-42) He
claims that he subsequently received inadequate medical
treatment, and felt "constant excruciating pain" as a result.
(AC ¶ 43) Gates was thereafter transferred from the Fishkill
facility to the Riverview Correctional Facility ("Riverview"),
which he claims was done in an attempt to prevent him from
asking questions concerning his ligament damage, and as an
effort to conceal Fishkill's negligence. (AC ¶ 79) Gates claims
that, although he was transferred from the Fishkill facility, a
hold should have been placed to prevent such transfer amid
his continuing medical treatments. (AC ¶ 79) "A pattern
emerged that clearly shows that Plaintiff was moved from
facility to facility to deny Plaintiff his rights to proper medical
care." (AC ¶ 79)

**\*2** Gates also alleges facts specific to each of the defendants.
He contends that Strack, the superintendent at Fishkill, was
aware of Gates's fall on the ice; that Strack received all
of Gates's DOCS grievances; and that Strack transferred
him in order to conceal Fishkill's liability. (AC ¶ 48) Gates
alleges that Loinaz, a physician who attended to him after
his transfer from Fishkill to Riverview, failed to provide
follow-up medical treatment. (AC ¶ 57) He alleges that
Stinson, an official at Riverview, circulated a memorandum
containing false information about what medical supplies had
been provided to Gates. (AC ¶ 58) When Gates was later
transferred to the Auburn Correctional Facility ("Auburn"),
he claims, Walker failed to fulfill promises that he would tend

to his medical needs. (AC ¶ 65) Gates alleges that Matthew, a physician at the Auburn facility, failed to provide him sufficient medical treatment. (AC ¶ 66) Kooi, also a physician at the Auburn facility, allegedly told plaintiff that nothing was wrong with him, and instructed him to leave his office without examination. (AC ¶ 69) He alleges that Coyne "failed to take appropriate action's" [sic] despite being "repeatedly" notified of his medical problems. (AC ¶ 68)

Defendants Coyne, Strack, Loinaz, Stinson, Walker, Matthew, Stinson, and Kooi bring this motion pursuant to Rule 56(c), Fed.R.Civ.P., arguing that Gates (1) has not established deliberate indifference by the defendants; (2) has not shown personal involvement by defendants Strack, Walker, Coyne, and Stinson; and (3) cannot defeat defendants' defense of qualified immunity. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 2)

Defendants also move for summary judgment dismissing Gates's retaliatory transfer claim, arguing that Gates failed to administratively exhaust this claim. However, it is clear from Judge Maas's R & R, and Judge Berman's subsequent adoption thereof, that the retaliatory transfer claims already have been dismissed from this litigation. (R & R at 19 ("Accordingly, both of the defendants named in the Fishkill Retaliation Claim should be dismissed this case."); R & R at 21 ("the Transfer Retaliation Claim should be dismissed as against all four defendants named therein.")) Because the defendants move for summary judgment on claims dismissed from this action, I do not address their arguments pertaining to administrative exhaustion and retaliatory transfer. To the extent that this argument implicates the "total exhaustion" doctrine under the Prisoner Litigation Reform Act, 📕 42 U.S.C. § 1997e(a), the retaliation claims have already been dismissed from this action for reasons unrelated to exhaustion. (R & R at 18-21) The "total exhaustion" doctrine, if valid and applicable, would require the dismissal of all claims if any claim were subject to dismissal for non-exhaustion. *See, e.g., Farid v. Ellen,* 2003 WL 23018805 at *4 (S.D.N.Y. Dec. 23, 2003) (collecting cases). The Second Circuit has yet to speak on this issue. *See Ortiz v. McBride,* 02-0088 (Oral Argument, May 27, 2004). Regardless of how the Circuit rules, it would provide no comfort to defendants in this case because there would be no occasion to determine an administrative exhaustion issue pertaining to a claim dismissed on an entirely different ground earlier in the action.

*Summary Judgment Standard*

**\*3** Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law...."

📕 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation and quotation marks omitted); *accord* 📕 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

*Defendant Barkley*

Defendant Wayne Barkley died in January, 2002. (Defendant's Rule 56.1 Statement ("56.1") at 1 n. 1) Nothing in the docket or in the exhibits to this motion reflect that Gates has filed a motion to substitute a representative of Mr. Barkley's estate. Rule 25(a)(1), Fed.R.Civ.P. I must consider whether plaintiff was required to make such a substitution, and, if so, the effect of his failure to do so.

Rule 25(a)(1) reads in relevant part: "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties ... Unless the motion is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed at to the deceased party." Plaintiff was formally placed on notice of Barkley's death on the first page of defendants' Rule 56.1 Statement, which was served and filed on December 24, 2003.[1] The Rule 56.1 Statement was served pursuant to Rule 5, Fed.R.Civ.P., and therefore suffices to provide Gates with proper notice of Barkley's death. More

than 90 days have lapsed since the service and filing of the Rule 56.1 Statement. Dismissal therefore is appropriate.

Gates's memorandum of law and the accompanying affidavits mention Barkley's name only in passing. Plaintiff has, at no point in time, raised any opposition to the dismissal of Barkley, nor made any applications concerning the identity of Barkley's estate or a desire to make service thereon. Because Gates has not contested the notice of Barkley's death, and has not moved to substitute Barkley, Barkley is dismissed from this action. *See, cf.,* Hogan v. Metromail, 2002 WL 373245, at *1 n. 1 (S.D.N.Y. Mar. 8, 2002) (notice of plaintiff's death and substitution communicated in summary judgment brief was unopposed, and therefore accepted as valid).

*Gates's Eighth Amendment Claims*

**\*4** Defendants move for summary judgment on the basis that Gates failed to establish defendants' deliberate indifference to his medical needs. Gates has alleged Eighth Amendment violations by defendants Matthew, Kooi and Coyne of Auburn and defendant Loinaz of Riverview.

The Second Circuit has articulated a two-pronged approach to evaluate deliberate indifference claims. The first, objective prong requires that a deprivation must be "sufficiently serious." *See* Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108 (1995), *citing* Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991). A sufficiently serious deprivation is one that could lead to "death, degeneration, or extreme pain." *See id., quoting* Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). The second, subjective prong requires that a defendant-official must have acted with a sufficiently culpable state of mind, one that rises above negligence but is "less than conduct undertaken for the very purpose of causing harm." *Id., quoting* Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 (1994). To have a sufficiently culpable state of mind, a prison official must know of and disregard an "excessive risk" to inmate health and safety. *See id.* The official must both be aware of facts predicating an inference that a substantial risk of serious harm exists, and must also draw that inference. *See id* .

Defendants argue that, assuming the existence of a "sufficiently serious" deprivation, Gates cannot establish that defendants knew of and disregarded an excessive risk to Gates's health. (Def. Mem. at 10) Defendants offer a detailed record concerning Gates's history of medical treatment while incarcerated. Following the fracture of Gates's right ankle in December, 1996, he received surgical medical attention. (Singleton Decl. Ex. F, Bates Nos. 0186-0187). After surgery, Gates received follow-up medical treatment. (Singleton Decl. Ex. F., Bates No. 0218) Once transferred to Riverview, Gates received, *inter alia,* boots for ankle support, black knee-high support stockings, a Motrin prescription for 800/mg, application of an analgesic balm, a walking cane, high-top sneakers, additional x-rays, physical therapy, whirlpool treatment, and medical consultations. (Declaration of Dr. Michael Seidman ("Seidman Decl.") ¶¶ 8-21, 23) At the Auburn Correctional Facility, Gates received advice from or was examined by the facility's medical staff on multiple occasions. The medical staff, *inter alia,* attempted to secure Gates a cane (Singleton Decl. Ex. F, Bates No. 103), attempted to secure the replacement or repair of Gates's New Balance sneakers (Singleton Decl. Ex. F, Bates No. 104), inquired into Gates's desire for medical boots, and ultimately ordered them on his behalf (Singleton Decl. Ex. F, Bates No. 104-05), and noted Gates's preference to be treated by specific medical staffers (Singleton Decl. Ex. F, Bates No. 107). Gates was incarcerated at Auburn from March 10, 1998 through April 28, 1999, and the record reflects that Gates consulted with medical staff members on 67 occasions during his stay. (56.1 ¶ 2; Singleton Decl. Ex. F, Bates Nos. 98-122) His Ambulatory Health Record while at Auburn indicates that he often communicated with or visited members of the medical staff multiple times per week, and frequently on consecutive days. (Singleton Decl. Ex. F, Bates No. 113-14) At the Bare Hill Correction Facility, medical staffers recommended that Gates use high-top sneakers (Singleton Decl. Ex. F, Bates Nos. 131, 225, 235), administered at least one x-ray to Gates's ankle (Singleton Decl. Ex. F, Bates No. 137), measured Gates for orthopedic boots (Singleton Decl. Ex. F, Bates No. 226, 244, 248), and recommended that Gates be referred to an orthopedic consultant to address his concerns. (Singleton Decl. Ex. F, Bates No. 237)

**\*5** Gates acknowledges that after his transfer to Riverview, he was treated by an orthopedic specialist, Dr. Bhat, who recommended that Gates undergo physical therapy. (Plaintiff's Mem. at 8) "When plaintiff went to see the physical therapist, plaintiff's response to the treatment involved excruciating pain, thus afterwards the therapist told him that his injuries were too serious for physical therapy to have any effect." (Plaintiff's Mem. at 8) Gates argues that his treatment was motivated by the economics of managed health care, and that doctors "conspired" with DOCS officials

to prevent effective treatment of his injuries. (Plaintiff's Mem. at 8-9) Gates also argues that he was faced with a sort of Hobson's choice near the end of his prison term, wherein he was offered treatment by a specialist on the eve of his release, done with the knowledge that Gates would prefer release to medical treatment, and that prolonged incarceration would be an inevitable result of specialist treatment. (Plaintiff's Mem. at 9) Gates argues that such conduct "should shock the conscience of the [C]ourt." (Plaintiff's Mem. at 9) [2]

Against this background, defendants argue that Gates's single encounters with defendants Kooi, Loinaz and Matthew cannot support a deliberate indifference claim. (Def. Mem. at 12). I address in turn the claims regarding each of these three defendants. In so doing, I note that Gates, who is represented by counsel, failed to provide the court with a counterstatement under Local Rule 56.1. "If the opposing party failed to controvert a fact so set forth in the moving party's Rule 56.1 Statement, that fact will be deemed admitted." *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003). The moving part must nevertheless offer facts supporting its Rule 56.1 Statement, and must satisfy the movant's Rule 56 burden. *See id.* Despite Gates's omission, I have weighed the factual materials produced by plaintiff, and, required by Rule 56, draw all reasonable inferences in favor of the non-movant, Gates.

A. *Kooi*

Defendants argue that Gates cannot show that Kooi, a physician at Auburn, treated him with deliberate indifference.

(Def. Mem. at 12, *citing* *Hathaway,* 37 F.3d at 66) According to the Amended Complaint, Kooi's alleged failure to examine plaintiff's right lower leg and ankle constituted deliberate indifference. (AC ¶ 69) Upon Gates's arrival at Auburn, the nursing staff reviewed him in a routine examination. (Singleton Decl. Ex. F Bates No. 100; Declaration of Dr. Pang Kooi ("Kooi Decl.") ¶ 7) A subsequent appointment was arranged with Kooi. (Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 7) On April 10, 1998, Gates requested a sick call, which was deferred because he was asleep at the appointed time . [3] (Singleton Decl. Ex. F Bates No. 100; Kooi Decl. ¶ 9) Kooi examined Gates on April 27, 1998, at which point he requested that Gates be evaluated by an orthopedic specialist for the possible removal of hardware in his injured ankle. (Singleton Decl. Ex. F Bates No. 101; Kooi Decl. ¶ 10) Kooi states that he had no other medical encounters with Gates, and that he believed

that Gates underwent successful surgery for the removal of hardware in his right ankle. (Kooi Decl. ¶¶ 11-12)

**\*6** Neither the document captioned as an "Affirmation in Opposition" and signed by Gates's counsel, nor the affidavit proffered under Gates's name mention Kooi by name, or dispute the facts supported in Kooi's affidavit and the defendants' exhibits. The affirmation of Gates's counsel is further flawed, inasmuch as it purports to convey facts that are outside the scope of counsel's personal knowledge, including representations regarding the types of injuries suffered by Gates and details concerning DOCS procedures. (Affirmation in Opposition ¶¶ 6-8) Such averments are insufficient to defeat summary judgment. *See, e.g.,* *U.S. v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1994) (affidavit not based on personal knowledge insufficient to create issue of fact on summary judgment motion); *Omnipoint Communications, Inc. v. Common Council of the City of Peekskill,* 202 F.Supp.2d 210, 213 (S.D.N.Y.2002) ("An attorney's affidavit which is not based on personal knowledge of the relevant facts should be accorded no weight on a motion for summary judgment."). In any event, plaintiff's memorandum of law references no facts that meaningfully contradict Kooi's affidavit concerning Gates's treatment.

Based on the facts proffered by the defendants, including Kooi's request for a review of Gates's record by an orthopedic surgeon, there is no genuine question of material fact as to Kooi; there is no evidence to support a claim that Kooi engaged in a "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence but lesser than a purposeful intent to cause harm. *See* *Hathaway,* 37 F.3d at 66. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim" of deliberate indifference. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *accord Ortiz v. Makram,* 2000 WL 1876667, at *6 (S.D.N.Y. Dec. 21, 2000) (dismissing on summary judgment plaintiff's deliberate indifference claim). So long as treatment of a prisoner is adequate, no constitutional violation will be found. *See id.* Plaintiff has come forward with no evidence to show that Kooi's treatment of the plaintiff was anything other than attentive and safely outside the bounds of conduct prohibited by the Eighth Amendment.

Plaintiff's claim against Kooi is dismissed.

B. *Loinaz*

Regarding defendant Loinaz, defendants argue that Loinaz, a physician at Riverview, examined Gates for the first time on September 3, 1997. (56.1 ¶ 43; Declaration of Dr. Frederick Loinaz ("Loinaz Decl.") ¶ 7) The Amended Complaint alleges that Loinaz failed to provide sufficient follow-up treatment and monitoring, in disregard to plaintiff's "excruciating pain." (AC ¶ 57) According to Loinaz, Gates complained to him of pain and stiffness in his right ankle. (Loinaz Decl. ¶ 7) Loinaz observed that there was no redness or swelling at Gates's right ankle (Singleton Decl. Ex. F ¶ 92), and he was aware that an orthopedic specialist visited Gates on July 17, 1997.[4] (Loinaz Decl. ¶ 7) Loinaz states that he was aware that the orthopedist recommended that Gates receive a new cane, knee-high stockings, and high-top sneakers. (Loinaz Decl. ¶ 7) Further, Loinaz indicates that the absence of swelling and redness, Gates's ability to ambulate, and a preexisting Ibuprofen regimen led him to advise Gates that if pain persisted, he should report back to medical officials for follow-up treatment. (Loinaz Decl. ¶ 8) Loinaz states that he did not ignore Gates's complaints or fail to examine him, and that, after the September 3 examination, he had no further medical encounters with Gates. (Loinaz Decl. ¶¶ 9-10)

**\*7** As with Kooi, neither the Affirmation in Opposition nor the Gates Declaration mention Loinaz by name, much less dispute the facts supported in Loinaz's declaration and the defendants' exhibits. Similarly, plaintiff's memorandum of law offers nothing that would be sufficient to create an issue of fact as to Loinaz's treatment of the plaintiff. The facts produced by defendants show that Loinaz was attentive and thorough in his examination of the plaintiff, and observed an absence of any redness or swelling around plaintiff's ankle. Loinaz observed that Gates was capable of ambulating, and was aware of that Gates was consuming Ibuprofin. In light of these unchallenged assertions, there is no genuine issue of material fact: Loinaz is not responsible for any "sufficiently serious" deprivation of medical treatment, nor a state of mind more culpable than negligence but lesser than a purposeful intent to cause harm. *See Hathaway*, 37 F.3d at 66. As noted above, a difference of opinion on the proper course of treatment cannot predicate an Eighth Amendment deliberate indifference claim. *See Chance, supra* . Therefore, defendants' motion is granted, and Loinaz is dismissed from this action.

C. *Matthew*

During the time period relevant to this action, Matthew had been employed at Auburn as a physician. (56.1 ¶ 9) The Complaint alleges that Matthew denied Gates medical care and footwear without examining Gates's injuries. (Complaint ¶ 66) In denying the motion to dismiss Gates's claim against Matthew, Judge Maas determined that the pleadings provided an insufficient basis for determining whether Matthew's conduct was based on deliberate disregard of serious medical problems, or whether Gates was a malingerer who required no further treatment. (R & R at 15)

In contrast to the materials produced for Kooi and Loinaz, there are no factual submissions pertaining to Matthew's treatment of Gates. As such, the defendants fail to offer any facts that clarify or refute the allegations brought against Matthew in the Amended Complaint. Matthew is discussed in defendants' 56.1 Statement only insofar as he is identified as a physician formerly employed at Auburn.[5] (56.1 ¶ 9) He proffers no affidavit. Defendants do not cite to documentary exhibits that pertain to Matthew's treatment of the plaintiff.

As the moving party on a Rule 56 motion, defendants do not direct the Court to any facts sufficient to show that defendant Matthew is not liable for either the sufficient physical deprivation or a state of mind constituting deliberate indifference. Matthew's involvement with the medical treatment of Gates is no clearer now than it was at the Rule 12 stage. As a result, defendants' motion is denied as it pertains to Matthew.

*Gates's Claims for "Supervisory Liability"*

Defendants move for summary judgment dismissing Gates's claims against defendants Walker, Coyne, Stinson, and Strack. In evaluating defendants' Rule 12 motion, the R & R determined that the Amended Complaint, interpreted liberally, stated claims against these four defendants for liability in their roles as direct or indirect supervisors of the alleged wrongdoers. (R & R at 23-24)

**\*8** In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit set forth the criteria for determining whether a defendant's involvement in a section 1983 claim is sufficient to trigger liability. In addition to direct involvement in a constitutional violation, possible grounds for liability include the following:

A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Id.* at 323-24 (internal citations omitted). *See also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (listing same criteria). As noted in defendants' memorandum of law and the R & R, the doctrine of *respondeat superior* is insufficient to establish liability on a section 1983 claim, and a defendant must have some degree of direct personal involvement with the wrongdoing. *See Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973) (Friendly, J.), *overruled on other grounds, Graham v. Connor,* 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1870-71 (1989). I address in turn Gates's remaining claims asserting supervisory liability.

### A. *Walker*

Defendant Walker was employed by DOCS from August, 1964 to October, 2001. (56.1 ¶ 7; Declaration of Hans Walker ("Walker Decl.") ¶ 1) During the period relevant to this litigation, he was superintendent at Auburn. (56.1 ¶ 7; Walker Decl. ¶ 1) The Amended Complaint alleges that Gates wrote to Walker regarding his medical problems. (AC ¶ 65) It claims that Gates had "many face to face conversations" with Walker, who gave Gates "repeated assurances" that he would speak to Auburn's doctors to ensure that Gates would be treated. (AC ¶ 65) Gates alleges that Walker never spoke with doctors on his behalf. (AC ¶ 65)

As part of his responsibilities as superintendent, Walker states, he annually received approximately 3,000 letters or complaints from inmates, 900 of which included complaints about Auburn's medical staff. (56.1 ¶ 75; Walker Decl. ¶ 6) According to Walker, the volume of inmate complaints

prevented him from personally investigating or familiarizing himself with each complaint. (56.1 ¶ 75; Walker Decl. ¶ 6) He delegated complaints to deputy superintendents to investigate inmate allegations and respond. (56.1 ¶ 76; Walker Decl. ¶ 7) Complaints raising medical issues were directed to doctors or to the facility health services director, Walker states, all of whom responded directly to inmate complaints. (56.1 ¶ 76; Walker Decl. ¶ 7) Walker confirms that he received a letter of complaint dated September 29, 1998, in which Gates complained that the medical staff was not providing adequate follow-up treatment. (56.1 ¶ 77; Walker Decl. ¶ 8; Singleton Decl. Ex. F, Bates Nos. 35-36) He recalls no personal conversations with Gates. (Walker Decl. ¶ 12)

**\*9** According to Walker, he forwarded the complaint to First Deputy Superintendent Gary Hodges on the same day. (56.1 ¶ 77; Walker Decl. ¶ 8; *attached at* Singleton Decl. Ex. F Bates No. 37) Walker included instructions that Hodges was to investigate and handle directly; reply on Walker's behalf; and forward a copy of the reply to Walker. (56.1 ¶ 77; Walker Decl. ¶ 8; Singleton Decl. Ex. F Bates No. 37) On October 5, 1998, Hodges forwarded a reply to Gates. Copied to Walker, the entire text of the reply stated: "Your request to see a bone specialist has been approved and an appointment date has been confirmed." (56.1 ¶ 78; Singleton Decl. Ex. M) Walker states that he had no reason to question Hodges's investigation, and that he knew Hodges to thoroughly investigate inmate complaints. (56.1 ¶ 79; Walker Decl. ¶ 9-10)

As Judge Koeltl observed in *Amaker v. Goord,* 2002 WL 523371, at \*16 (S.D.N.Y. Mar. 29, 2002), certain DOCS officials receive thousands of inmate letters each year, which are then forwarded to appropriate personnel for further investigation. Such a circumstance will not support a finding of liability or personal knowledge on the part of the letters' recipient. *See id.* Accord *Greenwaldt v. Coughlin,* 1995 WL 232736 at \*4 (S.D.N.Y. Apr. 19, 1995) (Preska, J.) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

Walker's sworn declaration, in combination with the documentary evidence produced by defendants, is sufficient to negate any liability to Gates under a theory of supervisory liability. Gates offers no facts pertaining to Walker's involvement with any alleged Eighth Amendment violations he suffered. Indeed, Gates states that "through discovery

and trial, plaintiff would ascertain the exact involvement" that Walker played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As directed by Judge Berman, discovery in this five-year-old action closed on August 29, 2003, roughly five months before plaintiff filed opposition papers. (Docket Entry # 92) Neither plaintiff's memorandum of law nor the accompanying declarations refutes the averments contained in defendants' submissions, which reflect that Walker delegated investigative responsibilities to another DOCS official, and that Gates's complaint was one of thousands that arose annually. Gates offers no statements in opposition that raise a genuine question of material fact. Indeed, his argument appears to be based on a fundamental misunderstanding of the role of a summary judgment motion, and the standard required in its opposition. As such, I grant defendant Walker's motion for summary judgment dismissing Gates's claim against him.

### B. *Strack*

Defendant Strack was employed by DOCS from September, 1964 through September, 1999. (56.1 ¶ 6; Declaration of Wayne Strack ("Strack Decl.") ¶ 1) During the time period relevant to this litigation, Strack served as superintendent at Fishkill. (56.1 ¶ 6; Strack Decl. ¶ 1) The Amended Complaint states that Gates personally informed Strack of his need for medical treatment. (AC ¶ 48) In addition to allegations no longer included in this action, plaintiff claims that Strack "should have known that the Plaintiff would experience great pain(s) as a result of having Plaintiff's right ankle shackled with Plaintiff was being transferred to Riverview Correctional Facility." (AC ¶ 48)

 **\*10** As superintendent, Strack received approximately 2,000 letters or complaints per year from the facility's inmates. (56.1 ¶ 21; Strack Decl. ¶ 6) Strack contends that approximately 200 of those complaints implicated Fishkill's medical staff. (56.1 ¶ 21; Strack Decl. ¶ 6) According to Strack, the volume of complaints precluded him from personally investigating or reviewing every inmate letter. (Strack Decl. ¶ 6) Strack delegated to deputy superintendents the responsibility to investigate and respond to inmate complaints. (Strack Decl. ¶¶ 7-8) All complaints regarding medical services were forwarded to the director of the facility health services, a doctor who "would conduct thorough investigations into inmates' complaints." (Strack Decl. ¶¶ 7-8) Strack states that, to his knowledge, his deputies conducted "thorough routine investigations into inmates' complaints." (Strack Decl. ¶ 8) According to Strack's secretary, who maintained a log of inmate complaints, Gates filed two complaints-one on

December 19, 1996, and one on March 31, 1997. (Declaration of Kristin Woodward ¶¶ 4-6)

Based on the facts offered by defendants and the holdings of *Amaker,* 2002 WL 523371, at *16, and *Greenwaldt,* 1995 WL 2327236, at *4 (S.D.N.Y. Apr. 19, 1995) *Greenwaldt,* 1995 WL 2327236, at *4 (S.D.N.Y. Apr. 19, 1995), I conclude that Strack has satisfied his burden on this motion. Plaintiff offers no facts pertaining to Strack's involvement with any alleged Eighth Amendment violations. Indeed, he states that "through discovery and trial, plaintiff would ascertain the exact involvement" Strack played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As directed by Judge Berman, discovery in this five-year-old action closed on August 29, 2003, roughly five months before plaintiff filed his opposition papers. (Docket Entry # 92) Neither Gates's memorandum of law nor the accompanying declarations refute the averments contained in defendants' submissions, which reflect that Strack delegated certain responsibilities to other DOCS officials, and that Gates's complaints were two among thousands considered by the administration that Strack headed. Gates points nothing that supports a finding of "supervisory liability" on Strack's part. I grant defendant Strack's motion for summary judgment dismissing Gates's claim against him.

### C. *Coyne*

From January, 1989 thru May, 2002, defendant Coyne served as Nurse Administrator at Auburn. (Declaration of Christine Coyne ("Coyne Decl.") ¶ 1) According to Coyne, her position required her to maintain the quality of the nursing practice in the correctional facility. (Coyne Decl. ¶ 2) The Amended Complaint alleges that Coyne "was notified repeatedly by the Plaintiff of said Plaintiff's medical problems yet failed to take appropriate action[ ]." (AC ¶ 68) It offers no further specifics about Coyne's actions or knowledge.

Prior to being transferred to Auburn, Gates wrote to a DOCS Chief Medical Officer about the alleged denial of follow-up medical care; the complaint ultimately was forwarded to Coyne for review. (56.1 ¶ 50; Singleton Dec. Ex. F at Bates Nos. 31-33) Coyne received this complaint in April 1998, at which point she reviewed portions of Gates's medical record. (56.1 ¶ 51; Coyne Decl. ¶ 7) Coyne concluded that Gates received appropriate follow-up care, and had been evaluated on four occasions by orthopedic specialists between January and July, 1997. (56.1 ¶ 51; Coyne Decl. ¶ 7) She also observed that Gates received physical therapy sessions, and

that upon his discharge from physical therapy, was capable of ambulating independently with the aid of crutches. (56.1 ¶ 51; Coyne Decl. ¶ 7) Gates resumed physical therapy in July and August, 1997, and was thereafter placed on an independent exercise program. (56.1 ¶ 52; Coyne Decl. ¶ 8) "I noted that the nursing staff at Riverview had already scheduled an appointment for Mr. Gates to be assessed by a medical health care provider for an orthopedic follow up consult," Coyne states. (Coyne Decl. ¶ 8) After Coyne's investigation of Gates's treatment, she forwarded her findings to Nurse Administrator Betty Prendergast. (56.1 ¶ 52; Coyne Decl. ¶ 8; Singleton Decl. Ex. F, Bates Nos. 22, 33, 99-101)

**\*11** Coyne states that she later became involved in attempting to arrange Gates's appointment with an orthopedic specialist "for possible hardware removal." (56.1 ¶ 66; Coyne Decl. ¶ 9) Following "several phone calls," Coyne "eventually obtained approval for Mr. Gates to be seen at the orthopedic clinic at University Hospital, in Syracuse, New York." (56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne spoke with the orthopedic surgeon, who "assured" her that the hardware removal surgery would be performed. (56.1 ¶ 66; Coyne Decl. ¶ 10) Coyne states that to her knowledge, Gates underwent successful hardware removal surgery on November 28, 1998. [6] (Coyne Decl. ¶ 10) According to Coyne, she had no further involvement with Gates's case, had no medical encounters with him, and lacked the authority to issue medical permits for items such as special boots, high-top sneakers, stockings, or canes. (56.1 ¶ 73; Coyne Decl. ¶¶ 11-12)

As with other defendants who Gates sues under the theory of supervisory liability, plaintiff offers no facts pertaining to Coyne's involvement with any alleged Eighth Amendment violations he suffered. Gates states that "through discovery and trial, plaintiff would ascertain the exact involvement" Coyne played in Gates's treatment. This contention, even if construed under Rule 56(f), fails to defeat summary judgment. As noted above, discovery has been closed for several months. Neither plaintiff's memorandum of law nor the accompanying declarations refute the averments contained in defendants' submissions, which reflect that Coyne undertook a diligent review of Gates's medical treatment, and actively worked on Gates's behalf in obtaining consultation with a specialist. Gates offers no fact or legal argument that supports a finding of "supervisory liability" on Coyne's part. I grant defendant Coyne's motion for summary judgment dismissing Gates's claim against her.

## D. *Stinson*

During the time period relevant to the complaint, defendant Stinson was employed at Riverview as a deputy superintendent of security. (56.1 ¶ 8) At the request of former Riverview superintendent Wayne Barkley, Stinson responded to Gates's medical complaints. (56.1 ¶ 47) On March 25, September 19, and October 23, 1997, Stinson conducted an investigation into Gates's medical complaints. (56.1 ¶ 47) Following each of these investigations, Stinson wrote Gates concluding that Gates received treatment for his injuries. (56.1 ¶ 47) Stinson concluded that Gates had been evaluated by three physicians, received radiographic studies, learned that films revealed a healed fracture in Gates's right ankle and received permits for special boots, a bottom bunk, and a cane. (56.1 ¶ 47; Singleton Decl. Ex. F. at Bates Nos. 19, 22, 26)

The Amended Complaint alleges that Stinson issued a memorandum containing false information about medical supplies issued to Gates. (AC ¶ 58) In moving for summary judgment, defendants have not produced facts sufficient to show the veracity of Stinson's memoranda, either via affidavit or other support. Defendants direct the Court to a portion of Gates's deposition in which he acknowledges receiving a pair of Wolverine boots while at Riverview, and that he was also given a pair of high-top sneakers. (*See* Singleton Decl. Ex. E at 100, 109-10) Although plaintiff proffers no opposing facts or arguments showing that Stinson should be liable under a theory of supervisory liability, neither does Stinson carry his burden of showing that there are no genuine issues of material fact as to his liability. He produces three memos that he authored, without any averments to their accuracy or the methods used to compose them. As the movant for summary judgment, the burden lies with the defendant. Standing alone, I do not consider the Stinson memoranda as a sufficient basis on which to grant summary judgment.

**\*12** Stinson's motion for summary judgment is denied. [7]

## Qualified Immunity for Matthew and Stinson

Defendants argue that they are shielded by the doctrine of qualified immunity. "Government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 1699 (1999). The Supreme Court has adopted

a two-part inquiry to determine whether an official is entitled to qualified immunity: First, the court determines whether the facts alleged show that the official's conduct violated a constitutional right; second, the Court determines whether the constitutional right at issue was clearly established at the time the violation occurred. 🚩 *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001). The Second Circuit has developed an additional test for evaluating the second prong of the qualified immunity standard: a defendant is entitled to qualified immunity when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." 📄 *Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002) (citation omitted).

The Supreme Court has noted the difficulties imposed upon government officials when immunity is not established at the summary judgment stage, and observed that broad-ranging inquiries into official actions "can be peculiarly disruptive of effective government." *See* 📄 *Harlow v. Fitzgerald,* 457 U.S. 800, 816-18, 102 S.Ct. 2727, 2737-38 (1982). "The qualified immunity analysis depends upon an individualized determination of the misconduct alleged." 📄 *Poe,* 282 F.3d at 134. At the Rule 12 stage, Magistrate Judge Maas's R & R ruled that the qualified immunity defense presented an issue of fact that could not be resolved as part of the defendants' motion to dismiss. In this motion, defendants have done little to advance their argument past the Rule 12 stage. It is defendants' "burden at summary judgment to show the nonexistence of a clearly established right and [their] entitlement to qualified immunity." 📄 *Palmer v. Richards,* 364 F.3d 60, 67 (2d Cir.2004).

Defendants have produced no factual evidence as to Matthew's and Stinson's entitlement to qualified immunity. As determined in the preceding discussion, defendants have not met their burden of showing that their conduct did not violate a constitutional right. Defendants have offered no evidence that it was objectively reasonable for them to believe that their alleged actions did not violate clearly established law. It is axiomatic that deliberate indifference to prisoner medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See, e.g.,* 📄 *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth

Amendment.") (citation omitted). Stinson offers no facts to negate the possibility that, pursuant to *Williams,* he was directly involved in any possible violation. Similarly, if Matthew knowingly ignored any affliction that struck Gates, therein causing "the unnecessary and wanton infliction of pain contrary to contemporary standards of decency," 📄 *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993), he acted in violation of clearly established law. Under the second prong of *Poe,* defendants have not produced any evidence that supports a finding that their actions did not violate clearly established law. As with the rest of this motion, Gates's submissions are utterly silent as to the factual circumstances surrounding his treatment at the hands of Matthew and Stinson. Even so, defendants' failure to produce facts concerning plaintiff's allegations against Matthew, and their production of three memoranda authored by Stinson, are insufficient grounds for a grant of qualified immunity and a dismissal of Gates's claims.

**\*13** As the Second Circuit stated in *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001), "summary judgment only is 'appropriate' when the moving party has met its burden of production under Fed.R.Civ.P. 56(c) 'to show initially the absence of a genuine issue concerning any material fact,' " *quoting* 📄 *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1608 (1970). Defendants' submissions are silent to such basic issues as whether Matthew ever treated or diagnosed Gates, the methods underlying Stinson's investigation of Gates's complaint, and even whether Stinson's report had a basis in fact. In short, Matthew and Stinson have provided the Court with no relevant facts upon which to ground a qualified immunity analysis.

Without more, I conclude that Matthew and Stinson have failed to demonstrate an entitlement to the relief that they seek and their motion for summary judgment on the grounds of qualified immunity is denied.

*Conclusion*

Defendants' motion is GRANTED as to defendant Buckley, who is dismissed pursuant to Rule 25(a)(1).

Defendants' motion for summary judgment is GRANTED as to defendants Coyne, Strack, Loinaz, Walker, and Kooi.

Defendants' motion is DENIED as to defendants Matthew and Stinson.

I direct the parties to attend a final pretrial conference to be held on July 15, 2004, at 11 a.m. in Courtroom 12C, 500 Pearl Street, New York, NY.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1488405

## Footnotes

1    The docket reflects that the Rule 56.1 Statement was filed on December 24, 2003, although the Statement itself is dated November 12, 2003.

2    Plaintiff confuses the standards used in Rule 12 and Rule 56 motions in arguing that "[i]t is implicit in the Judge's [Rule 12] order that there is a triable issue of fact as to the defendants [sic] personal involvement named above since he dismissed the claims against many other defendants named in the plaintiff's original complaint but he decided not to grant dismissal against the remaining defendants." (Plaintiff's Mem. at 4) A motion under Rule 12 addresses only the sufficiency of allegations, and not whether there is factual support for them.

3    In his memorandum of law, Gates disputes that he missed an appointment due to sleep. (Plaintiff's Mem. at 10-11) Kooi's representation is supported not only by affidavit, but also by contemporaneous documentary evidence. In contrast, Gates's memorandum of law cites to no supporting evidence.

4    That orthopedist, identified as G. Bhat, M.D. (56.1 ¶ 43) was dismissed from this action at the Rule 12 stage. (R & R at 11-12)

5    Other averments refer to a "Nurse Matthews" at Riverview who administered the drug Motrin and an analgesic balm to the plaintiff. (56.1 ¶ 30; Seidman Decl. ¶ 10) I make no assumption as to whether "Nurse Matthews" is the same person identified as defendant Gregory Matthew, M.D., of the Auburn facility.

6    Defendants' Rule 56.1 Statement ¶ 70 indicates that the removal surgery occurred on November 25, 1998, *citing* Singleton Decl., Ex. F at Bates Nos. 110, 211. I do not consider that discrepancy to be material to the resolution of this motion.

7    "Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation." *Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999). With defendant Loinaz dismissed from the case, Gates has no remaining claims implicating events at Riverview, with the exception of this supervisory liability claim against Stinson. *Clarke v. Sweeney,* 312 F.Supp.2d 277, 298 (D.Conn.2004), held that a claim for supervisory liability could not stand in a section 1983 action after the court determined that there was no underlying constitutional violation. Stinson has not argued that this is a basis for granting his motion, and preliminary research did not yield any precedent in the Eighth Amendment context. Because defendants do not raise this argument, much less offer any facts that would strengthen it, I do not consider it at this time.

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 127 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Steves and Sons, Inc. v. JELD-WEN, Inc., E.D.Va.,
May 1, 2018

2016 WL 1274585
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles T. MCINTOSH, Plaintiff,
v.
UNITED STATES of America, Mr. P. Conklin, Ms.
M. Recktenwald, Mr. M. Whinnery, Mr. Susney,
Mr. J. Diehl, Mr. D Hickman, Mr. A. Dachisen,
Joseph Miraglia, and Brad Magie, Defendants.

Case No. 14-CV-7889 (KMK)
|
Signed 03/31/2016

**Attorneys and Law Firms**

Charles T. McIntosh, Pekin, IL, Pro se Plaintiff.

Natasha Waglow Teleanu, Esq., United States Attorney's
Office, SDNY, New York, NY, Counsel for Defendants
United States Of America, Mr. P. Conklin, Ms. M.
Recktenwald, Mr. M. Whinnery, Mr. Susney, Mr. J. Diehl,
Mr. D. Hickman, Mr. A. Dachisen, Joseph Miraglia, and Brad
Magie.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Charles T. McIntosh ("Plaintiff"), proceeding pro
se, brings this action against the United States of
America, Patrick Conklin ("Conklin"), Monica Recktenwald
("Recktenwald"), Matthew Whinnery ("Whinnery"), David
Susney ("Susney"), Jason Diehl ("Diehl"), Derek Hickman
("Hickman"), Andrew Dachisen ("Dachisen"), Joseph
Miraglia ("Miraglia"), and Brad Magie ("Magie"), asserting a
host of constitutional violations. Defendants move to dismiss
on a variety of grounds, pursuant to Rules 12(b)(1) and 12(b)
(6) of the Federal Rules of Civil Procedure. Additionally,
Plaintiff seeks an injunction preventing Defendants from
destroying certain evidence and requesting sanctions in
connection with Defendants' failure to preserve those
materials. For the reasons that follow, Defendants' Motion is
granted in part, and Plaintiff's Motion is denied in part.

I. Background

A. Factual Background
The following facts are taken from Plaintiff's Amended
Complaint and, for purposes of resolving Defendants' Motion
only, are presumed true.

1. Plaintiff's Assignment to the Special Housing Unit

At the time of the events giving rise to the instant
Amended Complaint, Plaintiff was an inmate in Unit D-B at
Otisville Correctional Facility ("Otisville"), and Conklin was
a corrections officer at least initially in Unit D-A. (See Am.
Compl. ¶¶ 1–2, 6 (Dkt. No. 22).) At some point in October
or November 2013, after Conklin and another corrections
officer completed the 10:00 pm lockdown count, Conklin told
the inmates in Unit D-B that, "if he continue[d] to smell
[cigarette] smoke in the dorm, he was going to turn off the
TV[ ]s every night at 10[ ]pm." (See id. ¶¶ 1–2.) [1] Plaintiff
then told Conklin that (1) he was not authorized to carry
out that threat, (2) Conklin could not punish a whole unit
for the behavior of individuals who chose to smoke, and (3)
Plaintiff did not smoke. (See id. ¶ 3.) According to Plaintiff,
"[i]t is the officer's job to catch/find th[ose] person[ ]s"
who committed the infraction "and [to] punish them alone,"
but it was "wrong" "to try and force [the inmates] to do
the officer's job," and, in any event, "[one] would need
the administration's approval to authorize the turning off of
the TV[ ]s." (Id. ¶ 4.) After Plaintiff's statement, Conklin
became agitated, and, "[f]rom that day [on]," Conklin's
attitude toward Plaintiff "changed," and Conklin "verbally
and ph[ys]ically [harassed]" Plaintiff every time that Conklin
saw him. (See id. ¶¶ 5–6.) For instance, Conklin made
"[s]arcastic comment[ ]s" to Plaintiff, searched Plaintiff as
well as his carrying bag, and "stat[ed] that there [would] be
a[ ]lot of changes when [Conklin] start[s] to work back in D-
B next quarter." (See id. ¶ 6.)

On December 6, 2013, Plaintiff walked out of Unit D-B "at
the call of Insulin-line" and, after dinner, walked back to his
unit, which required him to walk through Unit D-A. (Id. ¶
7.) As he was doing so, for under two minutes, he fielded a
"legal question" from an inmate in Unit D-A "about the draw
law[ ]s being litigated on by [C]ongress." (See id. ¶¶ 8–9.)
That inmate followed Plaintiff into Unit D-B, (see id. ¶ 9),
but was not issued an incident report, "[s]howing a clear case

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 128 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

of targeting, personal vendetta, and retaliation against this Plaintiff etc.," (*see id.* ¶¶ 27–28).) Plaintiff entered his living area, and, about 30 minutes later, Conklin entered Unit DB, walked past everyone directly to Plaintiff, and asked for his ID. (*Id.* ¶¶ 10–12.) Plaintiff asked Conklin why, and Conklin said that "he didn[']t have to tell [Plaintiff] why." (*Id.* ¶ 12 (internal quotation marks omitted).) When Plaintiff replied that Conklin indeed had to tell Plaintiff because Conklin was "not [Plaintiff's] unit officer" and because Plaintiff "should know why [his] ID [was] being requested," Conklin replied that Plaintiff would "find out soon." (*See id.* (internal quotation marks omitted).) Conklin then approached the same Unit D-B inmates whom he had earlier walked past and asked for their IDs in an attempt to avoid creating the impression that he was "singling Plaintiff out or otherwise "personally attacking ... Plaintiff." (*See id.* ¶ 13.) These inmates were not issued incident reports. (*See id.*) Plaintiff asked the inmates why Conklin was taking the inmates' IDs, and, after the inmates said that "[Conklin] was writing ... up incident report[s] for being up-front in his unit," Plaintiff informed the inmates "that he has [Plaintiff] fucked up because [Plaintiff] [doesn't] associate with anyone in [Unit] D-A like that." (*See id.* ¶ 14.) Conklin heard this conversation as he was exiting Unit D-B. (*Id.* ¶ 15.)

**\*2** Plaintiff then went to the office of the unit officer, whom he told that "Conklin just came ... and took [Plaintiff's] ID for some unknown reason." (*Id.* ¶ 16.) The unit officer said that he would call Conklin and find out why, after which time Plaintiff's case manager, Ms. Ferdula ("Ferdula"), came into Unit D-B, had a conversation with the unit officer, and called Plaintiff into her office to ask what happened between Plaintiff and Conklin. (*Id.* ¶¶ 16–17.) After Plaintiff told her, she asked him to wait outside while she spoke to the unit officer and the other inmates whose IDs were taken. (*Id.* ¶ 17.) Ferdula then told Plaintiff that he was being called into the lieutenant's office. (*Id.*)

As Plaintiff entered the lieutenant's office, he noticed Lt. Munios ("Munios"), who supposedly had a problem with Plaintiff because he "exerc[ised] his due process right to grieve" by filing grievances on staff and others. (*Id.* ¶ 18.) Plaintiff knew that he would be assigned to the Special Housing Unit ("SHU") because the lieutenant finally had the opportunity. (*Id.*) Lt. Heli ("Heli") told Plaintiff what Conklin wrote in his incident report and then asked Plaintiff what happened. (*Id.* ¶ 19.) Plaintiff told the lieutenants the statement that he made was to directed to the inmates to whom he was talking, that Conklin was already out the door,

and that "in no way was any threatening statement ... made directly to ... Conklin." (*Id.*) Plaintiff told the lieutenants that they could check his record and that Plaintiff was not one to disrespect staff or a fellow inmate in all his years in prison. (*Id.*) Plaintiff explained that he had just finished a heated phone call and was upset but never made a threatening statement toward Conklin. (*Id.*) Munios said that, if it were up to him, he would throw Plaintiff in the SHU right then and there. (*Id.* ¶ 20.) Heli then told Plaintiff that he would be placed in the SHU for the weekend to "'cool off' just in case [Plaintiff] made another phone call and g[o]t more upset and [took] it out on his officer." (*Id.* ¶ 21.) Plaintiff then said that sort of behavior was "not his styl[e]" and that it was not "in his jacket [sic] to ever ac[t] like that." (*Id.* ¶ 22.) Plaintiff then said that sending him to the SHU was a "retaliation act [for] Plaintiff filing on staff" and that Munios "was tak[ing] this opportunity to place Plaintiff in the SHU." (*Id.* (internal quotation marks omitted).) Munios stated that, "even though [P]laintiff made it direct or indirect to the officer, he still heard it and took it the way he wanted."[2] (*Id.* ¶ 23.)

At 7:20 pm that evening, Plaintiff was placed in the SHU, where he received a "false and fraudulent" incident report made by Conklin, which indicated that, upon asking Plaintiff for his ID card, Plaintiff responded in a very loud manner that Conklin (1) "need[ed] a reason to take it" and (2) was "fucking with the wrong guy." (*Id.* ¶ 24 (internal quotation marks omitted).) With regard to the first statement, Plaintiff concedes that he uttered these words but disputes that he said them in a loud manner. (*See id.* ¶ 25.) With respect to the second sentence, however, Plaintiff claims that Conklin "altered" his statement because "Plaintiff is a[n] African American" and, apparently consequently, "has never used the word [']guy['] in his vocabulary," and the relevant statement and conversation "was taking place among inmates, not inmates and officers." (*Id.* ¶ 26.)

## 2. Plaintiff's Run-in with Officer Magie

**\*3** On March 11, 2014, the SHU lieutenant and officer refused to take Plaintiff to the shower, despite it being no more than ten feet from his cell. (*Id.* ¶ 58.) Magie, despite knowing that Plaintiff is handicapped, walks with a cane, and has a back injury and swollen feet, nonetheless refused to allow Plaintiff to use the closest shower and instead "intended to walk Plaintiff on the other[ ]side of the building without his cane." (*Id.*) Magie also refused to allow Plaintiff to use a

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 129 of 164

"belly-chain" with the handcuffs, "which [Magie] intended to handcuff Plaintiff [with] behind his back." (*Id.*)

Plaintiff refused to be "placed on the other side of the building" and to be cuffed from the back. (*Id.* ¶ 59.) In response, Magie went ballistic, yelling, "This is [my] fucking house! You have to do what I say to do! Not the other way around! You don't tell me what you want! I tell you what I want! I run things back here! etc." (*Id.*) Plaintiff was then forced to wash up in the cell-sink of a "very severe freezing cell," in which Magie made him remain without clothing despite Plaintiff repeatedly saying that he was naked and freezing. (*Id.* ¶ 60.) Plaintiff called for the SHU lieutenant, but he did not answer, so Plaintiff banged on and kicked the SHU cell door. (*See id.* ¶ 61.) The lieutenant then came to the cell-door, where Plaintiff explained the situation to him. (*Id.*) The SHU lieutenant requested that the SHU officer provide Plaintiff with clothing, to which Magie responded that "he [would] get [the clothes] when he's ready[ ] because ... Plaintiff [doesn't] run shit back here." (*Id.* ¶ 62.) Magie then continued to ignore Plaintiff's living conditions, instead walking by Plaintiff's cell without giving Plaintiff any clothing. (*Id.* ¶ 63.) Fifteen minutes later, Plaintiff kicked and banged on the cell door for the lieutenant's attention to show him that Magie still had not provided Plaintiff with clothing. (*Id.* ¶ 64.) As a result, the lieutenant then turned around and took clothing off of a cart across from Plaintiff. (*See id.*) [3]

### 3. Plaintiff's Request to Make a Phone Call and Subsequent Transfer

At some point in 2014, Plaintiff received a letter from an attorney regarding civil action settlement conditions. (*Id.* ¶ 65.) Plaintiff forwarded a request to Mr. Repecki ("Repecki"), the unit manager, who told Plaintiff that he would instruct Mr. Demeo ("Demeo"), Plaintiff's counselor, to provide Plaintiff with a legal phone call. (*Id.*)

On the day Plaintiff was packing his property to prepare for his upcoming transfer from Otisville to MDC Brooklyn, Plaintiff told Demeo that Repecki indicated that he would tell Demeo that Plaintiff was to be allowed to place a call to an attorney. (*Id.* ¶ 66.) Demeo responded that he just met with Repecki, who had said nothing about providing Plaintiff with a legal call. (*Id.*) Demeo said that, in any event, Plaintiff was "outta here" and "[didn't] need any m[ ]ore legal calls to the law firm of Reed Smith LLP." (*Id.* ¶ 66.)

A week later, Plaintiff was transferred to MDC Brooklyn. (*Id.*) The legal proceedings would be delayed for a month until Plaintiff reached his destination at F.C.I. Terre Haute. (*Id.*)

### 4. Plaintiff Pursues his Administrative Remedies with Respect to Conklin

Just over three weeks after Plaintiff was initially put in the SHU, on December 28, 2013, he filed his "BP-8 informal resolution for the submi[ss]ion of a false incident report, 'official/legal' filing against ... Plaintiff to the D-unit counselor, Mr. Demeo," which was then submitted to Whinnery on December 30, 2013. [4] (*Id.* ¶ 29; *see also* Pro Se Pl.'s Resp. to the Government's Mot. To Dismiss ("Pl.'s Opp'n") ¶¶ 2–3 (Dkt. No. 28); Pl.'s Opp'n Ex. B. (BP-8 Form); Pl.'s Opp'n Ex. C (BP-8 Response).) [5] Plaintiff was then called into an office where Diehl was waiting for Plaintiff. (Am. Compl. ¶ 30.) Plaintiff then explained the incident, after which time Diehl told Plaintiff that he had to wait for the "DHO" hearing before Plaintiff could file a grievance against Conklin. (*Id.*) [6] Plaintiff said that the matter was not one for DHO but rather was an "administrative matte[ ]r dealing with criminal conduct and acts by a[ ] United States Government employee in official duties." (*Id.*) Plaintiff was then dismissed. (*Id.* ¶ 31.)

**\*4** In early January 2014, Plaintiff received Diehl's response to Plaintiff's BP-8, which said, among other things, that allegations such as Plaintiff's are "taken seriously" and received "an appropriate amount of review" but that, "[d]ue to the privacy interest of the staff member which [Plaintiff] name[d], [the Bureau of Prisons] [was] unable to disclose to [Plaintiff] any findings or the result o[f] [the Bureau's] review of th[e] matter." (*Id.*; *see also* Pl.'s Opp'n ¶ 3; Pl.'s Opp'n Ex. C (BP-8 Response).) Afterwards, Conklin returned to work on his regular schedule and continued to target Plaintiff with "pat-searches" and "verbal com[m]ents degrading Plaintiff's effort[s] of filing his administrative remedy grievances." (Am. Compl. ¶ 32.) That same day, Plaintiff submitted his BP-9 administrative remedy to Dachisen, who turned Plaintiff's BP-9 over to Special Investigative Services ("SIS") instead of the administrative remedy coordinator for the facility. (*Id.* ¶ 33; *see also* Pl.'s Opp'n ¶ 4; Pl.'s Opp'n Ex. D (BP-9 Form and Response).) [7]

A few weeks later, Hickman summoned Plaintiff to the lieutenant's office to address his BP-9 grievance form. [8] (Am. Compl. ¶ 34.) Plaintiff explained that, if Conklin were to continue to work in the unit, Plaintiff wished to exhaust his administrative remedies because it was clear to him that the prison administration had no intention of ever remedying Conklin's submission of fraudulent and misleading incident reports. (*See id.*) Hickman said that he would "forward the process[ ] and give his response" so that Plaintiff could continue to exhaust his administrative remedies. (*Id.* ¶ 35.)

On February 12, 2014, Recktenwald responded to Plaintiff's BP-9, stating that, "[o]n December 10, 2013, the UDC found [Plaintiff] committed [Code] 312, Insolence Towards a Staff Member and sanctioned, accordingly" and that "[a]dditionally, [Plaintiff] also admitted that [he] made the statement in reference to the staff member." (*Id.* ¶ 41; *see also* Pl.'s Opp'n ¶ 5; Pl.'s Opp'n Ex. E (BP-9 Response).) [9] Since then, the Otisville administration has "refus[ed] to address and avoid the submission of [a] fraudulent incident report of being in an [u]nauthorized [a]rea which gave rise to Plai[ ]ntiff's statement made to fellow inmates and not to staff directly or indirectly." (*See* Am. Compl. ¶ 42.) Rather, "Conklin read [the BP-9] [as] allowing [him] to believe he had the green light to do as he pleased without the [fear] of any interference from his co-workers, commanding officer[ ]s[,] and administration/warden." (*Id.*)

Sometime around February 16 or 17, 2014, Conklin, who was assigned to Unit D-B for the quarter, called Plaintiff to come retrieve his mail. (*See id.* ¶ 36.) About 15 to 30 minutes after Plaintiff did so and returned to his living area, Conklin called Plaintiff to an office where Conklin "with a sm[i]rk on his face" handed Plaintiff his BP-9. (*Id.*) About 30 minutes later, Conklin walked out of his office, directly to Plaintiff's living area, and started searching. (*Id.* ¶ 37.) Conklin made two or three more visits to Plaintiff's living area that same night. (*Id.*) At the 5:00 pm call for insulin, Conklin waited outside the Unit D-B doors where he stopped Plaintiff and questioned him about his double mattress that Plaintiff had had since before Conklin began working there. (*Id.* ¶ 38.) "Upon return back to [the] D-B unit[,] ... Conklin stood outside the entrance to D-B from the D-A unit [and] ... threatened ... Plaintiff[,] stating[,] 'if you don't put that second mattress in[ ]front of my office[,] you will be going to the SHU.'" (*Id.* ¶ 39.) Plaintiff then immediately took the mattress off his bed and put it in front of Conklin's office. (*Id.* ¶ 39.) That night, Conklin "repeatedly made his rounds stric[t]ly at Plaintiff's living area." (*Id.* ¶ 40.)

**\*5** On February 20, 2014, Plaintiff filed a "Notice of Motion for Restraining O[r]der against [Bureau of Prisons ("BOP") ] staff employee at [Otisville], on ... Conklin for har[ ]assment, which was being done with malicious intent[ ] [t]o the United States District Court sentencing Judge[ ] William C. Griesbach, to the United States Attor[ne]y General, Eric Holder, Jr., and to the B[OP] Regional O[ ]ffice." (*Id.* ¶ 43; *see also* Pl.'s Opp'n ¶ 16; Pl.' Opp'n Ex. P. (E.D. Wis. Mot.); Pl.'s Opp'n Ex. V (E.D. Wis. Mot.).) [10] On February 24, 2014, Plaintiff also filed a complaint of reprisal and abridgment of rights to redress. (Am. Compl. ¶ 44.) The next day, the Otisville administration received its copy of the restraining order motion, and, at 9 am, Plaintiff was escorted to an office where he was stripped, had pictures of his body taken, and was handcuffed before being brought to the SHU. (*Id.* ¶ 45.) Plaintiff was processed into the SHU after Hickman and Susney waited for Plaintiff to provide "an affidavit stating the reason why Plaintiff filed his motion." (*Id.* ¶ 46.) Susney told Plaintiff that he would receive a copy of his signed affidavit; however, he did not, and, upon Plaintiff's transfer from Otisville, Susney told him that he "[could] not rec[ei]ve a copy of his own affidavit" "because it involve[d] staff." (*Id.*)

In March 2014, Plaintiff filed a "complaint of reprisal/ abridgment of right to redress Plaint[ ]iff's filing complaint of retaliation." (*Id.* ¶ 47.) "Stating that at around 9:15 or 9:30am, Plaintiff [was] es[ ]corted off the F.C.I. Otisville compound and [was] place[d] in the SHU for filing complaint." [11] (*Id.* ¶ 48.) Plaintiff was then placed in a freezing cell without heat at a "[temperature] way below zero" and windows that were open, broken, and could not be closed. (*Id.* ¶ 49.) "Plaintiff also stated that he was without shoes on a cold ic[ ]y floor with only one pair of socks on his feet for two whole days until the warden walked by doing their [sic] SHU rounds." (*Id.* ¶ 50.) Finally, on April 14, 2014, Plaintiff submitted a Central Office Administrative Remedy Appeal to the BOP, to which he received a response on October 28, 2014. (*See* Pl.'s Opp'n ¶ 1; Pl.'s Opp'n Ex. A (Office of General Counsel Appeal).)

### 5. Plaintiff's Other Complaints

In his Amended Complaint and Opposition to Defendant's Motion, Plaintiff also alleged he raised other issues with various prison and other governmental officials.

First, and apparently not directly connected with his claims in this case, Plaintiff complained that he believed the prison was

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 131 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

tampering with his mail. (*See* Pl.'s Opp'n ¶ 6; Pl.'s Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013)).)

Additionally, by letter dated February 24, 2014, Plaintiff requested that Attorney General Eric Holder and a component of the Department of Justice issue a restraining order against Conklin and suspend him without pay for 60 days because, Plaintiff asserted, Conklin harassed him and retaliated against him. (*See* Pl.'s Opp'n Ex. O (Letter from Pl. to "Special Investigation Attorney General" (Feb. 24, 2014)); *see also* Pl.'s Opp'n ¶ 15.)

Several days later, on February 26, 2014, at around 12:30 pm, the warden, "both A.W's Captain," the health service administrator, warden assistant, and the unit manager for D-Unit were made aware of Plaintiff's living conductions in cell #209 of the SHU. (Am. Compl. ¶ 52.) Additionally, on March 4, 2014, Plaintiff wrote a "notice" to Recktenwald, which was submitted to her the next day. (*Id.* ¶ 53; *see also* Pl.'s Opp'n ¶ 7; Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)).) That notice addressed four issues: (1) that Plaintiff signed an affidavit on February 24, 2014 with Susney but had not yet received a copy of it despite repeatedly asking for one; (2) that Plaintiff wears hand braces for both hands but that neither the SHU nor the medical staff had replaced a set as promised on February 25, 2014; (3) that there was no heat in Plaintiff's cell, which, with all the windows being either open or broken, made the experience akin to being outside at night in the middle of a blizzard when the temperature is fifteen degrees below zero, causing Plaintiff's feet, toes, and hands to be frozen ever since he was placed in the SHU; (4) that Plaintiff is being "subjected to cruel and unusual punishment by [her] administration" and that Plaintiff was "placing [her] on notice with this document of this deliberate indifference, cruel and unusual punishment[,] ... reprisal[,] and abridgment of [Plaintiff's] right to redress and grieve an injustice acts [sic] upon [his] person." (*See* Am. Compl. ¶ 53; Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)).) [12]

 **\*6** Next, Plaintiff submitted a letter dated February 27, 2014 to "special investigation attorney general," in the Civil Rights Division's Special Litigation Section at the Department of Justice complaining about, among other things, the fact that Plaintiff was photographed by the compound officer, that his cell was freezing, that Plaintiff was not permitted a pair of medical shoes, that he does not have hand braces, and that he was being retaliated against. (*See generally* Pl.'s Opp'n Ex. Q (Feb. 27, 2014 complaint packet); *see also* Pl.'s Opp'n ¶ 17.) Although it is unclear whether it relates to Plaintiff's

February 27 letter, Plaintiff received a letter dated April 3, 2014 from Jonathan Smith, chief of the Special Litigation Section of the Department of Justice, thanking him for his letter and indicating that the section "d[id] not have the resources to followup [sic] on every letter," but he "[would] review [Plaintiff's] letter to decide whether it [was] necessary to contact [Plaintiff] for additional information." (Pl.'s Opp'n Ex. S (Letter from Jonathan Smith to Pl. (Apr. 3, 2014)), at unnumbered 1; *see also* Pl.'s Opp'n ¶ 19.) The letter stressed that "[t]he Special Litigation Section only handles cases that arise from widespread problems that affect groups of people" and that it could not "assist with individual problems" or "help [inmates] recover damages or any personal relief." (Pl.'s Opp'n Ex. S (Letter from Jonathan Smith to Pl. (Apr. 3, 2014)), at unnumbered 1.) In a separate letter dated April 3, 2014, also from Jonathan Smith, the Special Litigation Section informed Plaintiff that it "d[id] not have jurisdiction in [Plaintiff's] matter" but "believe[d] that authority for handling this matter may rest with the Federal Bureau of Prisons" to whom it would refer the matter. (Pl.'s Opp'n Ex. T (Letter from Jonathan M. Smith to Pl. (Apr. 3, 2014)); *see also* Pl.'s Opp'n ¶ 20.) That letter was sent to the BOP by letter dated April 3, 2014, which, in turn, informed Plaintiff on May 20, 2014 that a review of it revealed that it contained issues that should first be brought to the attention of prison staff. (*See* Pl.'s Opp'n Ex. Q (Feb. 27, 2014 complaint packet) at unnumbered 1–3.)

On March 5, 2014, Plaintiff also "placed the warden on notice" that he was being prevented from using the phone as needed, that he was not housed in the SHU for breaking any BOP policies, and that it was "cruel and unusual punishment" and "deliberate indifference" to be subjected to cold confinements yet not charged with a crime or violation. (*See* Am. Compl. ¶ 54; *see also* Pl.'s Opp'n ¶ 13; Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)).) That same day, Plaintiff wrote a letter addressed to Mary Patrice Breun at the Department of Justice, complaining of a number of issues, including that he had a freezing cell, was not permitted to wear his medical shoes, needs to wear hand braces, was forced to give up his mattress, and was retaliated against. (*See generally* Pl.'s Opp'n Ex. N (Letter from Pl. to Mary Patrice Breun (Mar. 5, 2014)); *see also* Pl.'s Opp'n ¶ 14.)

At the breakfast serving the following day, Plaintiff contacted the SHU lieutenant and informed him that Plaintiff was in the SHU "right now for a restraining order against ... Conklin and 'for [his] protection' as SIS claim [sic]," but that "the same officer [was] at [the] door feeding [Plaintiff]" (*See* Am.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 132 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Compl. ¶ 56; Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)); *see also* Pl.'s Opp'n ¶ 11.) Also on March 6, Plaintiff submitted a letter to the SHU lieutenant complaining that he had not yet received a copy of his signed affidavit. (*See* Pl.'s Opp'n ¶ 9; Pl.'s Opp'n Ex. I (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)).)

Additionally, the next morning, Plaintiff submitted to the SHU lieutenant a request to make more than one phone call, on the grounds that he was not placed in the SHU for breaking BOP policies. (*See* Am. Compl. ¶ 55; Pl.'s Opp'n Ex. L (Letter from Pl. to SHU lieutenant (Mar. 7, 2014)); *see also* Pl.'s Opp'n ¶ 12.)

On March 9, 2014, Plaintiff submitted a letter requesting to speak to Susney, who, the letter said, was on duty at that time. (Pl.'s Opp'n ¶ 10; Pl.'s Opp'n Ex. J (Letter from Pl. (March 9, 2014)).) On March 11, 2014, Plaintiff wrote a note directed to Demeo indicating that Plaintiff "need[ed] to talk to [Demeo] about being authorized to have a third (3rd) box of legal documents transferred with [Plaintiff] and [his] property." (Pl.'s Opp'n Ex. W (Letter from Plaintiff to Demeo (Mar. 11, 2014)) (emphasis omitted).) Finally, on March 12, 2014, Plaintiff again informed the warden that he was "being hindered from contacting his lawyers[ ] [and] making a legal call" by virtue of the fact that he was being held in the SHU despite not violating any BOP policies and that he was "restricted" in his normal activities and was "subjected to one call every 30 days." (*See* Am. Compl. ¶ 57; Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)); Pl.'s Opp'n Ex. X (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) *see also* Pl.'s Opp'n ¶ 8.)

### B. Procedural History
On September 29, 2014, Plaintiff brought suit against Conklin, Dachisen, Diehl, Hickman, Recktenwald, Susney, Whinnery, the United States of America, and a number of John and Jane Doe defendants, and, in that Complaint, requested the appointment of counsel. (Dkt. No. 1.) That same day, Plaintiff requested to proceed in forma pauperis ("IFP"), (Dkt. No. 2), and file a motion entitled "Complaint Supplemental 'Emergency Ex Parte' Motion to Preserve Evidence," (Dkt. No. 4), which the Court denied without prejudice until Plaintiff served Defendants, (Dkt. No. 8). Plaintiff also moved to vacate the order granting his IFP status, (Dkt. No. 5), relief the Court granted shortly on December 1, 2014, (Dkt. No. 6). On December 10, 2014, the Court denied Plaintiff's request for the appointment of counsel without prejudice. (Dkt. No. 9.)

**\*7** On April 9, 2015, Plaintiff filed an Amended Complaint against Conklin, Dachisen, Diehl, Susney, Hickman, Recktenwald, Whinnery, Miraglia, Magie, and the United States of America. (Dkt. No. 22.) The next day, Defendants submitted a pre-motion letter in advance of their Motion to Dismiss, (Dkt. No. 19), and the Court set a briefing schedule for that Motion, (Dkt. No. 21). On May 20, 2015, Defendants filed their Motion to Dismiss and accompanying papers, (Dkt. Nos. 23–27); Plaintiff filed his opposition on June 25, 2015, (Dkt. No. 28); and Defendants filed their Reply on July 14, 2015, (Dkt. No. 29). On August 4, 2015, Plaintiff filed (1) a document entitled "Pro Se Plaintiff's Sworn Affidavit in Support of Response to Defendant's Motion to Dismiss Amended Complaint Sworn Affidavit of Plaintiffs' [sic] Proof of PLRA Compliance," and (2) a Motion entitled "Complaint Supplemental '[E]mergency Ex Parte' Motion to Preserve Evidence," which sought preservation of certain video footage and logbooks. (Dkt. Nos. 31–32.) On August 21, 2015, Defendants filed their opposition to this latter Motion, along with accompanying papers. (Dkt. Nos. 34–35.) On September 2, 2015, Plaintiff filed a document entitled "Pro Se Motion for Release Detained Legal Document[ ]s/Access to Law[ ]Library," (Dkt. No. 37), to which Defendants responded on September 10, 2015, (Dkt. Nos. 38–39), and upon which the Court ruled on September 10, 2015, (Dkt. No. 40), and as to which it clarified its ruling on September 18, 2015 (Dkt. No. 44).

On December 9, 2015 Plaintiff filed a document entitled "Motion for Release of Legal Property/Documents and Access to Law-Library," (Dkt. No. 46), to which Defendants responded on December 30, 2015, (Dkt. Nos. 49–52). Additionally, on December 22, 2015, Plaintiff filed a document entitled "Pro Se Plaintiff's Response and Sanction for Spoliation of Evidence Motion to the Defendant[ ]s['] Memorandum of Law in Response to Plaintiff's Motion To Preserve Evidence," (Dkt. No. 48), comprising a belated reply in support of his earlier motion for preservation of documents and a request for an adverse inference relating to that same documents. Subsequently, Plaintiff, characterizing Defendants' December 30, 2015 opposition as a "motion," requested on January 20, 2016 an additional 30 days to respond, so that he could "submit exhibits" and "reach access to the SHU Law Library," (Dkt. No. 53), relief the Court denied on January 22, 2016, on the grounds that a reply was not necessary, (Dkt. No. 54). Shortly thereafter, Defendants, noting a new argument raised in Plaintiff's reply, sought leave to file a sur-reply on February 11, 2016, (Dkt. No. 58), which

the Court granted the same day, (Dkt. No. 59). Defendants then filed their sur-reply. (Dkt. Nos. 61–64.)

Additionally, on February 5, 2016, Plaintiff filed without permission a 105-page motion, entitled "Pro Se Plaintiff [sic] Motion for Leave to File Supplemental Pleadings [sic] Pursuant to Federal Rules [sic] of Civil Procedure 15(d) & Response to the Government Motion to Dismiss," (Dkt. 55), which the Court noted appeared to lack relevance to this lawsuit, and granting Plaintiff permission to submit an explanation in a two-page letter by February 29, 2016, (Dkt. No. 57). Pursuant to Plaintiff's requests, (Dkt. Nos. 65, 67), the Court granted Plaintiff two final extensions, (Dkt. Nos. 66, 68).

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical." *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same), *aff'd*, 591 F. App'x 28 (2d Cir. 2015). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same). However, "[o]n a Rule 12(b)(1) motion, ... the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)). This difference as to the allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules. *Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL 2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (same).

### 1. Rule 12(b)(1)

**\*8** "A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also N.Y. State Citizens' Coal. for Children v. Carrion*, 31 F. Supp. 3d 512, 516 (E.D.N.Y. 2014) (same).

### 2. Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by

showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

For the purposes of Defendants' Motion To Dismiss, the Court is required to consider as true the factual allegations contained in the Amended Complaint. *See Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). Moreover, it is appropriate to consider statements made by Plaintiff "submitted in response to a defendant['s] request for a pre-motion conference" for the purpose of resolving the instant Motion. *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013). Finally, the Court construes "the submissions of a pro se litigant ... liberally" and interprets them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and some italics omitted).

## B. Analysis

**\*9** Defendants have moved to dismiss portions of Plaintiff's claims on a variety of grounds. The Court will address each in turn.

### 1. Claims against the United States

In his Amended Complaint, Plaintiff names the United States of America as a defendant, (*see* Am. Compl. 1), and, further, specifies that he brings suit against "the above Defendant(s) ... acting in their official and in their individual capacities," (*id.* at 2). Defendants, however, argue (1) that Plaintiff's claims against the individual Defendants in their official capacities are also considered suits against the United States, (Mem. of Law of Defs. in Supp. of their Mot. To Dismiss the Am. Compl. ("Defs.' Mem.") 20 (Dkt. No. 24)), (2) that the United States has not waived sovereign immunity for constitutional torts, (*id.*), and (3) that, to the extent that Plaintiff tries to allege a tort claim, it fails for failure to exhaust his administrative remedies under the Federal Tort Claims Act ("FTCA"), (*id.* at 20–21 n.8). Plaintiff responds that, while he has "show[n] ... that all 4-[ph]ases of exhaustion under [the Prison Litigation Reform Act] w[ ]ere completed, the retaliat[ory] transfer of Plaintiff deter[r]ed his exhaustion to the Federal Tort Claim Act § 2671 filing." (Pl.'s Opp'n 29.) Therefore, the Court is faced with two questions: (1) can Plaintiff bring a *Bivens* claim against the individual Defendants in their official capacities; and (2) does the FTCA's administrative exhaustion requirement bar Plaintiff's suit?

#### a. *Bivens* Official Capacity Claims

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (internal quotation marks omitted); *see also Diaz v. United States*, 517 F.3d 608, 611 (2d Cir. 2008) (same). "The waiver of sovereign immunity is a prerequisite to subject matter jurisdiction." *Presidential Gardens Assocs. v. U.S. ex rel. Sec. of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999). "[W]aivers of sovereign immunity must be 'unequivocally expressed' in statutory text, and cannot simply be implied." *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004) (quoting

*United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33 (1992)). Moreover, a plaintiff bears the burden to demonstrate that sovereign immunity has been waived. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("[T]he plaintiff bears the burden of establishing that [his or] her claims fall within an applicable waiver.").

"The United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts." *Alston v. Sebelius*, No. 13-CV-4537, 2014 WL 4374644, at *8 (E.D.N.Y. Sept. 2, 2014) (quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)). Accordingly, "*Bivens* claims do not lie against federal employees in their official capacities, because such suits are considered actions against the United States, and are barred by the doctrine of sovereign immunity." *Wright v. Condit*, No. 13-CV-2849, 2015 WL 708607, at *1 (S.D.N.Y. Feb. 18, 2015) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994)); *see also Gonzalez v. Shahnoon*, No. 15-CV-2961, 2015 WL 6118528, at *4 (E.D.N.Y. Oct. 16, 2015) ("*Bivens* claims against federal officials in their official capacity are barred by the sovereign immunity doctrine."). Therefore, to the extent that Plaintiff (1) brings a *Bivens* claim against the individual defendants in their official capacities, or (2) a tort claim against the United States directly, his claim is barred by the doctrine of sovereign immunity and must therefore be dismissed.

### b. FTCA Official Capacity Claims

**\*10** The same is not true, however, with respect to any claims that Plaintiff brings pursuant to the FTCA. Before delving into why that is so, the Court notes that it is less than entirely clear what Plaintiff's putative FTCA claim is. In the section of their Memorandum of Law in support of their Motion to Dismiss identifying Plaintiff's claims, Defendants do not even list an FTCA claim, (*see* Defs.' Mem. 10)—and seemingly for good reason: the only hints that Plaintiff attempts to bring such a claim are stray allusions to the FTCA or the "tort claim act" in the Amended Complaint's cover page or sections concerning venue and subject matter jurisdiction, (*see* Am. Compl. 1, 3), and his assertion for the first time in his Opposition that he was "deter[r]ed" from exhausting his FTCA claim, (Pl.'s Opp'n 29). Nevertheless, for the reasons that follow, whatever Plaintiff's FTCA claim consists of, the Court lacks jurisdiction over it.

In enacting that statute, Congress created a "limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances." *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) (quoting *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007)); *see also Regnante v. Sec. & Exch. Officials*, No. 14-CV-4880, 2015 WL 5692174, at *13 (S.D.N.Y. Sept. 28, 2015) (same). An FTCA action "against the United States is the exclusive remedy for a suit for damages for injury resulting from the negligent or wrongful act or omissions of any employee of the Government while acting within the scope of his office or employment." *Bearam v. Sommer*, No. 12-CV-1858, 2013 WL 5405492, at *8 (S.D.N.Y. Sept. 25, 2013) (internal quotation marks omitted) (citing, *inter alia*, 28 U.S.C. § 2679(b)(1)); *see also Finley v. Hersh*, No. 12-CV-162, 2013 WL 3450270, at *7 (D. Vt. July 9, 2013) ("As to [the plaintiff's] tort claims, his exclusive remedy for monetary damages against the United States is under the Federal Tort Claims Act.").

When bringing an FTCA claim, plaintiffs are required to first exhaust their administrative remedies. *See, e.g.*, *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court."); *Morrow v. Dupont*, No. 08-CV-3083, 2010 WL 1005856, at *3 (E.D.N.Y. Mar. 15, 2010) (same); *see also* 28 U.S.C. § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."). The FTCA's exhaustion requirement is "jurisdictional and cannot be waived." *Celestine*, 403 F.3d at 82; *see also Bastien v. Samuels*, No. 14-CV-1561, 2015 WL 5008837, at *2 (E.D.N.Y. Aug. 21, 2015) (same); *R.C.L. Infant v. Bronx-Lebanon Hosp. Ctr.*, No. 13-CV-6764, 2015 WL 1499745, at *4 (S.D.N.Y. Mar. 31, 2015) (same). [13] "The plaintiff bears the burden of pleading compliance with the FTCA's exhaustion requirement." *Sherman-Amin-Braddux:Bey v. McNeil*, No. 10-CV-5340, 2011 WL 795855, at *2 (E.D.N.Y. Feb. 25, 2011) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987));

*accord* *Foster v. Fed. Emergency Mgmt. Agency*, No. 14-CV-1750, 2015 WL 5430370, at \*10 (E.D.N.Y. Sept. 15, 2015) (same); *Bastien*, 2015 WL 5008837, at \*5 (same); *see also* *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."). "With respect to claims against the BOP, the FTCA requires that an inmate mail or deliver his or her claim to the BOP's Regional Office, and then to appeal an adverse decision in writing to the BOP prior to filing suit in U.S. District Court." *Lockwood v. Fed. Bureau of Prisons*, No. 13-CV-8104, 2015 WL 4461597, at \*2 (S.D.N.Y. July 21, 2015) (citing 28 C.F.R. §§ 543.31(c), 543.32(g)).

**\*11** Here, Plaintiff has not attempted to plead or argue that he complied with the FTCA's exhaustion requirement. To the contrary, he argues that he was "deter[r]ed" from exhausting his FTCA claim. (Pl.'s Opp'n 29.) That is not the same thing, and, so, this Court simply does not have jurisdiction to entertain Plaintiff's FTCA claim, to the extent one even is to be found in the Amended Complaint. *See* *Sherman-Amin-Braddox:Bey*, 2011 WL 795855, at \*2 (noting that "[t]he plaintiff bears the burden of pleading compliance with the FTCA's exhaustion requirement"). [14] However, Plaintiff's claims are dismissed without prejudice, and Plaintiff is granted leave to file a Second Amended Complaint within 30 days of this Opinion. Consequently, if Plaintiff has exhausted his administrative remedies pursuant to the FTCA by that time, he may assert his FTCA claim in his Second Amended Complaint. *See* *Vitrano v. United States*, No. 06-CV-6518, 2008 WL 1752221, at \*4 (S.D.N.Y. Apr. 16, 2008) ("When and if [the plaintiff] is able to plead satisfaction of jurisdictional prerequisites [of his FTCA claim], he will be entitled to assert these claims either by amending his complaint here or by filing a new action."). To the extent that Plaintiff has exhausted such remedies but his FTCA claim is nonetheless untimely, *see* 28 U.S.C. § 2401(b), he is free to allege facts sufficient to argue that untimeliness should be forgiven under the doctrine of equitable tolling, *see* *Palmer-Williams v. United States*, No. 14-CV-9260, 2016 WL 676465, at \*3 (S.D.N.Y. Feb. 18, 2016) (noting that "the U.S. Supreme Court recently ruled that time limitations under the FTCA are nonjurisdictional and therefore subject to equitable tolling" (citing *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015)))—particularly if, as he says, he was "deter[r]ed" in exhausting his administrative remedies, (Pl.'s Opp'n 29).

## 2. PLRA Failure to Exhaust

Defendants also argue that Plaintiff has failed to administratively exhaust the bulk of his claims—indeed, all of his claims save those relating to the December 6, 2013 dispute with Conklin—and that, accordingly, his allegations should be dismissed. (*See* Defs.' Mem. 12–16.)

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also* *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.'" *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)).

**\*12** The Second Circuit has made clear that "administrative exhaustion is not a jurisdictional predicate," but rather "failure to exhaust is an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citation omitted). Accordingly, "defendants bear the burden of proof[,] and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003); *see also* *Miller v. Bailey*, No. 05-CV-5493, 2008 WL 1787692, at \*3 (E.D.N.Y. Apr. 17, 2008) (explaining that the exhaustion requirement "must be pleaded and proved by a defendant" (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007))). Further, "'[a] court may not

dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available.'" *Rossi v. Fischer*, No. 13-CV-3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015) (quoting *Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004)). The Second Circuit has recently made clear that "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law," and "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation, alteration, and internal quotation marks omitted); *see also Perez v. City of N.Y.*, No. 14-CV-7502, 2015 WL 3652511, at *2 (S.D.N.Y. June 11, 2015) (same).

Finally, the Second Circuit has recognized certain exceptions to the exhaustion requirement that apply when "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense ... or acted in such a[ ] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). "[T]he resolution of the exhaustion issue does not necessarily fit exactly into any of these three categories, and a particular fact pattern may implicate one or a combination of these factors." *Pagan v. Brown*, No. 08-CV-724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19, 2009) (citing *Giano*, 380 F.3d at 677 n.6). Therefore, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane." *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13–CV–1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit

suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

Of note, it is not entirely clear that the above-discussed factors—colloquially referred to as the *Hemphill* exceptions—remain good law after the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006). In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates not merely "exhaustion *simpliciter*" but rather "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules." 548 U.S. at 83, 88, 91. Although Second Circuit has confirmed that *Woodford* may indeed have imperiled the *Hemphill* exceptions' vitality, it has not yet explicitly decided the question. *See, e.g.*, *Amador*, 655 F.3d at 102 ("Subsequent decisions have questioned the continued viability of this framework following the Supreme Court's decision in *Woodford* ...."); *Ruggiero*, 467 F.3d at 176 ("We need not determine what effect *Woodford* has on our case law in this area, however, because [the plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Rambert v. Mulkins*, No. 11-CV-7421, 2014 WL 2440747, at *11 (S.D.N.Y. May 30, 2014) (noting that "the Second Circuit has left unresolved the continuing vitality of the *Hemphill* exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo*," but concluding that "*Hemphill* remains good law").

**\*13** Nevertheless, when nonexhaustion is not clear from the face of the complaint, a defendant's motion can and should be converted to a motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about [the] plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Stevens v. City of N.Y.*, No. 12-CV-1918, 2012 WL 4948051, at *3 (S.D.N.Y. Oct. 11, 2012) (quoting *McCoy*, 255 F. Supp. 2d at 251); *see also Rambert*, 2014 WL 2440747, at *6 (same); *Smalls v. Jummonte*, No. 08-CV-4367, 2010 WL 3291587, at *3 (S.D.N.Y. Aug. 13, 2010) (same). When doing so in the context of an action brought by a pro se prisoner, the potential consequences of a motion for summary judgment as well as the procedural requirements for responding to one must first be explained, and the Court must also allow Plaintiff the opportunity to take discovery. *See Hernández v. Coffey*, 582 F.3d 303, 305, 307–08 (2d Cir. 2009) (noting that "[i]n the case of a pro se party ..., notice is particularly

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 138 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

important because the pro se litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues" and that, "[a]ccordingly, pro se parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment" (alterations, italics, and internal quotation marks omitted)). As a result, in the PLRA exhaustion context, courts typically have insisted upon limited discovery before converting a motion to dismiss for failure to exhaust administrative remedies as required by the PLRA into a motion for summary judgment. *See, e.g.*, *Lovick*, 2014 WL 3778184, at *5 (observing that "when converting a Motion to Dismiss into a Motion for Summary Judgment under Fed. R. Civ. P. 12(d), notice to the parties is mandated, particularly when a pro se litigant is involved," and accordingly "permit[ting] the parties to engage in limited discovery confined solely to the issue of administrative exhaustion" (italics omitted)); *Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 (S.D.N.Y. 2013) (noting that the court could convert motion to dismiss into motion for summary judgment on issue of PLRA exhaustion but observing that, if it were to do so, "the parties would be entitled to an opportunity to take discovery and submit additional relevant evidence, and the parties have not yet been allowed such an opportunity"); *Stevens*, 2012 WL 4948051, at *6 (noting that it was appropriate before converting the motion to dismiss into a summary judgment motion to permit discovery limited to the issue of administrative exhaustion).

A number of courts have, however, declined to convert the motion where discovery may reveal whether administrative remedies were available to a plaintiff or other special circumstances would excuse his failure to exhaust. *See, e.g.*, *McNair v. Rivera*, No. 12-CV-6212, 2013 WL 4779033, at *6 (S.D.N.Y. Sept. 6, 2013) (declining to convert motion because "bifurcating discovery, with additional motion practice, creates the potential for complication and delay," and because "the court [did] not anticipate that full fact discovery [would] be sufficiently laborious ... to counter [the] plaintiffs' interest in a just disposition of their suits"); *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061, 2013 WL 1122628, at *6 (E.D.N.Y. Mar. 18, 2013) (declining to convert Rule 12(b)(1) motion to dismiss into motion for summary judgment because discovery had not yet occurred and because FRCP 12(d) contained no authority to convert a Rule 12(b)(1) motion into a motion for summary judgment).

Here, Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint, and, indeed, Plaintiff argues in his Opposition to Defendants' Motion that his any nonexhaustion

should be excused under one of the *Hemphill* exceptions. (*See* Pl.'s Opp'n 16–17 (section entitled "'Special Circumstances' Justifying Failure To Exhaust").) [15] Additionally, although procedurally suspect and less than fully factually dispositive of the question surrounding whether he, indeed, exhausted, Plaintiff has submitted a document entitled "Pro Se Plaintiff's Sworn Affidavit in Support of Response To Defendant[ ]s['] Motion To Dismiss Amended Complaint Sworn Affidavit of Plaintiff[']s Proof of PLRA Compliance." (Dkt. No. 31.) At the risk of inviting further unsolicited and, frankly, unhelpful submissions, the Court surmises that the fact that Plaintiff has submitted the document—even if not sufficient in its own right to answer the question of whether exhaustion is clear from the face of the Amended Complaint—underscores that Plaintiff's Amended Complaint did not mean to intimate that Plaintiff had failed to exhaust his administrative remedies.

**\*14** Therefore, the Court will allow conversion of the instant Motion to one for summary judgment but will allow for limited discovery on the issue of administrative exhaustion. "Plaintiff may, for example, respond with evidence of his efforts to exhaust, and/or evidence that (a) administrative remedies were unavailable, (b) he was inhibited from exhausting available remedies by one or more Defendant's actions, or (c) special circumstances exist that justify his failure to comply with the exhaustion requirements." *Smalls*, 2010 WL 3291587, at *3 (citing *Hemphill*, 380 F.3d at 686; *McCoy*, 255 F. Supp. 2d at 251).

### 3. Personal Involvement

Defendants also move to dismiss the Amended Complaint insofar as it seeks relief against Whinnery, Dachisen, Diehl, Hickman, and Susney, and to the extent that it seeks to hold Recktenwald liable for anything beyond her denial of Plaintiff's grievance relating to Conklin's allegedly false incident report. (*See* Defs.' Mem. 17–20.) The Court agrees.

"A plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006) (citing *Bivens*, 403 U.S. at 389). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 139 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

676; *see also Thomas*, 470 F.3d at 496 ("Because the doctrine of *respondeat superior* does not apply in *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation." (some italics omitted)); *see also J.S. v. T'Kach*, No. 11-CV-103, 2014 WL 4100589, at *8 (S.D.N.Y. Aug. 20, 2014) (same).

"Before *Iqbal*, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was 🔖 *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)." *Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at *7 (S.D.N.Y. Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015); *see also Correa v. Hastings*, No. 13-CV-5862, 2015 WL 6681186, at *4 (S.D.N.Y. Nov. 2, 2015) (identifying *Colon* as establishing the test for finding personal involvement in *Bivens* claim where showing of intent is not required). [16] Under the framework set forth in that case, courts find personal involvement of a supervisory defendant where evidence shows:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

🔖 *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (italics omitted) (quoting 🔖 *Colon*, 58 F.3d at 873); *see also* 🔖 *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting 🔖 *Colon*, 58 F.3d at 873) (same). Since then, the Second Circuit has recognized that the "[*Iqbal*] decision ... may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," 🔖 *Grullon*, 720 F.3d at 139; however, "[it] has thus far declined to resolve the question." *Golodner v. City of New London*, No. 14-CV-173, 2015 WL 1471770, at *7 (D. Conn. Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at *6 (noting that "the continuing validity of the *Colon* factors has been called into question by the Supreme Court's ruling in *Iqbal*").

### a. Generalized Allegations of Conspiracy

**\*15** Before delving into Plaintiff's specific allegations against each of these Defendants and whether he sufficiently alleges personal involvement, it bears noting that Plaintiff alleges that "Recktenwald, Whinnery, Dachisen, Susney, Diehl, and Hickman[ ] rec[ei]ved Plaintiff['s] grievances/ complaints about ... Conklin['s] misconduct and fals[e] fraudulent incident report ... and conspired to cover it up until Plaintiff served them their copies of his restraining order/ motion on Feb. 25.14." (Pl.'s Opp'n 6 (citing *id.* Ex. O (Letter from Pl. to "Special Investigation Attorney General" (Feb. 24, 2014)), *id.* Ex. P (E.D. Wis. Mot.).)) This broad assertion does not create personal involvement.

To state a legal truism, just because a litigant posits the existence of a conspiracy does not make it plausible. Indeed, the Supreme Court has made clear, "conclusory ... allegations" are "disentitle[d] ... to the presumption of truth." *Iqbal*, 556 U.S. 681. [17] Likewise, even under the *Colon* regime, Second Circuit law has long taught that, "merely recit[ing] the legal elements of a successful ... claim for supervisory liability ... does not meet the plausibility pleading standard." *Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); 🔖 *Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient ...." (internal quotation marks omitted)), *reconsideration granted in part on other grounds*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, No. 11-CV-9102, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("To the extent [the plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates

who were violating her rights, the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (internal quotation marks omitted)); *Kee v. Hasty*, No. 01-CV-2123, 2004 WL 807071, at *2 (S.D.N.Y. Apr. 14, 2004) (same); *Russo v. Glasser*, 279 F. Supp. 2d 136, 145 (D. Conn. 2003) (determining in *Bivens* action that "[the] [p]laintiff's claims of conspiracy are vague and conclusory, and accordingly are dismissed" (emphasis omitted)).

### b. Whinnery

With respect to Whinnery, Plaintiff essentially alleges that (1) his BP-8 was submitted to Whinnery, (*see* Am. Compl. ¶ 29; *see also* Pl.'s Opp'n ¶ 2; Pl.'s Opp'n Ex. B (BP-8 Form)), (2) that Whinnery responded to a grievance he brought relating to Conklin's alleged tampering with his mail, (*see* Pl.'s Opp'n ¶ 6; Pl.'s Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013))), and (3) that "the Supervisory Officials to [sic] actions on Feb. 25, 2014 at or around 9:a.m. or 9:30 a.m., ordered the compound officer to enter into the educational department and called Plaintiff to the front entrance, to[ ]where Plaintiff was escorted to the Lt.'s/ Captains' office where Captain Whinnery stated, quote 'this is for my protection. [W]e want to make sure you[']r[e] not hurt,'" (Pl.'s Opp'n 6–7).

**\*16** The first of these allegations fails to establish personal involvement because mere receipt of a complaint or grievance from an inmate is insufficient to establish personal involvement, even under the *Colon* regime. *See, e.g.*, *Whitenack v. Armor Med.*, No. 13-CV-2071, 2014 WL 5502300, at *6 (E.D.N.Y. Oct. 30, 2014) ("Since [the] plaintiff has pled no facts, beyond [the sheriff's] presumed receipt of grievances and his position atop the correctional center ..., [the plaintiff] has failed to plausibly plead [the sheriff's] personal involvement in any infringement of [the plaintiff's] constitutional rights." (alterations and internal quotation marks omitted)); *Rivera v. Bloomberg*, Nos. 11-CV-629, 11-CV-4325, 2012 WL 3655830, at *10 (S.D.N.Y. Aug. 27, 2012) (concluding that the "[p]laintiffs [did] not ple[a]d facts sufficient to demonstrate that [one defendant] was personally involved in the alleged violation of their constitutional rights," despite allegation that the "[p]laintiffs [had] informed [her] of their claims"); *Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *7 (S.D.N.Y. Sept. 29, 2004) ("[T]he receipt of letters or grievances or

complaints from inmates is insufficient to impute personal involvement."); *Rivera v. Goord*, 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000) (dismissing complaint against five defendants as to whom the plaintiff failed to allege any facts demonstrating that personal involvement in or knowledge of the alleged constitutional violations, where the plaintiff instead "merely assert[ed] that he wrote to these defendants complaining about the conduct of various [other] [d]efendants and that his complaints were ignored"). [18] To be sure, many courts have declined to dismiss claims pursuant to this principle to situations where the alleged violation is ongoing, such that the defendant's inaction upon receipt of the complaint allowed the violation to persist. *See, e.g.*, *Gantt v. Lape*, No. 10-CV-83, 2011 WL 673783, at *3 (N.D.N.Y. Jan. 18, 2011) ("[T]he second *Colon* category— that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal—applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation."), *adopted by* 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011); *Zappulla v. Fischer*, No. 11-CV-6733, 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) ("[I]f a plaintiff alleges that a constitutional violation is ongoing, and that a defendant, after being informed of a violation through a report or appeal, failed to remedy the wrong, the plaintiff's claim against that defendant should not [be] dismissed under Rule 12(b)(6).")'; *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it."). Thus, the mere receipt of Plaintiff's BP-8 concerning Plaintiff's discrete, non-continuing run-ins with Conklin cannot establish Whinnery's personal involvement for the first allegation.

**\*17** The second of these allegations fails because it relates to conduct that actually predates the conduct at issue in this case. (*Compare* Pl.'s Opp'n Ex. F (Letter from M. Whinnery to Plaintiff (Sept. 30, 2013)) *with, e.g.*, Am. Compl. ¶ 1 (indicating that the day upon which Conklin first complained about smelling cigarette smoke was "[o]n or about October into November of 2013").) While a court "evaluating the legal sufficiency of a pro se plaintiff's claims ... may rely on the plaintiff's opposition papers," *Vlad-Berindan v. MTA N.Y. City Transit*, No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (italics omitted), a plaintiff may not assert new claims through those opposition papers, *see Weerahandi v. Am. Statistical Ass'n*, No. 14-CV-7688, 2015

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 141 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

WL 5821634, at *8 (S.D.N.Y. Sept. 30, 2015) (noting that the plaintiff raised new claims in his papers opposing the motion to dismiss but "declin[ing] to address them for the purposes of [the] [d]efendant's motion to dismiss" "[b]ecause these claims were not raised in the complaint"); *Bernstein v. City of N.Y.*, 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) ("New claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss." (alterations and internal quotation marks omitted)). Because Whinnery's handling of a mail dispute several months before the action underlying Plaintiff's *Bivens* claim as described in the Amended Complaint alleges not personal involvement but, at best, a new claim, the Court need not address it. *See Weerahandi*, 2015 WL 5821634, at *8.

Similar logic also dooms Plaintiff's allegations concerning Whinnery's statement to Plaintiff in the office. (*See* Pl.'s Opp'n 6–7.) *See also Weerahandi*, 2015 WL 5821634, at *8 (declining to address new claims in the plaintiff's opposition to the motion to dismiss "[b]ecause these claims were not raised in the complaint"). Even if this statement did not predate the events at issue in this case, it does not fit into any of the existing claims currently included in the Amended Complaint. Additionally, one struggles to understand what prong of the *Colon* analysis this statement could possibly implicate. It does not include (1) direct participation in a constitutional violation, (2) a failure to remedy a wrong, (3) creation or perpetuation of a policy or custom under which unconstitutional practices occurred, (4) gross negligence in supervising subordinates, or (5) failure to act upon information. *See Colon*, 58 F.3d at 873.

Therefore, Plaintiff fails to adequately allege Whinnery's personal involvement in any constitutional fouls allegedly suffered by Plaintiff.

### c. Diehl

Plaintiff similarly fails to adequately plead Diehl's personal involvement. As a refresher, Plaintiff alleges that he met with Diehl, who told Plaintiff that he had to wait for the "DHO hearing" before he could file a grievance against Conklin, and Plaintiff said that this was "not [a] DHO matter, but an administrative matte[ ]r dealing with criminal conduct and acts by a[ ] United States Government employee in official duties." (Am. Compl. ¶ 30.) Plaintiff also alleges that, in early January, 2014, he received a response from Diehl confirming receipt of Plaintiff's BP-8 and telling Plaintiff, among other

things, that it was the policy of BOP and the facility "to treat all inmates in a fair and impartial manner," but that "[d]ue to the privacy interest of the staff member which [Plaintiff] name[d]," the findings or result of the review of the matter could not be disclosed to Plaintiff. (*Id.* ¶ 31; Pl.'s Opp'n Ex. C (Jan. 3, 2014 response); *see also* Pl.'s Opp'n ¶ 3.) At best, these assertions can be taken as an allegation that Diehl received Plaintiff's grievance, which, as stated, is insufficient by itself to establish personal involvement. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014), *appeal dismissed* (Jan. 8, 2015) ("[R]eceipt of letters or grievances is insufficient to impute personal involvement. Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison officials could name the supervisor as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the supervisor." (internal quotation marks omitted)).

### d. Dachisen

**\*18** Plaintiff also does not allege enough with respect to Dachisen. In his submissions, Plaintiff makes only two allegations that unambiguously refer to Dachisen.[19] First, Plaintiff alleges that, "[o]n $^1/_6$/2014, Plaintiff filed his BP-9 administrative remedy to acting Warden, Mr. Dachisen who intern [sic] once against turned Plaintiff's BP-9 over to SIS, instead of the administrative rem[e]d[ ]y co[o]rdinator for the facility." (Am. Compl. ¶ 33.) Second, in his opposition, Plaintiff also states that he "verbally placed [Dachisen] on notice on 12/9/2013 at main-line of ... Conklin['s] misconduct and false and fraudulent incident report[ ] as[ ]well[ ]as the violations that [were] committed against Plaintiff being sent to the SHU, was in control and Acting Warden of the FCI [O]tisville Administration before ... Recktenwald took control." (Pl.'s Opp'n 2–3.) As with Diehl, mere allegations that Plaintiff's complaints made their way to Dachisen are not sufficient. *See Acevedo*, 2014 WL 5015470, at *16; *see also Barnes v. Prack*, No. 11-CV-857, 2012 WL 7761905, at *6 (N.D.N.Y. Sept. 7, 2012) (finding that the plaintiff's allegations that he spoke with a prison superintendent about instances of abuse that the plaintiff was allegedly experiencing did not establish personal involvement due to lack of facts showing the superintendent could remedy the problem), *adopted by* 2013 WL 1121353 (N.D.N.Y. Mar. 18, 2013).

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 142 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

e. Hickman

Plaintiff likewise fails to satisfactorily allege Hickman's personal involvement. Plaintiff alleges that, a few weeks after submitting his BP-9, Hickman called him to the lieutenant's office to address his BP-9 grievance form against Conklin. (Am. Compl. ¶ 34; *see also* Pl.'s Opp'n ¶ 4; Pl.'s Opp'n Ex. D (BP-9 Form and Response).) Plaintiff allegedly told the "lieutenant" that, if Conklin were to continue to work in the unit, Plaintiff would wish to proceed and exhaust his administrative remedy because it was clear to him that "this F.C.I. Otisville administration has no intentions o[f] ever remed[y]ing this situation of the officer submission of fraudulent and misleading incident reports." (Am. Compl. ¶ 34.)[20] Hickman allegedly then "replied that he would forward the process, and give his response so Plaintiff can continue exhau[s]ting his BOP administrative remedy." (*Id.* ¶ 35.) Additionally, Plaintiff alleges that Hickman (along with Susney) "waited for Plaintiff to state an affidavit stating the reason why Plaintiff filed his motion" before processing Plaintiff into the SHU. (*Id.* ¶ 46.)[21]

**\*19** Here, Plaintiff's allegations are that Hickman helped Plaintiff move his grievance process along and waited for Plaintiff to fill out an affidavit. As is hopefully clear by now, the first founders because mere receipt of a grievance —if that is even what is alleged here—does not amount to personal involvement. *See* Acevedo, 2014 WL 5015470, at *16; *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009) (observing that the facility superintendent's act of "referring [the plaintiff's] letters to staff for investigation [was] not sufficient to establish [his] personal involvement"). The second fails because it is not clear how waiting for Plaintiff to fill out an affidavit could amount to personal involvement in depriving him of his constitutional rights. Indeed, if receiving a grievance detailing the facts at issue in this case cannot create personal involvement, simply alleging Hickman's presence while Plaintiff filled out an affidavit falls shorter still.

f. Recktenwald

Plaintiff makes a number of allegations about Recktenwald; however, they can be distilled into two categories: First, Plaintiff alleges that, on February 12, 2014, she "responded to Plaintiff's BP-9 stating that 'On December 10, 2013, the UDC

found you committed [Code] 312, [I]nsolence [T]owards a [S]taff Member and sa[n]ctioned, accordingly. Additionally, you also admitted that you made the statement in reference to the staff member,'" (Am. Compl. ¶ 41; *see also* Pl.'s Opp'n ¶ 5; Pl.'s Opp'n Ex. E.), a statement which Conklin read as giving him "the green light to do as he pleased," (*Id.* ¶ 42). Second, Plaintiff also alleges that he submitted a number of complaints to Recktenwald, the details of which need not be recited here, or that she was otherwise on notice. (*See* Am. Compl. ¶¶ 52–54, 57; Pl.'s Opp'n ¶¶ 7, 8, 13; Pl.'s Opp'n ¶ 6; Pl.'s Opp'n Ex. G) (Letter from Pl. to Warden (Mar. 4, 2014)); Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)); (Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)).) Defendants, apparently, do not seek dismissal of Plaintiff's claims against Recktenwald on the basis of personal involvement with respect to the first category. (*See* Defs.' Mem. 19 ("Only Plaintiff's exhausted allegations regarding Recktenwald's denial of Plaintiff's BP-9 Form could be arguably sufficient to withstand a motion to dismiss, because the allegation that Recktenwald or any other defendant was on notice of Plaintiff's complaints fails to state a claim.").) With respect to the latter, suffice it to say that "the receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement," *Johnson*, 2004 WL 2199500, at *7, and generalized allegations of knowledge are too conclusory, *see* Iqbal, 556 U.S. at 680–81. Therefore, the Court grants the Motion to dismiss Recktenwald with regard to this second category.

g. Susney

Finally, Plaintiff's claim also fails with respect to Susney. Along with Hickman, Susney allegedly "waited for Plaintiff to state an affidavit stating the reason why Plaintiff filed his motion" before he was processed into the SHU. (Am. Compl. ¶ 46.) Additionally, Susney "stated to Plaintiff that after he signed the affidavit Plaintiff would receive a[ ] copy of this document," but failed to subsequently provide one. (*Id.*; *see also id.* ¶ 53 (indicating that he wrote to Recktenwald that he signed an affidavit on February 25, 2014 with Susney but had not received a copy).) Susney also allegedly "met ... Plaintiff in R & D" before Plaintiff's transfer from F.C.I. Otisville and "stated 'because it involves staff, Plaintiff can[ ]not receive a copy of his own affidavit.'" (*Id.* ¶ 46.) Plaintiff also alleges that, on March 6, 2014 and on March 9, 2014, he requested to speak with Susney, knowing he was on duty at the latter time but that Susney did not show up to speak with Plaintiff. (*See* Pl.'s Opp'n ¶ 9–10; Pl.'s Opp'n Ex. I (Letter from Pl.

to SHU lieutenant (Mar. 6, 2014)), Pl.'s Opp'n Ex. J (Letter from Pl. (March 9, 2014)).) The Court is frankly unsure how Plaintiff's allegations about Susney could be construed to allege involvement in the purported constitutional infractions at issue in this case. While it is obligatory to liberally construe Plaintiff's submissions, *see Triestman*, 470 F.3d at 474–75, there exists a line between liberal construction and gratuitous revision. Because, ultimately, it is Plaintiff's burden to plead personal involvement, *cf. Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *10 (S.D.N.Y. June 9, 2015) ("Plaintiff has not met the burden of pleading personal involvement for any of the 12 individual [d]efendants."), and because Plaintiff has not done so, his claim against Susney must also be dismissed.

### 4. Qualified Immunity

**\*20** Defendants further argue that "Plaintiff's *Bivens* claims against Whinnery, Dachisen, Hickman, Susney, Diehl, and Recktenwald fail for the additional reason that these Defendants are entitled to a qualified immunity from suit on such claims." (Defs.' Mem. 19.) Plaintiff's claims against Whinnery, Dachisen, Hickman, Susney, and Diehl have, however, already been dismissed for failure to allege personal involvement. There is thus no need to address the qualified immunity argument as to those Defendants. *See Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) ("When the facts, viewed in light most favorable to the plaintiff, do not demonstrate that an officer's conduct violated a constitutional right, the court need not further pursue the qualified immunity inquiry."); *see also Dawson v. City of N.Y.*, No. 13-CV-5956, 2014 WL 5020595, at *2 (S.D.N.Y. Oct. 8, 2014) (same); *Cooper v. Marrero*, No. 11-CV-9260, 2013 WL 2529723, at *5 (S.D.N.Y. June 11, 2013) (same). Because Defendants did not move to dismiss the claim for denying Plaintiff's grievance on appeal asserted against Recktenwald on the grounds of insufficient personal involvement, however, the Court must consider whether it may be dismissed pursuant to the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity "'gives government officials breathing room to

make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). Because qualified immunity is "an affirmative defense [that] ... reflects an immunity from suit rather than a mere defense to liability[,] ... it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a preanswer motion to dismiss." *Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013) (italics and internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

In determining whether a right is clearly established, "th[e] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (internal quotation marks omitted). "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).

Recktenwald is entitled to qualified immunity. As she accurately recounted when denying Plaintiff's BP-9, Plaintiff alleged that "staff made and submitted fraudulent, false[,] and misleading statements personally targeting [Plaintiff]." (Pl.'s Opp'n Ex. E (BP-9 Response); *see also id.* Ex. D (BP-9 Form and Response).) Moreover, Recktenwald also noted that "[a] review of the matter" was conducted and concluded that "[Plaintiff] admitted that [he] made the statement [at issue in his disciplinary proceedings] in reference to the staff member." (Pl.'s Opp'n Ex. E (BP-9 Response).) Recktenwald additionally informed Plaintiff of his right to appeal her decision to the Regional Director for the Northeast Region of the Federal Bureau of Prisons. (*Id.*) This is enough to safely conclude, at the absolute minimum, "a reasonable [warden] would not have understood from the existing law that her conduct was unlawful." *Schubert*, 775 F. Supp. 2d at 702; *see also Green v. Bauvi*, 46 F.3d 189, 195 (2d Cir. 1995) ("[A]dherence to [state] regulations may be pertinent in considering whether a reasonable official would have known his [or her] actions violated the Constitution.");

*Selah v. Fischer*, No. 09-CV-1363, 2015 WL 1893340, at *13 (N.D.N.Y. Apr. 15, 2015) (dismissing complaint against correctional facility superintendent on qualified immunity grounds where "he denied plaintiff's appeals in connection with the grievances based on his belief that plaintiff was seeking relief that he was not authorized to provide, and he provided plaintiff with instructions regarding how to seek the relief requested" and followed all relevant New York State Department of Corrections and Community Supervision policies). [22] Additionally, given that qualified immunity may shield the prison official who denies an inmate's grievance following an investigation, *see Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 145 (S.D.N.Y. 2002) (finding prison official who denied a grievance on the grounds that he believed a Department of Corrections employee who said the conduct at issue was the result of a "mere misunderstanding" was entitled to qualified immunity), and given that this protection in such cases extends to the official who affirms that denial, *see Cancel v. Mazzuca*, No. 01-CV-3129, 2002 WL 1891395, at *5 (S.D.N.Y. Aug. 15, 2002) (dismissing as futile proposed addition of new defendants who affirmed denial of grievance where the employee who denied the grievance was entitled to qualified immunity, reasoning that the proposed defendants would also be entitled to qualified immunity), it stands to reason that Recktenwald should not be stripped of the same immunity, absent some legally sufficient reason to think her "plainly incompetent or ... [to have] knowingly violate[d] the law." *Sheehan*, 135 S. Ct. at 1774 (internal quotation marks omitted).

### 5. Plaintiff's § 1986 Claim

**\*21** Defendants also move to dismiss Plaintiff's § 1986 claim for neglect to prevent conspiracy on the grounds that he has not alleged the existence of a conspiracy sufficient under § 1985. (Defs.' Mem. 21–22.) Defendants' point is a fair one, and, accordingly, Plaintiff's § 1986 claim is dismissed.

"[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993); *see also Karam v. Cty. of Rensselaer*, No. 13-CV-1018, 2016 WL 51252, at *21 (N.D.N.Y. Jan. 4, 2016) (same); *Poulos v. City of N.Y.*, No. 14-CV-3023, 2015 WL 5707496, at *8 (S.D.N.Y. Sept. 29, 2015) (same); *Townsend v. New York*, No. 14-CV-6079, 2015 WL 4692604, at *7 (E.D.N.Y. Aug. 6, 2015) (same).

The Second Circuit has made clear that the four elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian*, 7 F.3d at 1087 (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983)); *see also Townsend*, 2015 WL 4692604, at *7 (same); *Robinson v. Bratton*, No. 14-CV-2642, 2014 WL 3496460, at *6 (E.D.N.Y. July 8, 2014) (same). [23] Additionally, "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Mian*, 7 F.3d at 1088 (quoting *Scott*, 463 U.S. at 829); *see also Ramirez v. Port Auth.*, No. 15-CV-3225, 2015 WL 9463185, at *7 (S.D.N.Y. Dec. 28, 2015) (same). While "[§] 1985(3) covers classes beyond race," the term "class" as used in § 1985(3) "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (internal quotation marks omitted). Consistent with this logic, the Second Circuit has explicitly rejected the proposition that "[§] 1985(3) encompasses classes of jailhouse lawyers ...." *Id.* At best, that is essentially the argument that Plaintiff makes. (*See* Am. Compl. ¶¶ 67–71.) He alleges no action taken against him as, for instance, a member of a racial, gender, or political subgroup. *Cf. Dolan*, 794 F.3d at 296 (citing *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989); *Keating v. Carey*, 706 F.2d 377, 387 (2d Cir. 1983)). He, therefore, fails to make out a § 1985 claim and, a fortiori, a § 1986 claim.

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 145 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

### 6. Plaintiff's Access-to-the-Courts Claim

**\*22** Next, Plaintiff brings a claim under the Fifth and Sixth Amendments for a "violation of [his right of] access to the court[s]," (Am. Comp. ¶ 83), which Defendants move to dismiss, (Defs.' Mem. 22–23). [24]

First, Plaintiff cannot make out a Sixth Amendment claim because his Sixth Amendment rights are not implicated by the facts alleged. "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'"

*United States v. Mills*, 412 F.3d 325, 328 (2d Cir. 2005) (second alteration in original) (quoting U.S. Const. amend. VI). However, the words "prosecutions" and "accused" are not mere surplusage, and "the Sixth Amendment only guarantees the right to counsel after formal proceedings have begun against a suspect." *Fountain v. City of White Plains*, No. 13-CV-7016, 2015 WL 5602869, at *6 (S.D.N.Y. Sept. 23, 2015); *see also* *Mills*, 412 F.3d at 328 ("The Sixth Amendment right to counsel does not attach until a prosecution is commenced ...."); *Smart v. City of N.Y.*, No. 08-CV-2203, 2009 WL 862281, at *8 (S.D.N.Y. Apr. 1, 2009) ("[T]he Sixth Amendment right to counsel does not attach until the Government commits itself to prosecution by initiating adversary judicial proceedings.") (citing *Moran v. Burbine*, 475 U.S. 412, 431 (1986)); *cf.* *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001) (explaining that "[t]he reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them"). However, here, Plaintiff has made no allegations that would suggest his desire to speak with his attorney had anything to do with defending criminal proceedings. (*See* Am. Comp. ¶ 83.) To the contrary, Plaintiff alleges that he "rec[ei]ved a correspondent letter from attorney Bonnie M. Mangold regard[ing] *civil action settlement conditions*." (*Id.* ¶ 65 (emphasis added)); (*see also id.* ¶ 83 (referring to "attorney Ms. Bonnie Mangold from the law office of Reed[ ]Smith" in a paragraph alleging that "Otisvill[e] staff and administration ignored and refused the request for legal phone call to attorney").) "[T]he Sixth Amendment does not govern civil cases." *Turner v. Rogers*, 564 U.S. 431, 131 S. Ct. 2507, 2516 (2011). Consequently, his Sixth Amendment right-to-counsel claim must be dismissed.

**\*23** Plaintiff's Fifth Amendment right-of-access-to-the-courts claim is also infirm, albeit for different reasons. [25] To be sure, "[p]risoners have a constitutional right of access to the courts," *Bourdon*, 386 F.3d at 92 (alterations omitted), and courts have construed pro se prisoner's claims related to ability to call their attorney outside the context of criminal proceedings as an access-to-the-courts claim, *see, e.g.,* *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *7 (S.D.N.Y. Mar. 11, 2014) (report and recommendation) ("To the extent that [the plaintiff] was communicating with his attorney on monitored lines regarding a matter other than his criminal prosecution or appeal, his claims arise under the right of access to the courts."). However, an inmate's right to a telephone is not unlimited, and courts routinely consider whether a prison's phone restrictions have wholly closed off his communications with his attorney. *See, e.g.,* *Huggins v. Schriro*, No. 14-CV-6468, 2015 WL 7345750, at *9 (S.D.N.Y. Nov. 19, 2015) (report and recommendation) ("Because inmates have no right to unlimited telephone calls, a constitutional violation only exists if the inmate was stripped of alternate methods of communication." (citation and internal quotation marks omitted)); *Martinez v. Healey*, No. 14-CV-302, 2014 WL 5090056, at *3 (S.D.N.Y. Oct. 10, 2014) (noting that "inmates have no right to unlimited telephone calls" and that "phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel" (alteration and internal quotation marks omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *5 (S.D.N.Y. Mar. 8, 2012) ("Because inmates have no right to unlimited telephone calls, [the plaintiff] must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights" (alterations, citation, and internal quotation marks omitted)); *Henry v. Davis*, No. 10-CV-7575, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel."), *adopted by* 2011 WL 5006831 (S.D.N.Y. Oct. 20, 2011); *Paulino v. Menifee*, No. 00-CV-5719, 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (denying injunction to restore phone privileges where inmate did not allege that alternate means of communication were inadequate); *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988) ("[R]estrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel.");

*Pino v. Dalsheim*, 558 F. Supp. 673, 674–75 (S.D.N.Y. 1983) (permitting restrictions on telephone use in light of the inmate's unlimited opportunities to communicate with his attorney by, among other options, written correspondence). Here, Plaintiff has not alleged that he had no other method of accessing counsel; in fact, if anything, Plaintiff's allegations suggest that he was able to correspond with her by letter. (*See* Am. Compl. ¶ 65.)

Plaintiff's claim relating to his access to the courts suffers from a second deficiency, however, which is that he alleges no injury from it. When asserting a claim for deprivation of the right to access the courts, a plaintiff must allege facts sufficient to show that he suffered an actual injury.

*See* *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Groenow*, 2014 WL 941276, at *7 ("[A] plaintiff must show that deprivation of his right to access the courts unfairly prejudiced his case." (citing *Lewis*, 518 U.S. at 353)); *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *12 (S.D.N.Y. Oct. 13, 2015) ("In order to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." (internal quotation marks omitted)). To do so, a plaintiff must "demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." *Quezada*, 2015 WL 5970355, at *12 (internal quotation marks omitted); *see also Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, i.e., took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." (alterations and internal quotation marks omitted)); *Williams v. Superintendent of Brooklyn Det. Ctr.*, No. 15-CV-6085, 2015 WL 7281646, at *2 (E.D.N.Y. Nov. 17, 2015) ("[T]he plaintiff must show that a nonfrivolous legal claim had been frustrated or was being impeded due to the actions of prison officials." (alterations and internal quotation marks omitted)). "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); *see also Smith v. City of N.Y.*, No. 14-CV-443, 2015 WL 1433321, at *3 (S.D.N.Y. Mar. 30, 2015) (same).

**\*24** Although it is not entirely clear, Plaintiff seems to argue that he suffered prejudice in that the "attorney contact stated that if there was any questions in the proceedings, Plaintiff was to contact them." (Am. Compl. ¶ 83.) Because forcing Plaintiff to correspond with attorneys by means other than a phone call seems to eke out, at best, a claim for "mere delay," *Davis*, 320 F.3d at 352, Plaintiff's allegations do not state a constitutional injury. Indeed, nothing else in his submissions indicates that Plaintiff has suffered the type of injury needed to state an access-to-courts claim. *See* *Lewis*, 518 U.S. at 349, 353. Therefore, Plaintiff's access-to-the-courts claim is dismissed.

### 7. Plaintiff's Retaliation Claims

Next, Defendants move to dismiss Plaintiff's claims for retaliation, arguing that some of his retaliation claims are unexhausted and the others relating to Conklin—contained in ¶¶ 5–6, 10–14, and 24–26—fail to state a claim. (Defs.' Mem. 23–25.) Because the Court cannot reach the former question until after the Parties have had the chance to engage in limited discovery concerning the exhaustion issue for the reasons discussed earlier, the Court takes up the question of whether Plaintiff has stated a claim for the false incident report grievance.

"To state a First Amendment retaliation claim ..., a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan*, 794 F.3d at 294 (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Quezada*, 2015 WL 5970355, at *19 (same); *Ramrattan*, 2015 WL 3604242, at *12 (same). [26] The Second Circuit has made clear that courts are to "approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis*, 320 F.3d at 352; *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of N.Y.*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). A corollary of that proposition, however, is that the "ordinary

firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he fact that a particular plaintiff ... responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *see also Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))).

Regardless of whether Plaintiff has suffered an adverse action, his claim fails because he has not pled that he engaged in protected activity causally connected to at least potentially adverse action. By the Court's liberal reading, Plaintiff has alleged several actions that arguably could count as protected activity:

> **\*25** • First, Plaintiff alleges that, sometime in approximately October or November 2013, he "addressed th[e] issue" of Conklin's authority to restrict television use at 10 pm if Conklin continued to smell cigarette smoke. (*See* Am. Compl. ¶¶ 1–4.)

> • Next, Plaintiff alleges that, on December 6, 2013, he demanded to know why Conklin wanted his ID and told him that he was "not [Plaintiff's] unit officer and [that] [Plaintiff] should know why [his] ID [was] being requested." (*See id.* ¶¶ 8, 12, 24–26.)

> • Plaintiff alleges that, on December 6, 2013, he told the inmates in reference to Conklin's request for IDs, "that he has me fucked up because I don[']t associate with anyone in DA like that." (*Id.* ¶ 14.)

> • Fourth, on December 6, 2013, Plaintiff spoke to an officer and Ferdula about his interchange with Conklin, and then described the situation when asked to Heli. (*Id.* ¶¶ 16–17, 19.)

Similarly, Plaintiff alleges the following potentially adverse actions:

> • Since the date in October or November 2013 when Plaintiff made his initial comments to Conklin, "Conklin's attitude changed towards ... Plaintiff, [in that] every time ... Conklin s[aw] Plaintiff, he verbally and ph[ys]ically har[ ]assed ... Plaintiff," and further made "[s]arcastic comment[ ]s ... to ... Plaintiff," "pats[ ]earch[ed] Plaintiff down and check[ed] Plaintiff's

carrying bag," "search[ed] Plaintiff[,] and stat[ed] that there will be a[ ]lot of changes when [he] start[s] to work back in [another unit] next quarter." (*Id.* ¶ 6.) [27]

> • On December 6, 2013, Conklin "walked past everyone else [in the unit] [and] ... walked directly to Plaintiff and asked Plaintiff for his ID," telling Plaintiff when he asked why his ID was being requested that he would "find out soon," and then asking other inmates for their ID to "make it look like[] [Conklin] was not singling Plaintiff out, or personally attacking [him]." (*See id.* ¶¶ 8, 12–13.)

> • Sometime on December 6, 2013, Conklin prepared a "false and fraudulent incident report." (*See id.* ¶¶ 17–19, 24–26.) [28]

> • On December 6, 2013, Plaintiff was placed in the SHU, where he received a copy of Conklin's false incident report. (*See id.* ¶¶ 24–26.)

**\*26** At the outset, it merits clarifying that not every statement an inmate makes in prison is afforded First Amendment protection. Indeed, "[t]he Supreme Court has held that '[i]n a prison context, an inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (second alteration in original) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)); *see also Williams v. Walter Ford*, No. 14-CV-1181, 2015 WL 8490910, at *5 (D. Conn. Dec. 10, 2015) (same).

Nevertheless, there is authority in the Second Circuit for the proposition that verbal complaints can be protected action for purposes of a First Amendment retaliation claim. *See, e.g., Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *9 (S.D.N.Y. Feb. 23, 2015) ("[C]ase law in this Circuit indicates that a prisoner's oral complaints to a correction officer may serve as the basis for a First Amendment retaliation claim."), *adopted in part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *24 n.10 (S.D.N.Y. May 29, 2007) ("The [c]ourt notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983."); *Smith v. Woods*, No. 03-CV-480, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) ("I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but,

under some circumstances, the making of oral complaints to corrections officers."), *aff'd*, 219 F. App'x 110 (2d Cir. 2007); *Gill v. Riddick*, No. 03-CV-1456, 2005 WL 755745, at *10 (N.D.N.Y. Mar. 31, 2005) (finding the "filing of the grievance agenda and making oral complaints" to be "clearly protected"). *But see Allah-Kasiem v. Sidorowicz*, No. 09-CV-9665, 2012 WL 2912930, at *1, *8–9 (S.D.N.Y. July 17, 2012) (rejecting plaintiff's argument that he filed an "'oral sexual harassment complaint' or grievance" when he made an "extremely graphic" comment to a prison guard, reasoning that, "[h]aving chosen not to use the grievance process ..., [the plaintiff] [could not] claim that his comments to [the guard] [were] entitled to the same protection that adheres to properly filed grievances").

However, courts in the Second Circuit and others have distinguished between unambiguously protected activity and situations where an inmate verbally confronts a prison official. *See, e.g.*, *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995) (finding in the qualified immunity context "no clearly established First Amendment right to approach and speak to" an officer who allegedly retaliated against the plaintiff inmate where the plaintiff "'approached [the officer] and ... told [him] that according to institutional policy that was wrong what he was doing" after seeing that the officer "'was trying to implement something on another inmate'" who "'couldn't defend himself'"); *Young v. Ice*, No. 14-CV-1475, 2015 WL 471675, at *3 (N.D. Ohio Feb. 4, 2015) ("While prisoners have a clear right protected by the First Amendment to file formal grievances against prison officials, arguing with corrections officers, or being insolent or disrespectful toward corrections officers is not conduct protected by the First Amendment." (citation omitted)); *Martin v. Hurley*, No. 14-CV-66, 2014 WL 7157336, at *2 (E.D. Mo. Dec. 15, 2014) ("Prisoners have no constitutionally protected right to confront staff and discuss issues with them, particularly when ordered not to do so."); *Riddick v. Arnone*, No. 11-CV-631, 2012 WL 2716355, at *7 (D. Conn. July 9, 2012) (finding the inmate plaintiff's statement that a correctional facility employee could not issue a disciplinary report "more like a schoolyard taunt than an attempt to petition the government for redress of grievances," and, therefore, unprotected); *Rossi v. Goord*, No. 00-CV-1521, 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer, however, does not constitute protected speech deserving of First Amendment protection.") (citing *Rodriguez*, 66 F.3d at 478–79), *reconsideration granted in part on other grounds*,

2007 WL 952051 (N.D.N.Y. Mar. 29, 2007); *Garrido v. Coughlin*, 716 F. Supp. 98, 101 (S.D.N.Y. 1989) ("While there is a claim of retaliation here ..., it was not for exercise of [the plaintiff's] First Amendment rights; rather, the alleged retaliation arose out of a verbal confrontation."). *But cf. Lugo v. Van Orden*, No. 07-CV-879, 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved.").

**\*27** The Court does not underestimate the importance—both as a practical and a constitutional matter—of preserving inmates' ability to bring grievances. *See, e.g.*, *Davis*, 320 F.3d at 352–53 ("[T]he filing of prison grievances is a constitutionally protected activity ...."). Nevertheless, there is a distinction to be made between the inmate who stridently challenges a prison official's authority in the moment and his peer who instead brings his complaints through the designated channels, such as the prison's grievance procedure, where feasible. *Cf.* *Rodriguez*, 66 F.3d at 478. For that reason, Plaintiff's comments fall on the wrong side of the line. Indeed, Plaintiff's fall 2013 attempt to "address[ ] th[e] issue" of Conklin's authority to restrict television use at 10 pm should the smell of cigarette smoke continue unabated, (*see* Am. Compl. ¶¶ 1–4), amounted to little if anything more than an effort to "confront [a member of] staff and discuss [an] issue[ ] with him," *Martin*, 2014 WL 7157336, at *2, which, in prison, simply does not enjoy First Amendment protection, *see Garrido*, 716 F. Supp. at 101 (distinguishing between "[an] exercise of [the plaintiff's] First Amendment rights" and "a verbal confrontation"). Likewise, no greater protection is afforded to Plaintiff's December 6, 2013 demand to know why Conklin wanted his ID coupled with the comment that Conklin was "not [Plaintiff's] unit officer and [that] [Plaintiff] should know why [his] ID [was] being requested," (*see* Am. Compl. ¶¶ 8, 12), or Plaintiff's remark "that [Conklin] has [Plaintiff] fucked up because [Plaintiff] do[es]n['t] associate with anyone in D-A like that," (*id.* ¶ 14), as each plainly falls somewhere on the spectrum between "schoolyard taunt," *Riddick*, 2012 WL 2716355, at *7, and "[t]he questioning by an inmate of a lawful order given by a corrections officer," *Rossi*, 2006 WL 2811505, at *10 n.16. Accordingly, Plaintiff's complaints to Conklin or about him to the other inmates were not protected activity, and his retaliation claim with respect to those incidents collapses as a consequence. (*See* Am. Compl. ¶¶ 1–4, 12, 14, 24–26.)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 149 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Plaintiff's decision to speak with another officer and Ferdula about his run-ins with Conklin, (*id.* ¶¶ 16–17), and his subsequent conversation with Heli, (*id.* ¶ 19), may, conceptually, be another matter; however, they also fail. As noted, a retaliation claim requires a "causal connection" between the protected action and the adverse action. *Dolan,* 794 F.3d at 294. It is true that "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 558 F.3d at 129; *see also Colon,* 58 F.3d at 872 ("Temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation."); *Quezada,* 2015 WL 5970355, at *20 (same). However, it is also true that, where the allegedly adverse action occurs *before* the allegedly protected activity, a court may appropriately decline to find a causal connection. *See Winfield v. Bishop,* No. 09-CV-1055, 2012 WL 1657190, at *4 (N.D.N.Y. May 10, 2012) ("[T]he [a]mended [c]omplaint states that other adverse action preceded the protected conduct .... Given these facts and the particular care with which courts must scrutinize retaliation claims, the [c]ourt finds that [the] [p]laintiff has failed to state a retaliation claim against [one of the] [d]efendant[s]."); *Rose v. Goldman,* No. 02-CV-5370, 2009 WL 4891810, at *14 (E.D.N.Y. Dec. 9, 2009) (rejecting the plaintiff's assertions of causal connection upon motion for summary judgment, and noting that the defendant took the allegedly adverse action before the plaintiff engaged in any alleged protected activity), *adopted by* 2011 WL 1130214 (E.D.N.Y. Mar. 24, 2011); *cf. Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001) (noting in employment context that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise"). Here, Plaintiff alleges that Conklin's report—that is, the adverse action for his retaliation claim—*preceded* those conversations. (*See id.* ¶¶ 16–21 (describing, inter alia, how, Plaintiff spoke with another officer about Conklin, and "then" Ferdula called Plaintiff to her office where they had a conversation, after which "Ferdula ... stated to Plaintiff that he was being called to the Lt. office," where he "listened to the Lt. Heli state what ... Conklin wrote and filed in his incident report").) Even if Plaintiff's complaints to this officer and Ferdula were protected activities—which the Court does not hold at this time—there is simply no causal connection between it and the allegedly adverse activities.

## C. Plaintiff's August 4, 2015 Motion

Since submission of Defendants' Motion to Dismiss, Plaintiff also submitted an August 4, 2015 "Complaint Supplemental '[E]mergency Ex Parte' Motion To Preserve Evidence." In that Motion, Plaintiff requests certain video footage and sign-in logs. (*See* Compl. Suppl. '[E]mergency Ex Parte' Mot. To Preserve Evidence ("Pl.'s Evid. Mot.") 2–3 (Dkt. No. 32).)[29] Plaintiff says that, based upon his "experience[,] personal knowledge, and belief," BOP staff will, among other similar acts, "intentionally suppress" the evidence Plaintiff seeks, and therefore asks the Court for a "preliminary injunction directing [Recktenwald], and tho[ ]se under her immed[i]ate control, to preserve all foregoing referenced evidence and further, [to] take no action whatsoever that might tend to prejudice or compromise Plaintiff's case and/or preemptively 'moot' it." (*Id.* at 4–5.) Plaintiff explains that "[b]arring judicial order, all surv[e]illance videos are routinely recorded over after a 12 month holding period which is set to expire in this particular instance." (*Id.*)[30]

**\*28** In response to Plaintiff's Motion, Defendants submitted a declaration from Wayne D. McBride ("McBride"), a technician in the Special Investigative Service Department at Otisville. (*See* Decl. of Wayne D. McBride ("McBride Decl.") ¶ 1 (Dkt. No. 35).) According to McBride, Otisville has 208 security cameras running nonstop, which capture video but not audio, and footage from which is stored for a maximum of 21 days, unless staff overrides that automatic purge in order to preserve specific recordings. (*Id.* ¶¶ 3–5.) McBride indicated that the requested video footage had already been deleted by the date of Plaintiff's Motion. (*See id.* ¶ 8.) Additionally, McBride states that Plaintiff had previously requested some of the same video footage in connection with his January 7, 2014 BP-9 but that it had already been deleted by that time. (*Id.*)[31] Moreover, judging by McBride's declaration, he searched for all of the video footage that Plaintiff requested and for which he provided a date, only to find that the footage had been deleted. (*Compare id.* ¶ 6, *with* Pl.'s Evid. Mot. 2–3.) McBride indicated that he had copies of the log books for the SHU for December 6 and 16, Housing Unit D-A for December 6, and Housing Unit D-B for December 6 and 7. (*See* McBride Decl. ¶ 9.) McBride also indicated that he had a copy of the SHU sign-in log for December 16, 2013 but noted that Plaintiff was in general population that day. (*Id.* ¶ 10.) Nevertheless, he said that he would preserve a copy a result of Plaintiff's Motion. (*See id.*)

In his Motion, Plaintiff did not appear to request any sanctions; however, anticipating that he might, Defendants argued in their Memorandum of Law that, should he do so, sanctions would be inappropriate and that Defendants had not spoliated evidence. (*See, e.g.*, Defs.' Mem. of Law in Response to Pl.'s Mot. To Preserve Evid. ("Defs.' Evid. Opp'n.") 7 (Dkt. No. 34).) Moreover, Defendants argue that Plaintiff incorrectly seeks injunctive relief when he should seek discovery and that his request is, in any event, mooted as the relevant logs were being produced in response to the Motion. (*Id.* at 3–5.)

1. Request for Injunction

Plaintiff's request for an injunction is meritless. In order to obtain a preliminary injunction, a movant must ordinarily show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *see also VIDIVIXI, LLC v. Grattan*, No. 15-CV-7364, 2016 WL 106241, at *3 (S.D.N.Y. Jan. 11, 2016) (same); *Ins. Co. of the State of Pa. v. Lakeshore Toltest JV, LLC*, No. 15-CV-1436, 2015 WL 8488579, at *1 (S.D.N.Y. Nov. 30, 2015) (same). While a district court has wide discretion in determining whether to grant a preliminary injunction, *see Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005); *NM v. Hebrew Acad. Long Beach*, No. 15-CV-7004, 2016 WL 105950, at *9 (E.D.N.Y. Jan. 9, 2016), it is nevertheless an "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986) ("[P]reliminary injunctive relief is an extraordinary remedy and should not be routinely granted."); *Safe Step Walk-In Tub Co. v. CKH Indus., Inc.*, No. 05-CV-7543, 2015 WL 6504284, at *1 (S.D.N.Y. Oct. 26, 2015) (same). "The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits." *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, No. 15-CV-4200, 2015 WL 6813599, at *4 (E.D.N.Y. Aug. 7, 2015), *adopted by* 2015 WL 6813494 (E.D.N.Y. Aug. 28, 2015); *see also In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770

F.2d 328, 338 (2d Cir. 1985) ("Preliminary injunctions under Rule 65 are designed to preserve the status quo between the parties before the court pending a decision on the merits of the case at hand."); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 301 (E.D.N.Y. 2015) (same).

**\*29** Plaintiff has not carried his burden of persuasion. Most obviously, his preliminary injunction does not seek to preserve the status quo because essentially all of the material that he seeks (a) was destroyed long before his motion, (b) has been turned over to him, or (c) will be preserved. (*See* McBride Decl. ¶¶ 6–10.)[32] Likewise, he has failed to carry his burden of establishing a likelihood of irreparable harm. It may well be that the "intentional[ ] sup[p]ress[ion] [of] evidence," (*see* Pl.'s Evid. Mot. at 4), as an abstract matter, would constitute irreparable harm. However, the test is not whether a plaintiff can speculate as to an irreparable harm that may befall him, but rather if he can "*show* irreparable harm absent injunctive relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 33 (2d Cir. 2010) (emphasis added).[33] Here, even assuming the irreparably harmful character of the alleged future conduct that Plaintiff imputes to Defendants, he has not shown that he would suffer that harm absent injunctive relief. *Cf. Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative ...."). Indeed, his submission belies any such argument by positing that "surv[e]illance videos are routinely recorded over after a 12 month holding period" and yet seeking relief after that 12-month period expired. (*See* Pl.'s Evid. Mot. 5.) To upset the status quo based on a plaintiff's self-contradictory speculations would contravene many of the principles guiding the Court's discretion when assessing the merits of a proposed preliminary injunction.

2. Adverse Inference

**\*30** As Defendants predicted, on December 22, 2015, Plaintiff requested—albeit in a submission that at least partly functioned as a reply in support of his August 4, 2015 Motion —an adverse inference because the evidence was destroyed. (*See* Pro Se Pl.'s Resp. and Sanction for Spoliation of Evid. Mot. to the Def.'s Mem. of Law in Response to Pl.'s Mot. To Preserve Evid. ("Pl.'s Evid. Reply"), at unnumbered 1

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 151 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

(Dkt. No. 48).) Plaintiff is, however, not entitled to an adverse inference at this time.

### a. Standard and Applicability of New Fed. R. Civ. P. 37(e)

Spoliation refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (internal quotation marks omitted) (2d Cir. 2001); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (same). Historically, "[a] court's authority to impose sanctions in response to spoliation derives from at least two sources." *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 288 (S.D.N.Y. 2009). As one court explained:

> Where a party violates a court order—either by destroying evidence when directed to preserve it or by failing to produce information because relevant data has been destroyed—Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002); *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union*, 212 F.R.D. 178, 219–20 (S.D.N.Y. 2003). In addition, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding*, 306 F.3d at 106–07 (citations omitted); *accord West*, 167 F.3d at 779.

*Id.*

Second Circuit law makes clear that, in order to obtain an adverse inference based on the destruction of evidence, the moving party must show, first, "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed," second, "that the records were destroyed with a culpable state of mind," and, third, "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks omitted); *see also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (same). Well-established Second Circuit law also makes clear that mere negligence is sufficient to trigger the "culpable state of mind" requirement. *See Residential Funding*, 306 F.3d at 108; *see also, e.g., In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 9480315, at *2 (S.D.N.Y. Dec. 29, 2015); *Zubulake*, 229 F.R.D. at 431; *Johnson v. Waterford Hotel Grp., Inc.*, No. 09-CV-800, 2011 WL 87288, at *2 (D. Conn. Jan. 11, 2011).

Until December 1, 2015, Fed. R. Civ. P. 37(e) provided that, "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." However, courts in the Second Circuit did not apply a different culpability standard for the deletion of electronically stored information than for other evidence. *See, e.g., Bravia Capital Partners Inc. v. Fike*, No. 09-CV-6375, 2015 WL 1233334, at *5 (S.D.N.Y. Mar. 25, 2015) ("Since there was no intervening act of God or other circumstance beyond [the] [p]laintiff's control, the destruction of the emails was at a minimum negligent. Thus, [the] [p]laintiff acted with a culpable state of mind." (citation omitted) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003))). The Second Circuit's approach was consistent with the logic that "[a] court's authority to impose sanctions in response to spoliation derives from at least two sources," first, when a party has violated a court order, Fed. R. Civ. P. 34(b), and, second, the court's "inherent power to manage its own affairs," *Richard Green*, 262 F.R.D. at 288 (quoting *Residential Funding*, 306 F.3d at 106–07).

**\*31** On December 1, 2015, however, the new Fed. R. Civ. P. 37(e) went into effect. Pursuant to that provision:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 152 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). The Advisory Committee has explained that subdivision 37(e)(2) of Rule 37 "rejects cases such as Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Therefore, Plaintiff stands on shakier legal footing than previous litigants seeking adverse inferences if the December 2015 amendments apply to his Motion. [34]

Under Fed. R. Civ. P. 86(a), any amendments to the Federal Rules of Civil Procedure "take effect at the time specified by the Supreme Court, subject to 28 U.S.C. § 2074," and "govern ... proceedings after that date in an action then pending unless ... the Supreme Court specifies otherwise; or ... the court determines that applying them in a particular action would be infeasible or work an injustice." [35] In transmitting the proposed changes to Congress, Chief Justice Roberts specified that the 2015 amendments would "govern in all proceedings in civil cases" commenced after December 1, 2015, and, "insofar as just and practicable, all proceedings [ ] pending" on that date. *See* Order re: Amendments to Federal Rules of Civil Procedure (April 29, 2015), *available at* http://www.supremecourt.gov/orders/courtorders/frcv15%28update%29_1823.pdf.

**\*32** Here, the Court concludes that it would fall short of justice and practicability to apply the new Rule 37(e) to Plaintiff's Motion. As a general matter, the Court thinks that it makes sense to apply the old rules to motions briefed before the new rules came into effect. *See Trowery v. O'Shea, No. 12-CV-6473, 2015 WL 9587608, at \*5 n.11 (D.N.J.*

Dec. 30, 2015) ("Since the parties briefed the motions and conducted oral argument under the prior rule, the [c]ourt finds that it is not just and practicable to apply the amended rules in connection with these motions."). Here, Plaintiff filed an "emergency" motion before discovery even began in his case seeking material that he could have requested in discovery. Additionally, he did not actually request sanctions until his December 22, 2015 submission to this Court, over four months after Defendants objected to his original Motion and after the new Rule 37(e) went into effect. (*See generally* Defs.' Evid. Opp'n; Pl.'s Evid. Reply.) The Court is reluctant to reward Plaintiff's capriciously aggressive tactics by adjudicating his request under a more permissive standard. Nevertheless, because the Court takes seriously its obligation to afford special solicitude to pro se plaintiffs and because the Court does not think that justice would be served by inviting further motion practice surrounding the applicability of Rule 37(e), should Plaintiff initiate it, the Court applies the familiar law of *Residential Funding* and its progeny here.

### b. December 2013 Footage

The first requirement for a finding of spoliation—that "the party having control over the evidence had an obligation to preserve it at the time it was destroyed," *see Residential Funding*, 306 F.3d at 107—is sufficient to deny Plaintiff's Motion with respect to the December footage. Under well-established Second Circuit law, this obligation "arises when the party has notice that the evidence is relevant to litigation," which is "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *see also Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Stinson v. City of N.Y.*, No. 10-CV-4228, 2016 WL 54684, at \*4 (S.D.N.Y. Jan. 5, 2016); *Zubulake*, 220 F.R.D. at 216.

As noted, Plaintiff seeks footage from December 6, 2013, December 7, 2013, December 16, 2013, and various points in March 2014. (*See* Pl.'s Evid. Mot. 2–3.) With respect to the first two, because the tapes would have been erased by December 28, 2013 at the latest absent staff override, (*see* McBride Decl. ¶¶ 4–5), Plaintiff would have to show

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 153 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

that Defendants had "notice that the [tapes] were relevant to litigation" before that date, *Kronisch*, 150 F.3d at 126. Because Plaintiff's BP-8 was received on December 30, 2013, at least two days after the purge, (*see* Pl.'s Opp'n Ex. B. (BP-8 Form)), Plaintiff must provide some other basis to think Defendants were on notice before he filed his BP-8. In his reply, Plaintiff vehemently argues that he personally handed a "cop-out" complaint to Susney on December 9, 2013. (*See* Pl.'s Evid. Reply at 1, 2, 4–6, 11.) [36] According to Plaintiff, his cop-out "request[ed] ... investigation of that [f]alse and [f]raudulent incident report made and submitted by ... Conklin." (*Id.* at 2.) Likewise, Plaintiff argues that he told Defendants to preserve the videotapes. For instance, he says, when speaking with Heli, he "requested the viewing of these security cameras to pro[ ]ve his innocence and that a false and fraudulent incident report was filed." (*Id.* at 5–6.) Additionally, he suggests that a number of his submissions requested the videotape footage be preserved. (*See id.* at 6 ("Susney re[ei]ved the first filing on Dec. 9, 2013 in the [f]orm of a cop-out in the same fashion as the BP-8, 9, 10 and BP-11 which in all respect is part of the Otisville's legal Department on Dec. 9, 2013 making request received timely for any and all videotape[ ] footage from Dec. 6, 2013 to not be and prevently [sic] routinely [sic] deletion of these security cameras #78, 75, 300, 83 and 77.").)

**\*33** This is insufficient. At the outset, it is worth noting that, unlike in the context of deciding a Motion to Dismiss, the Court is under no obligation to accept as true Plaintiff's submissions. To the contrary, "[a] party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence." *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014) (citing *Byrnie*, 243 F.3d at 108); *see also Gutierrez-Bonilla v. Target Corp.*, No. 08-CV-3985, 2009 WL 5062116, at \*3 (E.D.N.Y. Dec. 16, 2009) ("The moving party bears the burden of proving that the alleged spoliator had an obligation to preserve evidence, acted culpably in destroying it, and that the evidence would have been relevant to the aggrieved party's case." (internal quotation marks omitted)). First, even assuming that Plaintiff did provide Susney with a cop-out requesting the videotapes, it is not at all clear that would be sufficient to convey that the videotape may be relevant to future litigation. The cop-out may have made clear that the BOP should have been worried about litigation; on the other hand, perhaps the cop-out's tone, informality, and other characteristics would not forecast litigation to a

reasonable observer. The missing details here matter, because imposing spoliation sanctions is serious business, and one which resists broad categorical pronouncements, like that which would be necessary to find notice based on a rumored cop-out per se sufficient to establish notice. *Cf. Fujitsu*, 247 F.3d at 436 ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis."). Second and relatedly, even if Plaintiff made his desire that the footage be preserved unequivocally clear, it not obvious that Defendants should have known the footage "may be relevant to future litigation." *Kronisch*, 150 F.3d at 126. To the contrary, Plaintiff may have wanted the footage not to go on the offense as a plaintiff but rather to clear his name—albeit after his SHU punishment—in connection with Conklin's incident report. Third, the fact that Plaintiff purportedly requested the footage *before* filing his BP-8 may, if anything, make a reasonable observer less inclined to anticipate litigation. As courts have recognized, "[t]he first step [in the inmate grievance program] is to submit a BP-8, or informal grievance, to prison staff." *Baez v. Kahanowicz*, 469 F. Supp. 2d 171, 178 (S.D.N.Y. 2007) (citing 28 C.F.R. Part 542 ("Administrative Remedy")), *aff'd*, 278 F. App'x 27 (2d Cir. 2008). To the extent Plaintiff declined to take that "first step" and submit a BP-8, opting instead to submit a cop-out first, a reasonable observer could conclude that Plaintiff was expressly declining to embark down the road to litigation.

To this, Plaintiff might well respond that his cop-out was, for all practical purposes, the same as a BP-8 and was similarly intended to initiate the litigation process. Such a response may well be sound, and the Court is certainly not prepared to conclude on the briefing in this case that a cop-out is per se a distinct creature from the BP-8. *See* 28 C.F.R. §§ 542.13–542.14 (indicating that "before an inmate submits a Request for Administrative Remedy," "an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue" and later describing a BP-9 as "a formal written Administrative Remedy Request"); *see also Bailey v. Fortier*, No. 09-CV-742, 2012 WL 6935254, at \*2 (N.D.N.Y. Oct. 4, 2012) ("This informal, initial procedure [described in 28 C.F.R. § 542.13(a)] typically begins with the filing of a 'cop-out,' which can be submitted either on a BP-8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description."), *adopted by* 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Bastien*, 2015 WL 5008837, at \*5 ("The law is clear

that the 'Inmate Request to Staff' forms submitted by [the] plaintiff, commonly known as 'cop out' forms, are informal requests to prison staff to resolve disputes, and are only the first step in the clearly established multi-level system within the Bureau of Prisons Administrative Remedy Program."); Families Against Mandatory Minimums, *How To Help your Loved Ones in Federal Prison*, *available at* http://famm.org/wp-content/uploads/2013/08/FS-Help-a-Federal-Prisoner2.23.11-NW.pdf ("The prisoner begins the administrative remedy process by filling out a 'cop-out' (also known as a BP-8 form) and giving it to staff."). However, the problem with embarking down this road is that it would seem inconsistent with the many documents and statements in this case that Plaintiff submitted his BP-8 on December 28, 2013. (*See, e.g.*, Am. Compl. ¶ 29; Pl.'s Opp'n ¶¶ 2–3; Pl.'s Opp'n Ex. B. (BP-8 Form); Pl.'s Opp'n Ex. C (BP-8 Response).) It may well be plausible that Plaintiff did submit a cop-out on December 9 that reasonably forecast his litigious designs and then later decided to submit a second informal grievance, rather than proceed to the next stage of the administrative remedy process. But that is not the question. Rather, the issue is whether Plaintiff has met his burden of showing that Defendants were under a duty to preserve the evidence at the time of its erasure. *See* 📙 *Gutierrez-Bonilla*, 2009 WL 5062116, at \*3; 📙 *Zubulake*, 220 F.R.D. at 216. Here, there are just too many question marks hanging over the contents of Plaintiff's cop-out.

**\*34** Likewise, Plaintiff has not met his burden with respect to the December 16, 2013 video. (*See* Pl.'s Evid. Mot. 2–3.) December 16 simply is not a meaningful date in this litigation. If the Court reviewing Plaintiff's Motion for spoliation sanctions cannot discern what about the December 16 footage is relevant to this litigation, it doubts very much that Defendants "should have known that the evidence may be relevant to future litigation" before it was destroyed. 📙 *Kronisch*, 150 F.3d at 126. [37]

#### c. March Footage

The Court is similarly not prepared to conclude that Defendants had notice of an obligation to preserve evidence from March 2014; however, the question is closer. Because Plaintiff's claims related to that footage may be barred by the PLRA exhaustion requirement, however, the Court declines to determine whether Defendants have indeed let documents which should have been preserved be destroyed.

To begin, Plaintiff submitted a large number of written complaints to prison authorities in early March 2014. (*See* Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar. 4, 2014)) (addressing Plaintiff's desire for signed copy of his February 25, 2014 affidavit, need for hand braces, lack of heat, and generalized allegations of cruel and unusual punishment); Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) (complaining about inability to use phone in SHU); Pl.'s Opp'n Ex. I (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)) (asking for copy of his affidavit); Pl.'s Opp'n Ex. J (Letter from Pl. (March 9, 2014)) (asking to speak with Susney); Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014)) (saying that he was in the SHU for a restraining order against Conklin but that Conklin is feeding him); Pl.'s Opp'n Ex. L (Letter from Pl. to SHU lieutenant (Mar. 7, 2014)) (saying that he "need[ed] to make more than one phone call"); Pl.'s Opp'n Ex. M (Letter from Pl. to Warden (Mar. 5, 2014)) (complaining that he was being prevented from using the phone, was "not allowed to w[ ]atch any T.V.," and was "subjected to ... cold confinement"); Pl.'s Opp'n Ex. W (Letter from Plaintiff to Demeo (Mar. 11, 2014)); Pl.'s Opp'n Ex. X (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)).)

With the possible exception of Plaintiff's March 6, 2014 letter (to be discussed below), these letters do not indicate that Defendants "should have known that the evidence may be relevant to future litigation." 📙 *Kronisch*, 150 F.3d at 126. Indeed, to hold otherwise would essentially lay down a rule that prison officials should anticipate litigation whenever an inmate makes a complaint about any condition of his confinement. Given that "an adverse inference instruction is an extreme sanction and should not be imposed lightly," *Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 107 (E.D.N.Y. 2012) (internal quotation marks omitted), the Court does not think the bar to finding its predicate obligation to preserve evidence should be so low, *compare* 📙 *Grant v. Salius*, No. 09-CV-21, 2011 WL 5826041, at \*1, \*3 (D. Conn. Nov. 18, 2011) (finding the defendants had no duty to preserve video footage despite the plaintiff's submitted administrative remedies where the loss was attributable to third parties), *with* 📙 *Barnes v. Alves*, 58 F. Supp. 3d 296, 300 (W.D.N.Y. 2014) (considering inmate's spoliation motion where the inmate requested preservation of the tape at issue in an earlier grievance).

**\*35** However, Plaintiff's March 6, 2014 letter may be different. That letter, addressed to "SHU Lt." and apparently written on "March 6, 2014 [at] 6:am [sic]," reads in its entirety:

> I am in the SHU right now for a restraining order agains[t] c/o P. Conklin and "for my protection," as SIS claim. And now you have the same officer at my door feeding me!!! [T]his is in clear violation of my restraining order and this is being recorded for future litigation. SHU #209 Charles T. McIntosh Breakfast # 08770-089.

(Pl.'s Opp'n Ex. K (Letter from Pl. to SHU lieutenant (Mar. 6, 2014))).

Although the Court is not prepared to say that Plaintiff's allusion to "future litigation" is per se enough to establish notice, *cf. Siggers v. Campbell*, No. 07-CV-12495, 2014 WL 4978648, at \*3 (E.D. Mich. Mar. 25, 2014) (declining to find an obligation to preserve evidence despite "some rumblings" about filing a lawsuit, because the plaintiff had not established that she saw the document), *aff'd* 2014 WL 4978655 (E.D. Mich. Oct. 6, 2014), this letter is obviously a closer call than the others. However, as noted earlier, it is not enough to conclude that Defendants had a duty to preserve the video footage; rather, "to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses." *Residential Funding*, 306 F.3d at 108; *see also Zubulake*, 220 F.R.D. at 218 (same). In this sense, relevance demands something more than that it be sufficiently probative under *Fed. R. Evid. 401*; "[r]ather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Residential Funding*, 306 F.3d at 109 (alterations and internal quotation marks omitted); *Stinson*, 2016 WL 54684, at \*7. Nevertheless, "[c]ourts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence," lest they "subvert the purposes of the adverse inference, and ... allow parties who have destroyed evidence to profit

from that destruction." *Residential Funding*, 306 F.3d at 109 (alterations and internal quotation marks omitted). Consequently, "a court's role in evaluating the 'relevance' factor in the adverse inference analysis is limited to insuring that the party seeking the inference had adduced enough evidence of the contents of the missing materials such that a reasonable jury *could* find in its favor." *Id.* at 109 n.4 (emphasis in original). [38]

**\*36** The relevance of the March footage is very much in doubt. Indeed, as discussed above, Defendants have sought dismissal of Plaintiff's claims for failure to exhaust in accordance with the PLRA other than those relating to the December 6, 2013 dispute with Conklin. (*See* Defs.' Mem. 12–16.) And, as also discussed, Defendants may well be entitled to summary judgment on those claims if Plaintiff failed to exhaust his administrative remedies. If that should come to pass, it is not clear to this Court how Plaintiff "ha[s] adduced enough evidence of the contents of [that video tape] such that a reasonable jury could find in [his] favor" on the claims related to the events of December 6, 2013. *Residential Funding*, 306 F.3d at 109 n.4 (emphasis omitted). Accordingly, before delving into the thorny legal questions of whether Defendants had an obligation to preserve evidence and whether Plaintiff can show negligence, the Court declines to rule on Plaintiff's spoliation Motion with respect to the March videotape request until after it has decided the PLRA exhaustion issue.

Finally, and for sake of completeness, it is worth making explicit that Defendants need not have anticipated litigation of the March 2014 events on the basis of Plaintiff's late 2013 BP-8 and related filings. (Pl.'s Opp'n Ex. B. (BP-8 Form).) Although Plaintiff's Amended Complaint offers a single, comprehensive lament detailing his various run-ins with Conklin and stays in the SHU from December 2013 through early 2014, the events are conceptually distinct, and there is no reason to conclude Defendants were on notice of potential future litigation over the events of March 2014 through this earlier set of filings.

### D. Request for Counsel

Lastly, appended on to the end of Plaintiff's Amended Complaint is a request for the appointment of pro bono counsel. (*See* Am. Compl. ¶¶ 113–15.) Although there is no constitutional right to counsel in civil cases, courts have the authority to appoint counsel for indigent plaintiffs. *See* [28]

U.S.C. § 1915(e)(1). Nevertheless, "[b]road discretion lies with the district judge in deciding whether to appoint counsel pursuant to this provision." *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986). When analyzing whether appointment of counsel is appropriate, the Court undertakes a two-step inquiry. *See Ferrelli v. River Manor Health Care Ctr.,* 323 F.3d 196, 203–04 (2d Cir. 2003). First, the Court "should [ ] determine whether the [movant]'s position seems likely to be of substance." *Id.* at 203 (quoting *Hodge,* 802 F.2d at 61); *see also Johnston v. Maha,* 606 F.3d 39, 41 (2d Cir. 2010) ("This [c]ourt considers motions for appointment of counsel by asking first whether the claimant has met a threshold showing of some likelihood of merit." (internal quotation marks omitted)). The claim must not be so "highly dubious" that the plaintiff appears to have no chance of success. *Hodge,* 802 F.2d at 60 (internal quotation marks omitted). In making this determination, the Court construes pleadings drafted by pro se litigants liberally and interprets them to raise the strongest arguments that they suggest. *See Triestman,* 470 F.3d at 474–75.

Second, if the threshold requirement is met, the Court will then proceed to consider other prudential factors such as the movant's

> ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented [to the fact finder], [the movant]'s ability to present the case, the complexity of the legal issues[,] and any special reason ... why appointment of counsel would be more likely to lead to a just determination.

*Ferelli,* 323 F.3d at 203–04 (internal quotation marks omitted); *see also Garcia v. USICE (Dep't of Homeland Sec.),* 669 F.3d 91, 98–99 (2d Cir. 2011) (listing *Hodge* factors).

Here, Plaintiff requests counsel because, he says, "when a colorable claim of constitutional violation is presented, the trial court is under a mandatory duty to appoint counsel." (Am. Compl. ¶ 113.) Further, Plaintiff argues that his injuries are "the consequences of a [sic] numerous and continuing injuries, and that made of proceeding is much to be preferred to piece mail [sic] litigation despite the possible loss in accuracy." (*Id.* ¶ 114.) Plaintiff also recites several lines concerning the liberal construction of pro se complaints as well as the pre-*Twombly* 12(b)(6) standard. (*Id.*)

**\*37** Even assuming that the threshold requirement has been met, the various prudential considerations militate against the appointment of counsel here. First, Plaintiff does not indicate why he would need counsel to help investigate the facts of the case. While a pro se litigant will often "be found unable to investigate the facts of his or her claim where, for example, he or she will be incarcerated for the duration of the case," *Walters v. N.Y.C. Health Hosp. Corp.,* No. 02-CV-751, 2002 WL 31681600, at \*2 (S.D.N.Y. Nov. 25, 2002) (citing *Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir. 1997)), that concern is less compelling here because Plaintiff was witness to most, if not all, of the events and facts giving rise to his claims, *see Goodson v. Sedlack,* No. 99-CV-10419, 2000 WL 278087, at \*2 (S.D.N.Y. Mar. 14, 2000) (declining to appoint counsel where "[the] plaintiff ha[d] an intimate knowledge of the facts and circumstances which [were] the most relevant to [the] action[,]" though the "[p]laintiff's ability to investigate the case, due to his incarceration, is limited"). Moreover, Plaintiff's submissions to this Court suggest that Plaintiff will be able to adequately investigate the facts of his case. In addition to filing a motion—albeit a procedurally inappropriate one—successfully identifying discovery that Plaintiff felt was germane to his claims, Plaintiff attached a great many relevant documents to his Opposition to Defendants' Motion to Dismiss, suggesting that he should be able to investigate the facts of his case. *See Bonilla v. Potter,* No. 04-CV-3205, 2006 WL 995195, at \*2 (S.D.N.Y. Apr. 17, 2006) (noting that "many of the documents attached to [the plaintiff's] complaint will undoubtedly be used by him as exhibits at the trial of the instant action to support the factual allegations he has made," and that he "[t]herefore ... will not need the assistance of counsel to undertake any investigation to uncover these documents or relevant facts"). Additionally, although Plaintiff's claims are complicated by their volume and extent of attendant motion practice, the underlying legal issues are not so complex as to demand the appointment of counsel. *See Davis v. Barrett,* No. 02-CV-545, 2010 WL 1407291, at \*1 (W.D.N.Y. Mar. 31, 2010) (denying request for pro bono counsel in connection with claim that the plaintiff was denied due process in course of administrative segregation hearing

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 157 of 164

where "the facts in th[e] matter [were] not complex and [the] plaintiff ha[d] demonstrated his capacity to articulate to the [c]ourt both the facts and legal theories supporting his claim"); *Armstrong v. N.Y.C. Dep't of Corr.*, No. 97-CV-7388, 1999 WL 61841, at *1 (S.D.N.Y. Feb. 10, 1999) (finding Eighth Amendment claim "not a complex issue"); *Maldonado v. Candidus*, No. 97-CV-4794, 1998 WL 690817, at *1 (S.D.N.Y. Sept. 30, 1998) ("[The plaintiff's] claims [including a claim of retaliatory action] do not appear so overwhelmingly complex that he cannot be afforded a just determination without legal representation"). Lastly, the fact that Plaintiff has not explained what attempts, if any, he has made to find an attorney on his own cuts against the appropriateness of the Court appointing pro bono counsel. *See Wise v. Superintendent of Attica Corr. Facility*, No. 08-CV-6312, 2009 WL 3165626, at *1 (W.D.N.Y. Sept. 25, 2009) ("[The plaintiff] does not explain what attempts, if any, he has made to retain an attorney, or have one represent him pro bono. He merely states that he is confined at Attica Correctional Facility. This fact alone does not preclude him from pursuing his own efforts, which he must do initially, to obtain representation for himself."). It is true that "conflicting evidence implicating the need for cross-examination" may be "the major proof presented to the fact finder," *Hodge*, 802 F.2d at 61–62, in light of the dispute over the accuracy of Conklin's incident report. However, as the foregoing analysis makes clear, this is just one of many factors, and, on balance, the Court thinks the appointment of counsel is not warranted in this matter at this time. Should circumstances change, Plaintiff may reapply for appointment of pro bono counsel.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Dismiss in part and denies in part Plaintiff's August 4, 2015 Motion. (*See* Dkt. Nos. 23, 32.) More specifically, the Court permits the Parties to engage in limited discovery on the issue of Plaintiff's PLRA exhaustion as described herein, and, with respect to the concededly exhausted claims:

- Dismisses Plaintiff's claims against Whinnery, Dachisen, Diehl, Hickman, and Suseny for lack of personal involvement;

- Dismisses Plaintiffs claims against Recktenwald for lack of personal involvement, except insofar as they relate to her denial of Plaintiffs false incident report grievance;

- Dismisses Plaintiffs remaining claims against Recktenwald, as she is entitled to qualified immunity;

- Dismisses all claims brought against individual Defendants in their official capacities, as they are barred by the doctrine of sovereign immunity;

- Dismisses all claims brought pursuant to the FTCA;

- Dismisses Plaintiffs § 1986 claims;

- Dismisses Plaintiffs Sixth Amendment right-to-counsel claims;

- Dismisses Plaintiffs Fifth Amendment access-to-the-court claims;

- Dismisses Plaintiffs retaliation claim; and

- Denies Plaintiffs August 4 Motion in its entirety, except that the Court declines to rule on the question of sanctions relating to Defendants ' preservation of the March 2014 footage.

Within 30 days of this Opinion, Plaintiff may file a Second Amended Complaint.

The Clerk of the Court is respectfully requested to terminate the pending Motions. (*See* Dkt. No. 23, 32.)

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1274585

## Footnotes

1    Occasional phrases and sentences in Plaintiff's Amended Complaint are written in all capital letters. Here and elsewhere, when quoting such phrases, this Opinion reverts to conventional capitalization for ease of readability.

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 158 of 164

2    The Court surmises that Plaintiff means to say that Munios told Plaintiff that, irrespective of whether his earlier described statement was made directly or indirectly to Conklin, Conklin still heard it and interpreted it as he did.

3    The Amended Complaint is silent as to whether the lieutenant then handed these clothes to Plaintiff.

4    A BP-8 is the form used to indicate that an inmate has presented his issue formally to staff. *See Aguiar v. Laird*, No. 07-CV-1081, 2008 WL 795303, at *1 n.2 (E.D.N.Y. Mar. 24, 2008) ("Under 28 C.F.R. § 542.13(a), an inmate must present an issue for informal resolution with a BP-8 form before he can make a formal request for administrative remedy through BP-9."); *United States v. Lovaglio*, No. 05-CR-194, 2007 WL 2752369, at *1 (E.D.N.Y. Sept. 20, 2007) ("To appropriately exhaust administrative remedies, an inmate must ... [f]irst ... initiate informal resolution by filing a 'BP-8' form." (citing, inter alia, 28 C.F.R. § 542.13(a))).

5    Here and elsewhere in this recitation of the facts of the case, the Court periodically draws on documents besides the Plaintiff's Amended Complaint. "Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of pro se complaints permit a court to consider allegations of a pro se plaintiff in opposition papers on a motion where ... consistent with the complaint." *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 246–47 (S.D.N.Y. 1998); *see also*

     *Anderson v. Buie*, No. 12-CV-6039, 2015 WL 9460146, at *13 (W.D.N.Y. Dec. 23, 2015) (same); *Elliott v. Nestle Waters N. Am. Inc.*, No. 13-CV-6331, 2014 WL 1795297, at *7 (S.D.N.Y. May 6, 2014) (considering, among other things, exhibits attached to the plaintiff's opposition brief in part "in light of the policy permitting courts to consider facts alleged for the first time in a pro se plaintiff's opposition to a motion to dismiss" (italics omitted)). On the other side of the coin, the Court declines to consider reiterations of the factual allegations submitted, for instance, in Plaintiff's late December 2015 submission entitled "Pro Se Plaintiff's Response And Sanction for Spoliation of Evidence Motion to the Defendant[s'] Memorandum of Law in Response to Plaintiff's Motion to Preserve Evidence." (*See* Dkt. No. 48.) Daunting though it no doubt is for pro se plaintiffs to prosecute their claims in court without counsel, the practical and accommodating rationales underlying the policy of liberally construing their submissions do not also militate in favor of the courts attempting to draw a line of best fit through all of a plaintiff's recitations of the facts of the case, wherever they may be found in the record.

6    This appears to be a reference to the Discipline Hearing Officer hearing described at 28 C.F.R. § 541.8

7    Plaintiff actually says "SIS" rather than "Special Investigative Services," but it appears that is the component to which he refers. *See Anderson v. Marr*, No. 10-CV-818, 2011 WL 3423694, at *1 n.4 (S.D.N.Y. July 18, 2011), *adopted by* 2011 WL 3585968 (S.D.N.Y. Aug. 10, 2011).

8    Plaintiff here refers to "Lieutenant Mr. D. Hickerman," but it appears that Plaintiff intended to refer to Hickman.

9    As an exhibit to his Opposition to Defendants' Motion, Plaintiff also attaches a response apparently from Hickman, dated February 7, 2014. (*See* Pl.'s Opp'n Ex. D (BP-9 Form and Response) at unnumbered 3.) It provides somewhat more detail than Recktenwald's response, but it does not reach a contrary conclusion. (*See id.*)

10   The court denied Plaintiff's motion, noting that Plaintiff was "expected and required to exhaust administrative remedies" and that "th[e] court ha[d] no jurisdiction over the bureau of prisons as it applies in this case." (Pl.'s Opp'n Ex. R (E.D. Wis. Order); *see also* Pl.'s Opp'n ¶ 18.)

11   Taking this allegation by itself, it would be unclear to the Court whether Plaintiff meant to say that he was thereafter placed in the SHU for filing his March 2014 complaint, or that he stated in his March 2014 complaint that he had been put in the SHU for making earlier complaints. However, the attachments to Plaintiff's Opposition to Defendants' Motion to Dismiss make clear that Plaintiff spent additional time in this SHU in March 2014. (*See* Pl.'s Opp'n Ex. H (Letter from Pl. to Warden Recktenwald (Mar. 12, 2014)) ("I'm being held in this SHU against all that is right ....").)

12   Here and elsewhere, there are slight discrepancies between how Plaintiff describes the content of his letters in his Amended Complaint and those letters as they appear when attached as exhibits to his Opposition to Defendants' Motion. (*Compare, e.g.*, Am. Compl. ¶ 53 *with* Pl.'s Opp'n Ex. G (Letter from Pl. to Warden (Mar.

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 159 of 164

4, 2014)).) Those differences are, however, inconsequential and will not be further noted going forward. It should be noted, however, that a tie goes to the documents.

13    The Supreme Court has recently held that the FTCA's time limits for filing an administrative claim and bringing suit in federal court are not jurisdictional. *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1629 (2015). However, "the Court's opinion did not address—and therefore did not disturb—the well-established principle that ... exhaustion of administrative remedies[ ] [is] jurisdictional in nature, and [is] not subject to waiver ...." *Mohamed v. F.B.I.*, No. 14-CV-7615, 2015 WL 6437369, at *6 (S.D.N.Y. Oct. 21, 2015); *see also Barnhill v. Terrell*, 616 F. App'x 23, 25 & n.1 (2d Cir. 2015) (concluding that "[Plaintiff] failed to exhaust his administrative remedies, and that it accordingly lacked jurisdiction to hear his FTCA claims" but noting that in *Kwai Fun Wong*, "the U.S. Supreme Court ruled that time limitations under the FTCA are nonjurisdictional and subject to equitable tolling"); *cf. Ortega v. Colvin*, No. 13-CV-3487, 2015 WL 6143591, at *4 (E.D.N.Y. Oct. 19, 2015) (noting the holding in *Kwai Fun Wong* but also indicating that "[t]he administrative exhaustion requirement [of the FTCA] derives from a cardinal principle of law—that the United States, as sovereign, is immune from suits in the courts of law" and that "[s]overeign immunity creates a jurisdictional bar to suit" (internal quotation marks omitted)).

14    Nor would it be an answer (to the extent that it is even true) that Plaintiff exhausted his remedies under the Prison Litigation Reform Act ("PLRA"), to be discussed shortly. To be sure, in his Opposition, Plaintiff periodically refers to the "Federal Tort Claims Act," when context suggests he intended to refer to the PLRA. (*See, e.g.*, Pl.'s Opp'n 15.) However, "[t]he exhaustion procedures under the two statutes differ, and the fulfillment of one does not constitute satisfaction of the other." *Owusu v. Fed. Bureau of Prisons*, No. 02-CV-915, 2003 WL 68031, at *2 (S.D.N.Y. Jan. 7, 2003) (footnote omitted); *see also Ward v. Ives*, No. 11-CV-1657, 2014 WL 4417764, at *6 (E.D. Cal. Sept. 4, 2014) ("Prison grievances are not sufficient to exhaust administrative remedies under the FTCA because exhaustion requirements for administrative remedies through the BOP's inmate grievance system differ from the exhaustion requirements for filing a claim under the FTCA." (alterations and internal quotation marks omitted)), *adopted by* 2014 WL 4929454 (E.D. Cal. Sept. 30, 2014); *Robinson v. United States*, No. 13-CV-1106, 2014 WL 2940454, at *6 (M.D. Pa. June 30, 2014) ("[A]n inmate may not rely upon the submission of prison grievances to satisfy his separate and independent exhaustion requirement under the FTCA.")

15    As when non-exhaustion is not clear on the face of a complaint, dismissal is similarly inappropriate when one of the *Hemphill* exceptions may well be applicable. *See Lopez v. Cipolini*, No. 14-CV-2441, 2015 WL 5732076, at *4 (S.D.N.Y. Sept. 30, 2015) ("[A] motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane." (internal quotation marks omitted)).

16    *Colon* involved a § 1983 claim, not a *Bivens* claim. *See Colon*, 58 F.3d at 868. Nevertheless, case law both before and after *Iqbal* makes clear that the personal involvement inquiry is the same under both. *See, e.g.*, *Griffin v. Doe*, 71 F. Supp. 3d 306, 318 (N.D.N.Y. 2014) ("Personal involvement is a prerequisite to the assessment of damages in a [§] 1983 case, and respondeat superior is an inappropriate theory of liability. The same law is applicable to *Bivens* actions." (citations and italics omitted)); *Alcantara v. City of N.Y.*, 646 F. Supp. 2d 449, 456–57 (S.D.N.Y. 2009) ("Federal courts have typically incorporated § 1983 law into *Bivens* actions. Both *Bivens* actions and § 1983 suits require personal involvement of the defendants in the alleged constitutional deprivation." (alterations, citations, and internal quotation marks omitted)); *Marsden v. Fed. Bureau of Prisons*, 856 F. Supp. 832, 835 (S.D.N.Y. 1994) ("Under *Bivens*, as under § 1983, a defendant's 'personal involvement' in an alleged deprivation of constitutional rights is a prerequisite to an award of damages.").

17    Although, as acknowledged, courts have questioned the extent of *Iqbal*'s holding on the *Colon* factors, they have done so in the context of considering *Iqbal*'s proscription of respondeat superior liability in § 1983 and *Bivens* suits. *See, e.g.*, *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012) (noting that "*Iqbal* has,

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 160 of 164

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*" after describing *Iqbal*'s holding as to vicarious liability (citing *Iqbal*, 556 U.S. at 676–77)). There is no question that *Iqbal*'s other holdings—for instance, its clarification that a court need not accept legal conclusions as true when faced with a motion to dismiss, *see Iqbal*, 556 U.S. at 678—applies with no less force in a *Colon* analysis than in any other area of law.

18    It merits mentioning that this proposition is not entirely obvious. In *Grullon*, the Second Circuit considered the district court's dismissal of a pro se inmate's claim against a prison warden for lack of personal involvement. *See* 720 F.3d at 138–39. While the case was still at the district court level, the plaintiff submitted a copy of a letter he had allegedly sent to the warden and asked that he "be allowed to amend his complaint" if the court found his allegations against the warden insufficient. *Id.* at 139–40 (internal quotation marks omitted). The district court chose to disregard the letter, noting that the plaintiff did not allege that the warden actually received the letter or took any action in response to the letter. *Id.* at 140. Reversing, the Second Circuit held that, "[a]t the pleading stage, even if [the plaintiff] had no knowledge or information as to what became of his [l]etter after he sent it," assuming he alleged he sent it to an appropriate address by appropriate means, "he would be entitled to have the court draw the reasonable inference ... that the [w]arden in fact received the [l]etter, read it, and thereby became aware of the alleged conditions" complained of in that letter. *Id.* at 141. "Several district judges in this Circuit have taken this language to mean that merely writing to a supervisory official who fails to act now suffices to establish personal involvement at the pleading stage." *Ciaprazi v. Fischer*, No. 13-CV-4967, 2015 WL 1315466, at *7 (S.D.N.Y. Feb. 24, 2015), *adopted in part, rejected in part on other grounds*, 2015 WL 1315676 (S.D.N.Y. Mar. 24, 2015) (citing *Jean-Laurent v. Lane*, No. 11-CV-186, 2014 WL 5335981, at *9 (N.D.N.Y. Oct. 20, 2014); *Selah v. Fischer*, No. 09-CV-1363, 2013 WL 5603866, at *3 (N.D.N.Y. Oct. 11, 2013)). Others, however, have stuck by the view that mere receipt of a letter or grievance is not enough. *See, e.g., Huggins v. Schriro*, No. 14-CV-6468, 2015 WL 7345750, at *4 (S.D.N.Y. Nov. 19, 2015); *Ciaprazi*, 2015 WL 1315466, at *7; *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014). The better view is that the unique procedural posture of *Grullon*, in which the district court declined to permit a pro se plaintiff to amend his complaint, suggests that traditional concerns of solicitude for pro se plaintiffs and Fed. R. Civ. P. 15's liberal amended policy underlay the Second Circuit's decision, rather than a desire to modify the personal involvement analysis. *See Ciaprazi*, 2015 WL 1315466, at *8 ("In *Grullon*, the court was concerned that the district judge had violated the principle that leave to amend should be granted freely unless any amendment would be futile.").

19    That said, Plaintiff also alleges that, "both A.W's ... [were] made aware of Plaintiff's living conditions in cell #209 SHU." (Am. Compl. ¶ 52.) Plaintiff's reference to the "A.W's" could be taken to refer to Dachisen, whom he also describes as an "acting Warden." (*Id.* ¶ 33.) Of course, an allegation that Dachisen was "made aware" of Plaintiff's living conditions is strikingly close to the allegation rejected in *Iqbal. See* 556 U.S. at 680–81 (finding "disentitle[d] ... to the presumption of truth" by virtue of their "conclusory nature" the plaintiff's allegations that two senior government officials were "'*knew of*, condoned, and willfully and maliciously agreed to subject [him]' to *harsh conditions of confinement* 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'" (last two alterations in original) (emphasis added)). In any event, because Plaintiff does not identify Dachisen as one of the "A.W's," the Court will not assume he was one. Plaintiff can clarify the allegation in a Second Amended Complaint.

20    Because Hickman is a lieutenant, (*see* Defs.' Mem. 5 n.4), context suggests he is to whom Plaintiff refers.

21    Although not entirely clear, it appears that the motion to which Plaintiff refers is one of his submissions to Judge Griesbach, the Department of Justice, or the BOP. (*See* Am. Compl. ¶¶ 43–45.)

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 161 of 164

Additionally, in his Opposition, Plaintiff attached as Exhibit U a February 25, 2014 an "Administrative Detention Order" signed by Hickman. (*See* Pl.'s Opp'n Ex. U (Administrative Detention Order).) To the extent that Plaintiff intends to bring a claim against Hickman over his role in a confinement to the SHU, he should clarify his claims in his Second Amended Complaint.

22   Although the "[qualified immunity] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken," *Pearson*, 555 U.S. at 244, rendering the subjective judgment calls of individuals beside the point, one signpost as to where a reasonable officer's judgment may lie perhaps can be found in the fact that, after receiving Plaintiff's appeal, the acting administrator for national inmate appeals with the BOP both wrote that "[t]he [w]arden at FCI Otisville ... adequately addressed [Plaintiff's] complaint" and explicitly "concur[red] with the response[ ] provided." (Pl.'s Opp'n Ex. A (Office of General Counsel Appeal).)

23   Even liberally construing Plaintiff's Amended Complaint, § 1985(3) is the only subsection that could underlie Plaintiff's § 1986 claim; the content of § 1985(1) and (2) is unambiguously unimplicated by Plaintiff's claims. *See* 42 U.S.C. § 1985(1), (2); *cf. Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 337 n.3 (S.D.N.Y. 1999) ("Although [the plaintiff] does not specify under which subsection of § 1985 he brings this action, only subsection three is applicable; § 1985(1) is entitled 'Preventing officer from performing duties,' and § 1985(2) is entitled 'Obstructing justice; intimidating party, witness, or juror.'"), *aff'd sub nom. Dove v. O'Hare*, 210 F.3d 354 (2d Cir. 2000).

24   Because, in substance, Plaintiff alleges that he was denied a "legal phone call," (Am. Compl. ¶ 83), Plaintiff's invocation of the Sixth Amendment is best construed as an alleged violation of his right to counsel.
To be sure, "the right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts." *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001); *see also Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at *22 (N.D.N.Y. Feb. 17, 2015) (same). However, "the right of access to the courts is grounded not in the Sixth Amendment but in various other constitutional provisions ...." *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004); *see also Osgood v. Amato*, No. 12-CV-565, 2013 WL 3777189, at *6 (N.D.N.Y. July 17, 2013) ("[A]ccess claims concern the ability of prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement. By contrast the Sixth Amendment confers the right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense." (alterations and internal quotation marks omitted)).

25   Although Plaintiff alludes to his Fifth Amendment right of access to the courts, it appears the constitutional source of that right is somewhat broader. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("Decisions of this Court have grounded the right of access to courts in the Article IV Privileges and Immunities Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses" (citations omitted)); *Bourdon*, 386 F.3d at 92 ("Prisoners ... have a constitutional right of access to the courts, as relevant to prisoners, in the constitutional guarantees of equal protection and due process." (citations and internal quotation marks omitted)); *Hamilton v. Fischer*, No. 12-CV-6449, 2015 WL 8207439, at *2 (W.D.N.Y. Dec. 7, 2015) ("The Supreme Court has 'made explicit that the [First Amendment] right to petition extends to all departments of the Government, and that [t]he right of access to the courts is ... but one aspect of the right of petition.'" (second and third alterations in original) (some internal quotation marks omitted) (quoting *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002))); *Groenow v. Williams*, No. 13-CV-3961, 2014 WL 941276, at *7 (S.D.N.Y. Mar. 11, 2014) (report and recommendation) ("The Supreme Court has 'grounded' this right [of access to the courts] in a number of constitutional provisions, including the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.")

26   Because Plaintiff argues that Conklin retaliated against Plaintiff on the basis of his statements, Plaintiff's retaliation claim—to the extent that he states one—is appropriately considered a claim for First Amendment

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD   Document 65   Filed 02/19/20   Page 162 of 164

retaliation. (*See, e.g.*, Am. Compl. ¶¶ 3, 6, 12, 24–26 (describing Plaintiff's various statements to Conklin leading up to his placement in the SHU).)

27    In considering some of these alleged possible adverse actions, the Court notes that, despite arguing that "Plaintiff failed to exhaust his administrative remedies with respect to any allegations of retaliation outside of the alleged false incident report grievance," (Defs.' Mem. 23–24), Defendants also indicate that "the only relevant allegations regarding Plaintiff's retaliation claim that are properly before this Court allege Conklin's singling Plaintiff out, making sarcastic comments toward and pat searching Plaintiff, and then filing an allegedly false incident report against Plaintiff," (*id.* at 24 (citing Am. Compl. ¶¶ 5–6, 10–14, 24–26)). Therefore, although it is not obvious to the Court that Plaintiff's allegations concerning Conklin's alleged sarcastic comments, for instance, would fall within the ambit of his concededly exhausted claim concerning the false incident report grievance, the Court treats them as potential instances of adverse action all the same. *See* 📄 *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 445 (2d Cir. 2006) ("[A] litigant's failure to exhaust in the PLRA context is an affirmative defense that can be waived ....").

28    Plaintiff's allegations make clear that the incident report was prepared sometime before Plaintiff met with Ferdula and the other officer on December 6, 2013. (*See* Am. Compl. ¶¶ 17–19 (noting that Plaintiff was called from Ferdula's office into the "Lt.'s office," where he was read the contents of Conklin's incident report).)

29    The video footage he requests is:
- SHU upstairs range surveillance video from 7:00 pm on December 16, 2013, (Pl.'s Evid. Mot. at 2);
- SHU control surveillance videos for cell #209 (1) from 5:30 am through 7:00 am on March 6, 2014, and (2) from 6:00 am through 9:00 am on March 11, 2014, (*id.*);
- SHU control surveillance videos "for the hour of 12[ ][noon] through 2:30 pm on March 5 and 12, 2014," (*id.*);
- All D-A Unit internal and external (unit tiers and walkways) surveillance videos "that tend[ ] to show staff and inmate movement to and from D-A unit" between 4:30 pm and 6:00 pm on December 6, 2013, (*id.* at 3);
- "All D-B United [sic] internal and external (Unit tiers and walkw[ ]ays) surv[e]illance videos (including video from D-A Unit camera(s) that tend[ ] to show staff and inmate movement to and from D-B Unit)," (*id.*);
- "All D-B Unit hallway internal and external (Unit walkways) surv[e]illance video (including video from D-A Unit cameras/tiers and walkways that tends to show staff and inmate movement to D-B from D-A Unit) between the hours of 4:30p.m. through[ ] to 7:30p.m. on 12/6/2013," (*id.*); and
- "All D-B Unit internal and external (Unit Dorm) surv[e]illance videos that tend[ ] to show staff and inmate movement from D-B Unit Dorm to hallway walkway between the hours of 2:30p.m. through to 10: Oclock [sic] on or about 12/16/2013 [sic], 12/7/2013 [sic] ....," (*id.*).

The sign-in logs Plaintiff requests are:
- SHU upstairs range sign-in log from 7:00 pm on December 16, 2013, (*id.* at 2);
- Unit D-A log entries for December 6, 2013, (*id.* at 3); and
- Unit D-B log entries for "on or about" December 16, 2013 or December 7, 2013, (*id.*).

30    The footage Plaintiff seeks principally dates back to December 2013, although some of his requests extend to March 2014. (*See* Pl.'s Evid. Mot. 2–3.) He offers no explanation as to the logic by which he concludes that such footage, if subject to a "12 month holding period," would be "set to expire" after the submission of his July 2015 motion, as opposed to in December 2014 or March 2015. (*See id.* at 5.)

31    Plaintiff appears skeptical that Defendants actually destroyed the videotape, arguing in his Reply submission that they must have seen it to have affirmed the denials of his grievance. (*See* Pro Se Pl.'s Response and Sanction for Spoliation of Evid. Mot. to the Def.'s Mem. of Law in Response to Pl.'s Mot. To. Preserve Evid. ("Pl.'s Evid. Reply"), at unnumbered 15–16 (Dkt. No. 48).) Plaintiff's conjecture, however, is insufficient to override the contents of the McBride Declaration.

32    Technically, Plaintiff also requested the D-B Unit logbook for December 16, 2013, (*see* Pl.'s Evid. Mot. 3), although it was not mentioned as something that Defendants would produce or retain in the McBride Declaration, (*see* McBride Decl. ¶¶ 9–10). The Court thinks—as, it suspects, Defendants do too—that

Plaintiff's allusions to December 16 was a typo, since he requests the logbook for "12/16/2013 [and] 12/7/2013," (see Pl.'s Evid. Mot. 3.), and because his allegations about events that occurred in the D-B unit seem to have occurred on December 6, (see Am. Compl. ¶¶ 7–12). Consistent with that intuition, the McBride Declaration indicates that Defendants conducted searches for evidence from December 6 in addition to requests for evidence from December 16. (Compare, e.g., Pl.'s Evid. Mot. 2 (requesting SHU footage and the SHU sign-in book from December 16, 2013), with McBride Decl. ¶¶ 6, 9–10 (indicating that he searched for footage from the SHU on December 6 and December 16 and that he was producing the December 6 SHU logbook and would retain the December 16 SHU logbook).) Therefore, while it would not technically be correct to say that everything Plaintiff requests was either destroyed before his Motion, produced, or retained, that is essentially true.

33   In his reply, Plaintiff presents additional arguments that arguably touch on the irreparable harm inquiry; however, they do not affect the outcome here. More specifically, Plaintiff argues that his "'Personal Experi[e]nce with BOP Staff' ... sufficiently demonstrates the BOP policy, practice and custom to create an irreparable harm" and that he "personally handed to Lt. Susney, on Dec. 9, 2013[,] the Monday Plaintiff was release[d] from SHU" his "cop-out-complaint," apparently in an attempt to suggest that Defendants should have preserved the evidence while it still existed. (Pl.'s Evid. Reply, at unnumbered 1.) The first argument fails because Plaintiff's suspicions of BOP staff do not amount to a likelihood of irreparable harm. Cf. True the Vote, Inc. v. Internal Revenue Serv., No. 13-CV-734, 2014 WL 4347197, at *3 (D.D.C. Aug. 7, 2014) (noting in irreparable harm component of preliminary injunction proceedings in which the plaintiff alleged spoliation of emails that "despite the general distrust of the defendants expressed by the plaintiff, the [c]ourt has no factual basis to concur with that distrust"). Plaintiff's assertion that he complained to Susney on December 9 is not enough because it is not at all clear that one complaint to one prison official almost three weeks before Plaintiff even filed his BP-8, (see Pl.'s Opp'n Ex. B. (BP-8 Form, dated Dec. 28, 2013)), entitles him to an injunction forbidding the Defendants from destroying that evidence, which was erased pursuant to prison practice well over a year before Plaintiff moved for a preliminary injunction, given that "[t]he purpose of a preliminary injunction is to preserve the status quo ...." SymQuest Grp, 2015 WL 6813599, at *4.

34   Of course, if the videotape that Plaintiff requests does not constitute "electronically stored information" within the meaning of Rule 37(e), then the Rule 37(e)'s change is beside the point. While such a legal detour is unnecessary, it is merits noting the issue is, at a minimum, the sort over which parties could fight. Compare Wilder v. Rockdale Cty., No. 13-CV-2715, 2015 WL 1724596, at *3 (N.D. Ga. Apr. 15, 2015) (considering the old Fed. R. 37(e) in context of alleged spoliation of a jail cell surveillance video), and Olson v. Sax, No. 09-CV-823, 2010 WL 2639853, at *3 (E.D. Wis. June 25, 2010) ("[T]he only evidence before the [c]ourt indicates that the recording over of the video record from July 22, 2008, was part of [the defendant's] routine good faith operation of its video system .... Therefore, pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, the [c]ourt denies [the plaintiff's] motion for sanctions."), with In re Kessler, No. 05-CV-6056, 2009 WL 2603104, at *16 (E.D.N.Y. Mar. 27, 2009) (considering Rule 37(e) in context of automatically taped-over footage of a fire but indicating that it was "not applicable here"); see also Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting that "[t]he wide variety of computer systems currently in use, and the rapidity of technological change, counsel against a limiting or precise definition of electronically stored information," and that "[r]eferences elsewhere in the rules to 'electronically stored information' should be understood to invoke this expansive approach").

35   28 U.S.C. § 2074 provides in pertinent part:
The Supreme Court shall transmit to the Congress not later than May 1 of the year in which a rule prescribed under section 2072 is to become effective a copy of the proposed rule. Such rule shall take effect no earlier than December 1 of the year in which such rule is so transmitted unless otherwise provided by law. The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

McIntosh v. United States, Not Reported in Fed. Supp. (2016)

Case 9:16-cv-01343-GTS-TWD    Document 65    Filed 02/19/20    Page 164 of 164

36    In their Sur-Reply, Defendants argue that "Plaintiff more likely than not did not submit a cop-out on December 9, 2013," (*see* Defs.' Sur-Reply in Resp. to Pl.'s Mot. To Preserve Evid. 4 (Dkt. No. 61)), because (1) nothing in Plaintiff's BP-8 submission refers to Plaintiff submitting a cop-out to Susney, (*see id.* at 2 (citing Pl.'s Opp'n 45–47)), (2) Susney does not recall receiving a cop-out form Plaintiff in December 2013 or January 2014, (*id.* (citing Decl. of David Susney ("Susney Decl.") ¶ 5 (Dkt. No. 62))), (3) Susney reviewed his files, but did not find any cop-out from Plaintiff during the relevant time period, (*id.* (citing Susney Decl. ¶ 6)), (4) agency counsel at the BOP reviewed Plaintiff's Central File and any electronic requests to staff by Plaintiff, but neither contained a reference to a cop-out from December 9, 2013 or a request for an investigation and review of security cameras relating to the December 6, 2013 incident, (*id.* (citing Decl. of Stephanie Scannell-Vessella ¶¶ 5–6, 8 (Dkt. No. 63))), and (5) when Plaintiff met with Susney to discuss his putative restraining order filed in the Eastern District of Wisconsin in late February 2014, Plaintiff, according to Susney, alluded to having sent a cop-out regarding Plaintiff's allegations against Conklin, but Susney recalled thinking during that conversation that he had received no such cop-out, (*id.* at 2–3 (citing Susney Decl. ¶ 7)). The Court agrees that these are strong reasons to question whether Plaintiff in fact submitted a cop-out on December 9, 2013. However, because Plaintiff's claims regarding his supposed submission of a cop-out are insufficient to trigger a preservation obligation, the Court need not—and, therefore, at this juncture, does not—take a stand on whether Plaintiff in fact submitted the supposed cop-out.

37    Of course, for the same reason, Plaintiff cannot meet his burden of showing that it is relevant. *See* *Residential Funding Corp.*, 306 F.3d at 107 (requiring the party seeking an adverse inference to show "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense").

38    It is worth observing here that "a finding that a party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is 'frequently' sufficient." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (citing *Residential Funding*, 306 F.3d at 109). The Court does not see any reason to conclude that the deletion of the video was conducted in bad faith, however, and, accordingly, will not dispense with the relevance requirement.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.